# EXHIBIT B

UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

Civil Action No. 1:13-CV-02741 RBK-AMD

STEVEN STADLER,

       Plaintiff(s),       ORAL DEPOSITION OF:

       -vs-          STEVEN STADLER

CITY OF ATLANTIC CITY; ACPD

OFFICER WILLIAM MOORE; ACPD

OFFICER GLENN ANTHONY

ABRAMS; ACPD OFFICER JOHN

DEVLIN; DR. ERIC WOLK, DO;

ATLANTICARE REGIONAL MEDICAL

CENTER

       Defendant(s).

\*    \*    \*    \*

WEDNESDAY, MAY 27, 2015

\*    \*    \*    \*

MASTROIANNI & FORMAROLI, INC.

Certified Court Reporting & Videoconferencing

251 South White Horse Pike

Audubon, New Jersey 08106

856-546-1100

Steven Stadler                                                    May 27, 2015

---

Page 2

```
1
2
3
4
5
6
7         Transcript of proceedings in the
8    above matter taken stenographically by
9    Theresa Mastroianni Kugler, Certified Court Reporter,
10   license number 30X100085700, Notary Public of the
11   State of New Jersey and the Commonwealth of
12   Pennsylvania at the United States District
13   Courthouse, Mitchell H. Cohen Courthouse, 401 Market
14   Street, Camden, New Jersey 08101, commencing at 10:40
15   AM.
16
17
18
19
20
21
22
23
24
25
```

---

Page 4

```
1
2             W I T N E S S   I N D E X
3
4        EXAMINATION OF STEVEN STADLER
5
6
     By Ms. Riley          Page: 6, 145, 184
7
     By Ms. Johnson-Stokes     Page: 140, 199
8
9    By Ms. Bonjean         Page: 146
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
1    A P P E A R A N C E S
2
3    BONJEAN LAW GROUP, PLLC
     BY: JENNIFER BONJEAN, ESQUIRE
4    142 JORALEMON STREET
     SUITE 5A
5    BROOKLYN, NEW YORK 11201
     718-875-1850
6    ATTORNEYS FOR THE PLAINTIFF,
     STEVEN STADLER
7
8
     LAW OFFICES OF RILEY & RILEY
9    BY: TRACY L. RILEY, ESQUIRE
     THE WASHINGTON HOUSE
10   100 HIGH STREET
     SUITE 302
11   MOUNT HOLLY, NEW JERSEY 08060
     609-914-0300
12   FAX - 609-914-0323
     ATTORNEYS FOR THE DEFENDANTS,
13   OFFICER WILLIAM MOORE,
     OFFICER GLENN ANTHONY ABRAMS,
14   OFFICER JOHN DEVLIN,
     DR. ERIC WOLK, DO
15
16
     MICHAEL A. ARMSTRONG & ASSOCIATES, LLC
17   BY: BARBARA ANN JOHNSON-STOKES, ESQUIRE
     79 MAINBRIDGE LANE
18   WILLINGBORO, NEW JERSEY 08046
     609-877-5511
19   FAX - 609-877-7755
     baja@armstronglawfirm.com
20   ATTORNEYS FOR THE DEFENDANT,
     CITY OF ATLANTIC CITY
21
22
23
24
25
```

---

Page 5

```
1              E X H I B I T S
2
3    EXHIBITS ATTACHED TO THE END OF THIS TRANSCRIPT
4
     Exhibit Stadler 1, New Jersey Judiciary Plea Form
5         Page 96
6
     Exhibit Stadler 2, transcript of plea and sentencing
7          dated December 6, 2013
          Page 99
8
9    Exhibit Stadler 3, CJIS 2000 Response
          Page 109
10
11   Exhibit Stadler 4, Atlantic City Police
              Department Complaint Form
12        Page 135
13
     Exhibit Stadler 5, form to be used by a prisoner in
14        filing a complaint under the civil
          rights act
15        Page 138
16
17
18
19
20             R E Q U E S T S
21
     (REQUEST) .......... Page 191
22
23
24
25
```

Pages 2 to 5

Steven Stadler                                              May 27, 2015

Page 6

1    (S T E V E N   S T A D L E R, having been duly sworn,
2    was examined and testified as follows:)
3    (EXAMINATION OF MR. STADLER BY MS. RILEY:)
4        Q.    Good morning, Mr. Stadler.
5        A.    Good morning.
6        Q.    My name is Tracy Riley and I represent
7    the named Atlantic City Police Officers in this
8    matter.
9              I'm going to go over some instructions
10   with you this morning, but before we do, I'm going to
11   ask the other attorneys present to introduce
12   themselves as well.
13             MS. JOHNSON-STOKES:  Good morning, Mr.
14   Stadler.
15             THE WITNESS:  Good morning.
16             MS. JOHNSON-STOKES:  My name is Ms.
17   Johnson-Stokes, my first name is Barbara.
18             THE WITNESS:  Okay.
19             MS. JOHNSON-STOKES:  Barbara Ann
20   Johnson-Stokes and I represent the City of Atlantic
21   City in this case.
22             THE WITNESS:  Okay.
23             MS. BONJEAN:  Jennifer Bonjean,
24   B-O-N-J-E-A-N, of the Bonjean Law Group on behalf of
25   Mr. Stadler.

Page 7

1    BY MS. RILEY:
2        Q.    Mr. Stadler, have you ever been deposed
3    before, sir?
4        A.    What do you mean by deposed?
5        Q.    Meaning sitting down in a setting like
6    we are today where a court reporter is taking down
7    everything that we say.
8        A.    Yes.
9        Q.    When were you deposed?
10       A.    In a court house.
11       Q.    Do you recall when that was?
12       A.    It was several times.  Being arrested,
13   being convicted.
14       Q.    Have you ever been involved in any
15   civil litigation before?
16       A.    No.
17       Q.    Have you been involved in any workers'
18   compensation claims?
19       A.    Yes.
20       Q.    And during the course of those workers'
21   compensation claims, did you ever have an attorney
22   sit across the table from you in an informal setting
23   with a court reporter and ask you questions?
24       A.    No.
25       Q.    I'm going to go over a series of

Page 8

1    instructions with you before we begin.  All right?
2        A.    Um-hum.
3        Q.    There is a court reporter that is
4    sitting to your right that is taking down everything
5    that we say today.
6              Do you understand that?
7        A.    Yes.
8        Q.    Do you understand that everything that
9    you say today is under oath and even though we are in
10   an informal setting, it has the same full force and
11   effect as if we were before a judge and a jury?
12       A.    Okay.
13       Q.    Do you understand that?
14       A.    Yes.
15       Q.    It's very important that you provide
16   verbal responses, you're doing great so far, because
17   the court reporter needs to take down everything that
18   we say.  So there may be times that you may nod your
19   head, either myself or the other attorneys present
20   will ask that you give a verbal response.  All right?
21   Everybody does it.
22       A.    Yes, ma'am.
23       Q.    Now, it's very important today that you
24   don't guess.  All right?
25             We want you to answer the questions

Page 9

1    truthfully.  If you don't know the answer to a
2    question, it's perfectly acceptable to indicate you
3    don't know.  All right?
4        A.    Um-hum.  Yes.
5        Q.    Now, that being said, if you answer my
6    question, I'm going to assume that you understood my
7    question.  All right?
8        A.    Yes.
9        Q.    If you don't understand my question,
10   please let me know and I'll repeat it as many times
11   as you need me to until you understand it.  All
12   right?
13       A.    Yes.
14       Q.    Now, it's very important that you allow
15   me to finish my question before you answer it, that
16   way we all know that you're answering the question
17   that's asked.
18       A.    Yes, ma'am.
19       Q.    Now, are you under the influence of
20   alcohol, drugs, prescription, non-prescription drugs
21   of any kind today?
22       A.    No.
23       Q.    Have you ever been convicted of a
24   crime?
25       A.    Yes.

Pages 6 to 9

Page 10

```
 1      Q.    How many convictions?
 2      A.    I don't know the exact number, but I
 3   would say at least 16 times.
 4      Q.    Now, that's an instruction --
 5      A.    I've been arrested, convicted maybe,
 6   don't know the exact number again. I would say four
 7   to five times.
 8      Q.    Now, if you don't know with
 9   specificity, as you just indicated, it's okay to
10   approximate or estimate, just let us know that you're
11   doing that. All right?
12      A.    Okay. Yes, ma'am.
13      Q.    Now, are you on probation presently?
14      A.    Yes.
15      Q.    Where are you on probation?
16      A.    Hunterdon County.
17      Q.    What are you on probation for?
18      A.    For the plea agreement I took prior to
19   this case.
20      Q.    What was the offense for?
21      A.    Burglary, resisting arrest which I must
22   indicate I did not resist.
23      Q.    Just to be clear, are you referring
24   about the charges out of Hunterdon or the cases that
25   we're here about today?
```

Page 11

```
 1      A.    The cases we're here about today, this
 2   is how I'm on probation.
 3      Q.    Now, you're on probation in Hunterdon
 4   County, is that because that's where you reside?
 5      A.    Yes, ma'am.
 6      Q.    Are you on probation for any other
 7   reason?
 8      A.    No.
 9      MS. BONJEAN: Just -- I don't want --
10   this is not a matter of coaching, I don't know if
11   he's using probation or parole interchangeably or if
12   it is something different. If it's legitimately
13   probation, I don't know if you want to get some
14   clarification because I don't know the answer to the
15   question.
16   BY MS. RILEY:
17      Q.    At the time you were sentenced in this
18   case, you were placed on probation, correct?
19      A.    Yes.
20      Q.    And that was actually as part of your
21   plea deal?
22      A.    Yes, ma'am.
23      Q.    You pled guilty and as part of the plea
24   you received probation?
25      A.    Yes, ma'am.
```

Page 12

```
 1      Q.    Have you ever been on parole?
 2      A.    Yes, ma'am.
 3      Q.    Do you know what the difference between
 4   parole and probation is?
 5      A.    Yes.
 6      Q.    What's the difference?
 7      A.    Parole is prior to getting released
 8   from prison. It's more strict, more demanding. It's
 9   state. Probation is sort of the same concept, but a
10   little bit more leniency, not as strict, not as many
11   rules.
12      Q.    Are you through with your answer?
13      A.    Yes.
14      Q.    I just wanted to make sure. If you
15   don't finish your answer at any point, you paused for
16   some reason, just let me know. All right?
17      A.    Yes, ma'am.
18      Q.    Now, you indicated that you've never
19   been involved in a civil lawsuit. You've never sued
20   anyone else? I just want to make sure that's clear.
21      A.    No.
22      Q.    Has anyone ever sued you?
23      A.    Not that I'm aware of.
24      Q.    Where do you currently reside?
25      A.    Hunterdon County.
```

Page 13

```
 1      Q.    And who do you reside with?
 2      A.    Myself.
 3      Q.    How long have you lived at the address
 4   that you're currently at in Hunterdon County?
 5      A.    I would say 90 days.
 6      Q.    Is it a private residence, apartment,
 7   halfway house? What type of residence is it?
 8      A.    It's an apartment.
 9      Q.    Where did you reside prior to that
10   apartment?
11      A.    A program called The Freedom House.
12      Q.    And how long were you at Freedom House?
13      A.    Again, I don't know the exact amount of
14   time, but it was close to eight months.
15      Q.    Tell me about Freedom House. Meaning
16   what is it?
17      A.    Freedom House is another step to
18   regaining yourself. It's like a reentry into
19   society, only where you can -- you're still
20   programming, you're still getting treatment, you
21   still have rules and regulations. You have to pay
22   rent as long as you're working, they allow you work.
23   You're allowed to go to and from work. When you get
24   back from work, there is chores, there is programs,
25   there is counseling you go to, there is meetings you
```

Steven Stadler                                                                          May 27, 2015

## Page 14

1  have to represent yourself in, a setting where you
2  have to gain a sponsor. And that's about it.
3       Q.    So is it fair to say, just so I
4  understand, that Freedom House is a place that one
5  can go once they've completed an inpatient program?
6  Is that fair to say?
7       A.    Yes.
8       Q.    Do you have a driver's license?
9       A.    No.
10      Q.    Have you ever had a driver's license?
11      A.    No.
12      Q.    Meaning you never applied for one or --
13      A.    No, never had one.
14      Q.    Why?
15      A.    I don't know how to answer that.
16      Q.    Did you ever want a driver's license?
17      A.    Yes.
18      Q.    Why didn't you apply to get a driver's
19  license?
20      A.    I made a lot of mistakes in my life.
21  I'm not proud to say it, but most of my life I've
22  been incarcerated.
23      Q.    Did you ever apply for a driver's
24  license?
25      A.    No.

## Page 15

1       Q.    So it's never been suspended because
2  you've never had one?
3       A.    I would say no.
4       Q.    Have you ever been married?
5       A.    No.
6       Q.    Do you have any children?
7       A.    No.
8       Q.    Where were you living in March of 2013?
9       A.    It was a motel. I don't remember the
10  name, but it was in Egg Harbor Township.
11      Q.    Other than being in Egg Harbor
12  Township, is there anything else that you recall
13  about the hotel? Meaning an address, what it was
14  near.
15      A.    I don't remember.
16      Q.    If you recall it as we're going through
17  me asking you additional questions, just let me know
18  and we can certainly come back to it. All right?
19      A.    Yes.
20      Q.    What is your date of birth?
21      A.    December 30th, 1968.
22      Q.    And in 2013, specifically March, do you
23  recall what your weight was?
24      A.    Say 170 pounds.
25      Q.    What is your weight as you sit here

## Page 16

1  today?
2       A.    About 185.
3       Q.    Do you have any siblings?
4       A.    Yes.
5       Q.    How many siblings?
6       A.    Two.
7       Q.    Their names?
8       A.    Joseph, younger brother.
9       Q.    Same last name?
10      A.    No. And Harry, older brother.
11      Q.    What is Joseph's last name?
12      A.    Norris.
13      Q.    And how about Harry?
14      A.    Ryan.
15      Q.    Did you go to high school?
16      A.    Yes.
17      Q.    Where did you go to high school?
18      A.    Gloucester City Junior and Senior High
19  School.
20      Q.    Did you graduate?
21      A.    No.
22      Q.    How far did you go?
23      A.    12th grade.
24      Q.    Did you complete 12th grade?
25      A.    Quit.

## Page 17

1       Q.    When did you quit?
2       A.    12th grade.
3       Q.    Do you recall when in 12th grade you
4  quit?
5       A.    No
6       Q.    Did you ever obtain your GED?
7       A.    Yes.
8       Q.    When did you get your GED?
9       A.    2001.
10      Q.    Where did you obtain that GED?
11      A.    A place called Vincent's House in
12  Trenton, New Jersey. It was a MAP program. MAP
13  Program.
14      Q.    I'm sorry?
15      A.    MAP, Mutual Agreement Program.
16      Q.    What is a MAP Program?
17      A.    It's a mutual agreement through parole.
18  Parole sends you there. It's another regaining
19  reentry into society where you program all day, you
20  work at that facility and you're allowed to go to
21  school, if you didn't have your high school diploma,
22  which I enrolled myself in school and obtained my GED
23  through that program.
24      Q.    Other than obtaining your GED, have you
25  ever received any other specialized training?

Steven Stadler                                                    May 27, 2015

Page 18

1    A.   No.
2    Q.   Have you ever been taught any kind of a
3    trade?
4    A.   I was self taught.
5    Q.   In what?
6    A.   Installing carpet.
7    Q.   Have you ever obtained a certificate or
8    certification in anything?
9    A.   No.
10   Q.   You indicated that you have been
11   incarcerated previously. Were you ever exposed to
12   any type of programs for training when you were
13   incarcerated?
14   A.   Yes.
15   Q.   Did you ever participate in those
16   programs?
17   A.   Yes.
18   Q.   What programs did you participate in?
19   A.   Forklift.
20   Q.   Anything else?
21   A.   Behavior modification.
22   Q.   Anything else?
23   A.   Anger management.
24   Q.   Any other programs?
25   A.   AA and NA.

Page 19

1    MS. JOHNSON-STOKES: You said AA?
2    THE WITNESS: And NA.
3    MS. JOHNSON-STOKES: Thank you.
4    BY MS. RILEY:
5    Q.   Anything else?
6    A.   No.
7    Q.   I'd like to go back.
8    You indicated behavior modification,
9    when did you attend classes? I'm assuming it's
10   classes, is that accurate?
11   A.   Yes.
12   Q.   When did you participate in classes on
13   behavior modification?
14   A.   Don't know the exact date, month. Year
15   was 2009.
16   Q.   And where were you incarcerated at that
17   time?
18   A.   Leesburg State Prison.
19   Q.   Was that a voluntary course or were you
20   required to participate in it, meaning the behavior
21   modification?
22   A.   Voluntary.
23   Q.   Why did you volunteer for the behavior
24   modification class?
25   A.   Because I needed a change in my life.

Page 20

1    Q.   When you say you needed a change in
2    your life, what do you mean?
3    A.   My behaviors, the way I thought, the
4    way I was thinking, the way I was living life.
5    Q.   How were you thinking at that point in
6    time?
7    A.   That this is no place for me to live my
8    life in a prison cell.
9    Q.   What way were you behaving at that
10   point in time that you felt you would benefit from a
11   behavior modification course?
12   A.   Doing the same things that I was doing
13   as if I was on the street.
14   Q.   What were the same things that you were
15   doing as if you were on the street?
16   A.   Surrounding myself with negative
17   people.
18   Q.   How were people negative?
19   A.   Doing drugs, getting drugs into the
20   prison, manipulating the system, so on and so forth.
21   Q.   Did you ever receive drugs when you
22   were in a prison in 2009?
23   MS. BONJEAN: I'm going to object and
24   I'm going to assert Mr. Stadler's fifth amendment
25   right to refrain from answering that particular

Page 21

1    question.
2    MS. RILEY: It's 2009 though. From a
3    statute standpoint, I don't think it would be an
4    issue.
5    MS. JOHNSON-STOKES: Which means no
6    privilege exists.
7    MS. BONJEAN: Well, you don't get to
8    make that determination, a judge does. But you may
9    be right.
10   Can I consult with my client real quick
11   for a second?
12   MS. RILEY: Absolutely.
13   MS. BONJEAN: Step out for a second.
14   (Off-the-record discussion)
15   (Brief recess)
16   MS. BONJEAN: It's fine anyway. I
17   think he misunderstand -- you can ask him  I'm
18   comfortable with him answering
19   MS. JOHNSON-STOKES: And just let me
20   indicate for the record that any objection I make is
21   on behalf of the City of Atlantic City and will be
22   made notwithstanding whatever the court will decide.
23   BY MS. RILEY:
24   Q.   During your course of incarceration at
25   Leesburg in 2009 when you were attending the behavior

Steven Stadler                                          May 27, 2015

Page 22

1  modification, did you receive drugs while you were
2  incarcerated at that time?
3      A.   No. And I'd like to indicate that the
4  question that you did -- was asking me. I was seeing
5  the same behaviors of, you know, drugs. Was I
6  getting drugs into the prison? No, I wasn't. Was I
7  doing the drugs in the prison? No, I wasn't. But
8  they were there and I didn't want to be involved in
9  that again. Thank you.
10     Q.   No problem.
11          After 2009, at some point you got out
12 of Leesburg State Prison, right?
13     A.   Yes.
14     Q.   Did you ever do drugs again?
15     A.   Yes.
16     Q.   Now, you also indicated that you
17 participated in anger management when you were at
18 Leesburg State Prison?
19     A.   Yes. I'm sorry.
20     Q.   That's all right. If I wait, I'm
21 generally looking for you to give me a response. All
22 right?
23     A.   Yes.
24     Q.   Now, did you volunteer for the anger
25 management class or were you required to attend the

Page 23

1  anger management class?
2      A.   Again, it was volunteer.
3      Q.   And when did you participate in anger
4  management?
5      A.   Same year.
6      Q.   Tell me what the behavior modification
7  class or counseling that you participated in, what
8  did that entail?
9      A.   It was -- it lasted for six weeks. It
10 was to try to get you to recognize the same behaviors
11 that brought you in there, to try to modify, try to
12 change the way you thought. Think before you react.
13     Q.   Now, you indicated that that was six
14 weeks.
15     A.   Um-hum.
16     Q.   Is that a yes?
17     A.   Yes.
18     Q.   And was that separate and apart from
19 the anger management or were they courses that you
20 took at the same time?
21     A.   No, they were apart. One followed the
22 other.
23     Q.   Did you take anger management at the
24 same exact time?
25     A.   No.

Page 24

1      Q.   How long was the anger management
2  course or class?
3      A.   Again, that one lasted two weeks.
4      Q.   Now, I'm referring to them as classes
5  or lectures, is that a fair assessment?
6      A.   Basically, yes.
7      Q.   Was it in a group setting?
8      A.   Yes.
9      Q.   And when I say group setting, behavior
10 modification and anger management?
11     A.   Yes.
12     Q.   What did the anger management class
13 entail for those two weeks?
14     A.   Again, it was just trying to get you to
15 identify what you were getting angry over and try to
16 adjust your thinking.
17     Q.   You indicated that you volunteered for
18 the anger management class. Why did you do that?
19     A.   To try and better myself.
20     Q.   Did you think in 2009 that you had
21 anger management issues?
22     A.   Yes.
23     Q.   Why?
24     A.   I come from a dysfunctional, broken
25 family where I held a lot of resentment and a lot of

Page 25

1  anger towards my stepfather.
2      Q.   Why were you angry with your
3  stepfather?
4      A.   Because he was abusive.
5      MS. BONJEAN: Do you want some water,
6  Steve?
7      THE WITNESS: Can I?
8  BY MS. RILEY:
9      Q.   Absolutely. And any point in time that
10 you want to take a break, just let me know.
11          Do you want to take a break?
12     A.   You're just going to a place I didn't
13 want to go to.
14     MS. BONJEAN: She's not going to go too
15 far into it, but she's going to ask you some
16 questions, so do your best to answer.
17     THE WITNESS: Thank you.
18     MS. BONJEAN: For the record, obviously
19 his background is fair game to some extent. If it
20 gets too harassing or too far removed from these
21 events, I'm going to object and we can get in front
22 of a judge, if it becomes necessary.
23     MS. RILEY: And correct me if I'm
24 wrong, counsel, but I believe there is a PTSD claim
25 in the complaint, so it's my position I'm entitled to

Pages 22 to 25

Steven Stadler                                                              May 27, 2015

Page 26

1    know about his background.
2         MS. BONJEAN: You are entitled to know
3    about his background. I'm not objecting to that, but
4    like I said, just giving you fair warning that I may
5    feel that it gets too far afield at some point, but
6    we're certainly not there yet.
7    BY MS. RILEY:
8         Q.   Were you finished your answer?
9         A.   I'm good. No. I can answer. I just --
10   you caught me off guard with that question.
11        Q.   Now, you indicated that your stepfather
12   was abusive, how was he abusive?
13        A.   Physically, mentally. Not only towards
14   me, but both my siblings and my mother.
15        Q.   When did your stepfather enter your
16   life?
17        A.   From the age of two to the age of 13.
18        Q.   Did you have any additional contact
19   with your stepfather after the age of 13?
20        A.   No, he passed away.
21        Q.   And you indicated that your family was
22   dysfunctional. What do you mean by that?
23        A.   Real simple. Chaotic.
24        Q.   How so?
25        A.   A lot of fighting, a lot of arguing, a

Page 27

1    lot of stress, a lot of not knowing where the next
2    meal is going to come from.
3         Q.   And how old were you at that point in
4    time where you would describe your family life as
5    being chaotic?
6         A.   Five, six, seven, eight, nine, ten.
7         Q.   So you would categorize is for that
8    essentially six-year period, 5 to 10?
9         A.   More than likely, yes.
10        Q.   Now, you indicated that your family was
11   broken. What do you mean by that?
12        A.   My older brother moved away when he was
13   10, 11, to live with an aunt and uncle who was much
14   better qualified, I guess, to take care of him
15   financially. Stepfather was in and out for months.
16   Leave for months, come back. Leave for months, come
17   back. Mom had no idea how to hold a job. And me and
18   my brother were left to fend for ourselves.
19        Q.   Now --
20        A.   Younger brother.
21        Q.   It was your older brother when he was
22   10 that moved with your aunt and uncle?
23        A.   Yes.
24        Q.   And was that by choice that he went or
25   was that done through the courts?

