# EXHIBIT D

Atlantic City Police Department
## USE OF FORCE REPORT (Attachment A)

### A. Incident Information

| Date | Time | Day of Week | Location | Incident Number |
|---|---|---|---|---|
| 03/13/13 | 22:00 | Wednesday | Albany and Filbert Avenues | 13-025481 |

**Type of Incident**

☑ Crime in progress ☐ Domestic ☐ Other dispute ☐ Suspicious person ☐ Traffic stop

☐ Other (specify)

### B. Officer Information

| Name (Last, First, Middle) | | Badge # | Sex | Race | Age | Injured | Killed |
|---|---|---|---|---|---|---|---|
| William C. Moore III | | 761 | M | Wht | 33 | No | No |
| Rank | Duty Assignment | Years of Service | | On-Duty | | Uniform | |
| Patrolman | Uniformed Patrol | 8 | | Yes | | Yes | |

### C1. Subject 1 (List only the person who was the subject of the use of force by the officer listed in Section B.)

| Name (Last, First, Middle) | Sex | Age | Race | Weapon | Injured | Killed |
|---|---|---|---|---|---|---|
| Stadler, Steven | M | 44 | wht | No | No | No |
| | Arrested | | Charges | | | |
| ☐ Under the influence | Yes | | Agg. assault on police, resisting | | | |
| ☐ Other unusual condition (specify) | | | arrest, theft, burg, assault on k9 | | | |

| Subject's actions (check all that apply) | Officer's use of force toward this subject (check all that apply) |
|---|---|
| ☑ Resisted police officer control | ☑ Compliance hold        Firearm's Discharge |
| ☑ Physical threat/attack on officer or another | ☑ Hands/fists        ☐ Intentional |
| ☐ Threatened/attack officer or another with blunt object | ☐ Kicks/feet        ☐ Accidental |
| ☐ Threatened/attack officer or another with knife/cutting object | ☐ Chemical/natural agent |
| ☐ Threatened/attack officer or another with motor vehicle | ☐ Strike/use baton or other object    Number of Shots Fired ___ |
| ☐ Threatened officer or another with firearm | ☐ Canine        Number of Hits ___ |
| ☐ Fired at officer or another | (Use 'UNK' if unknown) |
| ☐ Other (specify) | ☑ Other (specify) knee strike |

### C2. Subject 2 (List only the person who was the subject of the use of force by the officer listed in Section B.)

| Name (Last, First, Middle) | Sex | Age | Race | Weapon | Injured | Killed |
|---|---|---|---|---|---|---|
| | | | | | | |
| ☐ Under the influence | Arrested | | Charges | | | |
| ☐ Other unusual condition (specify) | | | | | | |

| Subject's actions (check all that apply) | Officer's use of force toward this subject (check all that apply) |
|---|---|
| ☐ Resisted police officer control | ☐ Compliance hold        Firearm's Discharge |
| ☐ Physical threat/attack on officer or another | ☐ Hands/fists        ☐ Intentional |
| ☐ Threatened/attack officer or another with blunt object | ☐ Kicks/feet        ☐ Accidental |
| ☐ Threatened/attack officer or another with knife/cutting object | ☐ Chemical/natural agent |
| ☐ Threatened/attack officer or another with motor vehicle | ☐ Strike/use baton or other object    Number of Shots Fired ___ |
| ☐ Threatened officer or another with firearm | ☐ Canine        Number of Hits ___ |
| ☐ Fired at officer or another | (Use 'UNK' if unknown) |
| ☐ Other (specify) | ☐ Other (specify) |

➤ If this officer used force against more than two subjects in this incident, attach additional USE OF FORCE REPORTS.

| Signature: | Date: |
|---|---|
| Wm. C. Moore III 761 | Wednesday, March 13, 2013 |

**Supervisor's Administrative Review**

The approving supervisor shall review the Use of Force report for accuracy and completeness and shall promptly address any issues as they may pertain to policy changes, training, weapons or equipment, or discipline. Recommendations to modify policy, apply remedial training beyond what can be performed by the supervisor, change weapons, equipment, or tactics; or apply discipline shall be thoroughly documented and forwarded through the chain of command.

| Print Reviewing Supervisor's Name: | Supervisor Signature: |
|---|---|
| Craig Mulhern | |

Atlantic City Police Department
USE OF FORCE REPORT (Attachment A)

## A. Incident Information

| Date | Time | Day of Week | Location | Incident Number |
|------|------|-------------|----------|-----------------|
| 03/13/13 | 2200 | Wednesday | Albany and Filbert Ave | 13-025481 |

Type of Incident
- [x] Crime in progress
- [ ] Domestic
- [ ] Other dispute
- [ ] Suspicious person
- [ ] Traffic stop
- [ ] Other (specify)

## B. Officer Information

| Name (Last, First, Middle) | Badge # | Sex | Race | Age | Injured | Killed |
|----------------------------|---------|-----|------|-----|---------|--------|
| K9 John A. Devlin | 744 | M | White | 38 | No | No |

| Rank | Duty Assignment | Years of Service | On-Duty | Uniform |
|------|-----------------|------------------|---------|---------|
| Patrolman | Uniformed Patrol | 11 | Yes | Yes |

## C1. Subject 1 (List only the person who was the subject of the use of force by the officer listed in Section B.)

| Name (Last, First, Middle) | Sex | Age | Race | Weapon | Injured | Killed |
|----------------------------|-----|-----|------|--------|---------|--------|
| Steven Stadler | M | 44 | White | No | Yes | No |

| | Arrested | Charges |
|---|----------|---------|
| [ ] Under the influence | Yes | Burglary,Aggravated assault on PO, |
| [ ] Other unusual condition (specify) _____ | | Resisting Arrest, Obstruction |

Subject's actions (check all that apply)
- [x] Resisted police officer control
- [x] Physical threat/attack on officer or another
- [ ] Threatened/attack officer or another with blunt object
- [ ] Threatened/attack officer or another with knife/cutting object
- [ ] Threatened/attack officer or another with motor vehicle
- [ ] Threatened officer or another with firearm
- [ ] Fired at officer or another
- [x] Other (specify) Assault on Police K9

Officer's use of force toward this subject (check all that apply)
- [x] Compliance hold
- [x] Hands/fists
- [ ] Kicks/feet
- [ ] Chemical/natural agent
- [ ] Strike/use baton or other object
- [x] Canine
- [ ] Other (specify) _____

- [ ] Firearm's Discharge
  - [ ] Intentional
  - [ ] Accidental
- Number of Shots Fired _____
- Number of Hits _____
  - (Use 'UNK' if unknown)

## C2. Subject 2 (List only the person who was the subject of the use of force by the officer listed in Section B.)

| Name (Last, First, Middle) | Sex | Age | Race | Weapon | Injured | Killed |
|----------------------------|-----|-----|------|--------|---------|--------|
| | | | | | | |

| | Arrested | Charges |
|---|----------|---------|
| [ ] Under the influence | | |
| [ ] Other unusual condition (specify) | | |

Subject's actions (check all that apply)
- [ ] Resisted police officer control
- [ ] Physical threat/attack on officer or another
- [ ] Threatened/attack officer or another with blunt object
- [ ] Threatened/attack officer or another with knife/cutting object
- [ ] Threatened/attack officer or another with motor vehicle
- [ ] Threatened officer or another with firearm
- [ ] Fired at officer or another
- [ ] Other (specify) _____

Officer's use of force toward this subject (check all that apply)
- [ ] Compliance hold
- [ ] Hands/fists
- [ ] Kicks/feet
- [ ] Chemical/natural agent
- [ ] Strike/use baton or other object
- [ ] Canine
- [ ] Other (specify) _____

- [ ] Firearm's Discharge
  - [ ] Intentional
  - [ ] Accidental
- Number of Shots Fired _____
- Number of Hits _____
  - (Use 'UNK' if unknown)

➢ If this officer used force against more than two subjects in this incident, attach additional USE OF FORCE REPORTS.

| Signature: | Date: |
|------------|-------|

**Supervisor's Administrative Review**
The approving supervisor shall review the Use of Force report for accuracy and completeness and shall promptly address any issues as they may pertain to policy changes, training, weapons or equipment, or discipline.  Recommendations to modify policy; apply remedial training beyond what can be performed by the supervisor; change weapons, equipment, or tactics; or apply discipline shall be thoroughly documented and forwarded through the chain of command.

| Print Reviewing Supervisor's Name: | Supervisor Signature: |
|------------------------------------|------------------------|
| Craig Mulhern | |

Atlantic City Police Department
## USE OF FORCE REPORT (Attachment A)

### A.  Incident Information

| Date | Time | Day of Week | Location | | Incident Number |
|---|---|---|---|---|---|
| 03/13/13 | 2200 | Wednesday | Albany and Filbert Ave | | 13-D2548T |

Type of Incident
- [x] Crime in progress
- [ ] Domestic
- [ ] Other dispute
- [ ] Suspicious person
- [ ] Traffic stop
- [ ] Other (specify)

### B.   Officer Information

| Name (Last, First, Middle) | | Badge # | Sex | Race | Age | Injured | Killed |
|---|---|---|---|---|---|---|---|
| Anthony Abrams | | 787 | M | White | 28 | No | No |
| Rank | Duty Assignment | Years of Service | | On-Duty | | Uniform | |
| Patrolman | Uniformed Patrol | 7 | | No | | No | |

### C1.  Subject 1 (List only the person who was the subject of the use of force by the officer listed in Section B.)

| Name (Last, First, Middle) | Sex | Age | Race | Weapon | Injured | Killed |
|---|---|---|---|---|---|---|
| Steven Stadler | M | 44 | White | No | Yes | No |

| | Arrested | Charges |
|---|---|---|
| [ ] Under the influence | | Burglary,Aggravated assault on PO, |
| [ ] Other unusual condition (specify) _____ | Yes | Resisting Arrest, Obstruction |

| Subject's actions (check all that apply) | Officer's use of force toward this subject (check all that apply) |
|---|---|
| [x] Resisted police officer control | [ ] Compliance hold          Firearm's Discharge |
| [x] Physical threat/attack on officer or another | [x] Hands/fists          [ ] Intentional |
| [ ] Threatened/attack officer or another with blunt object | [ ] Kicks/feet          [ ] Accidental |
| [ ] Threatened/attack officer or another with knife/cutting object | [ ] Chemical/natural agent |
| [ ] Threatened/attack officer or another with motor vehicle | [ ] Strike/use baton or other object    Number of Shots Fired _____ |
| [ ] Threatened officer or another with firearm | [ ] Canine          Number of Hits _____ |
| [ ] Fired at officer or another | (Use 'UNK' if unknown) |
| [ ] Other (specify) _____ | [ ] Other (specify) _____ |

### C2.  Subject 2 (List only the person who was the subject of the use of force by the officer listed in Section B.)

| Name (Last, First, Middle) | Sex | Age | Race | Weapon | Injured | Killed |
|---|---|---|---|---|---|---|
| | | | | | | |

| | Arrested | Charges |
|---|---|---|
| [ ] Under the influence | | |
| [ ] Other unusual condition (specify) | | |

| Subject's actions (check all that apply) | Officer's use of force toward this subject (check all that apply) |
|---|---|
| [ ] Resisted police officer control | [ ] Compliance hold          Firearm's Discharge |
| [ ] Physical threat/attack on officer or another | [ ] Hands/fists          [ ] Intentional |
| [ ] Threatened/attack officer or another with blunt object | [ ] Kicks/feet          [ ] Accidental |
| [ ] Threatened/attack officer or another with knife/cutting object | [ ] Chemical/natural agent |
| [ ] Threatened/attack officer or another with motor vehicle | [ ] Strike/use baton or other object    Number of Shots Fired _____ |
| [ ] Threatened officer or another with firearm | [ ] Canine          Number of Hits _____ |
| [ ] Fired at officer or another | (Use 'UNK' if unknown) |
| [ ] Other (specify) _____ | [ ] Other (specify) _____ |

➤  If this officer used force against more than two subjects in this incident, attach additional USE OF FORCE REPORTS.

| Signature: | Date: 3/13/2613 |
|---|---|

**Supervisor's Administrative Review**
The approving supervisor shall review the Use of Force report for accuracy and completeness and shall promptly address any issues as they may pertain to policy changes, training, weapons or equipment, or discipline.  Recommendations to modify policy; apply remedial training beyond what can be performed by the supervisor; change weapons, equipment, or tactics; or apply discipline shall be thoroughly documented and forwarded through the chain of command.

| Print Reviewing Supervisor's Name: | Supervisor Signature: |
|---|---|
| Cory Mulhern | |

# EXHIBIT E

## DECLARATION OF VANNESS H. BOGARDUS, III

I, VANNESS H. BOGARDUS III, declare:  I reside in Grass Valley, Nevada County, California.  My mailing address is 10556 Combie Road, Suite 6222, Auburn, California 95602-8908.