Page 28

1         A.   That was by choice.
2         Q.   Whose choice, if you know?
3         A.   I don't know.
4         Q.   Now, you also indicated that you
5    participated in AA and NA meetings --
6         A.   Yes.
7         Q.   -- while you were in Leesburg?
8         A.   Yes.
9         Q.   When did you participate in AA and NA?
10        A.   The same year.
11        Q.   Same year?
12        A.   Yeah.
13        Q.   How long?
14        A.   That was a program that didn't last.
15   It was there for maybe a month and they discarded it,
16   I guess, did away with it.
17        Q.   Did you volunteer for that program or
18   were you required to participate?
19        A.   I volunteered.
20        Q.   Other than the courses that you've
21   participated in at Leesburg, have you been
22   incarcerated in any other prisons other than
23   Leesburg?
24        A.   Yes.
25        Q.   What prisons have you been incarcerated

Page 29

1    in?
2         A.   Northern State Prison.
3         Q.   When was that?
4         A.   Again, I don't know the exact month.
5    That was in 2000, 2001.
6         Q.   How long were you there?
7         A.   Don't know the exact time frame. I
8    would say less than a year.
9         Q.   Did you participate in any programs
10   while you were at Northern State?
11        A.   No.
12        Q.   Did they offer programs when you were
13   at Northern State?
14        A.   No.
15        Q.   Have you been incarcerated anywhere
16   else besides Northern State and Leesburg?
17        A.   Southern State Prison.
18        Q.   When were you incarcerated at Southern
19   State?
20        A.   I don't know the exact date, time. I'm
21   going to say 2003 and then again just recently, 2012.
22        Q.   I'd like to start with 2003.
23        A.   Um-hum.
24        Q.   Is that a yes?
25        A.   Yes. I'm sorry.

schedules@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
                                Professionals Serving Professionals

Steven Stadler

May 27, 2015

Page 30

1    Q.    That's all right.
2          In 2003, how long were you incarcerated
3    for?
4    A.    2003 to 2007.
5    Q.    While you were incarcerated from 2003
6    to 2007, did you participate in any programs at
7    Southern State?
8    A.    I don't remember.
9    Q.    Do you recall if they offered any
10   programs?
11   A.    I'd have to say yes.
12   Q.    Do you recall what programs they
13   offered? And I'm asking these questions to see if it
14   prompts your memory at all.
15   A.    I don't remember.
16   Q.    In 2012, how long were you incarcerated
17   for at Southern State?
18   A.    Ten months.
19   Q.    And when you were incarcerated for
20   those ten months at Southern State, did you
21   participate in any programs?
22   A.    Yes.
23   Q.    What programs did you participate in?
24   A.    Forklift, certified forklift driver.
25   Q.    And how long was that course?

Page 31

1    A.    Two weeks.
2    Q.    Did you participate in any other
3    programs while you were at Southern State?
4    A.    No.
5    Q.    Do you recall in 2012 what programs
6    they offered?
7    A.    No.
8    Q.    Other than at Leesburg, did you ever
9    participate in any other anger management course
10   while you were incarcerated?
11   A.    Don't remember.
12   Q.    Other than at Leesburg, do you recall
13   whether or not you attended any other behavioral
14   modification classes while you were incarcerated?
15   A.    No.
16   Q.    No, you don't recall or no you didn't?
17   A.    No. I didn't.
18   Q    Other than the three state prisons that
19   you've indicated, have you been incarcerated anywhere
20   else?
21   A.    I don't understand that question.
22   Q.    That's fair enough.
23          You've indicated that you were at
24   Southern State, Northern State and at Leesburg,
25   right?

Page 32

1    A.    Um-hum.
2    Q.    Is that a yes?
3    A.    Yes.
4    Q.    Have you ever been in any other prison?
5    A.    No, no prison. No other prison besides
6    those three.
7    Q.    Are you currently employed?
8    A.    Yes.
9    Q.    Where are you employed?
10   A.    Employed in Flemington, New Jersey.
11   Place called the Country Griddle. It's a restaurant,
12   breakfast, lunch and dinner.
13   Q.    I'm sorry, Country?
14   A.    Griddle, G-R-I-D-D-L-E.
15   Q.    How long have you been employed there?
16   A.    August this year I'll be there a year.
17   Q.    How did you get that job?
18   A.    While I was at Freedom House we were
19   allowed to go out and seek employment. After my
20   two-week blackout or seven -- I'm sorry, seven-day
21   blackout, on the eighth day I went out and looked for
22   a job and I found a job on my eighth day.
23   Q.    What does seven-day blackout mean?
24   A.    Means you cannot leave the house for
25   anything. You're allowed to call your family and let

Page 33

1    them know where you're at and they can mail you stuff
2    up such as cosmetics, clothing. Other than that,
3    you're not to leave the house. You're to program and
4    follow all the rules and regulations and they give
5    you a pamphlet of all the stuff that they require you
6    to do while you're in there.
7    Q.    And that seven-day blackout period, is
8    that when you first got to Freedom House?
9    A.    Yes.
10   Q.    Now, other than working at Country
11   Griddle, are you employed anywhere else presently?
12   A.    No.
13   Q.    Prior to August of last year, when was
14   the last time you worked?
15   A.    I would have to say Boston Market,
16   2011, in Vineland, New Jersey. And that went from
17   2010 to 2011.
18   Q.    What were you doing at Boston Market?
19   A.    I was a cook, prep cook.
20   Q.    Why did you leave that employment?
21   A.    I was in a halfway back program and I
22   was working in Vineland and living in Margate and it
23   got too expensive for me to travel that far making
24   eight dollars an hour.
25   Q.    When you say the halfway back program,

schedules@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
                              Professionals Serving Professionals

Steven Stadler                                          May 27, 2015

## Page 34

1    what is that?
2        A.    It's in Bridgeton, New Jersey.
3        Q.    When were you in the halfway back
4    program?
5        A.    I think it was 2010.
6        Q.    How long were you in the halfway back
7    program?
8        A.    Six months.
9        Q.    Explain to me what that is, meaning the
10   halfway back program, meaning what does it entail?
11       A.    Programming, eligible to go out and
12   work. It's a 90-day in, 90-day out.
13       Q.    When you say 90-day in, what does being
14   90 days in mean?
15       A.    Means you're there for 90 days that you
16   have to program. You have a chance to build a
17   resume, go to classes, seek counseling. And the
18   second 90-day you still continue to seek counseling
19   while you're allowed to go out and work.
20       Q.    How did you wind up in the halfway back
21   program?
22       A.    Parole granted me that.
23       Q.    When you say parole granted you that,
24   was going into the halfway back program a requirement
25   of your parole?

## Page 35

1        A.    Yes.
2        Q.    And what were you on parole for?
3        A.    Burglary, third degree.
4        Q.    Where was that burglary from? Meaning
5    what municipality?
6        A.    I don't remember.
7        Q.    Do you recall where you were paroled
8    from?
9        A.    Bayside, Leesburg State Prison.
10       Q.    Other than being employed from 2010 to
11   2011 at Boston Market, were you employed anywhere
12   else between 2010 and 2013?
13       A.    No.
14       Q.    Were you employed in March of 2013?
15       A.    No.
16       Q.    Did you ever work at McNaughton's
17   Garden Center?
18       A.    Yes.
19       Q.    When were you employed there?
20       A.    2007.
21       Q.    How long were you employed there?
22       A.    To the end of 2008.
23       Q.    And what did you do at McNaughton's?
24       A.    Everything. I was a loader, unloader.
25   I was a sales rep.

## Page 36

1        Q.    What was your salary when you were
2    working there?
3        A.    Groundskeeper.
4        Q.    Oh, I'm sorry.
5        A.    I'm sorry. I wasn't finished.
6        Q.    That's all right. Just let me know
7    that.
8        A.    I became the head groundskeeper. My
9    end pay was 11 dollars an hour.
10       Q.    Were you employed full-time?
11       A.    Yes.
12       Q.    When I say full-time, meaning over 40
13   hours a week?
14       A.    It was 40 hours a week.
15       Q.    And have you ever filed tax returns?
16       A.    Yes.
17       Q.    When was the last time you filed tax
18   returns?
19       A.    2014 or this year.
20       Q.    Had you ever filed them prior to this
21   year?
22       A.    Yes.
23       Q.    Did you work anywhere from the time you
24   left McNaughton's in 2008, I believe you said at the
25   end of 2008, until the time you were employed at

## Page 37

1    Boston Market from 2010 to 2011?
2        A.    No.
3        Q.    Have you ever made any workers'
4    compensation claims?
5        A.    Yes.
6        Q.    What employer?
7        A.    McNaughton's.
8        Q.    How many workers' compensation claims
9    have you filed with McNaughton's?
10       A.    Two. One is still pending.
11       Q.    Other than McNaughton's, have you ever
12   made any other compensation claims?
13       A.    No.
14       Q.    Let's talk about the one that has been
15   resolved.
16       A.    Yes.
17       Q.    When was that workers' compensation
18   claim made?
19       A.    2008.
20       Q.    And what was the claim for?
21       A.    Hernia.
22       Q.    And what happened as a result of that
23   claim?
24       A.    I had surgery.
25       Q.    Do you receive any money as a result?

Pages 34 to 37

Steven Stadler                                        May 27, 2015

Page 38

1    A.    Yes.
2    Q.    How much money did you receive?
3    A.    Nine thousand 536.
4    Q.    And when did you receive those monies,
5    if you recall?
6    A.    2012.
7    Q.    Who represented you --
8    A.    Petro Cohen, Matarazzo.
9    Q.    Now, you indicated that you had a
10   hernia. How did you get the hernia, if you know?
11   A.    Lifting heavy objects.
12   Q.    Was it a specific instance or was it
13   over a course of time?
14   A.    Over a course of time.
15   Q.    You indicated that there is a second
16   claim that's pending?
17   A.    Yes, ma'am.
18   Q.    When did you file that claim?
19   A.    2008.
20   Q.    So it was filed in the same year?
21   A.    Going to have to say yes.
22   Q.    And what was that claim for?
23   A.    Rotator cuff, right.
24   Q.    And how did you injure your rotator
25   cuff?

Page 39

1    A.    Fell through a makeshift hole through a
2    makeshift table.
3    Q.    And did you require surgery?
4    A.    Yes.
5    Q.    When did you have surgery?
6    A.    January 3rd, 2013.
7    Q.    And who performed your rotator cuff
8    surgery?
9    A.    Doctor Glenn Zuck, Z-U-C-K.
10   Q.    Where is he located?
11   A.    Somers Point, New Jersey.
12   Q.    And who was your attorney?
13   A.    Petro & Cohen.
14   Q.    Have you ever received any form of
15   public assistance?
16   A.    Meaning?
17   Q.    Meaning have you ever received any sort
18   of food stamps or ASBC through --
19   A.    Yes.
20   Q.    -- the welfare system?
21   A.    Yes.
22   Q.    When did you receive that?
23   A.    2003 out of Camden County I received
24   food stamps. And 2012 out of Atlantic County I
25   received food stamps.

Page 40

1    Q.    How long did you receive food stamps
2    from Atlantic County?
3    A.    Two to three months.
4    Q.    Have you received any other form of
5    public assistance?
6    A.    No.
7    Q.    Have you ever received disability?
8    A.    I don't understand that question.
9    Q.    Meaning this: When you were injured on
10   your job or at any other point in time in your life,
11   have you ever applied for any form of Social Security
12   Disability?
13   A.    Yes.
14   Q.    When did you apply for that?
15   A.    It came through the workman's comp. I
16   really didn't apply. It was already applied.
17   Q.    Do you recall when you started
18   receiving the disability through workers' comp?
19   A.    Again, I don't know -- little
20   confusing, but I know that upon release from prison,
21   regaining the status of my claim in 2013. I regained
22   disability for my surgery.
23   Q.    When you made the claim in 2008, do you
24   recall from the rotator cuff incident --
25   A.    And the hernia?

Page 41

1    Q.    And the hernia.
2    A.    I received disability.
3    Q.    From both?
4    A.    Yes.
5    Q.    And you began receiving it in 2008?
6    A.    Yes, for the hernia.
7    Q.    Were you receiving it in 2009, the
8    disability?
9    A.    I don't remember.
10   Q.    Do you recall if in March of 2013 you
11   were still receiving disability?
12   A.    I regained my disability prior to
13   getting released from prison. Because it stopped, it
14   was on hold because I was in prison. And once I got
15   released from prison, they reopened the claimed.
16   MS. BONJEAN: Objection. Listen to her
17   question, though, okay? Because I think you maybe
18   didn't listen to her question. okay? So try it
19   again.
20   (Designated question is read)
21   THE WITNESS: Yes.
22   BY MS. RILEY:
23   Q.    So from 2008 until March of 2013, do
24   you recall if you were receiving disability benefits
25   for that entire time frame?

Pages 38 to 41

Steven Stadler                                                                May 27, 2015

Page 42

1    A.    Oh, no.
2    Q.    You were not?
3    A.    No.
4    Q.    When did you stop receiving disability
5    benefits?
6          MS. BONJEAN:  I'm going to object to
7    the extent that -- ask for clarification.  When
8    you're saying disability benefits, he referenced two
9    kind of forms of -- for two claims.  So are you
10   talking about any disability benefits?
11   BY MS. RILEY:
12   Q.    Any disability benefits.  You
13   represented that you started getting disability
14   benefits initially because of the hernia incident in
15   2008, correct?
16   A.    Um-hum.
17   Q.    Is that a yes?
18   A.    Yes.
19   Q.    And you also had a rotator cuff injury
20   in 2008 as well?
21   A.    Yes.
22   Q.    My question is, from 2008 until the
23   time of the incident that we're here about today
24   which occurred in March of 2013, for that entire time
25   period, from '08 until March of '13, were you

Page 43

1    receiving disability benefits?
2    A.    No.
3    Q.    When did they stop?
4    A.    2009.
5    Q.    Why did they stop?
6    A.    I went back to prison.
7    Q.    What did you go back to prison for in
8    2009?
9    A.    Violation of parole.
10   Q.    Let me ask you this first, what were
11   you on parole for?
12   A.    Third degree burglary.
13   Q.    How did you violate your parole in
14   2009?
15   A.    I had an incident where I guess -- I
16   got arrested for domestic violence.
17   Q.    Where were you arrested?
18   A.    Mays Landing.
19   Q.    Who were you involved in a domestic
20   violence incident with?
21   A.    I don't remember her first name, but I
22   know her last name was Tartaglio.
23   Q.    Do you know how to spell that?
24   A.    T-A-R-T-A-G-I-L-O?
25   Q.    Now, you indicated that you were

Page 44

1    arrested, meaning the police responded to an
2    incident?
3    A.    Yes.
4    Q.    Do you recall when that incident was?
5    A.    2009.
6    Q.    Do you recall when in 2009?
7    A.    I don't remember the exact month.
8    Q.    What happened to those domestic
9    violence charges?
10   A.    They were dropped.
11   Q.    Once they were dropped, how did that
12   affect your parole violation, if at all?
13   A.    It violated.  I violated.
14   Q.    But once the domestic violence charges
15   were dropped, did that change your parole violation
16   at all?
17   A.    No.
18   Q.    Other than the domestic violence charge
19   themselves, were you charged with assault?
20   A.    No.
21   Q.    Was a restraining order ever obtained
22   against you as a result of that incident in 2009?
23   A.    Yes.
24   Q.    Was it a temporary restraining order or
25   a permanent restraining order?

Page 45

1    A.    Temporary.
2    Q.    Did you appear in court over the
3    temporary restraining order?
4    A.    Yes.
5    Q.    And what happened?
6    A.    It was dropped.
7    Q.    How long were you in jail in 2009 for
8    the parole violation?
9    A.    A day or two.
10   Q.    Once you got out after the day or two,
11   did your disability benefits become reactivated?
12   A.    I went from jail to prison.
13   Q.    You say you went from jail to prison
14   why?
15   A.    Because I violated.
16   Q.    When you go from the one to two days in
17   jail to state prison, how long were you in state
18   prison?
19   A.    A little over a year.
20   Q.    Once you got out, were your disability
21   benefits reactivated or did they begin again?
22   A.    No.
23   Q.    Do you know why?
24   A.    Because I was working.
25   Q.    And you were working at that point at?

Pages 42 to 45

Steven Stadler                                              May 27, 2015

| Page 46 | Page 48 |
|---|---|

**Page 46**

1    A.    Boston Market.
2    Q.    Did your disability benefits become
3  active at some point in time after you left Boston
4  Market?
5    A.    No.
6    Q.    So when you left Boston Market in 2011,
7  did you reapply for your disability benefits?
8    A.    No.
9    Q.    I just want to make sure we're clear
10  here.
11           Are you saying that you haven't
12  received any disability benefits since 2011?
13       MS. BONJEAN:  He's talking about --
14  he's separating out the two disability claims, so
15  when you say disability benefits, I mean I see the
16  confusion.  I think he reapplied -- I think he got
17  disability as to the second claim after that fact,
18  but he's still referring to the first claim.
19  BY MS. RILEY:
20    Q.    All right.  When did you start
21  receiving disability benefits for the second claim?
22    A.    2013.
23    Q.    When did you make the application for
24  the disability benefits for the second injury?  Do
25  you recall when?

**Page 47**

1    A.    I don't understand the question.
2    Q.    Meaning this:  You indicated you
3  started receiving disability benefits for the second
4  claim in 2013, right?
5    A.    Yes.
6    Q.    When did you make that application?
7  Meaning what month?
8       MS. BONJEAN:  If you don't remember,
9  don't speculate.
10       THE WITNESS:  I'm not speculating, but
11  I was released -- I maxed out of prison November
12  30th, 2012.  Maybe a month after or two months after,
13  I don't know exactly, but I contacted Petro & Cohen
14  and disability benefits reopened.
15  BY MS. RILEY:
16    Q.    Do you recall when you started
17  receiving disability benefits?
18    A.    I would have to say February of 2013.
19    Q.    When you received your benefits and I
20  understand you're approximating, February of 2013,
21  did you receive a retro check?  And when I say a
22  retro check, meaning a couple months worth of
23  disability benefits in one check?
24    A.    Yes.
25    Q.    Do you recall how much that first check

**Page 48**

1  was?
2    A.    I don't know the exact amount.  I would
3  say 16 hundred.
4    Q.    Do you recall in 2013 what your monthly
5  benefit was?
6    A.    308 weekly.
7    Q.    Did you receive a check weekly or
8  monthly?
9    A.    Biweekly.
10    Q.    I'd like to ask you, in March of 2013,
11  other than receiving disability, what other form of
12  income did you have?
13    A.    None.
14    Q.    And where were you residing at that
15  time?
16    A.    Again, it was a motel on Tilton Road.
17    Q.    I apologize.  You did answer that.
18  Tilton Road?
19       MS. BONJEAN:  Yeah, I don't think he
20  remembered where, though.
21       THE WITNESS:  Tilton Road, Egg Harbor
22  Township.  I don't remember the name.
23  BY MS. RILEY:
24    Q.    That's okay.  You gave us Tilton Road.
25  That was more than what you remembered before.

**Page 49**

1    A    Okay.  Thank you.
2    Q.    Do you recall how long you were living
3  at that motel at the time, meaning as of March of
4  2013?
5    A.    Two months.
6    Q.    Were you paying the -- for the room or
7  was some other agency paying for the room for you?
8    A.    Some other agency.
9    Q.    Who was paying for the room?
10    A.    Welfare.
11    Q.    How long had they been paying for the
12  room?
13    A.    Two months.
14    Q.    Why was welfare paying for the room if
15  you were receiving disability?
16    A.    I wasn't receiving disability at that
17  time.  I was homeless.
18    Q.    Do you recall when you applied to
19  welfare to receive housing assistance?
20    A.    November.  Actually it was beginning of
21  December because I was maxed out November 30th, last
22  day.
23    Q.    Did welfare continue to provide your
24  housing once you received the disability benefits?
25    A.    No.

Pages 46 to 49

Steven Stadler                                        May 27, 2015

Page 50

1    Q.    Now, I'd like to talk to you about
2  March 13th, 2013. You indicated that, and correct me
3  if I'm wrong, your only form of income was disability
4  benefits, right?
5    A.    Yes, ma'am.
6    Q.    Was welfare providing housing
7  assistance in March of 2013?
8    A.    Yes.
9    Q.    Were you receiving any other benefit or
10 support of any kind in March of 2013?
11   A.    No.
12   Q.    I'd like for you to start as early in
13 the day as you can recall and I know we're going back
14 in terms of time, on March 13th, 2013, what do you
15 recall about that day?
16   A.    I woke up about 8:30, 9.
17   Q.    When you say 8:30, 9 --
18   A.    AM. Do you want me to continue?
19   Q.    Yep.
20   A.    Oh, I'm sorry. I was waiting for the
21 next question.
22   Q.    That's all right.
23   A.    Woke up about 8:30, 9 AM. You know,
24 made something to eat, walked over to the liquor
25 store about 10, 10:30 AM, grabbed a couple 40 ounce

Page 51

1  bottles of beer. Watched a little TV as I was
2  consuming the alcohol. A friend called from Atlantic
3  City stating that she needed some company.
4    Q.    Do you recall what time she called you?
5    A.    I guess it was about two, three in the
6  afternoon.
7    Q.    What was the name --
8    A.    2, 3 PM, I'm sorry.
9    Q.    That's all right.
10       Do you recall the name of that friend
11 that called you?
12   A.    No. She's -- I don't know what they
13 call her, something, Nai-Nai or something.
14   Q.    How did you know her?
15   A.    Just knew her through the streets.
16   Q.    Is it somebody you dated?
17   A.    No.
18   Q.    Was it somebody you had purchased drugs
19 from?
20   A.    Yes.
21   Q.    So Nai-Nai, as you referred to her,
22 called you between two and three o'clock?
23   A.    Yes. In the afternoon, PM.
24   Q.    How did she reach you? Did you have a
25 cell phone?