## PROFESSIONAL QUALIFICATIONS

1.      I am a retired Los Angeles County Deputy Sheriff, having honorably served about 17 years as a deputy.  My professional qualifications include the following:  Three years active duty, Sergeant, United States Marine Corps (1967-1970 [honorable discharge]); Bachelor of Arts degree in Public Management and Administration (University of Redlands, 1977); January 1971, to May 1988, Los Angeles County Deputy Sheriff (Honor Cadet, August 1971); Certified as Staffelfuhrer (staff leader), under the standards of the Landespolizeischule fur Diensthundfuhrer, NRW (State Police Canine School), March, 1985.  In 1978, I became a member of the LA Sheriff's Department Special Weapons Team, more commonly known as SWAT.  In June 1980, I became one of two pilot canine handlers for the Los Angeles County Sheriff's Department.  I served as a Los Angeles County Sheriff's Department canine handler and, on occasion, trainer for the Sheriff's Department from June 1980, to approximately November 1986.  I have trained numerous canine units for the Los Angeles County Sheriff's Department, and the police departments of such cities in California as Montebello, South Pasadena, Glendale, Pomona and Alhambra.  I have also provided training and instructions to the governments of Kuwait, Cyprus, Philippines and Costa Rica (to name a few) on the use of canines for explosive detection, drug detection, police patrol, canine assisted police tactical operations and forensic tracking.

2.      I rely upon my training, certified in accordance with the California Department of Justice's Peace Officer's Standards and Training, aka "POST."  POST sets minimum training

1

standards for peace officers in the State of California. I hold basic, intermediate and advanced POST certificates.

3.      I also rely upon my combat experience as a Marine in Vietnam and my experience as a member of the Sheriff's Department SWAT team. Both as a Marine and SWAT team member, I learned and understand the "Rules of Engagement" and how to adjust the "Terms of an Engagement," doing what one should do to stay alive while accomplishing the objective of all good police officers – the preservation of life. My training and life experience have provided me with improved insight into matters that I am asked to review, analyze or evaluate. I have over three years (26,000 hours) of pre-law enforcement combat experience as a Marine Infantry Sergeant and counter-guerilla warfare specialist in Vietnam and an aggregate of over 47 years of overall experience in the matters that I may educate, train, instruct, teach, coach and testify about.

4.      Since my retirement from the Sheriff's Department, I have been employed as an advisor and trainer of police dogs and their handlers for use in police services by several municipalities and law enforcement agencies in Southern and Northern California including: the Los Angeles County Sheriff's Department, the Orange County Sheriff's Department, the San Bernardino County Sheriff's Department, the Kern County Sheriff's, the City of Los Angeles Housing Authority, the cities of Huntington Park, Monterey Park, Pomona, Glendale, Burbank and South Pasadena. This includes patrol and narcotics detection training. Training of the dog necessarily includes training of the prospective dog handler, a police officer, in the use of the dog. I have been an advisor to police agencies in Northern California on the use of police dogs for both patrol and narcotics detection to the Placer County Sheriff's Department, the El Dorado County Sheriff's Department, the Sacramento County Sheriff's Department, the Nevada County

2

Sheriff's Department and the City of Auburn.

5.   I am a professor of administration of justice at Sierra College, Rocklin, California.   I am primarily involved in police oriented small-arms instruction, with an emphasis in the legal, moral and ethical implications of firearms usage.   As a licensed range master, I regularly train law enforcement personnel, security industry and interested civilians in the practical aspects of hand gunnery, combat shotgun or high-powered rifle techniques. This specialized instruction necessarily includes presentations pertaining to advanced strategies of safety and tactics.

6.   I have testified on numerous occasions in state and federal courts as an expert in police practices, procedures and tactics (SWAT, etc.), use of force, firearms training and usage, police dog training and usage and the training of police officers as dog handlers, precision marksmen and special team members.

7.   My professional services are charged at $75.00 for in-office work, $150.00 for out-of-office work.   Testimony time in deposition or trial is charged at an hourly rate of $395.00.   When travel requires multiple days, my per diem rate is $895.00.   For testimony, whether in deposition or trial, I charge portal to portal and reasonable travel expenses.

8.   I have been retained by counsel for the plaintiff Steven STADLER to review material and render opinions pertinent to the 10:00 PM, Wednesday, March 13, 2013 incident involving defendant CITY OF ATLANTIC CITY, POLICE DEPARTMENT, et al. Accordingly, in compliance with Federal Rule 26, I have affixed to this declaration Exhibit A, disclosures of my activities in similar matters during the last four years and Exhibit B, my current professional resume.

## MATERIALS RELIED UPON

To render my preliminary opinions regarding the Wednesday, March 13, 2013 incident,

where Steven Stadler was assaulted by Officers Glenn Abrams (Unit A-787) and William Moore, (Unit B2B), of the Atlantic City PD. He was then bitten by an ACPD dog handled by K9 Officer John Devlin (Unit K07), I have reviewed the following material:

A.     United States District Court, District of New Jersey, Camden Vicinage, Steven STADLER v. City of ATLANTIC CITY, et al.   Civil Action No. 13-CV-02741, Amended Complaint and Jury Trial Demand, (23 pages);

B.     Atlantic City Police Department Report Packet, 22:00 Hours, 13 March 2013, pertaining to the arrest of Steven Stadler, Male, White, 51 years, File No. 13-025481, (21 pages);

C.     United States District Court, District of New Jersey, Camden Vicinage, Steven Stadler v. City of ATLANTIC CITY, et al.  Civil Action No. 13-CV-02741, deposition transcripts of:

1.     Steven Stadler, plaintiff, taken at 10:40 AM, Wednesday, May 27, 2015, (202 pages, plus exhibits);

2.     Glenn A. Abrams Jr., defendant officer, taken at 10:36 AM, Wednesday, July 15, 2015, (294 pages, plus exhibits);

3.     William Moore, defendant officer, taken at 10:056 AM, Thursday, May 28, 2015, (240 pages, plus exhibits);

4.     John Devlin, defendant officer, taken at 10:41 AM, Wednesday, July 15, 2015, (170 pages, plus exhibits);

5.     George Adams, Sergeant and PMK, taken at 10:15 AM, Friday, July 31, 2015, 180 pages, plus included exhibits:

a.     Atlantic City Police Department, K9 Policy & Procedures, dated

July 29, 201, (41 pages);

    b.      Atlantic City Police Department, K9 Policy & Procedures, dated July 7, 2010, (57 pages);

    c.      Atlantic City Police Department, Record of Complaints re: Frank Timek, (3 pages);

    d.      Atlantic City Police Department, K9 Policy & Procedures, dated July 29, 2011, (40 pages);

    e.      Letter of 9/22/2012 from Sergeant Robert Campbell Jr. to Captain Thomas Coholan, recommending Officer Sterling Wheaton be given the opportunity to become a K9 handler and attend the 2013 K9 Academy, (2 pages, plus misc. supporting application docs);

D.     Atlantic County, John "Sonny" Burke K-9 Academy, Patrol Class #38, commencing 1/20/2012 and ending 5/11/2012, (including 82 basic training pages, 96 training search data reports and 25 written test pages);

E.     Color copy injury photos of Steven Stadler (17 pages) and additional color copy scene survey photos (42 pages);

## OPINIONS

10.     My preliminary opinions are:

A.     The canine bites suffered by Mr. Stadler on March 13, 2013 were a direct result of the policies, practices, training and customs permitted by the Atlantic City Police Department.

B.     The canine bites suffered by Mr. Stadler on March 13, 2013 were unreasonable, unnecessary and excessive force.  The bites did not comport with generally accepted

standards governing the use of physical force in law enforcement.

C.      K9 Officer Devlin's ordered application of an aggressive "find & bite" trained dog to bite an unarmed, immobilized suspect being held down on the ground by at least two other ACPD officers, where there was a clear risk of those officers and other potentially innocent third parties being bitten, was tactically dangerous and calculated to expose not only himself, but other officers and the general public to the unnecessary risk of sustaining serious injuries or death.   In fact, even under the Atlantic City Police Department's version of the events, it is my opinion that the use of unreasonable, unnecessary and excessive force under these circumstances was intentional and exercised with deliberate and reckless disregard for the safety of other ACPD officers and Mr. Stadler's life.

D.      When practical, the use of injuring force requires that suspects be warned before any force is used so that they can be afforded an opportunity to submit to the authority of the officers.   If a suspect is compliant or surrenders to officer's orders, no use of physical force is necessary, nor can any use of physical force greater than a firm grip be justified.

E.      Although at least Officers Moore, Abrams and Floriani (Unit B1A) were not dog handlers, they had a duty to intervene when they learned of K9 Officer Devlin's intention to use his dog to inflict unreasonable, unnecessary and excessive force upon Mr. Stadler. They breached this duty by condoning and making no attempt to stop Officer Devlin from using unreasonable, unnecessary and excessive force once it had commenced.

H.      The Atlantic City Police Department's Use of Force Policy did not offer adequate guidance to line level officers *or* dog-handlers to prevent issues of unreasonable, unnecessary and excessive use of force in the form of [1] "tackling Mr. Stadler from

behind to the ground," [2] delivery of multiple fist strikes to Mr. Stadler's face, [3] holding him down, exerting blunt force to the body (*i.e.* punching and kicking), and [4] unwarranted dog biting of an unarmed, immobilized and non-threatening suspect.

I.     On March 13, 2013 had there been an adequate ACPD use of force policy and had that policy been competently supervised, K9 Officer Devlin would not have permitted his dog to bite anyone, especially without an adequate warning with an opportunity to comply, because to do so would have been recognized as an improper escalation of force in violation of their department's policy governing the use of physical force and potentially subjecting them to departmental discipline.

J.     The Atlantic City Police Department's Canine Policy does not offer adequate guidance to line-level officer dog-handlers to prevent issues of unwarranted K-9 aggression and unreasonable, unnecessary and excessive use of force in the form of dog biting. Had there been an adequate canine policy in effect on March 13, 2013, K9 Officer Devlin would *not* have permitted his dog to bite anyone, because to do so would have been in violation of his department's policy governing the conditions that would have to be present to permit an Atlantic City PD dog to bite. In sum, had there been an adequate and enforced, through competent supervision, Atlantic City PD Canine policy, Mr. Stadler would not have been bitten, because to do so would have carried disciplinary consequences for Officer Devlin.

11.    I base my use of force/canine bite opinions upon the following:

A.     It is universally agreed among law enforcement agencies that when, in the course of a criminal investigation, an officer releases a dog with knowledge that the dog may bite a person it finds, that is a use of force by the *officer*. That is, the dog's actions in

finding and biting someone will be evaluated under the use of force standards that apply to the officer had he himself used the degree of physical force the dog used.  In other words, regardless of the instrumentality the officer elects to use (gun, dog, baton, mace, control hold, etc.), the same use of force rules should apply.

B.      As a use of force, the dog attack must be considered a very high level of force, that is, force creating a substantial risk of causing serious injury:

      1.      When ordered to bite the dog is expected to bite hard and to bite anywhere on the body – the *"bite and hold"* standard.  The dog's bite has been measured in excess of 600 PSI.  Consequently, because of its training a police dog is far more likely to cause serious injury than an ordinary dog of comparable breed and size.

      2.      The in-patient hospitalization rates for victims of police dog attacks are higher than any other police weapon (except for a gun).  I have found hospitalization rates for victims of police dog attacks ranging from about 25% to nearly 50% of all persons bitten.  Thus, a police dog attack is far more likely to cause serious injury than a police baton strike.  (The in-patient hospitalization rate for persons struck by a police baton has been found to be no more than 5.8 percent of all persons struck.).

      3.      Mr. Stadler suffered a serious injury from the dog bites. For reasons explained above, his injury is *not* surprising. Rather, the injury is reasonably foreseeable given the dog's "full-mouth" and "bite & hold" training and use (*Ref.* Materials List D. Atlantic County, John "Sonny" Burke K-9 Academy, Patrol Class #38 training records). Also, the federal Eleventh Circuit has recognized that police dog attacks are likely to cause serious injury. *Kerr v. City of West Palm*

*Beach,* 875 F.2d 1546, 1550 (11th Cir. 1989) (court of appeals finds "suspects often suffer serious injury" from police dog attacks).

C.      Under generally accepted law enforcement standards, force that creates a substantial risk of causing serious injury may not be used unless the suspect presents an immediate and credible threat of inflicting a serious injury. This is because K9 Officer Devlin was not justified in simply walking up to Mr. Stadler and mutilating him with a knife. Officer Devlin cannot avoid the use of force rules by saying, "Chief, the dog inflicted the injuries to Mr. Stadler, not me!"

D.      Even if one were to disagree with the placing of a canine above a baton, at the top of the injuring force category, no reasonable view of the scenario described by any of the Atlantic City PD officers, or Mr. Stadler, would allow for the use of the canine in the manner used here. This is because the method by which this canine was trained, the "full-mouth bite" & "bite and hold" method," will <u>always</u> create some level of injury, far out of proportion to what was required to control a suspect being held down by at least two other officers when, Officer Devlin, "commanded" his dog to bite Mr. Stadler.

E.      Officer Devlin was originally dispatched to 600 Albany Avenue regarding a burglary in progress. He was updated that "the male was resisting Officer Abrams (see Officer Abrams Initial Report)." Officer Devlin then reported, "Upon my arrival in the area, I observed a male (later identified as Steven Stadler) violently resisting arrest and assaulting Officer Abrams and Officer Moore (see Officer Moore's Supplemental Report) on the corner of Albany and Filbert." Based upon K9 Officer Devlin's report dated 03/30/13 – generated 17 days after the fact, it is my opinion that Mr. Stadler's reported actions fail to support the assertion that he was waging an assault on police officers.