Page 52

1    A.    No. She called the phone in the room,
2  motel room. I guess it was about 5:30, 6, I managed
3  to get to the bus stop, catch a bus to Atlantic City.
4  Got to Atlantic City around -- close to seven, seven
5  o'clock. Went to her house. She had some more beer
6  there, drank a couple more beers.
7    Q.    Do you recall where she lived?
8    A.    It was on Martin Luther King Boulevard.
9  From there we made a phone call and she got some
10 crack cocaine. She bought 50 dollars worth, I bought
11 50 dollars worth.
12   Q.    Where did you buy it?
13   A.    I don't know. She made a phone call,
14 somebody came by and dropped it off.
15   Q.    So it was brought to the house?
16   A.    Yes.
17   Q.    Meaning her house?
18   A.    Yes.
19   Q.    Do you recall what time the crack
20 cocaine was brought to the house?
21   A.    Say about 7:30.
22   Q.    So is it fair to say you had only been
23 at the house for about a half-hour by the time the
24 cocaine was delivered?
25   A.    Yes.

Page 53

1    Q.    So once the cocaine is delivered, tell
2  me what happens.
3    A.    We got high. We smoked it.
4    Q.    Now, you say 50 dollars worth of
5  cocaine. In 2013, how much crack cocaine could you
6  buy for 50 dollars?
7        Let me rephrase that.
8        How much crack cocaine did you buy for
9  50 dollars back in March of 2013?
10   A.    About a -- it comes in rock form, so I
11 would say half of a golf ball. That's the best way I
12 can put it to you.
13   Q.    So once you smoked the crack cocaine,
14 did you stay at the house or what did you do?
15   A.    Yeah. Yeah. I continued, you know, to
16 smoke the crack. More people showed up, my money was
17 gone, the crack was gone. This was like maybe
18 eight -- close to nine and it was time for me to go.
19 Once your money is gone and the drugs are gone, the
20 next person is coming in and you have to go.
21   Q.    Now, when you were at Nai-Nai's house,
22 you indicated that you drank some beer when you were
23 there?
24   A.    Um-hum. Yes.
25   Q.    How many beers did you drink when you

schedules@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
                                   Professionals Serving Professionals

Steven Stadler                                                                    May 27, 2015

Page 54

1    were at Nai-Nai's house?
2        A.    I would say at least three cans of
3    Budweiser.
4        Q.    Anything else?
5        A.    No.
6        Q.    Once the crack cocaine was brought to
7    the house, did you have any other alcohol to drink?
8        A.    No.
9        Q.    Now, I believe you indicated, and
10   correct me if I'm wrong, you had had surgery in
11   January of that year, 2013?
12       A.    Yes.
13       Q.    Were you on any pain medication at the
14   time?
15       A.    0.5 Perk --
16       Q.    Percocet?
17       A.    Yeah.  Thank you.
18       Q.    Were you taking Percocet on March 13th,
19   2013?
20       A.    Yes.  Earlier that day.
21       Q.    Were you taking it as prescribed?
22   Meaning if the doctor said one pill every five or six
23   hours, were you taking it as it was prescribed?
24       A.    No.
25       Q.    Why?

Page 55

1        A.    Because I was a drug addict.
2        Q.    So you were taking more than what you
3    were supposed to?
4        A.    Yes.
5        Q.    Did you take more than what you were
6    supposed to on March 13th, 2013?
7        A.    Yes.
8        Q.    How many Percocets had you taken that
9    day?
10       A.    I don't know the exact number of pills
11   I ingested, but you're supposed to take two every
12   four hours.  I was taking maybe four every four
13   hours.
14       Q.    Had you taken four every four hours on
15   March 13th, 2013?
16       MS. BONJEAN:  If you recall.
17       THE WITNESS:  I can't say I have, no.
18   BY MS. RILEY:
19       Q.    Do you recall when you last took them
20   during the day on March 13th, 2013?
21       A.    About 2:30, 3 when I left the house,
22   the room.
23       Q.    Did you take Percocet before you went
24   to the liquor store?
25       A.    Yes.

Page 56

1        Q.    Now, you indicated that you smoked the
2    cocaine.  During the time that you were smoking the
3    cocaine, did you have any additional alcohol to
4    drink?
5        A.    Yes.
6        Q.    What alcohol did you have to drink?
7        A.    I drank the three cans of beer.
8        Q.    And I just want the record to be clear
9    because I understood your testimony to mean that you
10   had drank the three cans of beer before you had
11   smoked the crack cocaine, is that incorrect?
12       MS. BONJEAN:  I thought I recalled it
13   being the same time period at Nai-Nai's house, but
14   maybe he can clarify it.
15   BY MS. RILEY:
16       Q.    I just want to make sure the record is
17   clear.  You got to Nai-Nai's house, right?
18       A.    Yes.
19       Q.    And she had beer?
20       A.    Yes.
21       Q.    Did you drink the three cans of beer
22   before or after the crack cocaine was delivered?
23       A.    Before and during.
24       Q.    All right.  So the entire time you were
25   at Nai-Nai's house you had a total of --

Page 57

1        A.    Three beers.
2        Q.    All right.  Now, did you take any
3    additional Percocet --
4        A.    No.
5        Q.    -- from the time you left Atlantic City
6    until the time that you encountered the Atlantic City
7    Police Officers?
8        A.    No.
9        Q.    You indicated that more people showed
10   up when you were at Nai-Nai's house.  Do you know who
11   any of those people were?
12       A.    No.
13       Q.    Did they bring any additional drugs or
14   alcohol with them that you know of?
15       A.    I left.
16       Q.    You may have left, but do you know if
17   they brought any additional drugs or alcohol with
18   them?
19       A.    I don't know.
20       Q.    Now, you indicated you left, it was
21   close to nine o'clock?
22       A.    Yeah, it was -- yes.
23       Q.    Now, where did you go when you left
24   Nai-Nai's house?
25       A.    Started walking, started walking to the

Pages 54 to 57

Steven Stadler                                                    May 27, 2015

Page 58

1    bus station, realized I had no money for the bus and
2    decided to walk home.
3         Q.    I want to back up on the Percocets just
4    briefly. Who prescribed those for you?
5         A.    Doctor Glenn Zuck.
6         Q.    I'm sorry?
7         A.    Doctor Glenn Zuck.
8         Q.    Was any other doctor prescribing those
9    Percocets for you?
10        A.    Yes.
11        Q.    Who was that?
12        A.    I don't know his name.
13        Q.    Do you know where his office was
14   located?
15        A.    He was in the same office as Mr. Glenn
16   Zuck.
17        Q.    Other than the doctors in that
18   particular group, after your surgery in January of
19   2013, was any other doctor prescribing you Percocet?
20        A.    No.
21        Q.    Did you have health insurance at the
22   time, meaning March of 2013?
23        A.    No.
24        Q.    How were your prescriptions being paid
25   for?

Page 59

1         A.    Workman's comp.
2         Q.    So when is it you realized you had no
3    money for the bus?
4         A.    When I left the house.
5         Q.    When you left Martin Luther King --
6         A.    Boulevard.
7         Q.    -- Boulevard from Nai-Nai's house, how
8    did you get to the bus station?
9         A.    I walked.
10        Q.    Meaning what path did you take? Do you
11   recall?
12        A.    I'm not sure if it's Atlantic or -- I
13   believe it's Atlantic Avenue.
14        Q.    Once you realized you don't have bus
15   fare, what do you do?
16        A.    I start to make my way home.
17        Q.    How do you make your way home? I
18   understand you're walking, but what route did you
19   take to walk home?
20        A.    Straight down Atlantic Avenue.
21        Q.    How long were you walking?
22        A.    15, 20 minutes maybe.
23        Q.    Do you recall how far you got in your
24   walk?
25        A.    I got to Albany Avenue.

Page 60

1         Q.    So just to be clear, you went down
2    Atlantic Avenue to Albany Avenue?
3         A.    Yes.
4         Q.    And what happens when you get to Albany
5    Avenue?
6         A.    Albany Avenue, I seen a car wash
7    located on Albany Avenue and I figured that was an
8    easy way to get some money.
9         Q.    When you say you thought it would be an
10   easy way to get some money, what do you mean?
11        A.    Through the coin boxes, cash boxes.
12        Q.    How did you know the car wash had coin
13   boxes?
14        A.    How did I know?
15        Q.    Yes.
16        A.    Because I used the car wash before.
17        Q.    How did you -- when you get to the car
18   wash, let me phrase it this way, you get to the car
19   wash, what do you do?
20        A.    I tried to get inside.
21        Q.    What were you wearing at the time?
22        A.    Gray sweat pants, gray sweat shirt,
23   white sneakers.
24        Q.    Were you wearing glasses?
25        A.    Yes.

Page 61

1         Q.    When did you start wearing glasses?
2         A.    2008.
3         Q.    Who was your eye doctor in 2008?
4         A.    Didn't have an eye doctor.
5         Q.    How did you get glasses?
6         A.    Wal-Mart.
7         Q.    What Wal-Mart did you go to to get
8    glasses?
9         A.    Mays Landing.
10        Q.    Are you near-sighted or far-sighted?
11        A.    Near-sighted.
12        Q.    How did you get in the car wash?
13        A.    Put my hand on the handle, turned it
14   and the door opened up.
15        Q.    So the door wasn't locked?
16        A.    No.
17        Q.    What door did you go to?
18        A.    Back door.
19        Q.    Let me ask you this, and if you know,
20   did the car wash have more than one door to enter?
21        A.    Yes.
22        Q.    So you went to the door that was
23   located in the back?
24        A.    Yes.
25        Q.    And you indicated it was unlocked?

Pages 58 to 61

Steven Stadler                                    May 27, 2015

## Page 62

1   A.   Yes.
2   Q.   Did anybody give you permission to go
3   in?
4   A.   No.
5   Q.   Was anybody with you when you entered
6   the car wash?
7   A.   No.
8   Q.   Tell me what happens when you get
9   inside the car wash?
10   A.   There was absolutely nothing in there
11   but a bunch of tools and equipment and stuff that I
12   had no clue of. So I got myself some tools, a long
13   screwdriver, a couple other like -- a hammer and that
14   was about it, and I went to the outside to try to pry
15   open one of the change boxes, the cash boxes.
16   Q.   Where was the change box or the cash
17   box located?
18   A.   It was on the wall at the inside of
19   where you wash your car at.
20   Q.   What did you use to pry -- try to pry
21   it open?
22   A.   Screwdriver.
23   Q.   Screwdriver. Were you successful?
24   A.   No. Can I pause for a minute?
25        MS. BONJEAN: Do you want to take a

## Page 63

1   break?
2        THE WITNESS: Yeah.
3        MS. RILEY: Just let me know.
4        THE WITNESS: Yeah, thank you.
5        (Brief recess)
6   BY MS. RILEY:
7   Q.   We took a brief break. I just want to
8   back up a little bit just so I understand.
9        When you found the screwdriver and the
10   hammer, did you remain inside the car wash?
11   A.   No.
12   Q.   What did you do?
13   A.   Went outside to where you wash your
14   cars actually and there is a cash box that's on the
15   wall.
16   Q.   When you say it's on the wall, on the
17   wall of what?
18   A.   Of the interior.
19   Q.   So it's on an outside wall of the car
20   wash?
21   A.   It's a carport, you pull your car up in
22   the car wash and you grab the hose and you wash it
23   down. It's in there.
24   Q.   And did you take any of the tools from
25   inside the car wash outside the car wash with you?

## Page 64

1   A.   Yes.
2   Q.   What tools did you take outside?
3   A.   I believe it was the screwdriver and
4   the -- it was a couple screwdrivers and a hammer.
5   Q.   Did you ever try to go in the front
6   door of the car wash?
7   A.   Yes.
8   Q.   Did you do that before or after you
9   went to the back door?
10   A.   I would have to say before.
11   Q.   Was the front door locked?
12   A.   Yes.
13   Q.   When you come back out with the
14   screwdrivers, as you've described it, did you ever
15   try to go back through the front door area with the
16   screwdrivers?
17   A.   Yes.
18   Q.   What did you do?
19   A.   Try to pry it open.
20   Q.   How were you trying to pry it open?
21   A.   Using the screwdriver.
22   Q.   Why were you trying to get in through
23   the front door of the car wash?
24   A.   I thought that was another door to
25   another area.

## Page 65

1   Q.   Had you ever been in the front door of
2   the car wash before?
3   A.   No.
4   Q.   Had you ever been through the back door
5   of the car wash before?
6   A.   Yes.
7   Q.   When?
8   A.   Can I retract?
9   Q.   Absolutely.
10   A.   I believe I went through both and there
11   is also a side door that I went in and out.
12   Q.   And when you say that you went through
13   meaning, I want to make sure the record is clear, on
14   March 13th, 2013?
15   A.   Yes.
16   Q.   So you believe you went through three
17   doors?
18   A.   All three doors led to the same area.
19   I thought they led to somewhere else. And I did go
20   in and out of those doors, I believe, several times.
21   Q.   Why did you go through each individual
22   door? What were you looking for?
23   A.   Money.
24   Q.   Now, prior to March 13th, 2013, had you
25   ever been inside the car wash, meaning the interior

Pages 62 to 65

Steven Stadler                                          May 27, 2015

### Page 66

1  building that you've just described?
2      A.    Prior to that March 13th?
3      Q.    Correct.
4      A.    Can I talk to my attorney?
5          MS. BONJEAN:  You have to answer the
6  question first and then you can talk to me.
7          THE WITNESS:  Yes.
8  BY MS. RILEY:
9      Q.    When were you at the car wash?
10         MS. BONJEAN:  Do you want to take a
11 break before we proceed?
12         THE WITNESS:  Yes.
13         MS. BONJEAN:  Okay.
14         (Brief recess)
15         THE WITNESS:  I was there prior to
16 that, but I didn't enter no structure.  I was there
17 washing my car, that's what I thought that was the
18 question you were asking me.
19 BY MS. RILEY:
20     Q.    Okay.  So prior to March 13th, 2013,
21 you had never entered that car wash?
22     A.    Oh, no.  No.  No.  I was there at the
23 car wash prior to that washing my car, vacuuming it,
24 doing stuff like that, but not -- I didn't enter no
25 structure.

### Page 67

1      Q.    So you never went through the back door
2  of the car wash?
3      A.    Prior to March 13th?
4      Q.    Prior to March 13th, 2013.
5      A.    No.
6      Q.    You never went through the front door
7  of the car wash prior to March 13th, 2013?
8      A.    No.
9      Q.    And you never went through the side
10 door --
11     A.    No.
12     Q.    -- of the car wash prior to March 13th,
13 2013?
14     A.    No.  I'm sorry.  I misunderstood your
15 question.
16     Q.    That's okay.  That's why I just want to
17 make sure we're absolutely clear in terms of the
18 dates.
19     A.    Yes.
20     Q.    Now, on March 13th, 2013, you go out to
21 the cash box outside?
22     A.    Yes.
23     Q.    It's on the outside of the building,
24 but with the screwdrivers, right?
25     A.    Yes.

### Page 68

1      Q.    Were you able to open the cash box?
2      A.    No.
3      Q.    Why were you trying to pry open the
4  cash box?
5      A.    To get money.
6      Q.    Had you ever tried to pry open a cash
7  box at that car wash prior to March 13th, 2013?
8      A.    No.
9      Q.    When you were trying to pry open that
10 cash box, did you know that that was an illegal thing
11 to do?
12     A.    Yes.
13     Q.    Were you high at the time?
14     A.    Yes.
15     Q.    What did the cash box look like?  If
16 you want, start with size.
17     A.    I would say it was as big as a laptop.
18     Q.    Do you recall what color it was?
19     A.    Silver and black.
20     Q.    Is there more than one cash box on the
21 outside of the car wash?
22     A.    Yes.
23     Q.    How many, if you know?
24     A.    Don't know.
25     Q.    How many did you try to open?

### Page 69

1      A.    I believe two.
2      Q.    Were you able to open either of those
3  cash boxes?
4      A.    No.
5      Q.    Did you get any money from any source
6  at the car wash --
7      A.    No.
8      Q.    -- on March 13th, 2013?
9      A.    No.
10     Q.    Now, you've indicated you tried to open
11 up two cash boxes.  Did you try to open anything else
12 other than what you've already described?
13     A.    No, just those -- just the two cash
14 boxes.  I couldn't get into either one.
15     Q.    Tell me what happens once you're unable
16 to open that second cash box?
17     A.    What happens is that I'm trying to get
18 it open and out of the corner of my eye, a dark truck
19 pulls up.
20     Q.    When you say a dark truck, do you know
21 what type of truck?
22     A.    No.
23     Q.    And when you say truck, do you mean
24 like a pickup truck or an SUV truck?
25     A.    Sort of -- pickup truck.

Pages 66 to 69

Steven Stadler                                                   May 27, 2015

Page 70

1    Q.    Where were you located when the pickup
2  truck pulled up?
3    A.    On the outside.
4    Q.    Where on the outside?
5    A.    In the little, I guess, carport, trying
6  to open the cash box.
7    Q.    Is there more than one carport at the
8  car wash?
9    A.    Yes.
10   Q.    Do you know which carport you were
11 located in when the truck pulled up?
12   A.    No.
13   Q.    Were you closest to the building?
14   A.    Yes.
15   Q.    Or further away from the building?
16   A.    Closest to the building.
17   Q.    When the truck pulls up, do you know
18 what direction it came from?
19   A.    Came from behind me and I was facing
20 the building.
21   Q.    Do you know what entrance they entered
22 to get into the car wash?
23   A.    No.
24   Q.    Is there more than one entrance to get
25 into the car wash parking lot?

Page 71

1    A.    Yes.
2    Q.    Do you know which one the truck entered
3  through?
4    A.    No.
5    Q.    Tell me what happens once this truck --
6  strike that.
7         When the truck pulls up, are you still
8  trying to break into the cash box?
9    A.    Yes.
10   Q.    So the truck pulls up, tell me what
11 happens?
12   A.    An individual gets out in dark
13 clothing, asks me what I was doing. I didn't answer
14 him. I started to walk away at a very fast pace.
15   Q.    You said the individual was in dark
16 clothes. Do you recall what he was wearing?
17   A.    No, not really, no.
18   Q.    Do you recall -- you indicated you were
19 wearing a sweat shirt, do you know if they were
20 wearing a sweat shirt?
21   A.    I don't -- I don't remember.
22   Q.    Do you recall if they were wearing
23 jeans or sweat pants or shorts?
24   A.    Pants, dark pants.
25   Q.    How close was this individual that

Page 72

1  approached you before you turned to walk away?
2    A.    15, 20 feet.
3    Q.    So this person got out of their truck?
4    A.    Yes.
5    Q.    When they got out of their truck before
6  you turned to walk away, they were about 15 to 20
7  feet away from you?
8    A.    Yes.
9    Q.    Other than asking you what you were
10 doing, did this individual say anything else to you?
11   A.    No.
12   Q.    Did you later learn who this individual
13 was?
14   A.    Later, yes.
15   Q.    Who was it?
16   A.    It was a police officer.
17   Q.    Do you know which police officer?
18   A.    Later, yes, I found out through a
19 police report.
20   Q.    And what was that officer's name?
21   A.    Glenn Abrams, I believe, Junior.
22   Q.    When you turned to walk away, did the
23 person that you later learned to know to be Officer
24 Abrams, did he follow you?
25   A.    I walked away at a fast pace. I got to

Page 73

1  an alleyway and the dark truck pulled up again. I
2  would say yes, he followed me.
3    Q.    He followed you in his truck?
4    A.    I would say yes.
5    Q.    When you turned to walk away, did you
6  take the screwdriver with you?
7    A.    Yes.
8    Q.    How many screwdrivers did you take with
9  you?
10   A.    Several.
11   Q.    When you say several, do you know how
12 many you had?
13   A.    I don't recall.
14   Q.    When you turned to walk away, you
15 indicated that you headed towards an alley at a fast
16 pace. What alley did you go to?
17   A.    It was located right next to the car
18 wash. There is a closed-down bar on one side and the
19 car wash on the other. That's where I sat down and
20 released all the tools from my belongings.
21   Q.    You say you released all the tools from
22 your belongings, what tools?
23   A.    The tools I had in my hands.
24 Screwdriver, I don't recall how many, but I no longer
25 had anything on me at that point. I released them in

Pages 70 to 73

Steven Stadler                                    May 27, 2015

Page 74

1    the alleyway.
2        Q.    Did you have a hammer with you?
3        A.    No.
4        Q.    When you -- you say you sat down in the
5    alley to release the tools?
6        A.    Yes.
7        Q.    Why did you do that?
8        A.    I didn't need them anymore.
9        Q.    How far of a walk was it from where you
10   were trying to break into the coin box to the point
11   you stopped in the alleyway?
12       A.    Half a block.
13       Q.    Did you enter the alley from Albany
14   Avenue?
15       A.    No.
16       Q.    How did you enter the alleyway?
17       A.    The next street over. I don't know the
18   name of that street.
19       Q.    Now, you stated that the person in the
20   truck pulled up and saw you in the alleyway, is that
21   correct?
22       A.    Yes.
23       Q.    What were you doing when the officer
24   saw you in the alleyway?
25       A.    Sitting down, catching my breath.

Page 75

1        Q.    Where were you going at that point?
2        A.    Trying to get away from the person that
3    was in the dark truck.
4        Q.    Did the person in the dark truck, once
5    they saw you in the alleyway, did he say anything to
6    you at that point?
7        A.    Yes.
8        Q.    What did he say?
9        A.    Told me -- when I seen the dark truck
10   pull up, I immediately got up and started walking at
11   another -- again, at a fast pace heading towards
12   Albany Avenue, going down Albany Avenue towards
13   Atlantic City. He just -- the only words that came
14   out of his mouth were stop.
15       Q.    Did he ever identify himself as a
16   police officer at that point?
17       A.    No.
18       Q.    You indicated that you were wearing a
19   sweat shirt. Was it a hooded sweat shirt?
20       A.    No.
21       Q.    Now, when this person told you to stop,
22   you turned toward Albany Avenue?
23       A.    Yes.
24       Q.    Why didn't you stop?
25       A.    Why didn't I stop what?

Page 76

1        Q.    When the person that was driving the
2    truck told you to stop, why didn't you stop?
3        A.    I wanted to get away from him.
4        Q.    Why?
5        A.    Because I was doing something I wasn't
6    supposed to be doing.
7        Q.    Once you headed towards Albany Avenue,
8    you then indicated, and correct me if I'm wrong, you
9    then began to walk down Albany Avenue?
10       A.    Towards Atlantic City.
11       Q.    Tell me what happens.
12       A.    He's now -- I can hear him behind me
13   talking --
14       Q.    So he got out of his truck?
15       A.    I would say yes.
16       Q.    I'm sorry. Go ahead.
17       A.    Okay. I can hear him talking on the
18   phone loudly. I'm guessing -- knowing that he's
19   going to call the police and I need to get out of
20   there. So I was moving at a fast pace again down
21   Albany Avenue. And out of the corner of my eye I
22   noticed a marked police car.
23       Q.    When you say you were moving at a fast
24   pace, were you running?
25       A.    No, I wasn't running.