Note the following highlighted officer-reported differences and inconsistencies when dealing with Mr. Stadler at the same time and place:

1.    At the approximate time of Officer Devlin's arrival (*Ref.* Unit History Log: 22:04:07) Officer Moore reported, "I was able to pull my marked patrol car in front of him in attempt to stop the male from fleeing. As I was getting out of my vehicle, Officer Abrams caught up to where we were and tackled the male to the ground. Both Officer Abrams and I were in a [**struggle**] with this male while yelling 'Stop Resisting, you are under arrest.' I was able to secure one handcuff on the suspect. At this point, the suspect later identified as Steve Stadler kept [**kicking towards police**] while [**swinging his hands**], [**breaking free from my control**]. Stadler [**was attempting to roll around and spin away from our control**]."

2.    At the approximate time of Officer Devlin's arrival (*Ref.* Unit History Log: 22:04:07), Officer Abrams reported, "Officer Moore was able to cut Stadler off causing him to slow down (*Ref.* Unit History Log: 22:03:27). I was able to tackle Stadler from behind. We were now in a [**violent fight**] while attempting to get Stadler into custody. I was continually screaming for Stadler "STOP RESISTING YOU ARE UNDER ARREST." Stadler was [**swinging his arms wildly**] and was [**kicking his feet attempting to get away from our control**]. Officer Moore was able to get one handcuff onto Stadler but we were not able to secure the second handcuff on Stadler. Stadler [**began swinging the cuff**] [**violently at us**] while we were attempting to gain control of Stadler."

3.    In his sworn testimony, Mr. Stadler offers a very different account.

Essentially, he stated that he stopped for the uniformed officer (Moore) and complied with the officer's demand that he put his hands on his vehicle (*Depo*: 154/24-25, 155/1-6 and 155/17-19). He did not strike, push, kick or use any physical violence against the officer (*Depo*: 155/7-16).  Officer Moore, started to place him under arrest by putting his hand in a handcuff (*Depo*: 155/20-25). Shortly thereafter, at some point, he was "turned around" or "swung around" by the plain-clothes officer (Abrams) and punched hard in the face. The blow broke his glasses (*Depo*: 156/14-22). He then started feeling multiple strikes, punches, and kicks on his body. (*Depo*: 156/24-25 and 157/1-2). It felt that he was being beaten by more than one person prior to the dog biting (*Depo*: 157/13-19). During that beating he lost consciousness (*Depo*: 158/11-13). When he woke up, there was a dog around his leg (*Depo*: 158/14-16). He was still receiving strikes and kicks, while being told to stop resisting (*Depo*: 158/17-21). He was confused because he was in handcuffs in the front, the dog was around his leg and he couldn't move.  He asked, "How was I resisting?" (*Depo*: 158/22-25 and 159/1-14).

4.      It is important to mention, at the time of Officer Devlin's arrival (*Ref.* Unit History Log: 22:04:07), Unit B1A, Officer Albert Floriani, was already there, his arrival was logged at 22:04:02.  At that point, he was in a position to make a decision to take police action *or* do nothing and abandon his assigned call.   In the moment he was in a position to [1] physically assist Officers Abrams and Moore to complete handcuffing *or*, [2] actively participate in the assault on Mr. Stadler *or*, [3] under the circumstances, defend Mr. Stadler from a life-endangering

assault from three ACPD officers and their attack dog (*Ref.* Unit History Log: B1A Floriani Dispatched at 22:02:08, Arrived at 22:04:02 – 5 seconds before Officer Devlin's arrival and Finish at 04:19:11…Taken Care of…6 hours, 15 minutes, 9 seconds later – according to the log entries). Based upon the Unit History Log, it is my opinion that Officer Floriani was a percipient witness to the events as they unfolded on March 13, 2013. Conspicuously though, Officer Floriani did not submit a report. The record does not reflect what he did. It is generally accepted in American law enforcement and ACPD policy that an officer will submit a report to account for his actions in any departmentally assigned incident. In turn, the report is the subject of review by a supervisor to assure that the officer's conduct is in conformance with policy. B1A Officer Floriani's failure to report on his actions at his assigned 22:02:08 dispatched call is not a simple oversight. It is a critically important omission to the file that might have explained the following:

    a.    Officer Floriani's recorded observations at 22:04:02 would have supported Mr. Stadler's account, as reflected in his deposition testimony, as opposed to either Officer Moore's account, dated 03/13/13 at 22:00:00 *or* Officer Abrams account dated 03/13/13 at 23:30:00 – an hour and a half later regarding the actual level of resistance offered by Mr. Stadler at 22:04:07 when K9 Officer Devlin arrived with his dog.

    b.    His report might have explained why he did not just reach down and assist Officers Moore and Abrams in handcuffing Mr. Stadler. It is my opinion that three experienced police officers would have no difficulty

handcuffing any suspect, especially one that was already being held down on the ground.

c.      His report might have explained why he got out of the way of K9 Officer Devlin and his dog, but failed to intervein and stop the pending exertion of unreasonable, unnecessary and excessive force.   He had enough time and the ability to do so.  It was not as if Mr. Sadler was able to break free, stand up and pose a credible threat of escape in the presence of four ACPD officers and their attack dog.

d.      If sufficient man-power was a concern, Officer Floriani was aware that two more ACPD units were rolling to assist. The Unit History Log reflects that S34 Officer Craig Mulhern, 691 was dispatched at 22:03:38 and arrived at 22:04:56. Officer Mulhern's arrival time indicates that he was only 54 seconds behind Officer Floriani's arrival and 49 seconds after K9 Officer Devlin.  Also, the Unit History Log reflects that B2A Officer Peter Calabrese, M-757 was dispatched at 22:03:51 and arrived at 22:04:54. Officer Calibrese's arrival time indicates that he was only 52 seconds behind Officer Floriani's arrival and 47 seconds after K9 Officer Devlin.

e.      As a clear violation of ACPD Use of Force Policy, it is my opinion that Officer Floriani was required to write a report pertaining to his involvement in his 22:02:08 call with K9 Officer Devlin. The Unit History Log clearly reflects his presence. Curiously, Officer Floriani does not account his recorded 6 hours, 15 minutes and 9 second involvement in this

call.  In my opinion, this was not a simple oversight. ACPD would have benefitted by learning the answers to at least two important questions. *First*, "Why was Officer Floriani with at least Officer Abrams for 6 hours, 13 minutes and 54 seconds, post incident? *Second*, "What was it that took Officer Floriani 6 hours, 14 minutes and 51 seconds to resolve about this incident before clearing this call?"

f.      The Unit History Log reflects that Officer Floriani and K9 Officer Devlin were dispatched to the same call at the same time (22:02:08). Officer Floriani arrived 5 seconds before K9 Officer Devlin (22:04:07). Clearly, four Officers (Abrams, Moore, Floriani and Devlin) are present at the same time, same place and dealing with Mr. Stadler. Yet, [1] "Why was Officer Floriani's report overlooked?" [2] Why did it take Officer Moore 3 hours, 11 minutes and 24 seconds, post dog bite (22:04:14), to write a short one paragraph report and clear his call? [3] Why did it take Officer Abrams 6 hours, 14 minutes and 3 seconds, post dog bite (22:04:14), to write his two-page report and clear *his* observation?" [4] Although K9 Officer Devlin cleared his call 3 hours, 15 minutes, 25 seconds after his dog bit Mr. Stadler (22:04:14), why was it acceptable to the ACPD for him to take 17 more days to produce his three-page report dated 3/30/13?   As a generally accepted standard in American law enforcement, police officers are required to write their report contemporaneous with the event.   This becomes their "recollection recorded" for posterity.

F.      When K9 Officer Devlin released his dog with a "command" to bite, he did not have a factual basis (probable cause) to believe Mr. Stadler was armed or was offering up any substantial resistance.  He did not hear of any threats made by Mr. Stadler. Officer Moore or Officer Abrams did report that Mr. Stadler threatened them with a weapon. Although he claims that he saw Mr. Stadler assaulting Officer Abrams and Moore, neither officer reported that they were victims of an assault in the presence of K9 Officer Devlin.  Both Officer Moore and Officer Abrams simply heard K9 Officer Devlin's commands to stop resisting or he would release his dog and it would bite.  K9 Officer Devlin's assertion that, "Based on the circumstances of this incident, I feared for Officer Abrams and Moore's immediate safety and if I didn't act instantaneously, we would have sustained injuries from the suspect. I moved in and commanded my canine partner to apprehend the suspect."  This too begs another important question, "Why did he not just reach down and help complete handcuffing?  After all, he was the fourth ACPD officer to arrive on scene.  Mr. Stadler was already on the ground and, if his sworn testimony is to be considered, was unconscious, if not semi-conscious or delirious, from a serious beating by Officers Abrams and Moore.   Therefore, in my opinion, what K9 Officer Devlin was witnessing was Mr. Stadler doing what little he could to exercise his right to defend himself from unreasonable, unnecessary and excessive force.

G.      Historically, the generally accepted primary purpose of police patrol dogs is to find persons, places or things.  Usually patrol dogs are used as searching tools, utilizing their keen olfactory sense, after initial patrol officer efforts to find what they are looking for have proven fruitless.  It is my opinion that the Unit History Log offers good circumstantial evidence that "finding" a suspect was *not* the policy or the practice of the

ACPD on March 13, 2013. In the mix of officers dispatched, I notice that K9 Officer Devlin was dispatched *first*, essentially to assist Officer Abrams with a resisting suspect. There was no need to employ a searching <u>tool</u> find a purported resisting suspect, Mr. Stadler. In my opinion, rather, K9 Officer Devlin was dispatched *first* for the specific purpose of using his dog as a <u>weapon</u> to bite Mr. Stadler. In other words, it was the ACPD's intent, as expressed in their policy, training and practice, to allow K9 Officer Devlin to inflict serious injuries on Mr. Stadler when dispatched and before he arrived. All that was needed from K9 Officer Devlin was a rationale to release his attack dog, even if it took him 17 days to develop one.

H.      In the instant case, I note the striking similarities in pattern and practice where ACPD dogs have been used as weapons to inflict serious and invasive biting injuries to citizens in Atlantic City in three other recent cases (*Ref.* [1] 2013 Case of Julius ADAMS v. City of ATLANTIC CITY, et al. Civil Action No. 2013-CV-07133, [2] 2013 Case of David Connor CASTELLANI v. CITY OF ATLANTIC CITY, et al. Civil Action No. 13-cv-05848 (RMB) (AMD) and [3] 2014 Case of Charlie HARRISON v. CITY OF ATLANTIC CITY, et al. Civil Action No. 14-CV-06292 (JHR) (AMD).

I.      Dogs are just dogs. They cannot attain a higher status in life than their genes have already dictated. Dogs are amoral. They cannot think in abstracts like people think in abstracts. They cannot analyze facts, exercise common sense or form judgments. Therefore, dogs cannot tell you who a good person is (a "non-suspect"), and should *not* be bitten, nor can they tell you who a bad person is (a "suspect"), and should be bitten. It is all the same to the dog. Given similar conditions as are found in most training scenarios, the dog will as readily bite "non-suspects," including children, the elderly and

police officers or, for that matter, any other low level, non-violent and non-threatening suspects the same as they may bite the dangerous "suspects" that they encounter during actual service. Unfortunately, that is exactly what happened to Mr. Stadler once he was stopped by Officer Moore.

J.      Responsible police dog training, therefore, must be directed toward making the dog's response, in real street applications, to his or her handler's commands as predictable as it is reliable. Essentially, proper dog training is a slow daily methodical process of behavioral modification to turn the dog's inborn drives, instincts and character traits into qualities that demonstrate a benefit and not an unnecessary a detriment to those being served (in the instant case, the citizens of City of Atlantic City and its police officers).    Overall, the training process requires patience and perseverance in the application of operant conditioning, where desirable behaviors are positively reinforced through appropriate rewarding (*i.e.* vocal and/or physical praise, activity or food rewards). Further, undesirable behaviors are corrected and extinguished, mostly through the introduction of an element of pain (*i.e.* vocal and/or physical correction, deprivation of activity *or* food rewards). This includes the situations, in training or actual deployments, where the dog has demonstrated a propensity to inappropriately attack or bite anyone. The point is, this ACPD dog was obviously trained to and permitted to bite persons being held down by police officers (*Note*: By definition, this is a domesticated dog that was trained and permitted to behave un-domestically by viciously biting a defenseless person on the ground.) Especially in law enforcement, an attacking and biting dog does not benefit anyone. No one is safer in the presence of an attacking and biting dog. Rather, the biting dog exposes everyone, police, suspects and innocent 3rd

parties, anyone unfortunate enough to be in proximity, to unacceptable risks of serious injury or death. The handler, trainers, supervisors and managers of the ACPD K9 program failed to appreciate that there is no advantage to be realized with their attack-trained "find and bite" dog. Furthermore, as a force option, generally accepted use of force standards requires that a handler <u>must</u> be under direct assault in to justify the release of the dog to bite and inflict a serious injury.