Page 77

1        Q.    You saw a marked patrol car?
2        A.    Yes.
3        Q.    When did you first observe the marked
4    patrol car?
5        A.    I observed them as I was getting close
6    to the corner of West End Avenue.
7        Q.    I'm sorry?
8        A.    I was getting close to the corner of
9    West End Avenue.
10       Q.    Did they have their lights on?
11       A.    No. He was moving at a slow pace. He
12   turned the corner. I made my way towards him and he
13   got out of the car and told me to put my hands on top
14   of the hood of the car. I complied.
15       Q.    Okay. I'm going to stop you there.
16   You said him, I just want to make sure the record is
17   clear, so that when everybody goes to read it
18   later --
19       A.    Okay.
20       Q.    You said that you went towards him?
21       A.    Oh, the police officer.
22       Q.    In the marked patrol car?
23       A.    In the marked car, the uniformed cop.
24       Q.    Why did you go towards the uniformed
25   cop?

schedules@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
                                   Professionals Serving Professionals

Steven Stadler                                                          May 27, 2015

Page 78

1     A.    Because that's the direction I was
2  heading.
3     Q.    You didn't try to dart off to another
4  street?
5     A.    No.
6     Q.    Why?
7     A.    It was pretty much over at that point.
8     Q.    Was the officer that was originally in
9  the truck still behind you?
10    A.    I could hear him talking loudly.  I
11 don't recall exactly what he was saying, but the
12 uniformed officer directed me to put my hands on top
13 of the hood of the car, the police car, and I
14 complied.
15    Q.    Where was the car stopped?
16    A.    As soon as you turn the corner of
17 Albany Avenue, he was parked on West End Avenue.
18    Q.    Was the officer in the car or out of
19 the car when he told you to stop?
20    A.    He was out of the car.
21    Q.    When the officer told you to stop and
22 put your hands up, what did you do?
23    A.    He didn't tell me to put my hands up,
24 he told me to put --
25    Q.    Oh, I'm sorry.

Page 79

1     A.    He told me to put my hands on top of
2  the hood of the car.
3     Q.    And did you do that?
4     A.    Yes.
5     Q.    When you approached the hood of the
6  car, were you on the side of the car or the front of
7  the car?
8     A.    I was on the side.
9     Q.    So you put your hands on the hood of
10 the car?
11    A.    From the side.
12    Q.    From the side.
13         When you did that, what officers were
14 present, if any?
15    A.    The uniformed cop who got out of the
16 car, he was present.
17    Q.    Anyone else?
18    A.    And the man in the street clothes was
19 coming up from behind.  I could hear him talking very
20 loudly.
21    Q.    Was he walking or running?
22    A.    I don't remember.  I had my back
23 towards him.
24    Q.    Did you ever look over your shoulder?
25    A.    No.

Page 80

1     Q.    So it's your testimony you never ran at
2  any point in time?
3     A.    No.
4     Q.    No you didn't run --
5     A.    No.
6     Q.    -- or no, that's not accurate?
7     A.    No, I didn't run.
8     Q.    Do you know why the officer told you to
9  put your hands on the hood of the car?
10    A.    I don't know why, but he's an officer
11 in a uniform and I was compliant with what he asked
12 me to do.
13    Q.    Did you ever ask him why he wanted you
14 to put your hands on the hood of the car?
15    A.    Yes.
16    Q.    When did you ask him that question?
17    A.    As soon as I put my hands on top of the
18 hood, I asked him what is this for.  He replied, I
19 have to get more information, but you need to, you
20 know, do as I say.
21    Q.    And did you comply with what this
22 officer told you?
23    A.    Yes.
24    Q.    Was this officer in the marked patrol
25 car in uniform?

Page 81

1     A.    Yes.
2     Q.    Did you know that officer's name?
3     A.    No.
4     Q.    Did you come to find out later on the
5  name of that officer?
6     A.    Yes.
7     Q.    When did you learn that officer's name?
8     A.    Through a police report.
9     Q.    Do you recall when you got the police
10 report?
11    A.    When I got to the county jail, when I
12 was released from the hospital, I received paperwork
13 and it was green sheets of the arrest and the
14 arresting officers and their statements.  And two
15 officers were named and that's who -- that's the only
16 names that I know.
17    Q.    What was the name of that officer that
18 told you to put your hands on the hood of the patrol
19 car, that you learned later to be?
20    A.    I don't even know if that's -- if
21 that's the officer.  I'm letting you know the only
22 officers that I know are the ones that were on the
23 paperwork on the green sheets that were provided to
24 me in the county jail.
25    Q.    Do you know how many officers or do you

Pages 78 to 81

Steven Stadler                                                    May 27, 2015

Page 82

1  recall how many officers came to where you were on
2  March 13, 2013 when you had your hands on the hood of
3  the patrol car?
4      A.    No, I don't know how many officers were
5  there.
6      Q.    Now, once the officer told you he
7  needed to get some more information, is that
8  accurate?
9      A.    Yes.
10     Q.    What happened at that point?
11     A.    He stood beside me. The next thing I
12  knew, I'm being swung around and I'm getting punched
13  in the face.
14     Q.    Who swung you around?
15     A.    The guy in the street clothes swung me
16  around and punched me directly in my face.
17     Q.    How many times did he punch you in the
18  face?
19     A.    Several times. From that point I kind
20  of lost, you know, my bearings and I was being hit on
21  either side of my face. Kicked. I'm falling to the
22  ground, I'm being kicked and punched, I'm being
23  yelled at, I'm being told to stop resisting. I was a
24  little confused at that time because I had no idea
25  what was going on. And I was continued to being

Page 83

1  punched on either side of my head, my face, my body.
2      Q.    I'm going to back up.
3            When you were being punched in the
4  face, when you were initially swung around, how many
5  officers were there?
6      A.    The uniformed cop and the guy in the
7  street clothes.
8      Q.    You've identified the guy in the street
9  clothes as the person that swung you around and
10  punched you in the face?
11     A.    Yes.
12     Q.    Do you know if anyone else punched you
13  in the face other than the guy in the street clothes?
14     A.    I don't understand. Can you back up a
15  little bit?
16     Q.    Absolutely.
17            You indicated that you were at the hood
18  of the car, right? You had your hands on the hood of
19  the car?
20     A.    Yes.
21     Q.    And you were swung around?
22     A.    Yes.
23     Q.    And you were punched in the face,
24  right?
25     A.    Yes.

Page 84

1      Q.    And you indicated that it was the
2  person in the plain clothes in the truck that swung
3  you around?
4      A.    Yes.
5      Q.    And was punching you in the face?
6      A.    Yes.
7      Q.    And you testified that he struck you
8  several times in the face?
9      A.    Yes.
10     Q.    Did any other officer at that point
11  strike you?
12     A.    I was getting punched and kicked on
13  both sides of my body, so I would have to say yes, I
14  was being struck by both police officers.
15     Q.    What did that other --
16     A.    The guy in the plain clothes and the
17  uniformed cop that happened to be in the patrol car.
18     Q.    What did that other officer look like
19  that was in the police uniform?
20     A.    I don't remember.
21     Q.    Do you recall what race he was?
22     A.    Oh, he was a white, white individual.
23     Q.    Do you recall what color hair he had?
24     A.    I honestly don't remember.
25     Q.    That's all right. If you recall later

Page 85

1  by me asking you something, let me know.
2      Q.    Do you recall if he was tall or short?
3      A.    He was taller than I.
4      Q.    And how tall are you?
5      A.    Sorry. Five-seven.
6      Q.    Is there any feature at all about this
7  other officer that was in uniform that you can
8  recall?
9      A.    It happened so fast and so quick that I
10  didn't have a chance to look at his face. I remember
11  him placing my hands on the hood and I'd like to
12  retract a little bit because he was trying to put
13  handcuffs on me when I did get spun around. And I
14  tried to explain to them real quick or explain to him
15  real quick that I just had rotator cuff surgery. And
16  it just -- the next thing I know, I'm getting spun
17  around, I'm being punched in the face, I'm being
18  kicked, I'm being told stop resisting. Which again,
19  I was a little confused because at this time I wasn't
20  resisting. I complied with what he said. I just
21  informed him that I just had rotator cuff, to be, you
22  know, be careful.
23            I lost consciousness during, you know,
24  within the first, I guess, couple minutes of the
25  beating. When I did come -- regain consciousness, I

schedules@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
                              Professionals Serving Professionals

Steven Stadler                                          May 27, 2015

Page 86

1     was handcuffed in the front. There was a dog around
2     my upper left thigh, around my leg, pulling me down
3     the street as I'm still being punched and kicked on
4     either side of me and in the front of my face. So I
5     would say yes, there was more than one person doing
6     this beating. And that went on for -- I mean it felt
7     like eternity. That went on for, I guess, several
8     minutes. I kept telling them please stop, please
9     stop. I'm not resisting. I'm not resisting. Please
10    release the dog from my thigh. At this point I can't
11    even think straight. The pain that was going through
12    my body and through my thigh was unbearable. I just
13    couldn't believe this was happening. And, I guess,
14    you know --
15          MS. BONJEAN: I'm going to object at
16    this point. There is no question pending. Unless
17    that's responsive to the last question which I don't
18    think it is at this point.
19    BY MS. RILEY:
20       Q.   You can continue.
21          MS. BONJEAN: If you know what question
22    you're answering at this point, you can continue.
23          THE WITNESS: Okay. That's about it.
24    BY MS. RILEY:
25       Q.   All right. We're going to go back

Page 87

1     then.
2             You indicated that the uniformed
3     officer, had he placed your hands on the hood of the
4     car?
5        A.   Yes.
6        Q.   How did the officer place your hands on
7     the hood of the car?
8        A.   I don't understand the question, place
9     my hands.
10       Q.   Meaning this --
11       A.   He told me to.
12       Q.   He told you to.
13       A.   Yeah.
14       Q.   Just a second ago you indicated that
15    the officer placed your hands on the hood of the car.
16    Did any officer physically grab your hands and put
17    them on the hood of the car?
18       A.   No.
19       Q.   Now, you also testified that you were
20    trying to explain to the uniformed officer that you
21    had just had rotator cuff surgery?
22       A.   Yes.
23       Q.   And this was the uniformed officer?
24       A.   Yes.
25       Q.   Was the non-uniformed officer present

Page 88

1     at that point?
2        A.   No.
3        Q.   So the officer is trying to handcuff
4     you at that point?
5        A.   Yes, uniformed.
6        Q.   The uniformed officer.
7             And was he trying to handcuff you from
8     behind or in the front?
9        A.   Well, he only had one arm and he was
10    pulling the one I had surgery on, so I was trying to
11    tell him to be careful. At this time I was spun
12    around and the individual in the street clothes
13    struck me.
14       Q.   Before you were spun around, was the
15    uniformed officer able to get the handcuff on your
16    arm where you had the rotator cuff surgery?
17       A.   Yes.
18       Q.   So you had one hand handcuffed -- one
19    hand handcuffed?
20       A.   Yes.
21       Q.   And then that's when the plain clothes
22    officer spun you around?
23       A.   Yes.
24       Q.   Now, you also indicated that at some
25    point you lost consciousness?

Page 89

1        A.   Yes.
2        Q.   Where were you when you regained
3     consciousness?
4        A.   On the ground.
5        Q.   Were you face up or face down?
6        A.   I was kind of on my back and -- I was
7     on my back.
8        Q.   How far were you from the police car?
9        A.   I really don't know. I mean I seen
10    headlights, I don't know how far I was.
11       Q.   When you say you saw headlights, was it
12    the headlights from the marked patrol car that you
13    originally had your hands on top of?
14       A.   I don't know.
15       Q.   Do you recall if there was another
16    police car there?
17       A.   I don't know.
18       Q.   You indicated that the dog had your
19    upper thigh?
20       A.   Yes.
21       Q.   And he was pulling you -- the dog was
22    pulling you down the street?
23       A.   Yes.
24       Q.   How were you being pulled down the
25    street?

Pages 86 to 89

Steven Stadler                                    May 27, 2015

### Page 90

1   A.   The dog was around my thigh and by my
2   thigh, the dog was dragging me down the street.
3   Q.   Were you on your back, your side or
4   your stomach?
5   A.   I was on my back. My buttocks was
6   being drug on the concrete.
7   Q.   How far were you drug by the dog?
8   A.   A couple inches. Not very far.
9   Q.   Correct me if I'm wrong, while the dog
10  was on your upper thigh, you're being kicked by
11  officers?
12  A.   Yes.
13  Q.   Who was kicking you?
14  A.   I don't know.
15  Q.   Do you know how many officers were
16  kicking you?
17  A.   I was being kicked on either side of my
18  face, in the front of my face, I was being punched in
19  my chest and on both sides of my ribs.
20  Q.   I want to make sure I have this
21  straight. Okay. You were being kicked on both
22  sides?
23  A.   Yes.
24  Q.   When you said both sides of your face?
25  A.   Yes, either head, face, back of the

### Page 91

1   head, front of the head, forehead.
2   Q.   And you were also being punched in the
3   chest?
4   A.   Punched, yes.
5   Q.   Other than being punched in the chest,
6   at that point in time were you punched anywhere else?
7   A.   Face.
8        MS. BONJEAN: Objection. Form. If you
9   understand what she means by at this point in time,
10  you can answer.
11  BY MS. RILEY:
12  Q.   Meaning when you're on the ground and
13  the dog is biting your thigh the way you've described
14  it, you've testified and correct me if I'm wrong that
15  you were also being kicked, correct?
16  A.   Yes.
17  Q.   And you were also indicating you were
18  being punched in the chest?
19  A.   Yes.
20  Q.   Do you know how many officers were
21  punching you in the chest?
22  A.   No.
23  Q.   Were you being punched in the chest at
24  the same time you were being kicked?
25  A.   Yes.

### Page 92

1   Q.   You also indicated that this went on
2   for several minutes.
3        Did you ever resist arrest?
4   A.   No.
5   Q.   So as you sit here today, you don't
6   know what uniformed officer stopped you?
7   A.   No.
8   Q.   Once the dog is released and no longer
9   biting your thigh the way that you've described, tell
10  me what happens at that point?
11  A.   At that point one of them -- one of the
12  officers or the man in the street clothes says, we
13  need to call the ambulance, he's bleeding.
14  Q.   Was an ambulance called?
15  A.   Yes.
16  Q.   Was an ambulance called right away?
17  A.   No.
18  Q.   How long -- from the time that the K-9
19  was off your thigh to the time an ambulance was
20  called, do you know how long passed?
21  A.   15, 20 minutes.
22  Q.   Do you know how many officers were
23  present at that point when an ambulance was called?
24  A.   No.
25  Q.   At the point that the plain clothes

### Page 93

1   officer says we need to call an ambulance, were you
2   handcuffed?
3   A.   Yes.
4   Q.   Who handcuffed you?
5   A.   I don't remember even getting
6   handcuffed.
7   Q.   Do you know if you were handcuffed in
8   the front or in the back?
9   A.   I was handcuffed in the front because I
10  couldn't pull myself off the ground.
11  Q.   Did you hear the plain clothes officer
12  say anything else at that point in time other than to
13  call an ambulance?
14  A.   No.
15  Q.   Did the plain clothes officer ever say
16  that you were trying to break into or rob the car
17  wash?
18  A.   I don't recall.
19  Q.   At what point in time were you told you
20  were under arrest?
21  A.   I was never told.
22  Q.   When the dog apprehended your thigh or
23  bit your thigh the way you've described it, were you
24  conscious or unconscious? Meaning were you awake
25  when the K-9 made the apprehension?

Pages 90 to 93

Steven Stadler                                                    May 27, 2015

Page 94

1    A.    No.
2    Q.    You were awake or not awake?
3    A.    I wasn't awake.
4    Q.    What position were you in when you woke
5    up and realized that this K-9 was on your leg?
6    A.    I was laying on my back with the dog
7    around my thigh.
8    Q.    What did the dog look like?
9    A.    A K-9 dog.
10   Q.    Do you know what type of dog it was?
11   A.    German Shepherd.
12   Q.    Do you know what color the German
13   Shepherd was?
14   A.    Dark.
15   Q.    Anything else?
16   A.    Big.
17   Q.    How many times did the dog bite you or
18   apprehend you?
19   A.    I don't know.
20   Q.    When you were waiting for the
21   ambulance, were you placed in a patrol car at all?
22   A.    No.
23   Q.    Where were you when the ambulance came?
24   A.    Lying in the street.
25   Q.    You indicated that the plain clothes

Page 95

1    officer said you were bleeding, where were you
2    bleeding from?
3    A.    My thigh.
4    Q.    Anywhere else?
5    A.    I couldn't tell you.
6    Q.    Now, you indicated that at no point did
7    you resist arrest?
8    A.    No.
9    Q.    Did you try to strike any of the
10   officers?
11   A.    No.
12   Q.    Did you ever try to strike the K-9?
13   A.    No.
14   Q.    Did you ever try to run?
15   A.    No.
16   Q.    Did you ever try to walk away at a fast
17   pace once you encountered the officers in the marked
18   patrol car?
19   A.    No.
20   Q.    Or the officer in the marked patrol
21   car?
22         Is that a no?
23   A.    No.
24   Q.    Do you know how long this beating took
25   place that you've just described, from the time you

Page 96

1    were spun around until the time you were handcuffed?
2    A.    No. I don't.
3          (Exhibit Stadler 1, New Jersey
4    Judiciary Plea Form, is marked for identification)
5    BY MS. RILEY:
6    Q.    Sir, you have just been handed Stadler
7    1.
8          Have you seen this form before?
9    A.    What is this?
10   Q.    This form is New Jersey Judiciary Plea
11   Form from Atlantic County and it lists two charges.
12   One being burglary, the other one being resisting
13   arrest, threats of force.
14         Have you ever seen this form before?
15         Why don't you go to the last page of
16   the document and can you tell me is that your
17   signature?
18   A.    Yes.
19   Q.    Do you recall appearing before Judge
20   DeLury?
21   A.    Yes.
22   Q.    On December the 6th, 2013?
23   A.    Yes.
24   Q.    Now, you're familiar with what the plea
25   form is, right?

Page 97

1    A.    Yes.
2    Q.    And you're required with your attorney
3    to fill that out before you enter a plea, right?
4    A.    Yes.
5    Q.    And, in fact, on the bottom corner of
6    each page on the right-hand side there are initials,
7    SS?
8    A.    Yes.
9    Q.    Are they your initials on each page of
10   the plea form?
11   A.    Yes.
12   Q.    Is that a yes?
13   A.    Yes, ma'am.
14   Q.    And the top of the form indicates, list
15   the charges to which you are pleading guilty.
16   A.    Yes.
17   Q.    And those charges were burglary and
18   resisting arrest by threats of force.
19         Do you see that?
20   A.    Yes.
21   Q.    Question 2A states: Did you commit the
22   offense to which you are pleading guilty?
23   A.    Yes.
24   Q.    And the circled answer, please circle
25   the appropriate answer, says yes.

schedules@mfreporting.com          Mastroianni & Fornaroli, Inc.          856-546-1100
                                   Professionals Serving Professionals

Steven Stadler                                                    May 27, 2015

## Page 98

1          Did you review that before you
2     initialed that page?
3          MS. BONJEAN:  Just answer the question.
4          THE WITNESS:  No, it happened so fast.
5     This -- signing this paper right here, this document,
6     because I took a plea agreement in order to get help
7     and I was advised through my attorney that everything
8     is okay, you're just going to plead out the resisting
9     arrest and burglary.  In order for you to get this
10    plea agreement, this is what you got to plea out to.
11    I did not...
12    BY MS. RILEY:
13         Q.    So my question is:  Did you review and
14    initial this page with the answer circled yes to the
15    question, did you commit the offenses to which you
16    are pleading guilty?
17         A.    Yes.
18         Q.    Underneath that same question it asks,
19    under point B, do you understand what the charges
20    mean.  And it's circled yes.
21              Did you review this form before the
22    answers were completed?
23         A.    Yes.
24         Q.    On the last page of the form, question
25    number 24, the question asks:  Are you satisfied with

## Page 99

1     the advice you have received from your lawyer.
2              Do you see that question?
3         A.    Yes.
4         Q.    And the response was yes.
5              Was that answer completed by you?
6         A.    Can you rephrase that?
7         Q.    Absolutely.
8              Did you circle the word yes to that
9     question or did your attorney do it?
10        A.    My attorney did it.
11        Q.    Did he ask you if you were satisfied
12    with the advice you had received from your lawyer
13    before the yes was circled?
14        A.    Yes.
15        Q.    So you agree with that response?
16        A.    Yes.
17              (Exhibit Stadler 2, transcript of plea
18    and sentencing dated December 6, 2013, is marked for
19    identification)
20    BY MS. RILEY:
21        Q.    Sir, you've just been handed Stadler 2
22    which is the transcript of your plea and sentence.
23    And we just established from the plea form that you
24    recalled being before Judge DeLury on December the
25    6th, 2013.

## Page 100

1          Do you recall that?
2         A.    Yes.
3         Q.    On page eight of the transcript, line
4     17, the question asks:  Now, let's talk about the
5     offenses, sir.  Count three alleges that on March
6     13th, 2013 that you were in Atlantic City, is that
7     true?
8              And you responded:  Yes.
9              Do you recall making --
10        A.    Yes.
11        Q.    -- that response to the court's
12    question?
13        A.    Yes.
14        Q.    And the court asked you the question on
15    this same page:  Where in Atlantic City were you when
16    you committed this resisting offense?
17              Answer:
18        A.    Where are we at?
19        Q.    I'm sorry.  Page eight, line 21.  The
20    page number is up on the top right-hand corner.
21        A.    Okay.
22        Q.    And the question was, on line 21, where
23    in Atlantic City were you when you committed this
24    resisting offense?
25              Answer:  It was Albany Avenue.

## Page 101

1          Do you recall making that statement?
2         A.    Yes.
3         Q.    Was it true?
4         A.    Yes.
5         Q.    You were asked the question:  Did you
6     there and then come into contact with Officer Devlin
7     of the Atlantic City Police Department?
8              Answer:  Yes, sir.
9              Is that answer true?
10        A.    Yes.
11        Q.    Who was Officer Devlin?
12              Meaning when you were on Albany Avenue,
13    which officer was Officer Devlin?
14        A.    The uniformed officer.
15        Q.    Is that the uniformed officer that you
16    first encountered?
17        A.    Yes.
18        Q.    Then you were asked the question, page
19    nine, line six:  And did you purposely prevent him
20    from arresting you by using physical force, threats
21    or violence?
22              Answer:  Yes.
23              Was that answer true?
24        A.    Yes.
25        Q.    Question:  What did you do, sir?