K.       Here, Mr. Stadler was being held down by at least two and possibly three ACPD officers, if Officer Floriani is counted, when the dog was ordered to bite. When the K9 cruiser door was opened at the scene and the dog was released, it was physically impossible for Mr. Stadler to escape and, as the physical evidence (*Ref.* injury photos and medical records) indicates, he did not fare well either against the three or four ACPD officers with their attack dog on scene. Perhaps most disturbing is Mr. Stadler's claim that he was unconscious when the dog bit him in the left inner thigh (*Depo*: 157/13-19). During that beating he lost consciousness (*Depo*: 158/11-13). When he woke up, there was a dog around his leg (*Depo*: 158/14-16). He was still receiving strikes and kicks, while being told to stop resisting (*Depo*: 158/17-21). He was confused because he was in handcuffs in the front, the dog was around his leg and he couldn't move. It is my opinion that the location of the bite wounds to his left thigh are good circumstantial evidence that Mr. Stadler was unable to defend himself from the dog's biting while unconscious (*Depo*: 157/13-19). When being bitten by a dog, it is a person's natural reaction to try to fend off the attack by striking or kicking the dog. It is not unusual under these circumstances to find defensive bite wounds primarily to the victim's forearms, hands, lower legs or feet. Except to the knuckle of his left hand, Mr. Sadler does not have substantial defensive

wounds as might be expected from a male adult in a physical position to wage a defense from an attack trained dog inflicting highly conditioned crushing "full-mouth" punctures and lacerations to the soft vulnerable tissues of the human anatomy.

L.      The ACPD K9 Program Administrators failed to recognize the latitude given in their Canine policy for K9 Officer Devlin to conclude a K9 operation by ordering his dog to bite just about anyone he deemed necessary, without clear guidelines regarding felony/misdemeanor distinctions or active/passive resistance distinctions exhibited by suspects. For example, the biting of a non-threatening suspect being held down by police officers cannot be justified from a training (*Note*: It is my opinion that an agency's first expression of policy is found in their training.) *or* actual deployment perspective. K9 Officer Devlin was well aware that the ordered dog biting was possible because there was not going to be any critical review of this important point by ACPD management or executives. Competent police K9 trainers understand that dogs are cursory hunters, requiring movement of their prey before they can be sufficiently stimulated [*exceed sensory thresholds*] to bite and eventually vanquish their prey. Motionless people, in and of themselves, do not pose a credible threat to anyone. It is distressing that this purportedly "domesticated" dog bit a human being, being held down by several other human beings. This is contrary to a domesticated dog's general nature and strongly suggests that (1) he was improperly trained to bite the bodies of motionless people and (2) being improperly trained, he had to be specifically ordered and targeted to bite a man [Mr. Stadler] being held down by multiple other police officers, even though "they" were not necessarily motionless. Competent dog trainers and K9 Unit supervisors always know what a dog was trained to do by looking at what the dog does. A dog is incapable of

figuring out what to do on his own otherwise.

M.      There is nothing in the material reviewed so far to suggest that this dog was disobedient or not going to be responsive to K9 Officer Devlin's commands. Unfortunately for Mr. Stadler, this dog was going to bite someone once he was released. The removal from the cruiser the same weight and effect in the dog's brain as a command from his handler to bite that he was to bite and keep biting someone, until I stop you. Clearly, K9 Officer Devlin knew that Mr. Stadler was so positioned under him that he was not only the easiest target, so long as his dog was able to focus his attack and biting, he was the only target of the biting. Under these circumstances, with all the activity, K9 Officer Devlin and his fellow officers were very lucky that they too were not bitten by this over-aggressive dog.

N.      A police dog does not know, and cannot be taught, any of the take-down maneuvers, control holds, or defensive blocks that a police officer learns as part of his self-defense training. A police dog cannot execute or be taught a control hold, foot sweep, arm-bar, wrist lock, etc. All a police dog can do is to attack and bite in the manner of any aggressive dog. (*Note*: Because dogs do not have hands, it is not possible for a dog to grab anyone either. It is impossible for them to make an arrest or apply handcuffs. They can only bite, much the same as if they were biting prey.) In this respect K9 Officer Devlin's dog is no different than any large aggressive dog attacking its prey, be it human or animal.

O.      Dogs are not good weapons. They cannot be effectively aimed like other weapons (*i.e.* gun, baton, taser, mace, etc.). Dogs are easily distracted. They are prone to act spontaneously and independently of their handlers. They are amoral. They cannot

analyze facts or exercise common sense or good judgment like people can. They cannot make distinctions between good people or bad people, suspects or non-suspects or who should be bitten or not bitten – it is all the same to them. Under certain conditions, they will as readily bite their handler or other innocent persons without provocation. According to the K9 policies of those police agencies that have K9 Units, including the ACPD, supervising the dog is the handler's greatest responsibility. But as is present in the instant case, it should not be surprising to anyone that tragic consequences can occur when police dogs are irresponsibly handled and inadequately supervised.

P.     The natural reaction of a person when attacked by a dog is to try to fend off the dog's attack. This usually takes the form of kicking and/or striking the dog, sometimes even running away from the dog, if that was physically possible. Typically, as is present in the instant case, there are multiple wounds caused by the dog's biting (*Ref.* photos of Mr. Stadler's left leg). This is good circumstantial evidence that the dog was not biting in conformance with his "bite and hold" training, rather being permitted to inflict serious bodily injury by repeatedly biting. It was not physically possible for Mr. Stadler to escape because he was being held down by two or three police officers and absorbing repeated blunt force to his face and head. From the start, Officer Abrams, Moore and Devlin were forcing a confrontation with Mr. Stadler, an unarmed suspect without the ability to offer up any substantial resistance. That was not probable cause to believe that Mr. Stadler was dangerous. See *Tennessee v. Garner*, 471 U.S. 1, (1985). Yet K9 Officer Devlin ordered his dog to attack while Mr. Stadler was being held down and beaten. Because a police dog attack is force greater than a police baton strike and was force reasonably capable of causing serious bodily injury, the dog attack violated

generally accepted law enforcement *use of force* standards as an unwarranted escalation of force.

Q.      Promulgation of a bad or a wrong policy by the ACPD is not a simple oversight. The ACPD policy clearly offers wide discretion for a line-level dog handler to abuse their position as law enforcement officers and take what they would claim otherwise is a "tool," albeit a searching tool, and use it as a means to inflict horrific pain and injury the same as a "weapon," even against defenseless persons or those persons they may take a personal dislike. A handler like K9 Officer Devlin allows his dog to bite with confidence that he will not be held accountable or disciplined by management for their indiscretions. (*Note*: As a conclusion to their deployment, the "Find & Bite" deployment method as used by ACPD essentially allows for the infliction of serious injuries by dog biting, of those that might "run" from, "hide" from or "fight" with police. Also note the "Full-mouth/Bite & Hold" standard was clearly violated against Mr. Stadler re: post attack, he was exhibiting multiple dog-inflicted biting lacerations and punctures around his left thigh.).

R.      Hundreds, if not thousands of times every day, U.S. police officers without dogs are skillfully arresting dangerous suspects without injury to anyone. Nevertheless, the fact remains, had Mr. Stadler produced a gun or any other weapon, K9 Officer Devlin and his two or three assisting officers would have been justified in defending themselves by shooting Mr. Stadler, once they saw the gun pointed at them and, no doubt, would not hesitate to exercise that force option. Unfortunately for Mr. Stadler, although he was not armed and was not threatening violence against officers, rather defending himself, Officer Stadler still needed a pretext of non-compliance with his orders before he could

justify giving his dog a bite command. It is important to mention that no weapons were used or threatened by Mr. Stadler in his encounter with the police on March 13, 2013. No guns or other weapons were found post dog attack and biting, including when there were other police applications of serious injuring force by these officers.

S.     Be that as it may, when an officer confronts a potentially combative person, the officer's primary objective is to induce the person into a passive and non-threatening posture. Officers accomplish this through self-defense tactics (control holds, take-downs, etc.) and calm, but skillful verbal persuasion. For reasons explained above, a dog is incapable of such tactics and cannot offer skillful verbal persuasion. Worse, by attacking, the dog encourages the opposite of what the officer wants. The person under attack responds in some violent and usually uncoordinated manner to stop the dog's attack which in turn, as a result of his attack training, encourages the dog to bite more and press its attack more violently.

T.     Additional problems arise given the dog's inability to recognize danger and a man's willingness to use a weapon, if he has one, against the dog. Unlike a gun or baton, a dog cannot be aimed or pointed. An officer who realizes he must stop the suspect from raising his right hand that holds a weapon knows to strike at the right hand. In the same situation, the dog is incapable of making such a distinction. The trained police dog ordered to bite will bite the suspect's left arm he offers the dog even though the suspect may hold in his right hand an ice pick or knife ready to plunge into the dog's skull when it bites. This is why the German Customs Police stopped training their dogs to attack and bite but instead, trained the dogs to circle and bark. The German police lost too many dogs to suspects who let the dogs bite one arm protected by padding while the suspects

used their other free arm to stab the dogs to death.

U.      Every handler understands how potentially vulnerable his dog is to a weapon in the hands of a person under attack by the dog.  Consequently, when the dog attacks a person, a handler's natural tendency is to observe and protect, if necessary, his beloved canine partner from injury.  This fact reinforces my opinion that Officers Abrams, Moore, Floriani and Devlin were always watching Mr. Stadler's hands from the moment they first observed him.  So, it remains a standard police practice that, if a handler is operating under a belief that a suspect does have a gun, the dog will not be released. They understand that the risk exceeds the dog's ability to adequately respond before it would be shot, seriously hurt or killed.  Instead, a handler simply calls for reinforcements, such as a SWAT team. In the instant case, the ACPD devoted six officers to deal with Mr. Stadler.  In my opinion, six officers are quite sufficient to deal with one unarmed suspect.

V.      Thus, by permitting his dog to attack and bite, K9 Officer Devlin increased the risk that he would be forced into a more violent physical confrontation with Mr. Stadler if only to protect his dog from injury when he was biting.  Moreover, by letting his dog bite, K9 Officer Devlin increased the risk of a shooting and endangered others nearby to the consequences of errant gunfire.  It is common knowledge that when attacked by a police dog, if they can, a person responds by trying to stop the dog's attack.  If the person is unarmed, the reaction is usually limited to kicking and/or striking the dog, and/or trying to run away from the dog. If the person is armed with a gun or knife, the attack usually prompts the person to use the weapon if only to stop the dog's attack.  For decades, police officers in similar circumstances regularly shoot large aggressive dogs that threaten them.  Therefore, had Mr. Stadler been armed with a gun (fortunately he was

not) the dog attack would have given him a reason to use the gun, if only to shoot the dog. Of course, had that happened K9 Officer Devlin may have believed that his life was in danger and responded by firing his gun. The same would be true of Officers Abrams, Moore and Floriani. For this very reason, most (if not all) competent police dog trainers instruct that a police dog should not be used to attack a person known to be armed with a gun or knife. I know of no SWAT or specialty units that use a dog "on point" in confronting armed suspects either, while numerous police departments expressly forbid the use of dogs to attack a suspect known to be armed (e.g., Riverside Police Department, LAPD, Escondido Police Department). I also know of many incidents where the police have ordered a police dog to attack a suspect known to be armed. In every case the police ended up shooting (and usually killing) the person once the person used his weapon against the dog.

W.      The ineffectiveness of an attacking dog as a control hold tactic is shown in this case. It was the officers who ultimately subdued and handcuffed Mr. Stadler, not the dog. All that the dog accomplished by attacking and biting Mr. Stadler was to inflict unnecessary serious injuries upon Mr. Stadler. The release of his dog to bite Mr. Stadler also drew K9 officer Devlin and the other three ACPD officers, closer into a close-quarters confrontation with a subject who was extremely agitated (frantic) because a large aggressive dog was attacking and biting him. A better outcome could have been realized by K9 Officer Devlin if he had done what he should have done, used his policing skills to calm Mr. Stadler and waited a few precious seconds, if needed, for his cooperation. Competent police officers understand that most persons comply with their directions, orders or commands. Mr. Stadler would have been taken into custody the same manner

as when police officers without dogs regularly do, minimizing, if not eliminating the risk of injury or death to anyone when making an arrest of an unarmed property crime suspect.

X.      It is generally accepted in law enforcement that before an officer uses physical force, classified in the "intermediate force" category, and that force creates a substantial risk of injury, the officer should warn the suspect, if feasible. The warning should advise the suspect of the intended use of force and the probable consequence ("stop or I'll shoot"; "come out or else I'll release the dog and you may be bitten"). See, for example, *Vathekan v. Prince George's County*, 154 F.3d 173, 179 (4th Cir. 1998) (holding that failure of police dog handler to give warning before letting dog bite violates the Fourth Amendment); *Deorle v. Rutherford*, 272 F.3d 1272, 1283-84 (9th Cir. 2001) ("Appropriate warnings comport with actual police practice.") and *Casey v. Federal Heights*, 509 F. 3d 1278 (10th Cir. 2007) (holding that the presence of an adequate warning and opportunity to comply voluntarily is crucial).