Pages 98 to 101

Steven Stadler — May 27, 2015

## Page 102

1      Answer: I resisted. I pushed away. I
2 tried to run.
3      Was that answer true?
4    A.   Yes.
5      MS. BONJEAN: I need to make a quick
6 phone call whenever we can take a two-minute break.
7      MS. RILEY: We can do it now.
8      MS. BONJEAN: I just got to arrange for
9 someone to pick up my kids at the bus stop. They got
10 left last time.
11      (Off-the-record discussion)
12      (Brief recess)
13 BY MS. RILEY:
14    Q.   Ready, Mr. Stadler?
15    A.   Yes.
16    Q.   In the same document, which is Exhibit
17 Stadler 2 of your transcript and plea of sentence, on
18 page 6, line 3, the judge asked you the question:
19 Now, you face as a result of your plea and depending
20 on your record to up to five years in state prison.
21      What did you understand that to mean?
22    A.   Can you rephrase that?
23    Q.   Absolutely.
24      When the judge stated: Now, you face
25 as a result of your plea and depending on your record

## Page 103

1 to up to five years in New Jersey State Prison, did
2 you understand that to mean that you could face five
3 years in New Jersey State Prison based on the plea?
4    A.   I don't understand. I really don't
5 understand what you're saying. You're saying if I
6 didn't take the plea, I could get five years?
7      MS. BONJEAN: Listen to the question,
8 she's referring to you here and what did it mean to
9 you? Just listen to the question.
10      THE WITNESS: Means I can get up to
11 five years.
12 BY MS. RILEY:
13    Q.   And you understood what that meant,
14 right?
15    A.   Yes.
16    Q.   Now, the judge also advised you it
17 could be consecutive to anything else you're facing?
18    A.   Okay.
19    Q.   Do you see that?
20    A.   Yeah.
21    Q.   On page 6, line 5.
22      What did consecutive mean?
23      MS. BONJEAN: If you understood it at
24 the time and if you understand the question now. I'm
25 going to admonish you not to speculate to what you

## Page 104

1 think she wants to hear.
2 BY MS. RILEY:
3    Q.   Actually, Mr. Stadler, I just want you
4 to answer the question.
5      You have done state prison time before,
6 right?
7    A.   Yes.
8    Q.   You know what consecutive means?
9    A.   Means running not together.
10    Q.   Right. Means one sentence runs after
11 the other, right?
12    A.   Yes.
13    Q.   Depending on the offense.
14    A.   Yes.
15    Q.   And the state, however, has agreed to
16 recommend one of two things, either a four-year
17 prison term concurrent or probation continued upon
18 long-term treatment.
19      Do you see that.
20      MS. BONJEAN: I think you misspoke, Ms.
21 Riley, conditioned not continued.
22      MS. RILEY: Oh, I'm sorry. Let me back
23 up.
24 BY MS. RILEY:
25    Q.   Page 6, line 6. Thank you.

## Page 105

1      The state, however, has agreed to
2 recommend one of two things, either a four-year
3 prison term concurrent or probation conditioned upon
4 long-term treatment.
5      Do you see that?
6    A.   Yes.
7    Q.   What did you understand that to mean at
8 the time?
9    A.   Means I have four years probation if I
10 take this plea agreement and I have to, upon being
11 released from the jail, finish a long-term inpatient
12 program.
13    Q.   Did you enter into a long-term
14 treatment program?
15    A.   Yes.
16    Q.   And that was a result of this plea?
17    A.   Yes.
18    Q.   And that plea was for resisting arrest
19 and burglary, right?
20    A.   Yes.
21    Q.   And you pled guilty to those charges?
22    A.   I did plead guilty to those charges.
23    Q.   Now, you indicated that the EMTs or the
24 ambulance was called?
25    A.   Yes.

Pages 102 to 105

Steven Stadler                                                May 27, 2015

### Page 106

1    Q.    What injuries did you have that you are
2    aware of at that point in time?
3         A.    I couldn't open my left eye completely.
4    It was completely shut. I had bumps and scars on my
5    head. I had lacerations on my head and forehead and
6    top of my head. I had staples that immediately fell
7    out while I was in the hospital. No stitches. They
8    just -- I had large lacerations, a piece of tissue
9    missing, looked like a chunk of meat was taken out of
10   my leg, my upper thigh, left.
11        Q.    Where were the large lacerations that
12   you just testified to?
13        A.    My left upper thigh.
14        Q.    Anything else, sir?
15        A.    There is a lot of scarring, a lot of
16   nerve damage in my thigh. From the top of my kneecap
17   to the top of my thigh is completely numb. I still
18   can't feel it. And I walk with a slight limp.
19        Q.    Where did the ambulance take you?
20        A.    Atlantic Regional Medical Care.
21        Q.    Do you know what time you were taken to
22   the hospital?
23        A.    No.
24        Q.    Did the EMTs ask you for your name?
25        A.    I don't remember if they asked me for

### Page 107

1    my name or not.
2         Q.    Did you ever tell them your name?
3         A.    Again, I don't remember if I did or I
4    didn't.
5         Q.    Do you recall if you provided them with
6    a false name?
7         A.    I don't remember stating that I had a
8    false name.
9         Q.    I understand you don't recall stating,
10   but do you know, as you sit here today, if you gave
11   them a false name?
12            MS. BONJEAN: Objection. He already
13   answered that.
14            THE WITNESS: I answered that?
15            MS. BONJEAN: I don't know, did you
16   answer it?
17            MS. JOHNSON-STOKES: You can answer it.
18   BY MS. RILEY:
19        Q.    You can answer it.
20        A.    Did I give them a false name?
21        Q.    Yes.
22        A.    Like I said, I don't remember.
23            MS. BONJEAN: The answer was I don't
24   remember.
25   BY MS. RILEY:

### Page 108

1    Q.    Did you provide a false name at the
2    hospital?
3         A.    Yes.
4         Q.    What name did you provide at the
5    hospital?
6         A.    I don't remember what name I gave them.
7         Q.    Why did you provide a false name to the
8    hospital?
9         A.    I was upset and I felt mistreated so I
10   gave them a false name.
11        Q.    Let me make sure I understand this.
12            The reason that you gave a false name
13   was because you were upset and you had been
14   mistreated?
15        A.    Yeah.
16        Q.    Was there any other reason you gave a
17   false name?
18        A.    No.
19        Q.    Didn't have anything to do with the
20   burglary?
21        A.    No.
22        Q.    Was there an active warrant out for
23   your arrest at the time?
24        A.    Was there?
25        Q.    Yes.

### Page 109

1    A.    I don't think so.
2            (Exhibit Stadler 3, CHS 2000 Response,
3    is marked for identification)
4    BY MS. RILEY:
5         Q.    Mr. Stadler, you have been just handed
6    Exhibit Stadler 3.
7            I'd like to go over this with you, your
8    criminal history.
9            Have you ever used the name Steven
10   Wilson?
11        A.    Yes.
12        Q.    When did you use that name?
13        A.    That was a long time ago. I don't
14   remember the exact date or time or year when I used
15   that name.
16        Q.    Do you recall why you used the name
17   Steven Wilson?
18        A.    No, I don't recall.
19        Q.    Do you know where you used the name
20   Steven Wilson?
21        A.    I believe it was Gloucester City.
22        Q.    What happened in Gloucester City that
23   required you to give the name Steven Wilson?
24        A.    I don't remember.
25        Q.    Were you ever in the State of Illinois?

Pages 106 to 109

Steven Stadler                                              May 27, 2015

## Page 110

1    A.    Yes.
2    Q.    When were you there?
3    A.    '94, '95.
4    Q.    Have you ever used false Social
5    Security numbers?
6    A.    Yes.
7    Q.    How many times?
8    A.    Once or twice.
9    Q.    Why did you use false Social Security
10   numbers?
11   A.    Hope that I wouldn't get caught.
12   Q.    Did you ever use a false date of birth?
13   A.    I don't remember.
14   Q.    How many times did you use the alias
15   Steven Wilson?
16   A.    I don't remember.
17   Q.    As you sit here today, do you know how
18   many times you've been arrested for burglary?
19   A.    No.
20   Q.    Has it been more than once?
21   A.    Yes.
22   Q.    Has it been more than five times?
23   A.    Yes.
24   Q.    Has it been more than 10 times?
25   A.    I don't --

## Page 111

1         MS. BONJEAN: Objection. I believe he
2    said I don't know, but you can answer, if you know.
3         THE WITNESS: I don't know.
4    BY MS. RILEY:
5    Q.    Let's go through Stadler 3.
6    A.    Where?
7    Q.    Stadler 3. Exhibit Stadler 3.
8         You were arrested on August 20th, 1987
9    in Gloucester City Police Department for burglary and
10   larceny.
11        Do you see that?
12        It's on the bottom of page RR 56 and
13   goes onto the top of RR 57.
14   A.    Burglary. I see burglary. Okay.
15   Yeah.
16   Q.    And the disposition of the burglary
17   charge was guilty.
18        Do you see that?
19   A.    Yes.
20   Q.    Did you go to trial in Camden County
21   Superior Court on that matter or did you plead
22   guilty?
23   A.    I don't remember.
24   Q.    Do you recall receiving three years
25   probation?

## Page 112

1    A.    Yes.
2    Q.    Do you recall who represented you in
3    that matter?
4    A.    Public defender.
5    Q.    Do you recall anything about that
6    incident from August 20th, 1987?
7    A.    No.
8    Q.    Did you ever violate your probation as
9    a result -- from those charges?
10   A.    Yes.
11   Q.    Do you recall when you violated your
12   probation?
13   A.    No.
14   Q.    Arrest number three, August 19th, 1992.
15   There are four charges out of Egg Harbor Township.
16   Damaged property, burglary, larceny and conspiracy to
17   commit burglary.
18        Do you see that?
19   A.    Atlantic County?
20   Q.    Yes.
21   A.    Yes.
22   Q.    And all of the charges were dismissed
23   with the exception of the felony conviction for
24   burglary.
25        Do you see that?

## Page 113

1    A.    Yes.
2    Q.    And it indicates guilty. Did you plead
3    guilty or did you go to trial on that matter?
4    A.    I pleaded guilty.
5    Q.    Do you recall who represented you in
6    that matter?
7    A.    Public defender.
8    Q.    Now, it indicates that you received
9    jail time credit and two years probation, is that
10   accurate?
11   A.    I don't remember.
12   Q.    You don't recall doing probation for
13   that incident?
14   A.    No.
15   Q.    The arrest number four from September
16   28th, 1996, Gloucester City, you were charged with
17   assault on police and resisting arrest.
18        Do you see that?
19   A.    Yes.
20   Q.    And it states that the disposition was
21   guilty to a local ordinance violation?
22   A.    What does that mean?
23   Q.    Meaning you appeared in municipal court
24   in Gloucester City.
25        Do you recall that?

Pages 110 to 113

Steven Stadler                                          May 27, 2015

Page 114

1     A.    Yes.
2     Q.    And you pled -- you were pled or found
3  guilty of a local ordinance violation.
4        Do you recall that?
5     A.    I don't know what a local ordinance is.
6     Q.    Okay. Do you recall being in
7  Gloucester City Municipal Court?
8     A.    Yes.
9     Q.    Were you represented?
10    A.    No.
11       MS. BONJEAN: No? Did you say no you
12  weren't represented?
13       THE WITNESS: I wasn't represented. It
14  was a municipal court.
15  BY MS. RILEY:
16    Q.    Do you recall a guilty charge, felony
17  conviction for causing or attempting to cause bodily
18  injury?
19    A.    Can you repeat that again?
20    Q.    Absolutely.
21       MS. BONJEAN: Where are you? I'm
22  sorry. Are you referring somewhere because if you
23  could give me the -- put a direct -- the attention --
24  my attention to where you're looking.
25       MS. RILEY: It's above arrest number

Page 115

1  five.
2        MS. BONJEAN: Okay.
3        MS. RILEY: You go up. See it?
4  Disposition guilty. Felony conviction. Cause or
5  attempting bodily injury.
6  BY MS. RILEY:
7     Q.    Do you see that, sir?
8     A.    No, I don't. Okay. I see it.
9     Q.    You got it?
10    A.    Yeah.
11    Q.    And the disposition date was January
12  the 8th, 1997?
13    A.    Um-hum.
14    Q.    What can you tell me about that
15  offense?
16    A.    I was being arrested. I fled. The
17  officer was chasing me, fell and hurt himself.
18    Q.    Do you recall anything else about that
19  incident?
20    A.    No.
21    Q.    Do you recall whether or not you
22  received jail time at the county for that?
23    A.    Yes.
24    Q.    And the form indicates that you were in
25  jail for 11 months and 29 days, is that accurate?

Page 116

1     A.    Yes.
2     Q.    On page RR 59, under arrest number six,
3  do you recall being indicted in Camden County
4  Superior Court for burglary and conspiracy to commit
5  burglary?
6     A.    You said number what? Six?
7     Q.    It's under arrest number six. It goes
8  on to RR 59, which is the number on the bottom
9  right-hand corner of the page?
10    A.    Um-hum.
11    Q.    Do you see where it indicates
12  disposition, guilty, felony conviction burglary?
13    A.    Yes, third degree. All right.
14    Q.    And then disposition guilty, third
15  degree felony conviction, conspiracy.
16       Do you see that?
17    A.    Yes.
18    Q.    What can you tell me about that
19  incident?
20    A.    I don't remember.
21    Q.    Did you go to jail?
22    A.    Yes. If I was convicted, yes.
23    Q.    Do you recall if you pled guilty or if
24  you went to trial?
25    A.    Again, ma'am, I don't remember.

Page 117

1     Q.    Have you ever gone to trial on a
2  criminal charge that you've had filed against you?
3     A.    Excuse me?
4     Q.    I'll repeat it.
5        Have you ever gone to trial over any
6  criminal charges ever filed against you?
7     A.    No.
8     Q.    June 9th, 2003, under arrest number
9  nine.
10    A.    Where are we at? RR what?
11    Q.    RR 60.
12       On June 9th, 2003, do you recall being
13  arrested in Cherry Hill Township for shoplifting?
14    A.    Oh, yes.
15    Q.    Tell me about that incident.
16    A.    I went into a Shop-Rite and committed
17  the act of stealing groceries, meats.
18    Q.    And you pled guilty to a local
19  ordinance violation?
20    A.    Yes.
21    Q.    Do you recall that?
22    A.    Yes.
23    Q.    On page RR 64, do you recall a
24  disposition date of October, looks like first, 2003
25  of guilty to a felony conviction of burglary?

schedules@mfreporting.com        Mastroianni & Formaroli, Inc.        856-546-1100
                                 Professionals Serving Professionals

Steven Stadler                                                    May 27, 2015

Page 118

1    A.    Where?  I don't know where you're at.
2    Q.    RR 64, at the very top of the page.
3    A.    October 1st?
4    Q.    October 1st, 2003.
5    A.    Do I answer?
6    Q.    Yes.
7    A.    I'm sorry.
8    Q.    That's okay.
9    A.    Yeah, that I do remember.  I robbed a
10   couple of garages for tools, bicycles, basically
11   anything I could get my hands on to sell for drugs.
12   Q.    You were looking to get items to sell
13   for drugs?
14   A.    Yes, ma'am.
15   Q.    January 8th, 2009, do you recall being
16   arrested in Atlantic City?
17   A.    Where are we at?
18   Q.    It is on the bottom of RR 64.
19   A.    Yes.
20   Q.    What do you recall about that incident?
21   A.    I went into a Rite Aid and reached into
22   their register and pulled money out.
23   Q.    Why did you do that?
24   A.    To get more, to supply my habit.
25   Q.    And what was your habit in January of

Page 119

1    2009?
2    A.    Drugs.  Crack cocaine.
3    Q.    And did you plead guilty to theft as a
4    result of that charge?
5    A.    Yes.
6    Q.    And were you sent to state prison as a
7    result?
8    A.    Yes.
9    Q.    Do you recall what your sentence was?
10   A.    I believe it was five years.
11   Q.    Now, you indicated earlier that you
12   believe that you may have been, and your attorney,
13   I'm sure, will correct me if I'm wrong, off on your
14   dates earlier based on what you represented?
15   A.    Yes.
16   Q.    What dates would you like to correct?
17   A.    I actually wrote them down.
18         Can I see them?
19         It was 1999 to 2001 was Northern State
20   Prison.
21         2001 to 2002 was Southern State Prison.
22         And then 2003 to the end of 2006 was
23   Bayside State Prison.
24         2009 and '10 was also Bayside State
25   Prison.

Page 120

1    And 2012 was Southern State.
2    Again, I'm not totally certain of that,
3    but I believe I got most of this right.  I'm not -- I
4    just don't remember, like, the years.  It's been --
5    that's the best I can do.
6    Q.    I appreciate that.
7    Are you left-handed or right-handed,
8    sir?
9    A.    Right-handed.
10   Q.    What drug rehab programs have you been
11   in?
12   A.    I've been in a Mutual Agreement Program
13   called MAP in 2001.  2006 I was in Kintock Program in
14   Newark.  2010 I was in Bridgeton in another Kintock,
15   Kintock II.
16   Q.    When you say Kintock II, is that the
17   name of it or meaning that was your second?
18   A.    No, that's Kintock II.  There is
19   Kintock I and Kintock II.
20   Q.    I'm sorry.  That was in Bridgeton?
21   A.    Yes.
22         MS. JOHNSON-STOKES:  And where was MAP?
23         THE WITNESS:  MAP was in Trenton,
24   Vincent's Place.
25         MS. JOHNSON-STOKES:  Thank you.

Page 121

1    BY MS. RILEY:
2    Q.    Any other programs?
3    A.    And Secaucus.  Recently present was
4    Secaucus Integrity House.  And then I went to the
5    Freedom House.  And that was all 2014 and '15, both
6    of those.
7    Q.    Meaning the Integrity House and
8    Freedom?
9    A.    Yeah.  I went from one to the other.
10   Q.    And that was, I'm sorry, what year,
11   sir?
12   A.    2014 to 2015.
13   Q.    How long were you at the MAP Program in
14   Trenton?
15   A.    Six months.
16   Q.    Did you successfully complete the
17   program in those six months?
18   A.    Yes.
19   Q.    Was it a six-month program?
20   A.    Yes.
21   Q.    Kintock I in 2006, how long was that
22   treatment program?
23   A.    Six months.
24   Q.    Did you successfully complete that
25   program?

Pages 118 to 121

Steven Stadler                                          May 27, 2015

Page 122

1      A.    Yes.
2      Q.    Kintock II in 2010, how long was that
3   program?
4      A.    Six months.
5      Q.    And I should have asked you this
6   previously, was MAP an in-patient program?
7      A.    Yes.
8      Q.    Was Kintock I an in-patient program?
9      A.    Yes.
10     Q.    Kintock II an in-patient program?
11     A.    Yes.
12     Q.    The Integrity House in Secaucus, how
13  long was that program?
14     A.    Six to nine months. I stayed for
15  eight.
16     Q.    Did you successfully complete that
17  program?
18     A.    Yes.
19     Q.    Did you successfully complete Kintock
20  II?
21     A.    Yes.
22     Q.    How long were you at Freedom House?
23     A.    Again, that's six to nine months. I
24  was there for, I'll say, eight months. And yes, I
25  did complete it.

Page 123

1      Q.    Are you currently seeking any drug
2   treatments or involved in?
3      A.    Presently, I'm living on my own. I
4   have a sponsor. I go to five meetings a week along
5   with a full-time job along with everyday living.
6      Q.    And your full-time job, is it the
7   Country Griddle?
8      A.    Yes, ma'am.
9      Q.    If you answered this, I apologize.
10  What do you do at the Country Griddle?
11     A.    I'm a food server.
12     Q.    And how many hours a week do you work?
13     A.    38 to 40.
14     Q.    Are you on shifts? Meaning do you have
15  shift work where you work five hours, eight hours?
16     A.    No, I work eight hours.
17     Q.    How many days a week?
18     A.    Six. Sometimes it's seven. Sometimes
19  it's six. You might get cut early. It all depends
20  on how the restaurant is doing, if it's busy or if
21  it's not.
22     Q.    When you were treated at the hospital
23  as a result of the incident on March 13th, 2013, did
24  you have any broken bones?
25     A.    No.

Page 124

1      Q.    Do you recall when you were in the
2   hospital if you had any X-rays or CT scans?
3      A.    No.
4      Q.    Do you recall what injuries you were
5   treated for in the hospital?
6      A.    My -- the leg, thigh.
7      Q.    Do you recall when you were in the
8   hospital if anyone, any medical personnel, asked you
9   if you used any drugs that day?
10     A.    I don't remember.
11     Q.    You don't remember if anyone asked you
12  that question?
13     A.    Yeah, I don't know if they asked that
14  question.
15     Q.    Do you recall if any of the medical
16  personnel asked you what happened?
17     A.    No, nobody asked me what happened.
18     Q.    You never told any medical personnel,
19  any doctor, that you were chased by a police officer?
20     A.    No.
21     Q.    Did you ever advise anyone of your
22  medical history?
23     A.    Yes, I told them I had hepatitis C.
24     Q.    Anything else?
25     A.    No.

Page 125

1      Q.    At that time, meaning March 13th, 2013,
2   did you have a prior medical history of anxiety?
3      A.    No.
4      Q.    At that time, March 13th, 2013, did you
5   have a prior medical history of depression?
6      A.    No.
7      Q.    So you never told anyone at the
8   hospital you suffered from anxiety or depression?
9      A.    Not that I'm aware of.
10     Q.    Have you ever been diagnosed as
11  suffering with depression?
12     A.    No.
13     Q.    You've never been treated for
14  depression?
15     A.    No.
16     Q.    In your answers to interrogatories you
17  indicate that you suffer from permanent injuries. I
18  just would like to go through those with you. All
19  right? Those permanent injuries, the first one
20  listed is scarring?
21     A.    Yes.
22     Q.    Where is the scarring?
23     A.    Left upper thigh.
24     Q.    Anywhere else?
25     A.    No.

Pages 122 to 125

Steven Stadler                                    May 27, 2015

Page 126

1    Q.    Nerve damage?
2    A.    Left upper thigh.
3    Q.    Numbness?
4    A.    Left thigh.
5    Q.    You also indicate that you have
6    suffered from permanent damage to your eye.
7    A.    Yes. Since the incident, I recently
8    went and got my eyes checked through Family Vision
9    and my left eye is completely -- the vision is
10   different. I need two different size lenses in my
11   glasses.
12   Q.    And the eye doctor that you went to is
13   Family Vision?
14   A.    Family Vision Care, yes, out of
15   Flemington, New Jersey.
16   Q.    When did you first go to Family Vision
17   Care?
18   A.    I don't know the exact date, but I
19   graduated on the 4th. I would say on the 20th of
20   February.
21   Q.    Of this year?
22   A.    Yes.
23   Q.    Now, you indicated that you started
24   wearing glasses, I believe it was 2008?
25   A.    Yes.

Page 127

1    Q.    How often did you have your eyes
2    checked from 2008 until the present?
3    A.    Maybe once.
4    Q.    Other than Wal-Mart in Mays Landing and
5    Family Vision Care, have you ever been seen by any
6    other eye doctor?
7    A.    Can you repeat that?
8    Q.    Absolutely.
9          Other than going to Wal-Mart in Mays
10   Landing and Family Vision Care in Flemington, have
11   you ever been seen by any other eye doctor?
12   A.    No.
13   Q.    Have you ever walked with a limp prior
14   to this incident?
15   A.    No.
16   Q.    Have you ever had an injury where you
17   broke a bone?
18   A.    I can't say -- I can't say I have. I
19   don't think I ever broke a bone.
20   Q.    Have you ever had a displaced fracture
21   on your right foot?
22   A.    I had, I guess, a twisted ankle. I
23   don't know if it was a fracture.
24   Q.    A non-displaced fracture, May 14th,
25   2008, do you recall that?