Y.      Fundamentally, K9 Officer Devlin did not vocalize as he should have and offer a crucial opportunity to comply voluntarily in advance of ordering his dog to bite. Had he done so, Mr. Stadler would not have been bitten because the dog would have been physically restrained until it was noted that he [1] heard the warning and [2] had a real opportunity to comply. As it was, from K9 Officer Devlin's arrival recorded at 22:04:07 until biting (*Note*: aka, in dog handler's parlance, "apprehension") It is important to mention that this was clearly not a handler defense issue posed by a physically threatening suspect waging a life endangering attack.  Such attacks would require the dog's immediate response to defend an incapacitated handler. K9 Officer Devlin was

certainly not incapacitated. The other officers he claimed to be assisting were not incapacitated either.

Z.       The ACPD Use of Force Policy addresses the authorized use of physical force to affect an arrest, prevent escape, or overcome resistance. Clearly the standard is addressing the use of force with actively resisting criminal suspects and not innocent, non-violent and non-threatening persons. Any use of force, in those contexts, would subject innocent, non-violent and non-threatening citizens to unreasonable searches and seizures in violation of the protections afforded under the 4th Amendment. However, according to that same policy, there appears in the instant case a clear and unwarranted escalation of force with the ordered dog biting, even though the ACPD policy conditions were not met. K9 Officer Devlin simply released and permitted his dog to repeatedly bite Mr. Stadler, an unarmed property crime suspect, in spite of clearly articulated policy provisions and case law to the contrary.

AA.    It is generally accepted that a law enforcement officer has a duty to intervene, if there is an opportunity to do so, when another officer uses unreasonable, unnecessary or excessive force. Although Officers Abrams, Moore and Floriani were not dog handlers, they had a duty to intervene when they saw K9 Officer Devlin using his dog to inflict unreasonable, unnecessary and excessive force upon Mr. Stadler. In virtually every state, including New Jersey, police training standards require (by oath of office) that police officers witnessing another using unnecessary or excessive force must intervene at least vocally (i.e. "Stop!" "Enough!" "Police, don't do that!") and attempt to physically intervene to take control of the situation to achieve a professional conclusion. Thereafter, percipient witness officers are obliged to report the incident to their supervisors for

investigation and resolution. The ACPD has such a policy provision in its Use of Force Policy. However, *all* of the involved ACPD officers breached this duty by making no attempt to stop (or report) K9 Officer Devlin from using unreasonable, unnecessary and excessive force against Mr. Stadler once the biting was underway. The Chief, the department executives, managers and supervisors breached this duty also by not providing adequate supervision and policy guidance and, perhaps most importantly, by not calling for an investigation once this egregious conduct was discovered.

BB.     In sum, the laws and the general use of force policies in the United States have not changed for decades. The fact that the ACPD condoned the actions of K9 Officer Devlin and three other ACPD officers and has not changed their policy is tantamount to an unwritten policy of routinely tolerating the use of serious injuring force. In the instant case, perhaps because all involved parties have a use of force issue facing them, *no* officer from the ACPD said anything to K9 Officer Devlin or took any action to prevent him from using his dog in a manner that would clearly result in additional charges of unreasonable, unnecessary and excessive force against Mr. Stadler, an unarmed, property crime suspect. For their failure to train, manage and supervise, when they had a clear opportunity to do so, well in advance of the March 13, 2013 incident, I conclude that the Chief of Police and the City of Atlantic City share culpability for their malfeasance.

CC.     In the interest of improving and promoting better guidance in K9 usage, the ACPD would benefit by adopting "Rules of Engagement" that would clearly define the acceptable conditions that must be present to permit one of their dogs to bite. For example:

"Outside of sanctioned training, department dogs are only permitted to bite suspects when the officer is responding to an immediate and a credible threat of serious injury or death to himself or another."

(*Note*: In the instant case, this was clearly not a handler defense issue posed by a physically threatening suspect waging a life endangering attack. Such attacks would require the dog's immediate response to defend his incapacitated handler. K9 Officer Devlin was certainly not incapacitated. The other officers he claimed to be assisting were not incapacitated either.)

The ACPD would benefit by adopting "Rules of Engagement" that would define the prohibited conditions where their dogs are *not* permitted to bite. For example:

"Other than responding to conditions that would permit department dogs to bite, department dogs are not allowed to bite:

1.      Identified persons, located persons, warrant suspects, non-violent felony or misdemeanor suspects.

2.      Juvenile subjects.

3.      Mentally impaired persons due to illness *or* injury.

4.      Persons impaired because they are under the influence of anything.

5.      Non-suspects or police officers, unless acting in a training capacity.

12.     I base my general police use of force opinions upon the following:

A.      Aside from K9 Officer Devlin, when he was stopped by Officer Moore, Mr. Stadler was unfortunate to be within the reach of Officer Abrams, then Officer Floriani and finally with K9 Officer Devlin with his attack trained dog. They were attempting to make an arrest of a purported physically resistant unarmed, property crime suspect. By

all indications, although the reports do not indicate which hand, Officer Moore applied at least one handcuff.

B.       At this juncture, it is troubling that two experienced police officers could not complete the handcuffing process on a suspect that was at least compliant with Officer Moore's initial efforts to block his path. Immediately, Officers Abrams and Moore are drawn into a 1 minute, 5 seconds struggle with Mr. Stadler to apply the second handcuff. Their reports, however, are silent regarding how Mr. Stadler sustained the several injuries to his face and head reflected in his medical reports. This fact, in and of itself, gives rise to an even greater problem at issue in the instant case. ACPD Use of Force policy requires, as virtually all U. S. police departments generally require in their oath of office that, "Personnel have a legal, moral and ethical obligation to report all situations in which force is used illegally by anyone. Personnel are encouraged to do whatever they can to interrupt the flow of events before other personnel do something illegal and before official action is necessary. Personnel can serve each other and the public by simply saying or doing the right thing to prevent fellow personnel from resorting to force illegally or inappropriately."

C.       Unfortunately, Mr. Stadler was the victim of Officers Abrams, Moore and Devlin's failure to appreciate their department's policy as well as ACPD's failure to enforce their own clearly articulated policy (*Ref.* Atlantic City Police Department's Use of Force Policy dated November 5, 2010). Mr. Stadler's intake medical records dated 3/13/13 indicate, post dog bites, that he complained of being beat up by police and was bitten by their dog. He sustained dog bites to the [1] lateral aspect of the left thigh, [2] left hamstring and [3] left quadriceps. He sustained [4] a deep contusion of the left eye,

[5] a facial contusion above the right eye, [6] a closed head wound over the right forehead.  Other than the dog bites, the ACPD police reports are silent as to who or how these head injuries were inflicted on Mr. Stadler.

D.      Under the circumstances, I notice that Officer Moore is observing that Officer Abrams may be culpable for an aggravated assault (*Ref.* N. J. Stat 2C:12-1. Assault, Sec. b. Aggrivated assault. A person is guilty of aggravated assault if he: (1) Attempts to cause serious bodily injury to another, or causes such injury purposefully or knowingly or under circumstances manifesting extreme indifference to the value of human life recklessly causes such injury.), against Mr. Stadler, in his response to Mr. Stadler's alleged flight from Officer Abrams. Officer Abrams's response was to further escalate the force used against Mr. Stadler by turning him around and punching him in the face, then escalating again to tackling.  As it was, Mr. Stadler's path was blocked by Officer Moore's car and, as he testified, he was complying with Officer Moore's orders to put his hands on the car.

E.      Generally accepted police use of force standards prohibit intentional head/face strikes unless, minimally, the officer is responding to an immediate and credible threat of sustaining a serious injury.  In the instant case, however, Officer Abrams reported, "I was able to tackle Stadler from behind."  In my opinion, Officer Abrams was not entitled to sneak up behind Mr. Stadler. Then, as Mr. Stadler testified, turn him around, punch him in the face repeatedly. By facing away from Officer Abrams, Mr. Stadler did not pose a credible threat of injury to Officer Abrams.  Under these circumstances, the highest level of force that Officers Moore or Abrams could justify was a "firm grip." They could only justify an escalation of force based upon Mr. Stadler's reactions thereafter.  Also, basic police weaponless defense training offers several viable options for control holds or take-

downs, if that is the officer's true objective. Usually this is done to prone out a dangerous suspect for safe handcuffing – the preferred method of physically arresting real dangerous suspects.

F.      It is worthy to mention that, in keeping with generally accepted standard practice and to reduce the risk of confusion during rapidly unfolding events, police officers forming an intent to arrest first inform the suspect that he is under arrest, and the charges, unless of course, the officers are in uniform *and* the charges are obvious. Typically, officers will then gain the suspect's cooperation by firmly directing that the suspect place his hands behind his back for handcuffing. It may be that the circumstances involving an impaired or a potentially uncooperative suspect may require an officer to apply a firm grip (*Note*: A "firm grip," with about the same amount of force as a firm handshake, is usually applied to a suspect's elbow. The firm grip is generally considered to be the first level of reportable use of physical force in a law enforcement context. It affords an arresting officer an opportunity to further evaluate the level of cooperation he is about to receive, or not receive from the suspect, as he proceeds through the arresting processes. It all culminates in handcuffing and safe transportation to booking. Based in <u>the level of the suspect's resistance</u> [Emphasis], the officer may be justified in escalating to greater force options. But again, that decision to escalate force is always based in the suspect's actions.). Thereafter, the safe positioning of the suspect in preparation for the application of handcuffs is important to all concerned. The proper application of handcuffs usually calms all parties in volatile circumstances, especially during arrests.

G.      The issues generated by this report do not turn on whether the incident emanated from an attempt to stop a fleeing burglary suspect. Most disturbing are the officer's

conflicting reports with each other about the same incident, involving the same person, at the same time and at the same location. It is just that two experienced police officers (Abrams and Moore) were having an unusually difficult time handcuffing an unarmed property crime suspect, a third percipient witness officer (Floriani) did not submit a report at all, a fourth K9 officer (Devlin) viewed the event as a life-endangering assault waged by Mr. Stadler against every officer on scene and within 7 seconds ordered his dog to bite Mr. Stadler as he was being held on the ground. In my opinion, it is always possible to see what was actually possible by the officers by understanding what happens after the dog has bitten the suspect. In the instant case, police officers did what their dog was incapable of doing, they finished handcuffing Mr. Stadler without further incident.

H.      Generally accepted law enforcement report writing standards require that, [1] All critical and pertinent facts and/or observations of the incident known to the officer at the time the report is generated must be included in the report. [2] Should additional facts become known later, the original report should be supplemented and included in the case file and/or cross-referenced with other reports pertaining to the same persons or incident. [3] Facts or observations not reported or documented, cannot be relied upon later as facts or observations. Moreover, the primary guiding principle in <u>all</u> police reports is that the <u>reports must be accurate</u>. This is because inaccurate reports serve no useful purpose to anyone.

I.      As mentioned earlier, Officer Abrams, Moore and Devlin reported that he ordered Mr. Stadler to stop resisting. On this point, it is worthy to mention that the officers also indicate that Mr. Stadler refused to comply. Mr. Stadler vigorously disputes this assertion. In my opinion, these facts are consistent with and good circumstantial

evidence of an exhibition of the ACPD officers, supervisors, managers and executive's willingness to accept a constructed, albeit nebulous and non-descript rational of pending danger as, a pretext to engage in excessive force and thereafter cloak the incident in the "Police Code of Silence," as a cover for officer misconduct (*Ref.* Wikipedia the Free Encyclopedia definitions re: "Blue Wall of Silence," "Blue Code" and "Blue Shield," etc. speaking to the phenomena of police officers garnering or eliciting silence as a means to cover for personal misconduct, criminal activity or internal corruption.  In the interest of time, further discussion on this point is omitted.).

J.     Clearly, the ACPD officers failed to appreciate the four generally accepted bright-line rules governing the use of force in law enforcement.  They are:

    1.     The objective in the use of any force must be to achieve <u>control</u> of a person or a situation.

    2.     Any use of force must be <u>reasonable</u>.

    3.     Any use of force must be in <u>direct response to an immediate and credible threat</u> (of sustaining a serious injury or death).

    4.     Any force used must <u>comport with department policy and the law.</u>

K.     In most states that I am aware of, use of force standards and rules of engagement for law enforcement officers are constructed around a use of force continuum.  For example, in California, POST taught the conventional use of force for police officers in terms of a force continuum under Unit Guide 26, generated circa 1991.  The benefit of using a force continuum is that it further clarifies an officer's Rules of Engagement when dealing with resistant suspects.  My experience teaching this subject in law enforcement extends from the Los Angeles County Sheriff's Department in 1972 as a Field Training

Officer, 1974 as an Academy Drill Instructor, as a SWAT Team Precision Marksman 1978 and a Special Programs Manager for the Patrol and Custody Divisions thereafter through 1988.

F.      It is widely held in American law enforcement that a police officer will only be as good as his training can make him.  Accordingly, to make the use of force subject easy to understand, especially in volatile and rapidly unfolding circumstances, "force continuums" were promulgated to provide guidance to an officer so he could quickly identify an appropriate response to an immediate and credible threat posed by a resistant suspect.  In the interest of promoting improved law enforcement responses to physically resisting suspects, I have included in this report a description of a generic, yet viable, force continuum and how it works.