Page 128

1    A.    No.
2    Q.    Do you recall ever injuring your right
3    foot while working at McNaughton's?
4    A.    Oh, my knee. Not my foot. It was my
5    knee.
6    Q.    You never injured your right foot?
7    A.    No, not my foot.
8    Q.    Did you have X-rays done at the time?
9    A.    Not to my foot.
10   Q.    How about your knee?
11   A.    My knee? Yes.
12   Q.    Have you ever been treated in a
13   hospital for injuries before this incident of March
14   the 13th, 2013?
15   A.    Can you repeat that again?
16   Q.    Absolutely.
17         Have you ever been treated in any
18   hospital for injuries prior to March 13th, 2013?
19   A.    Yes.
20   Q.    How many times?
21   A.    Once for the hernia, I got surgery for
22   that.
23   Q.    Anything else?
24   A.    My shoulder, my rotator cuff, I had
25   surgery for that. When I fell through the hole at

Page 129

1    McNaughton's, both my shoulders, my knee, I went to
2    the hospital for that. This is what you're looking
3    for?
4    Q.    Yes.
5    A.    Okay. When I developed the lump, I
6    guess I went and seen a doctor. I didn't go to the
7    hospital, I went and seen a specialist for the hernia
8    in 2008. I don't know if that...
9    Q.    Anything else?
10   A.    I really don't remember if I have or if
11   I haven't.
12   Q.    Do you recall how you tore your rotator
13   cuff?
14   A.    Falling through a hole.
15   Q.    That was actually from the fall you
16   tore your rotator cuff?
17   A.    Yeah.
18   Q.    In your answers to interrogatories you
19   indicated you have trouble sleeping --
20   A.    Yes.
21   Q.    -- as a result of this incident?
22         Did you ever have trouble sleeping
23   prior to this incident?
24   A.    No.
25   Q.    Do you recall going to AtlantiCare

Pages 126 to 129

Steven Stadler                                                    May 27, 2015

## Page 130

1   Hospital while you were incarcerated?
2       A.   Yes.
3       Q.   After this incident?
4       A.   Yes.
5       Q.   And what was that for?
6       A.   I started bleeding. I had a real bad
7   stomach. Couldn't breathe. Every time I stood up, I
8   passed out. And they said when I was there that
9   there was internal bleeding.
10      Q.   Do you know how that happened or why
11  that happened?
12      A.   I really couldn't tell you why -- how
13  it happened or why it happened, but...
14      Q.   Were you injured while you were
15  incarcerated?
16      A.   No.
17      Q.   No one struck you?
18      A.   No, no one hit me.
19      Q.   Your interrogatories and your testimony
20  here today indicated that you consumed crack cocaine
21  on March 13, 2013. Had you ever used cocaine before
22  that date, crack cocaine?
23      A.   Prior to March 13th?
24      Q.   Yes.
25      A.   Yes. Yes.

## Page 131

1       Q.   How often?
2       A.   Everyday.
3       Q.   How much would you use everyday?
4       A.   50 dollars worth.
5       Q.   How long had you used crack cocaine?
6       A.   Since I was 16.
7       Q.   Have you ever used any other street
8   drug?
9       A.   Yes.
10      Q.   What other street drugs have you used?
11      A.   Heroin.
12      Q.   How often did you use heroin?
13      A.   I didn't really -- that wasn't -- I
14  didn't like it, so I didn't use it a lot. I used it
15  for maybe about six months and that was it.
16      Q.   Do you recall when that was?
17      A.   2003, lasted for about six months.
18      Q.   You indicated that you've used crack
19  cocaine everyday.
20          Have you used it everyday with the
21  exception of being incarcerated?
22      A.   No. I haven't used it everyday from
23  just not being incarcerated. There was times where I
24  held a full-time job, you know, was doing good,
25  but I always seem to fall back into it.

## Page 132

1       Q.   After you were arrested and taken to
2   the hospital, do you recall being transferred to the
3   Atlantic County Justice Facility?
4       A.   Can you repeat that?
5       Q.   Absolutely.
6          After you were treated at the hospital,
7   do you recall being transferred or taken to the
8   Atlantic County Justice Facility?
9       A.   Yes.
10      Q.   And that was the next day, right?
11      A.   I would say yes.
12      Q.   And do you recall being asked questions
13  by an individual doing a health evaluation on you?
14      A.   No, I don't remember.
15      Q.   When you were taken to the Atlantic
16  County Justice Facility, do you recall being spoken
17  to or interviewed by a nurse?
18      A.   Yes.
19      Q.   Do you recall being asked questions
20  about your medical history?
21      A.   Yes.
22      Q.   Do you recall being asked if you used
23  any street drugs?
24      A.   Yes.
25      Q.   Do you recall what your answer was?

## Page 133

1       A.   Crack cocaine.
2       Q.   And that was the response that you gave
3   the nurse?
4          MS. BONJEAN: Objection. Objection to
5   when.
6   BY MS. RILEY:
7       Q.   We're still on March 14th, 2013. When
8   you were questioned by the nurse, your response to
9   the question, do you use any street drugs, your
10  response that you gave was crack cocaine?
11      A.   Yes.
12          MS. BONJEAN: Objection. He's not
13  testified that was his entire response, he said
14  that's one response he gave.
15  BY MS. RILEY:
16      Q.   Did you tell them you used any other
17  street drugs?
18      A.   Yeah, I used marijuana, I used beer, I
19  used heroin, anything I could get my hands on.
20      Q.   How often were you using marijuana?
21      A.   Maybe once a week.
22      Q.   When did you start using marijuana once
23  a week?
24      A.   Since I was about 14.
25      Q.   How often did you use it? Meaning I

Pages 130 to 133

Steven Stadler                                                    May 27, 2015

Page 134

1  understand once a week, but from 14 to what age?
2      A.    I don't know. I stopped here and
3  there. It wasn't like progressive, you know. I
4  don't really understand the question.
5          You're asking me how long did I use it,
6  when did I use it. There is periods in my life when
7  I didn't use drugs. It could have went from I used
8  it for six months, I stopped for six years, I picked
9  up again, I stopped for six years, I picked up again.
10  I mean I don't know how to answer this.
11      Q.    Okay. Let me ask you this question:
12  In March of 2013, were you using marijuana?
13      A.    No.
14      Q.    Do you recall the last time you used
15  marijuana?
16      A.    No.
17      Q.    Now, other than heroin, marijuana and
18  crack cocaine, have you used any other street drugs?
19      A.    Yeah, I tried -- street drugs. I don't
20  understand what you mean by street drugs.
21          Can you rephrase it?
22      A.    Absolutely.
23          Have you ever used ecstasy?
24      A.    No.
25      Q.    Have you ever used Percocets that were

Page 135

1  not prescribed to you?
2      A.    No.
3      Q.    You never purchased Percocets?
4      A.    Down highs, I don't -- no, I didn't.
5      Q.    How about Oxycodone?
6      A.    No.
7      Q.    Did you ever take those?
8      A.    No.
9      Q.    Do you recall when you were admitted
10  into Integrity House?
11      A.    Do I remember?
12      Q.    Yes.
13      A.    I don't --
14      Q.    Meaning what month, what year, do you
15  recall?
16      A.    Oh, it was in December of -- was it
17  '14, '13? December 17th, I believe it was, 2013 to
18  2014. July 22nd I was released. I don't know the...
19      Q.    Do you recall if you filled out an
20  Internal Affairs form with the Atlantic City Police
21  Department?
22      A.    I believe I did, yes.
23          (Exhibit Stadler 4, Atlantic City
24  Police Department Complaint Form, is marked for
25  identification)

Page 136

1  BY MS. RILEY:
2      Q.    You've been handed what has been marked
3  as Stadler 4.
4          Do you recognize that document, sir?
5      A.    Yes.
6      Q.    And was this document completed by you?
7      A.    Yes.
8      Q.    And was it accurate when you completed
9  it on I believe it's June the 11th, 2013, is that
10  correct?
11          MS. BONJEAN: And I'm going to instruct
12  that the witness actually read the document and
13  listen to the question and then answer it based on
14  what -- review the document before you actually
15  answer the question.
16          THE WITNESS: Okay.
17  BY MS. RILEY:
18      Q.    Have you had enough time to review
19  Stadler 4?
20      A.    I don't understand what Stadler 4 is.
21          MS. BONJEAN: That's what it's being
22  marked as. Every time she hands you a document, it's
23  going to be marked with the name and number. We're
24  on the 4th document that she's had you look at.
25          THE WITNESS: Okay.

Page 137

1  BY MS. RILEY:
2      Q.    Is that your signature on the bottom of
3  the page?
4      A.    Yes.
5      Q.    And is the date June the 11th, 2013?
6      A.    Yes.
7      Q.    Did you complete this form?
8      A.    Yes.
9      Q.    And is the information contained in
10  this form, Exhibit Stadler 4, accurate?
11      A.    No.
12      Q.    What's not accurate?
13      A.    This is what I wrote due to the fact
14  that what I received in the jail, what I had in front
15  of me was police reports. And these are the names
16  that were on the police report. So how I wrote it
17  was from that.
18      Q.    Okay.
19      A.    I don't know which office is which.
20      Q.    So I want to make sure it's crystal
21  clear what's not accurate in Exhibit Stadler 4.
22          What is it you're saying is not
23  accurate?
24          I understand that you say that you were
25  referring to the police report. What isn't accurate

Pages 134 to 137

Steven Stadler                                                    May 27, 2015

## Page 138

1    in Stadler 4?
2         A.    Yeah, it's accurate.
3         Q.    So everything contained in Stadler 4 is
4    accurate?
5         A.    Yes.
6         Q.    On Stadler 4, you don't indicate that
7    any officer kicked you.  Why is that?
8         A.    I mean hit is -- pretty much sums it
9    all, I mean I believe, that's how I wrote it.  No, I
10   didn't mention the word kick.
11        Q.    Were you complete with your answer?
12        A.    Yes.
13             (Exhibit Stadler 5, form to be used by
14   a prisoner in filing a complaint under the civil
15   rights act, is marked for identification)
16   BY MS. RILEY:
17        Q.    Sir, you're being handed Exhibit
18   Stadler 5.
19             Do you recognize this document?
20        A.    Yeah.  This is the -- what I got -- I
21   did paperwork on my own not knowing the law or
22   litigations and what you're supposed to do.  This is
23   just me trying to do this myself.
24        Q.    Now, on document number one, page ID
25   number up at the very top is number five.

## Page 139

1             Do you see that?
2             There is a section with number four and
3    then it indicates statement of claims.
4             Do you see that?
5         A.    Yes.
6         Q.    I would like you to read the statement
7    of claims that you made and tell me if that
8    information is accurate?
9         A.    March 13th --
10        Q.    To yourself.  I'm sorry.
11        A.    Oh.  No, it's not accurate.
12        Q.    All right.  What about this document
13   which is Stadler 5 is not accurate?
14        A.    I forgot to mention the word kicked.
15        Q.    So you didn't indicate anything about
16   being kicked in this form?
17        A.    No.
18        Q.    And was this document, Stadler 5,
19   completed by you?
20        A.    Yes.
21        Q.    Now, there was an amended complaint
22   that was filed by Ms. Bonjean on your behalf in this
23   case, you're aware of that, right?
24        A.    Yes.
25        Q.    And have you reviewed that complaint?

## Page 140

1         A.    Yes
2         Q.    So you're familiar with the complaint
3    itself?
4             MS. BONJEAN:  Objection.  He didn't say
5    when he reviewed it.  He said he reviewed it.  He's
6    not saying he's familiar now.  I would ask that
7    question before you assume it.
8             MS. RILEY:  Is there an objection?
9             MS. BONJEAN:  Yes, that's the
10   objection, just for clarification sake.
11   BY MS. RILEY:
12        Q.    Let me ask you this, how many times
13   have you reviewed the complaint filed by Ms. Bonjean,
14   the amended complaint?
15        A.    I think we went over it twice.
16        Q.    Were you provided with a copy of it?
17        A.    I believe -- yes.
18             MS. RILEY:  I believe that's all I
19   have.  Thank you.
20             MS. JOHNSON-STOKES:  Let's take a break
21   for a moment and I have a couple questions.
22             (Brief recess)
23   (EXAMINATION OF MR. STADLER BY MS. JOHNSON-STOKES:)
24        Q.    I just want to make sure I'm clear,
25   Mr. Stadler.  And I think I introduced myself earlier

## Page 141

1    today.
2         A.    Yes, ma'am.
3         Q.    You okay to continue?
4         A.    Yes, ma'am.
5         Q.    Okay.
6         A.    My leg just -- I can't sit too long.
7         Q.    Okay.  Why can't you sit too long?
8         A.    It just goes numb and it starts really,
9    really hurting.
10        Q.    And which leg are you talking about?
11        A.    The left one.
12        Q.    And that's the leg that was affected --
13        A.    Injured.
14        Q.    Let me finish the question.
15        A.    I'm sorry.
16        Q.    That was the leg that was injured at
17   the time of the arrest?
18        A.    Yes, ma'am.
19        Q.    Other than that, is there anything else
20   you are limited in doing with regard to that leg
21   besides the problem with sitting?
22        A.    Oh, yeah.  Yeah.  Like I said before, I
23   walk with a slight limp.  There is massive scarring.
24   There is a hole missing out of my leg.  I walk with a
25   limp.  If I can't sit too long or -- yeah, just

Pages 138 to 141

Steven Stadler                                                May 27, 2015

Page 142

1 walking up steps.
2      Q.    Now, you indicated that you've never
3 had a driver's license, is that correct?
4      A.    No, ma'am.
5      Q.    And have you attempted to apply for a
6 license?
7           MS. BONJEAN:  Objection.  This was
8 asked and answered.  He said no.
9 BY MS. JOHNSON-STOKES:
10      Q.    Have you recently attempted to apply
11 for a driver's license?
12      A.    Yes.
13      Q.    And why was that?
14      A.    Because I want my license, I want to
15 drive.
16      Q.    And how did you go about trying to
17 accomplish that?
18      A.    Went to the DMV and I owe some
19 surcharges and I started, you know, paying on the
20 surcharges so I can actually get my license.
21      Q.    And what did those surcharges come
22 from?
23      A.    They weren't allowed to go in detail.
24 I had to come up with the right documents and stuff
25 like that.

Page 143

1      Q.    Who wasn't allowed to go into detail?
2      A.    The lady at the DMV.
3      Q.    You don't know why you owe surcharges?
4      A.    No.
5      Q.    Had you driven before that day?
6      A.    Absolutely.
7      Q.    Okay.  And when was that?
8      A.    I don't recall when the dates, times,
9 years.
10      Q.    You did that stint in prison from two
11 thousand and -- correct me if I'm wrong, that long
12 time period in prison, 2003 to 2006?
13      A.    Yes.
14      Q.    Did this occur prior to that prison
15 sentence?
16      A.    Yes.
17      Q.    So you had driven prior to that?
18      A.    Yes.
19      Q.    And you haven't driven after that?
20           MS. BONJEAN:  Objection.
21           THE WITNESS:  No.
22 BY MS. JOHNSON-STOKES:
23      Q.    What was your answer?
24      A.    No.
25      Q.    Prior to that prison sentence, did you

Page 144

1 own a vehicle?
2      A.    No.
3      Q.    After that prison sentence did you own
4 a vehicle?
5      A.    No.
6      Q.    Prior to that prison sentence, did you
7 drive someone else's vehicle?
8      A.    No.
9      Q.    After that prison sentence, did you
10 drive anyone else's vehicle?
11           MS. BONJEAN:  Objection.
12           MS. JOHNSON-STOKES:  Are you objecting
13 to the form of the question?  Because that's all
14 you're permitted to do.
15           MS. BONJEAN:  I will object in the form
16 and fashion I see fit.  I'm objecting to the form of
17 the question.  I'm also objecting that it's
18 ambiguous, vague and that my client needs a little
19 more direction if you're going to expect an answer
20 that is accurate.  If you're going to just ask vague
21 questions then, you know, that's your business.  You
22 ask as many vague questions as you want, but, yes,
23 I'm objecting to the form.
24           MS. JOHNSON-STOKES:  Can I have the
25 question read back?

Page 145

1           (Designated question is read)
2           THE WITNESS:  After it, no.
3 BY MS. JOHNSON-STOKES:
4      Q.    At any time?
5      A.    No.
6      Q.    What about in 2013, did you drive
7 anyone's vehicle then?
8      A.    No.
9      Q.    Did you drive your own vehicle in 2013?
10      A.    I didn't have a vehicle.
11           MS. JOHNSON-STOKES:  I have nothing
12 further.  Thank you very much.
13           MS. RILEY:  I just have a follow-up
14 question.  I apologize.
15 (EXAMINATION OF MR. STADLER BY MS. RILEY:)
16      Q.    In the answers to interrogatories,
17 question number 22, you indicate that the defendants
18 were mocking and taunting me in the emergency room.
19 Which defendants were mocking you and taunting you in
20 the emergency room?
21      A.    Oh, I don't know their names, but they
22 were taking pictures, they were videotaping my leg
23 through their cell phones, they were laughing, they
24 were high-fiving each other.
25      Q.    Do you know anything about in terms of

Pages 142 to 145

Steven Stadler                                            May 27, 2015

Page 146

1  descriptive features, were they in uniform?
2      A.   They were all in uniform.
3      Q.   Were --
4      A.   Police officers.
5      Q.   Were any of them Officer Abrams?
6      A.   No.
7      Q.   Was it Officer Devlin?
8      A.   I don't even know. I don't know.
9      Q.   Was it Officer Moore?
10     A.   I have -- I don't know.
11     Q.   Do you know what the ethnicity or the
12  race of these officers were?
13     A.   Do I -- excuse me?
14     Q.   That were taunting and mocking you?
15     A.   No, I don't know.
16     Q.   What were they saying?
17     A.   Pretty much just laughing and giggling,
18  high-fiving each other and taking pictures and
19  videotaping my leg through their phones.
20          MS. RILEY:  That's all I have.  Thank
21  you.
22          MS. JOHNSON-STOKES:  I have nothing.
23  Not at this point.
24      (EXAMINATION OF MR. STADLER BY MS. BONJEAN:)
25     Q.   A few things I want to go through with

Page 147

1  you, Mr. Stadler.
2          I want to refer back to some of the
3  questions that Ms. Riley was asking you about the
4  anger management courses, class, course, that you
5  took when you were incarcerated.  Okay?
6      A.   Yes.
7      Q.   And I think you indicated that in
8  response to her question that you thought you could
9  benefit from taking an anger management course,
10  right?
11     A.   Yes.
12     Q.   And I think Ms. Riley may have asked
13  something in sum and substance, did you feel like you
14  had anger issues, do you recall that question?
15     A.   Yes.
16     Q.   And you said yes, right?
17     A.   Yes.
18     Q.   You also said you had resentment,
19  right?
20     A.   Yes.  Yes.
21     Q.   And I believe you also identified that
22  your anger and resentment stemmed, you thought, from
23  perhaps your childhood and the abusive home that you
24  lived in, right?
25     A.   Yes.

Page 148

1      Q.   How did your anger demonstrate itself
2  during that period of time when you took this anger
3  management course?
4      A.   It benefited me a lot.
5      Q.   No.  I didn't ask benefit.
6          How did you show your anger at that
7  time?
8          MS. RILEY:  I'm going to object to the
9  form.  Before or after the class?
10  BY MS. BONJEAN:
11     Q.   So when you thought you could benefit
12  from the anger management course, what type of anger
13  were you experiencing?  Were you aggressive?
14     A.   No.
15     Q.   So how did you experience the anger
16  that you referenced when you said you could benefit
17  and then followed up by taking an anger management
18  course?
19     A.   It was trying to learn to deal with the
20  angerment (sic) of my mother staying with my
21  stepfather as long as she did.  The resentment.
22  That's the anger that -- the frustration.  It wasn't
23  really trying to deal with being aggressive, trying
24  to go out and per se fight, that's not the kind of
25  person I was or am.

Page 149

1      Q.   So would it be fair to say that this
2  was internal anger?
3      A.   Yes.
4      Q.   Were you someone who went out and
5  picked fights in the jail?
6      A.   No.
7      Q.   Were you someone who went and picked
8  fights on the street?
9      A.   No.
10     Q.   Would you agree that people experience
11  anger in different ways?
12     A.   Yes.
13     Q.   Have you ever met someone who
14  experienced anger by just beating up people?
15     A.   Absolutely.
16     Q.   And would you agree through your
17  counseling and your therapy that you can experience
18  anger internally as well?
19     A.   Yes.
20          MS. RILEY:  Object to the form.
21  BY MS. BONJEAN:
22     Q.   Did you have anger at your mother?
23     A.   I wouldn't say anger, I would say just
24  resentment.  Just -- yeah, resentment.  I would say
25  resentment, not anger where I wanted to hurt her.

Pages 146 to 149

Steven Stadler                                      May 27, 2015

## Page 150

1  Anger as why would she stay in a relationship that
2  long with an abusive person who just liked beating
3  people up.
4      Q.   So you did have anger towards her, but
5  you didn't want to beat her up, right?
6      A.   No.
7      Q.   So I just want to make clear that the
8  anger that you were talking about was an anger that
9  came from inside, but didn't necessarily mean that
10 you were out being aggressive and assaulting people,
11 right?
12     A.   Yes, ma'am.
13     Q.   Now, I want to go back to the incident
14 that formed the basis of this lawsuit, okay, which
15 occurred in March, 2013. Okay?
16     A.   Um-hum.
17          MS. JOHNSON-STOKES: Is that yes?
18 BY MS. BONJEAN:
19     Q.   You have to answer with a yes or no,
20 right?
21     A.   Yes. Sorry.
22     Q.   So you've testified that you don't
23 necessarily know the names of all the officers,
24 right?
25     A.   I don't know -- yes. I don't know the

## Page 151

1  names.
2      Q.   Just listen to the question and answer.
3  Can you identify the name of the
4  uniformed officer who first started to place you
5  under arrest?
6          MS. RILEY: Object to the form.
7          THE WITNESS: Yes.
8  BY MS. BONJEAN:
9      Q.   Huh?
10     A.   I mean no. No.
11     Q.   Listen to my question.
12     A.   I'm not understanding what you're
13 asking me as I didn't understand some of her
14 questions what she was asking me.
15     Q.   Okay. Well, if you don't understand
16 it, don't answer it. All right? It's that simple.
17 Say I don't understand. It's that simple. Don't
18 guess.
19     A.   Okay.
20     Q.   Because we are all very smart people in
21 this room including yourself and I can rephrase the
22 question until you understand it, but I don't want
23 you speculating.
24     A.   Okay.
25     Q.   You testified earlier and you've stated

## Page 152

1  in your interrogatories that you remember seeing a
2  police car after you had left the car wash, right?
3      A.   Yes.
4      Q.   There was an officer associated with
5  that police car, right?
6      A.   Yes.
7      Q.   Did he have a uniform on?
8      A.   Yes.
9      Q.   I'm going to call him a uniformed
10 officer, all right? Is that fair?
11     A.   Yes.
12     Q.   As you sit here today, do you know who
13 that guy is?
14     A.   No.
15          MS. RILEY: Object to the form.
16 BY MS. BONJEAN:
17     Q.   But you do know that a uniformed
18 officer stopped you on the street, right?
19     A.   Yes.
20     Q.   When you were in jail, okay, and
21 drafting your complaint before you were represented
22 by counsel, right?
23     A.   Yes.
24     Q.   Did you know who that officer was?
25     A.   No.