## FORCE CONTINUUMS

1.      The use of force in law enforcement is a responsive/reactive event.  The responses by officers are based in the level of suspect resistance they are encountering.

2.      Force continuums are injury driven.  What this means is that, within the hierarchy of available force options, the tools or techniques posing greater probabilities of injuries, including death, are ranked higher on the scale.

3.      As a general rule, an officer is justified when escalating to and using "force-in-kind" against resisting suspects and not more.  To use more force than can be justified, likely results in the officer using unreasonable, unnecessary and excessive force.  However, each situation is evaluated according to the circumstances facing the officer and the suspect's actions at the moment any use

of force becomes necessary. That information is first gleaned from the officer's report, reflecting the "responsive link" between the threat posed and the level of resistance offered by the suspect's actions and the officer's response to those actions. The response by the officer is going to be viewed and analyzed within the context of (1) the level of force the officer elects to escalate to, (2) the intensity of the force application and (3) the duration of the force application. In other words, the intensity and how long the force application on the suspect lasted.

4. The use of physical force by law enforcement preemptively or as a retaliatory measure is not generally accepted by citizens, an employing law enforcement agency or the courts. Therefore, absent a clear link between the suspect's offensive actions and the officer's defensive reactions, the intentional infliction of injury for any reason whatsoever, including just for the securing of pain compliance from a suspect, is generally unacceptable and therefore, as a standard, prohibited.

5. The application of physical force to inflict pain or punishment only is specifically prohibited by state, federal and professional standards. Only the courts are entitled to impose punishment. Police or other persons are not entitled to inflict punishment out of anger, loss of emotional control or for retribution. To do so may be a crime in itself (*i.e.* a Civil Rights Violation or an Assault Under the Color of Authority, etc.), carrying with it internal discipline, termination and/or criminal penalties.

6. Force continuums are generally divided into three broad categories

governing the use of physical force.  In ascending order, they are "Controlling Force," "Injuring Force" and "Deadly Force."  They provide guidance as to the level of physical force that can be justified in response to the physical threat posed then and there by the suspects.

7.      Depending upon the law enforcement agency and their policing demographics, there may be minor differences in the placement of available force options (*i.e.* The LAPD places chokeholds in the deadly force category and the LASD positions choke holds in the injuring/intermediate force category.)  Within the concept of "escalation" and "de-escalation," a suggestion of a viable example of a generic Law Enforcement Force Continuum is as follows:

| SUSPECT'S ACTIONS | OFFICER'S ACTIONS | | BASIC OBJECTIVE |
|---|---|---|---|
| Life Threatening Attack | Deadly Force | DF | Stop, Produce Death/ |
| | | DF | Serious Bodily Injury |
| | Dog Attack (Bites) | IF/DF | Stop, Produce Serious |
| | | IF/DF | Bodily Injury (SBI) |
| | Choke Holds | IF/DF | Stop, Incapacitation |
| | | IF | Risk of SBI or Death |
| Physical Assault | Impact Weaponry | IF | Stop, Incapacitation, |
| | | IF | May Produce SBI |
| | Martial Arts Techniques | IF | Stop, Incapacitation, |
| | | IF | May Produce SBI |
| Active Resistance | Electronic Devices | IF | Stop by Shock - Stun |
| | | IF | May Produce Injuries |
| | Chemical Agents | IF | Stop-Irritate/Disorient |
| | | IF | May Produce Injuries |
| Passive Resistance | Pain Compliance | IF | Physical Compliance, |
| | | IF | Injuries not expected |
| | Control Holds | CF | Body Control, Risk of |
| | | CF | Injury is Minimal |
| (First Level Reportable) | Firm Grip/Hands-on | CF | Physical Control, by |
| | | CF | Directing or Ordering, |
| | | CF | Injuries are Unlikely |
| Cooperation | Verbalization | CF | Controlling Others via |
| | | CF | Persuasion, Injuries |
| | | CF | are Unlikely |

| In-view | Presence | CF | Influence Behavior |
| | | CF | of Others, Injuries are |
| | | CF | Unlikely |

G.     As with most current U.S. cases dealing with the use of force, the three-part test as given in *Graham v. Connor*, 490 U.S. 386 (1989) must be considered.  Specifically, the overall analysis of the use of force requires an examination of the severity of the offense the officer suspected at the time the force was used, (1) the level of threat the suspect posed to the officer or another, (2) the level of resistance offered up by the suspect and (3) any attempt by the suspect to evade arrest by flight.  In review of Mr. Stadler's reported conduct, it was only after Officer Abrams provoked Mr. Stadler to non-descript heightened action, in his vain attempt to defend himself from a surprise police assault, that they produced the needed felony charges worthy enough to justify their application of serious injuring force. Mr. Stadler's reported resistance, such as it was, was slight until he was rendered "unconscious." He did not attempt to evade arrest by flight, mostly because it was not physically possible with three police officers and an attack dog on top of him.  According to the Graham factors, where the suspect poses only a remote and theoretical threat to officer safety and where the officers have not attempted to make a proper arrest, it is my opinion that it is objectively unreasonable to use serious injuring force or order a police dog to bite a suspect to merely subdue that suspect.  Thus, failing the three-part Graham test, I conclude that Officers Moore, Abrams and Devlin's use of serious injuring force in the form of tackling from behind, inflicting at least two facial strikes, a closed head wound, not to mention blunt force body kicks and an ordered dog bite were objectively unreasonable and therefore excessive force in violation of the 4th Amendment.

H.      Because the use of injuring force and the K9 deployment were both unnecessary and unreasonable as to Mr. Stadler, the assaults on him were *per se* unreasonable and unnecessary, it is my opinion that the ACPD officers intended to exert excessive force for retribution on Mr. Stadler, to teach him a lesson, for defying their authority (*Note*: aka in police parlance as "Contempt of Cop").   This deployment and use of force was ratified afterwards by the ACPD and therefore it was done pursuant to ACPD policy.   It is therefore my opinion that this incident is worthy of referral to the U. S. Department of Justice (FBI) for investigation of a federal civil rights violation under U. S. Code, Title 18, Section 241 and 242.

I.      I am informed by plaintiff's counsel that additional material may be produced. My review of that material may serve as the basis to generate additional opinions and report further on this case.

///

///

///

///

///

///

///

///

///

///

///

In the matter of Steven STADLER v. City of ATLANTIC CITY, et al., I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct. Executed, this 6th day of February 2017, at Grass Valley, Nevada County, California.

*Van Ness H. Bogardus III.*

Van Ness H. Bogardus, III.

**BOGARDUS, EXHIBIT A:  February 2013 through February 2017**

**Re:  Stadler – last four years of activity, in conformance with Federal Rule 26**

**Depositions**

*Youngblood v. City of Bakersfield, CA (2013)*

**Trials**

*Bourland v. City of Redding, CA. (2013)*
*Watkins v. City of Sacramento, CA. (2016)*

**Court Hearings**

# THE 2017 PROFESSIONAL RESUME OF

## VAN NESS H. BOGARDUS, III.

DATE OF BIRTH: 15 January 1948          PLACE OF BIRTH: Pasadena, California

EMPLOYMENT:

**WELCOME HOME VETS, Inc:** Board of Directors, Ministering to Warriors
248 Mill Street, P.O. Box 189, Grass Valley, CA 95945

**READY AMERICAN, LLC:** President and Chief Executive Officer
10556 Combie Road, PMB 6222, Auburn, California 95602-8908
(Refer to Attachment A)

Senior Investigator, Foundation Health Federal Services, Foundation Health Systems Inc.,
Program Integrity, Special Investigations Unit (PI/SIU)
2025 Aerojet Road, Rancho Cordova, California 95742-2348
(Refer to Attachment B)

Professor, Administration of Justice, Adjunct Faculty, Staff Range Master, Sierra College
5000 Rocklin Road, Rocklin, California 95677
(Refer to Attachment C)

**STARFORCE 1,** Law Enforcement Practices, Police Dog Forensics and Training Expert
10556 Combie Road, Suite 6222, Auburn, California 95602-8908
(Refer to Attachment D)

Teacher, Range Master, Special Programs Coordinator and Police Service Dog Trainer
La Puente Valley Regional Occupational Program (LPVROP)
455 North Glendora Avenue, La Puente, California 91744
(Refer to Attachment E)

Senior Deputy Sheriff, Los Angeles County Sheriff's Department
4700 Ramona Boulevard, Monterey Park, California 91754-2169

| | |
|---|---|
| Date Appointed: | 13 January 1971, ID 008098, LASD Badges 3087 & 2901 |
| Date Retired: | 2 May 1988, ID 44-93326-1, Los Angeles County Employees Retirement Association – LACERA (Refer to Attachments F through N) |

ASSIGNMENTS:                                                      FROM:        TO:

| | FROM: | TO: |
|---|---|---|
| Patrol Division North, San Dimas Station Canine Services Detail          (Refer to Attachment F) | Jul'85 | May'88 |

1

| | | |
|---|---|---|
| Patrol Division East, Special Enforcement Bureau Canine Services Detail  (Refer to Attachment G) | Jun'80 | Jul'85 |
| Custody Division, Main Central Jail, Administration and Special Training Detail  (Refer to Attachment H) | Jun'79 | Jun'80 |
| Patrol Division East, Special Enforcement Bureau Special Weapons Team  (Refer to Attachment I) | Sep'78 | Jun'79 |
| Patrol Division East, Norwalk Station, Patrol and Lead Field Training Officer  (Refer to Attachment J) | May'76 | Sep'78 |
| Administrative Division, Training Bureau, Firearms and Staff Drill Instructor & Program Manager  (Refer to Attachment K) | Jan'74 | May'76 |
| Patrol Division East, Lakewood Station, Patrol, FTO and Patrol & Traffic Detail  (Refer to Attachment L) | Aug'71 | Jan'74 |
| Administrative Division, Training Bureau, Basic Training, Honor Cadet  (Refer to Attachment M) | Apr'71 | Aug'71 |
| Custody Division, Hall of Justice Jail, Pre-Academy "Off-the-Street" Program  (Refer to Attachment N) | Jan'71 | Apr'71 |

EDUCATION:                                                                                    DATE:

| | |
|---|---|
| High School Diploma, Lakewood Senior High School Lakewood, California | 1966 |
| Bachelor of Arts Degree, Public Management and Administration University of Redlands, Redlands, California | 1977 |

| CERTIFICATIONS: | ISSUING AUTHORITY: | DATE: |
|---|---|---|
| Certificate of Merit, Highest Achievement and Performance as Honor Cadet of Class 147 | Sheriff Peter J. Pitchess Los Angeles County Sheriff's Department | 1971 |
| Basic POST Certificate | California Commission on Peace Officer's Standards and Training | 1971 |
| Disorders and Riot Training (aka: D.A.R.T.) | California Commission on Peace Officer's Standards and Training | 1971 |
| Management and Supervision | Los Angeles County Professional | 1972 |

2

| | | |
|---|---|---|
| for Police Administrators | Peace Officer's Association | |
| Community Safety Team Inaugural Member | City of Cerritos, California | 1972 |
| Advanced Patrol and Special Enforcement Training (aka: A.P.S.E.T.) | Los Angeles County Sheriff's Department, Special Enforcement Bureau | 1973 |
| Vocational Teaching Certificate | California Department of Education | 1974 |
| Officer Survival and Internal Security | California Specialized Training Institute (CSTI), San Luis Obispo | 1975 |
| Intermediate POST Certificate | California Commission on Peace Officer's Standards and Training | 1977 |
| Advanced POST Certificate | California Commission on Peace Officer's Standards and Training | 1977 |
| Protection Dog Operator and Qualified Manager | California Bureau of Collection and Investigative Services, Department of Consumer Affairs | 1983 |
| Staffelfuhrerlehrgang (Staff Leader's Training) Police Dog Trainer's Instructor Preparation | PSP America, Shelton State Community College, Alabama Commission on Peace Officer's Standards and Training (POST) | 1984 |
| Staffelfuhrerlehrgang (Staff Leader's Training) Police Dog Trainer's Instructor's Course | PSP America, Shelton State Community College, Alabama Commission on Peace Officer's Standards and Training (POST) | 1985 |
| Police Dog Trainer's Instructor Re-certification | PSP America, Shelton State Community College, Alabama Commission on Peace Officer's Standards and Training (POST) | 1987 |
| Police Dog Trainer's Instructor Re-certification | PSP America, Shelton State Community College, Alabama Commission on Peace Officer's Standards and Training (POST) | 1988 |
| Preliminary Designated Subjects Vocational Education Teaching Credential, Full-time | California Department of Education | 1988 |
| Instructor:  Standard First Aid Community CPR and Basic Life | American Red Cross | 1989 |

3

Support for the Professional

| | | |
|---|---|---|
| Instructor:  Disaster Preparedness | American Red Cross | 1990 |
| Instructor:  Shelter Management Qualified Manager (Lifetime) | American Red Cross | 1990 |
| Licensed Training Instructor - Firearms, Range Master | California Bureau of Collection and Investigative Services, Department of Consumer Affairs | 1990 |
| Licensed Training Instructor - Batons (Straight and Side-handle) | California Bureau of Collection and Investigative Services, Department of Consumer Affairs | 1990 |
| Chemical Mace Instructor | California Bureau of Collection and Investigative Services, Department of Consumer Affairs | 1990 |
| Handler 12 Instructor | Gripton International Corporation | 1991 |
| Licensed Chief Testing Judge | American Temperament Testing Society (ATTS) | 1991 |
| Basic Firearms Safety Certificate Program, DOJ Certified Instructor | California Department of Justice | 1995 |
| Private Investigator and Qualified Manager | California Bureau of Security and Investigative Services, Department of Consumer Affairs | 1996 |
| Handgun Safety Certification Program, DOJ Certified Instructor | California Department of Justice | 2003 |
| Certified Police Firearms Instructor | National Rifle Association | 1974 |
| Certified Range Safety Officer, Basic Handgun & Shotgun | NRA | 1988 |
| Certified Chief Range Safety Officer Basic Handgun, Instructor | NRA | 2012 |
| Basics of Personal Protection in the Home, Instructor | | |
| Basics of Personal Protection Outside of the Home, Instructor | | |
| Certified GLOCK Armorer | | 2016 |

<u>SPECIAL LAW ENFORCEMENT QUALIFICATIONS:</u>

Police Firearms Instructor and Marksmanship Coach

- \* Qualified as a "Distinguished Expert" and "Grand Master" with revolvers and semi-automatic pistols (1971 through 1988).
- \* Member of the LASD 300 Club (a perfect target marksman, since 1975).
- \* Designated Team Marksman, Special Weapons Team, Special Enforcement Bureau (1978 – 1979, All-Bureau and 1980 – 1985, Red Team primary).
- \* AR-15 Service Rifle, Department Record Holder (445 points scored of a possible 450 during an official LASD Qualification Course, April 1979).
- \* National Rifle Association Police Firearms Instructor X 3 times (Qualified by firing a possible 600 points, with 59X of 60 hits, with a Smith and Wesson, Model 15, Duty 4" service revolver and service-grade ammunition, January, 1989.)