## Page 153

1      Q.   Now, you do remember a plain clothes
2  fellow who punched you in the face, right?
3      A.   Yes.
4      Q.   I'm going to call him the plain
5  clothes -- who we now know to be an officer, but
6  we're going to call him the plain clothes officer,
7  okay?
8      A.   Yes.
9      Q.   Do you know who I'm referring to as I
10 sit here and say the plain clothes officer?
11     A.   Yes.
12     Q.   Is that the guy that punched you in the
13 face?
14     A.   Yes.
15     Q.   Now, there is also another officer that
16 was involved in this incident who had a dog, right?
17     A.   Yes, the dog was around my leg.
18     Q.   Do you have any independent
19 recollection about what the officer with the dog
20 looked like?
21     A.   No.
22     Q.   All right. You do remember a dog
23 around your leg, though, right?
24     A.   Yes.
25     Q.   But you don't know who the person is

Pages 150 to 153

Steven Stadler                                                    May 27, 2015

Page 154

1    that released the dog on you, correct?
2        A.   No, I have no idea.
3        Q.   So there is the uniformed officer,
4    right?
5        A.   Yes.
6        Q.   There was the plain clothes officer,
7    right?
8        A.   Yes.
9        Q.   And then we know there is a dog,
10   correct?
11       A.   Yes.
12       Q.   And we are assuming that there was an
13   officer associated with that dog, right?
14            MS. RILEY: Object to the form.
15            THE WITNESS: Yes.
16   BY MS. BONJEAN:
17       Q.   Right? You're assuming that, correct?
18       A.   Yes, absolutely.
19       Q.   Do you know what he looks like?
20       A.   No.
21       Q.   Did you know at the time what his name
22   was?
23       A.   No.
24       Q.   Now, going back to when the uniformed
25   officer stopped you --

Page 155

1        A.   Yes.
2        Q.   -- and he told you to put your hands on
3    the vehicle, correct?
4        A.   Yes.
5        Q.   Did you comply with that request?
6        A.   Yes.
7        Q.   Did you ever strike that officer?
8        A.   No.
9        Q.   All right. Did you ever push the
10   officer?
11       A.   No.
12       Q.   Did you ever kick the officer?
13       A.   No.
14       Q.   Did you use any physical violence
15   towards that officer?
16       A.   No.
17       Q.   All right. Did you comply with the
18   request to put your hands on the car?
19       A.   Yes.
20       Q.   And I believe it was your testimony
21   that at some point he started to place you under
22   arrest by putting your hand in a handcuff, right?
23       A.   Yes.
24       Q.   Is that right?
25       A.   Yes.

Page 156

1        Q.   And this is the uniformed officer,
2    right?
3        A.   Yes. The one that got out of the car.
4        Q.   Whose name, even as you sit here today,
5    you don't really have an independent knowledge of his
6    name, right?
7        A.   Don't know.
8            MS. RILEY: I'm going to object to the
9    form. That wasn't the basis of his testimony
10   earlier. Go ahead.
11           MS. BONJEAN: Well, you can certainly
12   follow up with any questions.
13   BY MS. BONJEAN:
14       Q.   Now, at some point you were turned
15   around or swung around, I believe was your testimony,
16   by the guy who was in the plain clothes, right?
17       A.   Yes.
18       Q.   And he punched you in the face, right?
19       A.   Yes.
20       Q.   Did he punch you hard in the face?
21       A.   Yes.
22       Q.   Did he break your glasses?
23       A.   Yes.
24       Q.   Now, I believe you testified then that
25   you started feeling multiple strikes, punches, kicks

Page 157

1    on your body?
2        A.   Yes.
3        Q.   I'm going to assume that you don't know
4    who was doing what at what time, but did you infer
5    that you were being struck by more than one
6    individual during the period of time which you were
7    being beaten before the dog was released on you?
8            MS. JOHNSON-STOKES: Object to the
9    form.
10           MS. RILEY: Object to the form.
11           THE WITNESS: Yes.
12   BY MS. BONJEAN:
13       Q.   So to be clear, did it feel as if you
14   were being beaten by more than one person prior to
15   the dog biting you?
16           MS. JOHNSON-STOKES: Object to the
17   form.
18           MS. RILEY: Object to the form.
19           THE WITNESS: Yes.
20   BY MS. BONJEAN:
21       Q.   And why did you infer that you were
22   being beaten by more than one person before the dog
23   bit you?
24           MS. JOHNSON-STOKES: Objection to form.
25           THE WITNESS: Because I was being

Pages 154 to 157

Steven Stadler                                                    May 27, 2015

## Page 158

1   struck on either side of my body where -- I've been
2   in a gang fight before, I've been beat up before and
3   by multiple people, and it was the same feeling.
4   Being struck on both sides of your body, being kicked
5   on both sides of your head. I felt more than one hand
6   on me.
7   BY MS. BONJEAN:
8       Q.   So in your experience and your common
9   sense told you that it was more than one person?
10      A.   Yes.
11      Q.   And during that beating, you lost
12  consciousness. I think you testified to, correct?
13      A.   Yes, ma'am.
14      Q.   And then you woke up and there was a
15  dog around your leg. right?
16      A.   Yes, around my upper left thigh.
17      Q.   And you were still receiving strikes
18  and kicks, is that fair?
19      A.   Yes.
20      Q.   And -- I'm sorry.
21      A.   Being told to stop resisting.
22      Q.   And I think you testified that was
23  confusing to you, why was that confusing to you?
24          MS. RILEY:  Object to the form.
25          THE WITNESS:  Because I was -- I was --

## Page 159

1   I remember being in handcuffs in the front of me and
2   the dog around my leg and I couldn't move. How was I
3   resisting?
4   BY MS. BONJEAN:
5       Q.   Would it be fair to say it was
6   confusing because they were telling you not to resist
7   and you weren't resisting?
8           MS. JOHNSON-STOKES:  Objection to the
9   form.
10  BY MS. BONJEAN:
11      Q.   But they continued to tell you to stop
12  resisting, right?
13          MS. JOHNSON-STOKES:  Objection to form.
14          THE WITNESS:  Yes.
15          MS. BONJEAN:  What's the form
16  objection?
17          MS. JOHNSON-STOKES:  You can continue.
18  He can answer the question. Objection to the form.
19          MS. BONJEAN:  Well, it's getting
20  harassing. You're saying form and it's just kind of
21  silly. You keep saying objection to form, objection
22  to form. If you're just doing it to --
23          MS. JOHNSON-STOKES:  That's your
24  correction. That's your interpretation. That's your
25  interpretation.

## Page 160

1           MS. BONJEAN:  Actually, under the rules
2   of federal procedure, I can ask you what form
3   objection you are making. You keep making it --
4           MS. JOHNSON-STOKES:  I don't remember
5   the question now.
6   BY MS. BONJEAN:
7       Q.   Okay. Now I want to ask you a couple
8   questions regarding the documents that Ms. Riley had
9   you look at earlier. Okay?
10      A.   Which one?
11      Q.   Let's start with -- let's start with
12  Stadler 1. Okay?  That's the plea, I think, the
13  written plea agreement?
14      A.   Yes.
15      Q.   All right. Now, at the top there it
16  says defendant's name. right?
17      A.   Yes.
18      Q.   Who filled that out?
19      A.   I believe my public defender.
20      Q.   That's not your handwriting, right?
21      A.   No.
22      Q.   So she filled out this top part, right?
23      A.   Yes.
24      Q.   And who made the circles all around the
25  yeses and the nos on this document?

## Page 161

1       A.   My public defender.
2       Q.   And I want you to look at question
3   number 12 on the second page of it. There is some
4   handwriting that says remaining counts, any related
5   DP offenses.
6           Do you see that?
7       A.   Yeah.
8       Q.   Whose handwriting is that?
9       A.   My public defender.
10      Q.   It's not your handwriting, right?
11      A.   No.
12      Q.   And then on 13, again, underneath that,
13  specify any sentence the prosecutor has agreed to
14  recommend. Four years NTSP or probation. And, I
15  guess, LTDP.
16          Do you see that part?
17      A.   Yes.
18      Q.   Is that your handwriting?
19      A.   No.
20      Q.   How quickly did you go through this
21  form with your public defender?
22          MS. RILEY:  Object to the form.
23          THE WITNESS:  A whole five seconds.
24  BY MS. BONJEAN:
25      Q.   Did she actually go through each

Pages 158 to 161

Steven Stadler                                              May 27, 2015

Page 162

1    question, read it out loud and explain it to you?
2        A.    No.
3        Q.    What was the message that the public
4    defender gave you about signing this form?
5            MS. RILEY: I'm going to object to the
6    form. Is he waiving all privileges based on that
7    question?
8            MS. BONJEAN: Is he waiving all
9    privileges based on that question? Well, I don't
10   know that he's waiving all privileges. I don't know
11   that he --
12           MS. RILEY: My position is if he
13   answers that question, he's waiving his privilege
14   based on communications. I didn't raise it on the
15   prior question, but I want clarification now. If he
16   answers that question, are you deeming --
17           MS. BONJEAN: I don't think that's a
18   problem.
19           MS. RILEY: All right.
20           MS. BONJEAN: But we'll come back to
21   that. But yeah, I don't think that's a problem.
22   BY MS. BONJEAN:
23       Q.    Well, I'm going to ask you this, did
24   you enter into this plea agreement on the advice of
25   counsel?

Page 163

1        A.    Yes.
2        Q.    Without getting into what conversations
3    you had with your attorney about this, did you enter
4    into the plea agreement because it was on the advice
5    of counsel that it was the best agreement you could
6    get?
7            MS. JOHNSON-STOKES: Objection to form.
8            MS. RILEY: Objection to the form.
9            THE WITNESS: Yes.
10   BY MS. BONJEAN:
11       Q.    And it's a non-issue.
12           Did your attorney tell you that you had
13   to plea to the resisting in order to get the deal?
14       A.    Yes.
15       Q.    And did your attorney tell you that
16   that was a condition of getting out of jail?
17       A.    Yes.
18       Q.    And going to get this long-term
19   treatment?
20       A.    Yes.
21       Q.    What was your primary concern about
22   your plea offer at that juncture?
23       A.    Getting out of there, getting the help
24   that I needed and getting to an in-patient program as
25   fast as possible.

Page 164

1        Q.    And why was that your predominating
2    concern?
3        A.    Because I was tired of living life like
4    I was living. 40-something years old, in and out of
5    institutions. I needed to get help and I needed help
6    now. No! -- I needed help right then and there. I
7    needed help.
8        Q.    Did you write any letters to people or
9    make any requests for the help that you were seeking
10   during the period of time in which you were in jail?
11       A.    Absolutely. I wrote Straight and
12   Narrow, I wrote Turning Point, I wrote Integrity
13   House, I wrote Freedom House. I wrote several more,
14   I just can't think of them.
15       Q.    You wrote -- you wrote various --
16       A.    Letters.
17       Q.    Various letters to drug treatment
18   programs, right?
19       A.    Yes, ma'am.
20       Q.    Because you wanted to be accepted into
21   those drug treatment programs?
22       A.    Yes, ma'am.
23       Q.    Were you desperate for drug treatment
24   help?
25       A.    Yes.

Page 165

1        Q.    And when you entered into this plea
2    form, was that your overarching concern, getting the
3    drug help that you needed?
4            MS. RILEY: Objection to form.
5            THE WITNESS: Yes.
6    BY MS. BONJEAN:
7        Q.    Was the overarching concern you had
8    when you entered into this plea form getting out of
9    jail to get drug treatment?
10       A.    Yes.
11       Q.    Were you ever offered any plea
12   agreement where you could avoid pleading to the
13   resisting arrest charge?
14       A.    No.
15       Q.    Did you have any issues pleading to the
16   burglary?
17       A.    No.
18       Q.    Why did you circle yes when asked did
19   you commit the offense to which you were pleading
20   guilty or offenses?
21       A.    Where was that at?
22       Q.    At 2A. 2A, first page.
23           It says: Did you commit the offenses
24   to which you are pleading guilty? And there is a
25   circle there, yes.

Pages 162 to 165

Steven Stadler                                                    May 27, 2015

## Page 166

1    Now, wait, let me first ask you this:
2    You didn't circle that, though, right?
3    A.    No.
4    Q.    But you did initial down at the bottom?
5    A.    Yes.
6    Q.    Why did you initial down at the bottom?
7    A.    Because that was the advice my attorney
8    gave me.
9    Q.    And when you said that you -- yes, you
10   did commit the offenses to which you were pleading
11   guilty, was it your understanding that you had to
12   answer yes in order to get this plea agreement?
13   A.    Yes. That was the only way.
14   Q.    All right. I want to have you look at
15   those transcripts which I think have been marked, I
16   don't know, Stadler 2. Okay?
17   This is the plea that you took in the
18   criminal charges that resulted from the incident that
19   underlies this complaint, right?
20   A.    Yes.
21   Q.    And that took place on December 6,
22   2013, that is, the plea took place on December 6,
23   2013, right?
24   A.    Yes.
25   Q.    Do you remember being in court that

## Page 167

1    day?
2    A.    Yes.
3    Q.    Was that the day also that you looked
4    at this Stadler 1, this plea form?
5    A.    Yes, that was -- yes.
6    Q.    Did it all happen the same day, as far
7    as you recall?
8    A.    Yes.
9    Q.    Where were you when you were talking to
10   your attorney about this? Physically where were you?
11   A.    In the county jail, handcuffed,
12   shackled and in a little room.
13   Q.    Do you remember what your attorney's
14   name was?
15   It's not a trick. If you don't
16   remember --
17   A.    I don't remember. I know she was
18   oriental.
19   Q.    Okay. Was her name Eileen LaBarre?
20   A.    Yeah, LaBarre, yep.
21   Q.    All right.
22   A.    Thank you.
23   Q.    Now, you were asked some questions by
24   the court, right, during your plea, isn't that
25   correct?

## Page 168

1    A.    Yes.
2    Q.    When I say the court, I mean the judge.
3    A.    Okay. Yes.
4    Q.    And I want to draw your attention to
5    page eight.
6    Actually, I'm sorry, page nine.
7    Now, you were asked: Did you there and
8    then come into contact with Officer Devlin of the
9    Atlantic City Police Department and you answered yes,
10   sir, right?
11   A.    Yes.
12   Q.    And then you were asked whether -- was
13   he in uniform at that time and you answered yes, sir,
14   right?
15   A.    Yes.
16   Q.    Did you have any recollection of who
17   Officer Devlin actually was, though?
18   A.    No.
19   Q.    Did you know whether Officer Devlin was
20   the officer who arrested you or the K-9 officer?
21   A.    No.
22   Q.    Why did you answer yes, sir then?
23   A.    I thought -- I thought that this was
24   what she -- I don't know.
25   Q.    I want you to listen to my question.

## Page 169

1    When he asked you about Officer Devlin,
2    was he in uniform?
3    A.    Yes.
4    Q.    You answered yes, sir, right?
5    A.    Yes.
6    Q.    Why were you answering yes, sir?
7    A.    I don't know.
8    Q.    Well, were you trying to get your plea?
9    A.    Yes.
10   MS. JOHNSON-STOKES: Objection to the
11   form.
12   MS. RILEY: Objection to the form
13   MS. JOHNSON-STOKES: Suggesting to the
14   witness what his answer should be.
15   MS. BONJEAN: No, he's saying he
16   doesn't know, but I'm asking him why he was answering
17   the question he was answering. I have no
18   suggestions. I just want to know from Mr. Stadler
19   why were you saying yes, sir when you didn't know who
20   Officer Devlin
21   MS. JOHNSON-STOKES: The record speaks
22   for itself.
23   MS. BONJEAN: I know it does
24   MS. JOHNSON-STOKES: Answer the
25   question from your knowledge, Mr. Stadler

Pages 166 to 169

schedules@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
                                   Professionals Serving Professionals

Steven Stadler                                          May 27, 2015

---

**Page 170**

1  BY MS. BONJEAN:
2      Q.    Only Mr. Stadler was there.
3      A.    I don't know who Officer Devlin is.
4      Q.    That's not my question, Steven --
5          MS. RILEY:  And if I can, I think
6  yelling at him is stressing him out.
7          MS. BONJEAN:  I'm not trying to yell at
8  him.  I want him to listen, though.  Okay?
9          MS. JOHNSON-STOKES:  Wait a minute.
10  Everybody is talking at one time.
11  BY MS. BONJEAN:
12     Q.    Okay.  I'm going to direct my client,
13  I just want you to listen to my question.  Okay?
14     A.    I'm listening.  Okay.
15     Q.    I'm not looking for an answer.  There
16  is no right or wrong answers here.
17     A.    Okay.
18     Q.    I really just want you to think about
19  when you were taking this plea what you were
20  thinking.  Okay?  That's it.  Okay?
21     A.    Yes.
22     Q.    Now, at line six, question:  And did
23  you purposely prevent him from arresting you by using
24  physical force, threats or violence?
25          And you answered yes, right?

---

**Page 171**

1      A.    I answered yes.
2      Q.    What physical force did you use?
3      A.    I didn't use any -- I didn't resist.
4      Q.    Mr. Stadler, listen to my question.
5      A.    Um-hum.
6      Q.    What physical force did you use?
7      A.    I didn't use any force.
8      Q.    What threats did you make against
9  Officer Devlin?
10     A.    I didn't use any threats.
11     Q.    What violence did you use against
12  Officer Devlin?
13     A.    There was no violence.
14     Q.    Okay.  But you answered yes, right?
15     A.    Yes.
16     Q.    Okay.  And as you sit here today, do
17  you know why you were answering yes if you didn't use
18  any physical force and you didn't use any threats and
19  you didn't use any violence?
20     A.    That's what was part of the plea
21  agreement, that's what my attorney advised me to say
22  upon getting this plea agreement.
23     Q.    Okay.  Now, you were even asked what
24  did you do, sir, in line 10, right?  Question, do you
25  remember being asked that question?

---

**Page 172**

1      A.    Yes.
2      Q.    You see it here anyway, right?
3      A.    Yes, I see it.
4      Q.    And you answered:  I resisted, right?
5      A.    Yes.
6      Q.    I pushed away?
7      A.    Yes.
8      Q.    I tried to run?
9      A.    Yes.
10     Q.    Okay.  So we're going to go through
11  these.
12          You said I resisted, right?
13          Is that right?  That's what you said,
14  right?
15     A.    No, I didn't resist.
16     Q.    Okay.  Listen to my question.  But you
17  did say I resisted?
18     A.    I know.
19     Q.    It's not -- I'm just -- that's what you
20  read there, right?
21     A.    Yeah.
22     Q.    You said, I resisted, right?
23     A.    Yes.
24     Q.    Now, did you actually resist, though?
25     A.    No.

---

**Page 173**

1      Q.    Okay.  And you said, I pushed away,
2  right?
3      A.    Yes.
4      Q.    Okay.  How did you push away or did you
5  push away?
6          MS. RILEY:  Object to the form.
7          THE WITNESS:  I pushed away trying to
8  defend myself because I was getting punched and hit.
9  I tried to -- if that's what you want to call it,
10  running, that's -- then -- I was trying to get out of
11  the way because I was being hit in every direction
12  possible.
13  BY MS. BONJEAN:
14     Q.    And did you, at any point during the
15  incident, forget what's written here, but during the
16  incident at any point, did you run away?
17     A.    No.
18     Q.    Did you try to run away?
19     A.    No.  No.
20     Q.    Were you able to run away?
21     A.    No.
22     Q.    By the time the dog was on you, were
23  you able to go anywhere?
24     A.    No.
25     Q.    Were you handcuffed?

---

Pages 170 to 173

Steven Stadler                                                    May 27, 2015

Page 174

```
 1      A.    Yes.
 2      Q.    So when the dog was on you, you were
 3  handcuffed, right?
 4          MS. RILEY:  Object to the form.
 5          THE WITNESS:  Yes.
 6          MS. RILEY:  And the basis is with one
 7  hand or both?
 8          MS. BONJEAN:  When I say handcuffed,
 9  I'm assuming two hands.  I would have indicated if I
10  meant one, but thank you for clarifying.
11  BY MS. BONJEAN:
12      Q.    When you woke up to find your hands
13  handcuffed in front of you, there would have been two
14  hands handcuffed, right?
15      A.    Both hands were handcuffed in front of
16  me.
17      Q.    AND that's when the dog was on your
18  thigh, right?
19      A.    Yes.
20      Q.    Did you have the ability to run at that
21  point?
22      A.    No.
23      Q.    At any point before the dog was
24  released on you, did you try to run?
25      A.    No.
```

Page 175

```
 1      Q.    Now, Ms. Riley asked you earlier when
 2  she was questioning you, she asked you, going through
 3  this transcript, she read the transcript as I have
 4  done here and I'm going to do it again where the
 5  judge asks you:  And did you purposely, line six,
 6  purposely prevent him from arresting you by physical
 7  force, threats or violence?
 8          Answer:  Yes.  Right?
 9      A.    Yes.
10      Q.    That's what it says, right?
11      A.    Yes, that's what it says.
12      Q.    And that's what you said in open court,
13  right?
14      A.    Yes.
15      Q.    But then she asked you whether that was
16  true.  Do you remember her asking you that?
17      A.    If that statement was true.
18      Q.    Yeah, do you remember -- well, I don't
19  know -- I'm asking you, do you remember Ms. Riley
20  asking you whether that statement was true?
21      A.    Yes.
22      Q.    Is that statement true?
23      A.    No.
24      Q.    Did you use any physical force?
25      A.    No.
```

Page 176

```
 1      Q.    Did you use any threats?
 2      A.    No.
 3      Q.    Did you use any violence?
 4      A.    No, no violence.
 5      Q.    In your entire deposition today, have
 6  you testified that you used any physical force
 7  against -- have you identified any physical force
 8  that you used against the officers?
 9      A.    No, I didn't use any force.
10      Q.    And have you identified any threats
11  that you've made against the officers?
12      A.    No.
13      Q.    And did you identify any violence that
14  you made against the officers?
15      A.    No.
16      Q.    And that's because you didn't use any
17  violence against the officers?
18          MS. JOHNSON-STOKES:  Objection to the
19  form.
20          MS. RILEY:  Object to the form.
21          MS. BONJEAN:  I can ask him the
22  question any way I want.
23  BY MS. BONJEAN:
24      Q.    Is it true that you did not use
25  violence against the officers?
```

Page 177

```
 1          MS. RILEY:  Object to the form.
 2          MS. JOHNSON-STOKES:  Objection to the
 3  form.
 4          THE WITNESS:  Yes, that's true.
 5  BY MS. BONJEAN:
 6      Q.    That's true.
 7          Did you use physical force against the
 8  officers?
 9      A.    No.
10      Q.    Now, I want to refer you to Stadler 4.
11      A.    Yes.
12      Q.    And this is a complaint that you made
13  with the Atlantic City Police Department, correct?
14      A.    Yes.
15      Q.    And you have a little bit of a
16  narrative down there at the bottom about what
17  happened to you, right?
18      A.    Yeah, what did this person do.
19      Q.    Okay.  Do you see that little section?
20      A.    Yes.
21      Q.    And I believe you testified it was
22  accurate, right?
23      A.    Yes, I -- yes.
24      Q.    When something is accurate, it means
25  it's truthful?
```

Pages 174 to 177

Steven Stadler                                        May 27, 2015

Page 178

1     A.    Yes.
2     Q.    Is it complete, though?
3     A.    No, it's not complete.
4     Q.    All right. There is a difference
5  between accurate and complete, right?
6     A.    Yes.
7     Q.    So does it contain all the facts about
8  what happened on the night that you were brutalized
9  by the Atlantic City Police Officers named in this
10  complaint?
11     A.    No, it doesn't have everything.
12     Q.    It's a small summary, right?
13     A.    Yeah, I was just trying to get to the
14  point of what happened real quickly.
15     Q.    And it includes some information about
16  what transpired, but it doesn't include all the
17  information, right?
18          MS. RILEY: Object to the form.
19          THE WITNESS: No. Need a couple pages.
20  BY MS. BONJEAN:
21     Q.    And then in what has been marked as
22  Stadler 5, which is the original complaint that you
23  filed in federal court, right?
24     A.    Yeah, I did this, yes.
25     Q.    Did you have any help doing this?