I provided basic through advanced revolver and semi-automatic pistol training to the Los Angeles County Sheriff's Department, as a Law Enforcement Firearms Instructor and Armorer.

I provided basic police tactical shotgun training, as a Los Angeles County Sheriff's Department, Weapons Training Staff member, as a Police Firearms Instructor.

I conducted on-going firearms qualification courses in accordance with California POST standards and department policy. Marksmanship coaching was provided as required.

I provided specific pistol-craft instruction to law enforcement personnel re-arming with semi-automatic pistols.

I provided specific instruction and coaching regarding the usage of assault rifles and high-powered rifles. I conducted qualification courses as required.

I provided specific instruction and coaching regarding the usage and delivery of chemical agents. I conducted qualification courses as required.

I provided specific instruction and coaching regarding the usage and delivery of less-lethal munitions from standard 12ga shotguns, 37mm guns and "ARWEN" gun systems. I conducted pertinent qualification courses as required.

I developed program and curriculum material for the Los Angeles County Sheriff's Department's "Hogan's Alley," a law enforcement simulated combat firing range.

I assisted in the construction of the "Smith House," a law enforcement tactical simulated-combat firing range.

I managed the Los Angeles County Sheriff's Department's Disorders and Riot Training School (DART) as an Academy Staff Instructor.

I was a member of the Los Angeles County Sheriff's Department's Report Writing Manual Committee, producing the original 1975 POST model and "LASD Report Writing Manual."

I was a member of the Los Angeles County Sheriff's Department's 1974 "Academy '75 Committee," producing the first Basic California POST Academy Curriculum write-up that served as the state model for professional entry-level law enforcement training in.

I was a member of the Los Angeles County Sheriff's Department's Side-handle Baton Feasibility Study Committee. The committee ultimately recommended the adoption of the standard "PR-24/tonfa" as the primary issue LASD service baton.

I was a member of the Los Angeles County Sheriff's Department's John Kolman In-service Training Group, delivering regular safety scenario training to in-service field personnel.

I was a member of the Los Angeles County Sheriff's Department's Officer Survival and Tactics Training Group, delivering advanced academic and practical instruction, in accordance with California POST standards, to entry level and in-service law enforcement personnel at the College of the Redwoods, Arcata, California (Carroll Hogue Group – Kolman, Kostka, Marino, Barthel & Bogardus).

I developed the program and model curriculum for the Los Angeles County Sheriff's Department's Patrol School. Coordinated the on-going evaluation of LASD deputies assigned to patrol service, according to professional California POST and department standards.

I provided basic entry-level police instruction, serving as a functional supervisor, to cadet trainees in the Los Angeles County Sheriff's Department's Academy, as a Staff Drill Instructor.

I developed model programs and emergency contingency planning for the Los Angeles County Sheriff's Department's Custody Division, Main Central Jail, Special Operations and Security Team (SOST) as a Lead Field Training Officer and Team Leader.

I provided specific instruction to Los Angeles County Sheriff's Department's Custody Division, Main Central Jail, staff and line personnel, in the following topics:

*     Jail Emergency Procedures
*     Rapid Mobilizations for Fires, Riots or Escapes – Active SOST Team Supervisor
*     Custody Division Officer Safety and Survival
*     First Aid, Cardio Pulmonary Resuscitation (CPR) and Basic Life Support (BLS) for Custody Officers
*     Air-pack Functions ("Scott" and "Surviv-air" models)
*     Movement and Security of High-risk Prisoners
*     Leadership in Small Unit Operations

I scheduled and coordinated California POST 40-hour mandated training for the Los Angeles County Sheriff's Department, Custody Division, Main Central Jail, staff and line personnel.

As the Custody Division Armorer, I inventoried, maintained and controlled firearms and other specialized equipment in the Los Angeles County Sheriff's Department's Main Central Jail Armory.

I was specifically selected, as the "pilot handler," to inaugurate the Los Angeles County Sheriff's Department's Patrol Dog Program at the Special Enforcement Bureau, Canine Services Detail, in June, 1980.

I pioneered law enforcement efforts to determine the feasibility of augmenting Los Angeles County Sheriff's Department's, Special Enforcement Bureau, Special Weapons Teams, with well-trained police handler/dog teams. In September 1980, I became the first American law enforcement officer to provide regular canine assisted support to deployed special weapons teams.

I provided specific instruction, as a police dog trainer, to entry-level and in-service Los Angeles County Sheriff's Department's, Special Enforcement Bureau, Canine Services Detail pertaining to police dog training, unit management and deployment technology.

I provided regular technological support to department managers and executives regarding the development of the newly formed Los Angeles County Sheriff's Department's police dog policies, standards and training.

I provided regular consultation and instructional support to Los Angeles County Sheriff's Department units and adjacent law enforcement agencies regarding overall canine unit development, management, training and deployment.

I provided specific instruction to the Los Angeles County Sheriff's Department's, Special Enforcement Bureau, Special Weapons Teams, pertaining to the following topics:

* The Principles of Command and Leadership for Modern Law Enforcement
* Small Unit Operations and Tactics for Modern Law Enforcement
* Weapons and Transitions in Modern Law Enforcement Small Arms Usage
* Principles of Counter Ambush ("Surprise Attack") for Modern Law Enforcement
* Principles of Counter Sniper for Modern Law Enforcement
* Specialized Modern Law Enforcement Tactics in Canine Assisted Operations

I served as a member of and a trainer for the Los Angeles County Sheriff's Department's, Special Enforcement Bureau, Canine Services Detail and Summer Olympic Games, Special Weapons Team, from concept inception in June, 1980 through July, 1984 (TAD to the Olympic "Red Team" – July, 1984 and thereafter actively through to November, 1986).

I received over 100 career commendations, recognizing exemplary performance of duty, as a Los Angeles County Deputy Sheriff.

I was an experienced law enforcement specialist instructor and trainer in the following topic areas:

* Police Firearms - Revolvers, Pistols, Shotguns, Rifles and other Special Weapons
* Field Training Officer and Lead FTO Responsibilities
* Officer Safety and Survival
* Counter-ambush (countering the surprise attack) Measures for Police
* Squad, Platoon and Company Mobil Tactics
* Planning and Preparation for Unusual Occurrences
* Jail Emergency Procedures
* Rapid Mobilizations in the Jail for Fires, Riots or Escapes
* Custody Officer Safety and Survival
* American Red Cross First Aid, CPR and BLS
* Air-pack Functions ("Scott" and "Surviv-air" models)
* Vertical Movement - Rappel Master
* Field Interviews and Interrogations
* Law Enforcement Report Writing
* Police Patrol Procedures and Tactics
* Traffic Control and Investigations
* Principles of Command and Leadership
* Small Unit Operations
* Doppler Radar Operation
* Dignitary and Executive Protection – Body Guarding
* Police Dog Policy, Training, Certification, Usage and Unit Management

## EXTRA DEPARTMENTAL EXPERIENCE:

I received advanced law enforcement instruction, as a police service dog trainer and police dog program management in the following specific topic areas:

* Police Canine Unit Management and Administration
* Police Dog Selection Criteria, Evaluation and Testing
* Police Dog Training Theory
* Police Dog Deployment and Tactical Theory (Will it be a "Tool" or a "Weapon?")
* Police Dog Tactical Obedience and Movement
* Police Dog Assisted Detentions and Arrests
* Scent Theory and Forensic Tracking
* Scent Theory and the Detection of Evidence
* Scent Theory and the Detection of Illicit Drugs
* Scent Theory and the Detection of Explosives
* Scent Theory and the Detection of Cadaver Material
* Current Trends in Scent Work

8

* Specialized Police Dog Functions
* Police Dog Assisted Search and Rescue Operations
* Legal, Moral and Ethical Implications of Police Dog Usage
* What the Future Holds for Police Dogs

I was qualified and certified as a Police Dog Trainer's Instructor according to the standards of the Landespolizeischule fur Diensthundfuhrer, Schloss-Holte, Stuckenbrock, Nordrhein, Westfalen, Germany (State Police School for Service Dog Handlers. It is regarded as the largest and most innovative police dog school in the world. Its standards are historically and internationally respected as the model all other police dog programs are measured against.).

I provided authorized consultation to Dog Sports Magazine and the Tactical Edge Magazine, working dog and tactical training journals, as a technical expert and advisor on police dog training and usage issues and sound tactical measures.

I was the inaugural President of the United States Police Canine Association (USPCA), Southern California Region, from 1982 through 1984.

I am a Sergeant (E-5), 2397839, United States Marine Corps (USMC), Enlisted 18 July 1967 and Honorably Discharged 17 July 1973 – *"Once a Marine, Always a Marine!"*

I have combat infantry experience with Company "L", 3rd Battalion, 7th Marines, 1st Marine Division (REIN), FMFPAC, US Military and other allied units in operations against hostile insurgent communist forces (NLF/VC and Regular NVA) operating primarily in and around Quang Nam Province and the Northern I Corps areas of the Republic of South Vietnam, during a thirteen-month tour of duty, from February 1969 through February 1970.

My Marine Corps training and experience includes over three years (26,000 hours) of well developed skills in combat leadership, specialized infantry tactics, small unit operations, small arms marksmanship, crew-served weaponry, counter-guerrilla warfare, military administration and personnel management. *"For those who fight for it, freedom has a flavor the protected will never know." Unknown Marine author defending Khe Sanh, Vietnam, 1968.*

I have regularly qualified, with a ten-year average weekly score of 476 points of 480, as a "Grand Master" in service revolver and semi-automatic pistol competitions (*e.g.* On 21 August 2000, I fired 480 of 480 points with a Smith & Wesson, Model 66, 4" service revolver, during weekly league competitions at *The Range,* Grass Valley, CA.) I have frequently attained individual range possible scores or records (*e.g.* back to back, 480 and 479 scores on 28 November 2005.).

I am a local college professor and frequently featured firearms instructor, offering specific entry level through advanced defensive revolver and semi-automatic pistol (including shotgun and rifle) training for civilians and enthusiasts, usually desirous of official qualification for concealed carry weapons permits, in accordance with contemporary law enforcement standards and state law.

9

I regularly offer support, primarily to Northern California law enforcement, security industry and academia as a Sierra College Administration of Justice Professor, a California Department of Consumer Affairs, licensed Firearms Trainer/Range Master #TIF906 (From 1989 through Present), California DOJ/HSC/FSC licensed firearms instructor CI No: 102944 (1-29-2013 through 1-29-2018) and a POST qualified range master and rifle/shotgun/pistol marksmanship coach, (dating back to January, 1974 when assigned to the Los Angeles County Sheriffs Department, Academy Staff, Specialized Weapons Training Section. Besides classroom instruction, I regularly conduct shooting exercises for students at the Grizzly Bear Range, Placer County, CA.

Refer to attachments for details:

**ATTACHMENTS TO THE 2017 PROFESSIONAL RESUME OF**

**VAN NESS H. BOGARDUS, III.**

A.   President and Chief Executive Officer, ***READY AMERICAN, LLC.***

    1.   Product development of a patented flexible soft loop ladder
    2.   Manufacturing and marketing patented flexible soft loop ladders

B.   Senior Investigator, Foundation Health Federal Services, Program Integrity, Special Investigations Unit, Region 11, CHAMPUS.

    1.   Investigations

        a.   Review referrals with a potential for significant case status.