Page 179

1     A.    No, this is me going to -- this is just
2  me.
3     Q.    Okay. How did you get the officers'
4  names that you named in your first complaint?
5     A.    Through the green sheets that they give
6  you.
7     Q.    All right. You didn't know who the
8  officers were independent from the green sheets that
9  you had, right?
10     A.    No, I don't.
11     Q.    And again, when you wrote out your
12  statement of claims in number four, right here,
13  right?
14     A.    Okay.
15     Q.    Do you see that?
16     A.    Yes.
17     Q.    Was this a summary of what happened to
18  you?
19     A.    Yes.
20     Q.    Did you include every detail about what
21  transpired that night in this little section?
22     A.    No, not every detail. I just wanted to
23  get to this specific -- summary of it.
24     Q.    And did you have any legal advice on
25  what was important to include or not include?

Page 180

1     A.    No legal advice.
2     Q.    Were you doing your best?
3     A.    Yes.
4     Q.    You're not a lawyer, right?
5     A.    No. I think I spelled everything
6  right.
7     Q.    Now, after you were brought to the
8  county jail, did you receive medical treatment for
9  your injuries at the county jail?
10     A.    Did I -- can you repeat that?
11     Q.    After you were brought to the county
12  jail after your arrest, you were first brought to the
13  hospital, right?
14     A.    Yes.
15     Q.    Okay. And then you were eventually
16  brought to the county jail?
17     A.    Yes.
18     Q.    Fair?
19     A.    Yes.
20     Q.    Did you receive medical treatment at
21  the county jail?
22     A.    Yes.
23     Q.    And there was a point in time when you
24  went back to the hospital, right?
25     A.    Yes.

Page 181

1     Q.    How long after, do you recall? If you
2  don't recall, that's okay too.
3     A.    Don't have an exact number, but I would
4  say at least five to six months.
5     Q.    And when you went back, you had some
6  internal bleeding, right?
7     A.    Yes.
8     Q.    Now, as you sit here today, you don't
9  know exactly how the internal bleeding occurred,
10  right?
11     A.    No. I just --
12     Q.    And you don't know why it exactly
13  occurred?
14     A.    No.
15     Q.    You're not a medical doctor, right?
16     A.    No.
17     Q.    But let me ask you this: Did you have
18  any injuries -- strike that.
19          Did you suffer any injuries from the
20  time that you entered the county jail to the time
21  that you went back to the hospital for internal
22  bleeding that may have -- let me start over.
23          Strike that.
24          From the time that you entered the
25  county hospital, okay, to the time you went back to

Steven Stadler                                          May 27, 2015

## Page 182

1    the hospital for internal bleeding, did you have any
2    fights?
3        A.    No.
4        Q.    Did anybody kick you or hurt you?
5        A.    No.
6        Q.    Did anybody punch you?
7        A.    No.
8        Q.    Did any correctional officer hurt you?
9        A.    Oh. no.
10       Q.    Can you point to anything that occurred
11   in the county jail that would have been the reason
12   that you had internal bleeding?
13       A.    No.
14       Q.    There is nothing that comes to mind.
15   right?
16       A.    No.
17       Q.    Did anybody ever tell you how it is you
18   might have had internal bleeding?
19             MS. RILEY:  Object to the form.
20             THE WITNESS:  The doctor said it was --
21   it was caused by blunt force.
22   BY MS. BONJEAN:
23       Q.    Okay.  And that blunt force that you
24   suffered -- well, strike that.
25             What was the blunt force that you

## Page 183

1    suffered prior to going back to the hospital?
2        A.    At the time of the arrest I was
3    beaten -- I took a beating from several officers that
4    were punching me and kicking me throughout the face
5    and body.
6        Q.    And that's the incident for this
7    complaint, correct?
8        A.    Yes.
9        Q.    There were no other beatings, right?
10       A.    No.
11       Q.    One other just a little clarification.
12   I believe that Ms. Riley asked you about your drug
13   use and you indicated that -- she asked you when you
14   weren't incarcerated, were you using crack cocaine
15   and I think you testified that you did use crack
16   cocaine when you were not incarcerated. right?
17       A.    Yes.
18       Q.    And she asked you how often and you
19   suggested everyday, correct?
20             MS. RILEY:  Object to the form.
21             THE WITNESS:  Yes.
22   BY MS. BONJEAN:
23       Q.    Is that right?
24       A.    Yes.
25       Q.    You don't mean every day of your entire

## Page 184

1    life?
2        A.    No
3        Q.    Did you use crack cocaine as a child?
4        A.    No.
5        Q.    Were there periods of time when you
6    were not using drugs at all?
7        A.    Yes
8        Q.    All right.  In fact, are you currently
9    in a period of time where you're not using drugs?
10       A.    Yeah. I have two years 26 days.
11       Q.    So would it be fair to say that when
12   you were abusing crack cocaine, it was not uncommon
13   to use it everyday?
14       A.    Yes.  That's pretty much how it works.
15       Q.    So when you're using, you used it
16   everyday?
17       A.    Yes, when I'm in my addiction, that's
18   when I use.  When I'm -- what do they call it?
19   Rehabilitating myself. rehab, what have you, in the
20   program, I do not participate in any kind of drug use
21   or alcohol use.
22             MS. BONJEAN:  I have nothing further.
23             MS. RILEY:  I have some follow-up
24   questions.
25   (EXAMINATION OF MR. STADLER BY MS. RILEY:)

## Page 185

1        Q.    When Ms. Bonjean began asking you
2    questions, you indicated that you were confused based
3    on questions that I asked you.
4             Do you recall that?
5        A.    Yes. ma'am.
6        Q.    What question did I ask you that you
7    answered that you didn't understand?
8        A.    The one -- in this one document here,
9    I'm thinking --
10       Q.    When you say this document, just so the
11   record is clear --
12       A.    The transcript of the court.
13       Q.    Stadler 2?
14             MS. BONJEAN:  Stadler 2.
15             THE WITNESS:  Yeah, Stadler 2, the
16   transcript of the court, about the -- me saying yes
17   to did I purposely prevent the arresting officer from
18   using physical force or threats or violence.  I
19   stated yes to the judge and you asked me is that
20   true, and I'm looking at this, looking at it, it's
21   saying yes thinking that this document is true.  I
22   didn't understand that I had a right to say no that
23   that wasn't true, that I didn't use force, I didn't
24   use violence and I didn't use any threats of violence
25   towards that officer.

schedules@mfreporting.com          Mastroianni & Formaroli, Inc.          856-546-1100
                                   Professionals Serving Professionals

Steven Stadler                                          May 27, 2015

Page 186

1   BY MS. RILEY:
2       Q.   Well, when is it that you learned that
3   you had a right to answer no?
4       A.   When did I learn?
5       Q.   Yeah. You indicated that you didn't
6   know that you had a right to say no. When is it that
7   you learned that you had a right to say no?
8       A.   When I went over through it in my head
9   that this is just, you know, a transcript of what the
10  court's saying.
11      Q.   But it's also a transcript of what you
12  said, isn't it?
13      A.   Yes. Yes. But I didn't -- there is a
14  lot of things I just -- I didn't understand and I'm
15  not here to make anybody's life any difficult than it
16  already is. I just didn't understand it.
17      Q.   Well, let me ask you this: When you
18  entered that guilty plea in Stadler 2, you understood
19  that that was a way to keep you out of jail, didn't
20  you?
21      A.   No, I understood that was a way to get
22  me help.
23      Q.   Let me ask you this: If you didn't
24  take the deal, as you put it, you were subjected to
25  jail time, weren't you?

Page 187

1       A.   Yes.
2       Q.   And you, based on testimony that you
3   gave to your attorney, you, in fact, admitted no
4   problem that you were guilty of the burglary, right?
5       A.   Yes.
6       Q.   And based on that plea, you were
7   subjected to five years New Jersey State Prison,
8   right?
9       A.   Yes.
10          MS. BONJEAN: Objection, form.
11  BY MS. RILEY:
12      Q.   And that didn't count the resisting
13  arrest charge, did it?
14      A.   I don't know.
15      Q.   Well, let me ask you this, based on the
16  form that was completed, you had exposure of ten
17  years in New Jersey State Prison, didn't you?
18      A.   I don't understand what you're saying.
19      Q.   Well, Mr. Stadler, this wasn't your
20  first time dealing with the criminal justice system,
21  was it?
22      A.   No.
23      Q.   And when you went to court and you
24  completed -- you signed this form with your attorney
25  on December 6th, 2013, you knew that you were

Page 188

1   pleading guilty to two separate charges, right?
2       A.   Yes.
3       Q.   And you knew that you faced five years
4   New Jersey State Prison for each charge, didn't you?
5          MS. BONJEAN: Objection. You can
6   answer, if you now.
7          THE WITNESS: I didn't know that.
8   BY MS. RILEY:
9       Q.   Do you recall me reviewing that
10  question with you earlier about what consecutive
11  meant?
12      A.   Yes.
13      Q.   Now, other than that, is there anything
14  else, any other question that I asked you that you
15  didn't understand that you answered?
16          MS. BONJEAN: Objection to form. It's
17  a vague, ambiguous question. I'm sure there is
18  plenty of questions that he didn't completely
19  understand.
20          THE WITNESS: No. I'm good.
21  BY MS. RILEY:
22      Q.   Did you have any problem understanding
23  any other questions that I asked you?
24      A.   There were some, but --
25      Q.   What question?

Page 189

1       A.   I don't -- we went through a thousand
2   questions, ma'am.
3       Q.   Well, let me ask you this: At the time
4   of your plea, the judge asked you specific questions,
5   you recall that, right?
6       A.   Yes.
7       Q.   In Stadler 2.
8          One of the questions that he asked you
9   was: Are you pleading guilty because you believe you
10  are guilty? And your answer was yes, sir. Isn't
11  that true?
12      A.   Yes.
13      Q.   And he also asked you if you were
14  pleading guilty voluntarily.
15          Do you recall that?
16      A.   Yes.
17      Q.   And you answered yes, sir, didn't you?
18      A.   Yes. This was under the advice of my
19  attorney.
20      Q.   So if it wasn't for your attorney, you
21  wouldn't have taken the deal?
22      A.   I would have tooken (sic) the deal, but
23  she got me that deal and that plea and that's what I
24  needed.
25      Q.   So you pled guilty to gain a benefit?

Pages 186 to 189

Steven Stadler                                                  May 27, 2015

Page 190

1  A.   Yeah, to better my life.
2  Q.   Well, my question is this then:  When
3  the judge asked you if anybody forced or threatened
4  you to plead guilty or to enter into this agreement
5  and you said no, sir --
6  A.   Nobody forced me, nobody threatened me.
7  Q.   It was your choice, wasn't it?
8  A.   Yes.
9  Q.   Now, you talked about writing letters
10 to various drug treatment programs.
11      Do you recall that?
12 A.   Yes.
13 Q.   When did you do that?
14 A.   While I was in the county jail.
15 Q.   And did your attorney know you were
16 writing those letters?
17 A.   She recommended me to do so.
18 Q.   Did you provide a copy of those letters
19 to your attorney?
20 A.   I wouldn't say I provided copies to
21 her, but the jail itself, through their social
22 workers, they should have copies.
23 Q.   Who was your social worker at the jail?
24 A.   I don't know her name.
25 Q.   Now --

Page 191

1  A.   But I believe I have copies of them.
2  Q.   (REQUEST) I'm going to ask if you have
3  them, you provide them to your attorney.
4  A.   Okay.
5  Q.   All right.  Now, the other question I
6  have for you is you talked about reviewing this form
7  with your attorney, the plea form.  Do you recall
8  that?  And it was a matter of seconds --
9  A.   LaBarre, Ms. LaBarre.
10 Q.   Right.  And you reviewed those in a
11 little room with her?
12 A.   No, this is actually in the courtroom
13 as the judge is talking to me telling me about my
14 plea.  She's circling everything and I'm initialing.
15 Q.   So which is it?  Was it the little room
16 that you told your attorney you reviewed the plea
17 form or was it in the courtroom?
18      MS. BONJEAN:  Objection.  That's
19 misstating his testimony.  He didn't say he was in
20 the little room when he reviewed that form
21 necessarily.
22 BY MS. RILEY:
23 Q.   You can answer.
24 A.   We discussed what was going on and what
25 the plea agreement was.  And when I got into the

Page 192

1  courtroom, that's when I signed everything.
2  Q.   Now, you received discovery from your
3  attorney in this case, didn't you, meaning from the
4  incident of March 13th, 2013?
5  A.   Yes.
6  Q.   So you didn't have just the green
7  complaint forms, you actually had the police reports
8  available to you as well, didn't you?
9  A.   No, I didn't -- no, I didn't have no
10 discovery.  Alls I had was from Ms. LaBarre, was the
11 green sheets.
12      MS. BONJEAN:  Objection.  When you say
13 this, this attorney, you're going to have to indicate
14 whether me or Ms. Bonjean -- or Ms. Bonjean or Ms.
15 LaBarre.  So I don't think we understood that.
16 BY MS. RILEY:
17 Q.   Let's back up, make sure it's clear.
18      Did Ms. LaBarre, your criminal public
19 defender, review with you your discovery from the
20 March --
21 A.   No.
22 Q.   -- 13th, 2013 incident?
23 A.   No, ma'am.
24 Q.   Did she ever discuss the discovery with
25 you from the March 13th, 2013 incident?

Page 193

1  A.   No, ma'am.
2  Q.   Did Ms. LaBarre ever provide you with a
3  copy of the discovery from the March 13, 2013
4  incident?
5  A.   No, ma'am.
6  Q.   And if I took her deposition, that's
7  what she would testify to?
8  A.   I don't know.
9  Q.   Now, you also indicated that you were
10 in -- you've been in a gang fight before?
11 A.   Yes.
12 Q.   When were you in a gang fight?
13 A.   That was a figure of speech, Ms.  I've
14 been in several altercations, fights, and got hit in
15 both directions.  And I was just saying I know what
16 it's like to feel a punch from this side of your face
17 and then another punch on this side of the face from
18 two different people.
19 Q.   How many times have you been in what
20 you categorize as a gang fight?
21 A.   Maybe once, twice.
22 Q.   When was the last time?
23 A.   I couldn't recall.  It's been a long
24 time.
25 Q.   Now, you realize that you were under

Pages 190 to 193

Steven Stadler                                                    May 27, 2015

## Page 194

1  oath at the time that you entered this plea --
2      A.   Yes, ma'am.
3      Q.   -- on December the 6th, 2013?
4      A.   Yes, ma'am.
5      Q.   And it's the same oath that you took
6  today, right?
7      A.   Yes, ma'am.
8      Q.   So my question is, sir, at what point
9  are you telling the truth, the December 6th, 2013
10  time of your plea or today?
11         MS. BONJEAN: Objection to the form.
12  BY MS. RILEY:
13     Q.   You can answer.
14         MS. BONJEAN: Objection. I'm going to
15  instruct him not to answer that. He's not going to
16  answer that question. You're going to have to phrase
17  the question a little differently, a little more
18  specifically if you want an answer. I'm not going to
19  have him answering a blanket response to that on
20  fifth amendment grounds.
21  BY MS. RILEY:
22     Q.   Were you telling the truth when you
23  were under oath and you entered your plea on December
24  6th, 2013?
25         MS. BONJEAN: Objection. He's not

## Page 195

1  going to answer that question. If it's a specific
2  question you want to ask him --
3         MS. RILEY: I am asking him a specific
4  question. You went line by line --
5         MS. BONJEAN: Go line by line. He did
6  the best he could under the circumstances and I'm not
7  going to -- he's not going to answer blanketly
8  whether he told the truth. That's not a fair
9  question. I'm not going to allow him to answer it.
10  BY MS. RILEY:
11     Q.   You would agree with me, wouldn't you,
12  Mr. Stadler, that the answers that you gave today
13  based on your attorney's questions are different than
14  what you told the judge on December 6th, 2013?
15     A.   No. No.
16     Q.   They're the same?
17         MS. BONJEAN: Objection. To which
18  question? It's vague, ambiguous. He can't answer
19  that question in a blanket fashion.
20  BY MS. RILEY:
21     Q.   Your attorney asked you very specific
22  questions line by line in terms of the plea.
23         Do you recall that?
24     A.   Yes.
25     Q.   And you gave answers -- different

## Page 196

1  answers to every one of those questions asked by your
2  attorney here today, didn't you?
3         MS. BONJEAN: Objection. Different
4  answers to every question? Objection.
5         THE WITNESS: No. I understood what --
6  I understood her.
7  BY MS. RILEY:
8      Q.   All right. Well, let's go back through
9  it. Back on Stadler 2.
10         MS. BONJEAN: That's the transcript
11  one. That's this one.
12  BY MS. RILEY:
13     Q.   Page nine. The question by the judge:
14  And did you purposely prevent him from arresting you
15  by using physical force, threats or violence?
16         Answer: Yes.
17         And that was on December 6th, 2013.
18         Do you recall giving that answer?
19     A.   Yes.
20     Q.   On December --
21     A.   By advice of my attorney.
22     Q.   On December the 6th, 2013, when you
23  gave that answer, was it true?
24     A.   Can you repeat that?
25         (Designated question is read)

## Page 197

1         THE WITNESS: No, it wasn't.
2  BY MS. RILEY:
3      Q.   So you lied?
4      A.   No, I didn't lie. I was under advice
5  of my attorney who told me this is how you have to
6  answer in order to get this plea agreement to get
7  help for yourself.
8         Is the statement -- it's not yes, I
9  didn't resist, I didn't use any physical force, I
10  didn't use any threats and I didn't use violence. I
11  had to take that plea, the resisting arrest and this
12  part, it was under the advice of my attorney.
13     Q.   You were asked the question on December
14  6th, 2013 in follow-up to that last question, what
15  did you do, sir?
16         Answer: I resisted. I pushed away. I
17  tried to run.
18     A.   That was after the fact of me getting
19  beat, hit. I was trying to get out of the way. If
20  that's what you want to call resisting and using
21  physical force or threats or violence, then so be it.
22  I mean I was being hit multiple times by multiple
23  officers.
24         We can go back and forth on this all
25  day long. Did I use -- did I resist? No. Were they

Pages 194 to 197

Steven Stadler                                          May 27, 2015

Page 198

1   kicking the shit out of me? Yes. Did I put up my
2   hands to try to protect myself? Maybe. It happened
3   so fast and so quick, I didn't know what to do.
4       Q.    Are you done?
5       A.    Yes.
6       Q.    When your attorney asked you that
7   question earlier, you said you did not resist arrest.
8   Isn't that true?
9       A.    Yes.
10      Q.    And when your attorney asked you that
11  question earlier about whether you pushed away, you
12  said no, right?
13          MS. BONJEAN: Objection. He did not
14  say that. Objection.
15          THE WITNESS: I don't think I did say
16  that.
17          MS. BONJEAN: He explained what he
18  meant by pushed away.
19  BY MS. RILEY:
20      Q.    How did you push away?
21      A.    Again, we're going over the same
22  question, Miss.
23      Q.    The question is still there.
24      A.    Pushed away. Okay. I don't know how
25  to explain it to you any better.

Page 199

1          When you're getting hit, your automatic
2   defense mechanism goes up where you want to protect
3   yourself. If I pushed him in any kind of way, it
4   wasn't purposely. I was defending myself or trying
5   to defend myself from multiple officers. I can't
6   answer this any other way.
7       Q.    And to be clear, you were never inside
8   that car wash other than March 13th?
9       A.    13th, 2013
10      Q.    You never entered it at any other time?
11      A.    No.
12      Q.    And you're as sure about that as any
13  other aspect of your testimony here today?
14      A.    Yes
15          MS. RILEY: That's all I have.
16  (EXAMINATION OF MR. STADLER BY MS. JOHNSON-STOKES:)
17      Q.    You said that you entered into this
18  plea agreement and you testified before the judge the
19  way you did because of the advice you received from
20  your counsel?
21      A.    Yes, ma'am
22      Q.    And what advice was that?
23      A.    This is the best plea agreement that I
24  can get for you. If you want help and you need help
25  like you say you do and want it, this is what you

Page 200

1   have to plea to. I cannot get anything else for you.
2       Q.    And what did that mean to you in terms
3   of what you had to do in order to get that done?
4       A.    I needed to take this plea agreement
5   and go to an in-patient, long-term program to better
6   my life which has, as I'm doing right today.
7       Q.    So my question is: When she told you
8   that, what did that mean that you had to do in order
9   to accomplish what she was -- what you thought she
10  was advising you?
11      A.    Say whatever -- agree to everything
12  that is written, agree to what the judge is asking me
13  and establish -- I was under the advice of my
14  attorney. This is how -- this is the best agreement.
15  This is the best plea.
16      Q.    I understand.
17      A.    I don't even know how --
18      Q.    I understand that.
19      A.    I really don't know how to answer -- it
20  says yes when it should say no.
21          MS. JOHNSON-STOKES: Excuse me for one
22  second. Could I just have his response back, the
23  question that I asked and his response? But I think
24  he already answered my question.
25          (Designated question and answer are

Page 201

1   read)
2   BY MS. JOHNSON-STOKES:
3       Q.    And establish what?
4       A.    Establish a better life for myself, get
5   to a program, get to an in-patient program and better
6   your life.
7           MS. JOHNSON-STOKES: So he did answer
8   the question.
9       Okay. I have nothing further.
10          MS. BONJEAN: I have nothing further.
11          (Witness excused)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Pages 198 to 201

Page 202

```
 1              C E R T I F I C A T E
 2
 3         I, Theresa Mastroianni Kugler, a Notary Public
 4    and Certified Shorthand Reporter of the State of New
 5    Jersey, do hereby certify that prior to the
 6    commencement of the examination,
 7              S T E V E N   S T A D L E R,
 8    was duly sworn by me to testify the truth, the whole
 9    truth, and nothing but the truth.
10         I DO FURTHER CERTIFY that the foregoing is a
11    true and accurate transcript of the testimony as
12    taken stenographically by and before me at the time,
13    place, and on the date hereinbefore set forth, to the
14    best of my ability.
15         I DO FURTHER CERTIFY that I am neither a
16    relative nor employee nor attorney nor counsel of any
17    of the parties to this action, and that I am neither
18    a relative nor employee of such attorney or counsel,
19    and that I am not financially interested in the
20    action.
21
22
23    _____
      Theresa Mastroianni Kugler, C.S.R.
24    Notary Public, State of New Jersey
      My Commission Expires July 15, 2016
25    Certificate No. XIO857
```

Page 202

# C E R T I F I C A T E

I, Theresa Mastroianni Kugler, a Notary Public and Certified Shorthand Reporter of the State of New Jersey, do hereby certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_Theresa Kugler_
Theresa Mastroianni Kugler, C.C.R.
Notary Public, State of New Jersey
My Commission Expires May 5, 2015
Certificate No. XI0857