            (1).   Criminal allegations
            (2).   High dollar loss
            (3).   High profile targets

        b.   Work with PI analyst on Investigative Plans of Action.
        c.   Develop referrals and reports through investigative effort.
        d.   Inform and coordinate findings with PI/SIU management.
        e.   Prepare reports for referral of matters to OCHAMPUS.
        f.   Appropriately collect healthcare fraud intelligence information.
        g.   Conduct internal investigations as directed.
        h.   Advise corporate officials re: jurisdiction and civil v. criminal issues.

    2.   Coordination and Liaison

        a.   Assist, as necessary, OCHAMPUS PI Branch with criminal fraud referrals.
        b.   Act as Point of Contact for DOD, DOJ, DHHS, FBI and the US Attorney.
        c.   Attend Regional US Attorney Healthcare Fraud Workgroup Meetings.
        d.   Develop working relationships with other investigators and staff on healthcare fraud issues.
        e.   Attend pertinent healthcare fraud training courses to enhance personal knowledge and professional development.

C.   Professor, Administration of Justice, Adjunct Faculty, Staff Range Master, Sierra College

    1.   Licensed Firearms Instructor and Range Master:  Specializing in revolver, semi-automatic pistol and tactical shotgun instruction to interested entry-level law enforcement personnel, limited duty officers and reserve police officers in an academic setting.
    2.   Conduct firearms qualification courses in accordance with California POST standards and law.
    3.   Assist with California POST firearms related program and curriculum development.

D.    **\* *STARFORCE 1,*** Owner, Instructor and Trainer

    1.    Law enforcement practices and police dog training and forensics expert, offering expert consultation services, specializing in the following:

        a.    Wrongful Death
        b.    Use of Force and Excessive Force
        c.    Police Practices, Procedures and Tactics
        d.    Police Firearms Training and Usage
        e.    Police Special Weapons Team Activities
        f.    Police Report Writing and Document Reconciliation
        g.    Police Dog Training and Usage
        h.    Police Dog Forensic "Sniff" Analysis
        i.    Police Canine Unit Management and Policy Development
        j.    Law Enforcement Risk Management and Assessments
        k.    Law Enforcement Training Standards

    2.    Offering the most technically advanced police service dog training to law enforcement and the security industry.
    3.    Offering advanced tactical training to law enforcement and the security industry.
    4.    Offering private investigation services, focusing primarily in areas of expertise, as reflected in resume.

E.    Teacher, Public Safety Instruction Staff, La Puente Valley Regional Occupational Program (LPVROP), Credentialed, Full-time.

    1.    Licensed Firearms Instructor and Range Master: Provided revolver, semi-automatic pistol and tactical shotgun instruction to the public, security industry, entry-level law enforcement cadets and reserve personnel, in an academic setting.
    2.    Conducted qualification courses for security industry personnel to carry side arms, during course and scope of duty, in accordance with California Department of Consumer Affairs standards and law.
    3.    Conducted American Red Cross courses in First Aid, Cardiopulmonary Resuscitation (Community CPR) and Basic Life Support for the Professional to law enforcement, security industry and the public.
    4.    Conducted American Red Cross courses in Disaster Preparedness and Shelter Management to law enforcement, public school districts and other public entities.
    5.    Conducted side-handle (PR-24) baton classes, Handler 12, Patrol Procedures, Chemical MACE, etc. to law enforcement, security industry and citizens in accordance with California Department of Consumer Affairs standards and law.
    6.    Coordinator of Special Programs: Responsible for program development of specialty subjects as requested by law enforcement and the security industry.
    7.    Licensed Protection Dog Operator: Provided instruction on canine unit development and service dog training to law enforcement and the security industry.

F.    Assignment:  Patrol Division North, San Dimas Station, Canine Services Detail, Senior Deputy, Police Service Dog Handler and Trainer

1.    Provided general law enforcement services to residents and visitors to the Angeles National Forest, Los Angeles County, California.

2.    Conducted specialized canine assisted patrol in remote mountainous areas of the Angeles National Forest, Los Angeles County, California, enforcing County, State and Federal laws.

3.    Conducted specialized canine assisted searches in support of SAR Teams and LASD Emergency Services Detail operations.

4.    Conducted canine assisted searches for suspects, victims, lost and injured persons utilizing well-developed canine forensic tracking, trailing or air scenting skills.

5.    Conducted canine assisted searches for felony suspects by Los Angeles County Sheriff's Department Units and responded to approved mutual-aid requests from other law enforcement entities.

G.    Assignment:  Patrol Division East, Special Enforcement Bureau, Canine Services Detail, Senior Deputy, Police Service Dog Handler and Trainer

1.    Trained, handled "MARCO" (Patrol Dog 3) and "NANDO" (Patrol Dog 24) in accordance with Los Angeles County Sheriff's Department's directives and policies.

2.    Answered calls for canine assisted searches for felony suspects by Los Angeles County Sheriff's Department Units and responded to approved mutual-aid requests from adjacent law enforcement entities.

3.    Conducted canine assisted selective patrol in high crime areas of Los Angeles County with Special Enforcement Bureau, Special Weapons Teams.

4.    Provided canine assisted support to Special Enforcement Bureau's, Special Weapons Teams, during high-risk operations.

5.    Provided specific police dog training and deployment instruction to Canine Services Detail and other municipal police department's handler/dog teams as requested or directed.

6.    Maintained a qualified "service-ready" status to serve as a member of a Special Enforcement Bureau, Special Weapons Team when requested or directed.

7.    Provided regular instruction to Special Enforcement Bureau personnel regarding collateral areas of expertise, as requested.

8.    *First* American Law Enforcement Officer to certify, in the United States, as a "Hundefuhrer" (Patrol Dog Handler) according to the Polizeischutzhundprufung (PSP) Police Patrol Protection Dog Standard of the Landespolizeischule fur Dienstundfuhrer, NRW, Germany.

9.    *First* American Law Enforcement Officer to deploy with a "Tactical Dog" in support of law enforcement Special Weapons Team.

H.    Assignment Custody Division, Main Central Jail, Administration and Training Detail, Senior Deputy

13

1.  Supervised un-sentenced and sentenced inmates in the Los Angeles County Jail System.
2.  Served as Watch Deputy, Scheduling Deputy, Floor Senior Deputy and Acting Watch Sergeant as necessary, assigned or directed.
3.  Served as the Lead Custody Division Training Deputy for the Los Angeles County Main Central Jail, providing and coordinating required training in accordance with California POST standards, policy and law.
4.  Served as Armorer for the Los Angeles County Sheriff's Department's Main Central Jail, responsible for the inventory control and maintenance of the specialized weaponry and equipment.
5.  Served as the Team Leader for the Los Angeles County Sheriff's Department's Main Central Jail Special Operations and Security Team (SOST), responsible for operational planning, logistics, training and rehearsals for Custody Division related emergencies.
6.  Assisted in the "Clark" evaluations and flammability studies of various products, commodities and mattresses used by inmates confined in any Los Angeles County Jail facility.
7.  Assisted in the "Clark" literacy programs for inmates confined in any Los Angeles County Jail facility.

I.  Assignment:  Patrol Division East, Special Enforcement Bureau, Special Weapons Team Detail, Senior Deputy Sheriff

1.  Conducted specialized team oriented saturation patrol in selected "high-crime" areas of Los Angeles County.
2.  Participated in selected "high-risk" operations in coordination with municipal, state and federal law enforcement agencies.
4.  Served as a designated primary marksman and assistant unit armor on a Los Angeles County Sheriff's Department, Special Enforcement Bureau, Special Weapons Team.
5.  Maintained a qualified and "service-ready" status with various special weapons. Able to deliver precision high-powered rifle fire in support of a law enforcement effort, as required or directed.
6.  Participated in regular cross-training sessions, exercises and drills to maintain familiarity with the varied positions and functions of a Special Weapons Team's table of organization and mission.

J.  Assignment:  Patrol Division East, Norwalk Station, Senior Deputy, Field Training Officer, and Traffic Enforcement Officer

1.  Answered calls for service and provided general law enforcement services to persons in the various jurisdictional areas of Norwalk Station.
2.  Served as the Station Lead Field Training Officer, responsible for current and innovative field training of a compliment of approximately 350 sworn.
3.  Served as a lead member of Norwalk Station's Morale and Training Group.

4.  Served as a Complaint Desk Deputy, Dispatch Deputy, Watch Deputy and Acting Watch Sergeant as assigned or directed, responsible for the coordination of field units in response to calls for service.

5.  Served as the Jail Deputy, responsible for booking and fingerprinting prisoners, supervision of other L. A. County inmates and overall security in the jail area of Norwalk Station.

6.  Conducted a comprehensive review of patrol procedures, including investigative skills, accurate preparation of reports, arrest techniques, officer safety, traffic enforcement, chains of evidence and other patrol related functions to newly assigned Deputies as a Field Training Officer.

7.  Responsible for training, instruction and functional supervision of newly assigned Deputies and Reserve Deputies in patrol functions.

8.  Field Training Officer, responsible for objectively evaluating newly assigned Deputies regarding their suitability for continued patrol service.

9.  Supported staff as a unit armorer, assuring proper arming, equipping and training of station personnel.

K.  Assignment: Administrative Division, Training Bureau, Academy Staff, Senior Deputy, Staff Instructor and Coordinator

1.  Served as a staff member, coordinator and instructor for the Los Angeles County Sheriff's Department's Disorders and Riot Training School (DARTS), a federally funded program offering advanced tactical training to local law enforcement.

2.  Served on the Los Angeles County Sheriff's Department's Baton Feasibility Committee, studying the merits of the standard PR24/Tonfa Baton as the general issue service baton.

3.  Served on the Los Angeles County Sheriff's Department's Report Writing Committee, ultimately producing the department's model Report Writing Manual.

4.  Served on the Academy '75 Committee, ultimately producing the Basic POST Academy Curriculum, representing the model for entry-level law enforcement training throughout California.

5.  Developed curriculum, coordinated and administered the Los Angeles County Sheriff's Department's Patrol School, responsible for preparing and evaluating Deputies about to be re-assigned to a patrol division.

6.  Served as a Police Firearms Instructor, Armorer and Marksmanship Coach, responsible for basic through advanced revolver, semi-automatic pistol, shotgun and other small arms instruction to entry-level and in-service law enforcement personnel.

7.  Served as a functional supervisor for entry-level law enforcement cadets as their Drill Instructor, responsible for the development of civilians into basically competent law enforcement officers.

8.  Served as the Administrative and Logistics Deputy, responsible for the inventory control and survey-out of law enforcement equipment to sworn personnel.

L.  Assignment: Patrol Division East, Lakewood Station, Field Training Officer, Deputy Sheriff

1. Refer to Attachment "I" for description of duties as a Field Training Officer and Deputy Sheriff.

2. Served as Deputy Team Leader of the inaugural City of Cerritos Community Safety Team, 1972, responsible for the coordination of community oriented contract law enforcement services to the city.

3. Served as Deputy Team Leader for the Los Angeles County Sheriff's Department's Neighborhood Car Program, 1973, responsible for the coordination of community oriented contract law enforcement services to the City of Lakewood.

4. Served as Lakewood Station Public Information Officer as required, responsible for the following:

   a. R&D of program material of interest to the public.
   b. Assist qualified guest speakers and public officials.
   c. Meet with citizens and local neighborhood groups.
   d. Offered presentations of mutual interest about local issues or answered questions about law enforcement's role in addressing community problems.
   e. Drafting and posting of bulletins and announcements.
   f. Submit reports as required.
   g. Consult with line, supervisory, management and command personnel as required.

5. Supported staff as a unit armorer, assuring proper arming, equipping and training of station personnel.

M. Assignment: Administrative Division, Training Bureau, Los Angeles County Sheriff's Department's Academy Class 147

1. Received basic California POST law enforcement training as a Deputy Sheriff Cadet, from April 1971 to August 1971, representing an aggregate of 22 weeks and over 1,750 hours of instruction.

2. Elected as "Class 147 Spokesman" for graduation ceremonies.

3. Recognized as the "Honor Cadet" of Academy Class 147 by achieving the highest overall performance grades and scores as a Deputy Sheriff Trainee.

4. Delivered Valedictory Address at Graduation Ceremonies of Los Angeles County Sheriff's Academy Class 147, 20 August 1971.

5. Pre-graduation from the Academy, I was initially involved in support to the Los Angeles County Sheriff's Department Weapons Training Staff *(Range Master Bill Burns and Senior Deputies Bill Reagan, Ted "Pappy" Benton, Kenny Howland, Jack Weaver, Winston Elliot, Tim Birkeland, Don Kalberlogh, John Voss, Jim Klinger, Jeff Moise, et al.)* during the survey-out of the Winchester 30-30 Lever Action Service Rifles. As an experienced Marine combat armor and trainer, I frequently assisted staff with current and on-going technical assistance,

curriculum development and qualification standards with the Sheriff's newly acquired AR-15 Service Rifles, circa Spring through Fall of 1971.

N.    Assignment:  Custody Division, Hall of Justice Jail, Deputy Sheriff

    1.    Participated pre-academy preparation in the Los Angeles County Sheriffs Department's "Off-the-Street" Program.

    2.    Supervised prisoners in the Los Angeles County, Hall of Justice Jail.