**Bonjean Law Group, PLLC**
**1000 Dean St., Ste. 422**
**Brooklyn, New York 11238**
**Tel: (718) 875-1850**
**Fax: (718) 230-0582**
**jennifer@bonjeanlaw.com**

Attorney for Plaintiff

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

---

**STEVEN STADLER**,

       Plaintiff,

  v.                              13-CV-2741 (RBK/AMD)


**GLENN A. ABRAMS, JR., ET AL.**

    Defendants.

---

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ATLANTIC CITY'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**INTRODUCTION**…………………………………………………………………………..2

**FACTUAL BACKGROUND**………………………………………………………………5

**APPLICABLE LEGAL STANDARD**……………………………………………………6

**ARGUMENT**………………………………………………………………………………..7

I.    Genuine Issues of Material Fact Exist As to Whether Defendant City of Atlantic City Has a Widespread, Well-Settled Practice or Custom of Permitting its Officers, including the Defendant Officers, to Employ Excessive Force Without Fear of Discipline…………......7

II.   Genuine Issues of Material Fact Exist As to Whether Defendant City of Atlantic City Has a Widespread, Well-Settled Practice of Exonerating Rogue Police Officers by Failing to Meaningfully Investigate Internal Affairs Complaints…………………………………..23

III.  Genuine Issues of Material Fact Exist on the Question of Whether the City Failed to Supervise, Discipline and Train its Officers With Regard to Officers' Use of Excessive Force……………………………………………………………………………………..35

IV.   Genuine Issues of Material Fact Exist on the Question of Whether the City Failed to Train, Supervise, and Discipline its K9 Handlers, Including Defendant Devlin, With Regard to the Appropriate and Constitutional Use of Patrol Dogs for so-called "Criminal Apprehension."……………………………………………………………………………..45

      A.    Defendant Atlantic City Showed Deliberate Indifference To The Safety And Well-Being Of The Citizens Of Atlantic City When ACPD Re-Deployed The K-9 Patrol Units Back To The Streets Of Atlantic City In 2010 Without Satisfying The Re-Training And Re-Certification Criteria For Their Return As Set Forth In Public Safety Director Petersen's Directive 025-2010………………………….46

      B.    Instead Of Disciplining, Monitoring, Or Supervising Problem Officers, ACPD Rewarded Unqualified And Problem Officers With Lengthy Complaint Histories And Reputations For Aggressiveness With The Prestigious K9 Assignment…...62

V.    Defendant Atlantic City Has a Widespread, Well-Settled Practice of Condoning Its K-9 Handlers' Use of Patrol Dogs to Bite Non-Threatening, Non-Violent, and often Impaired Petty Offenders as a Means of Gratuitous Punishment Causing Serious and Permanently Disfiguring Injuries. ………………………………………………………………..67

**CONCLUSION**……………………………………………………………………………74

**INTRODUCTION**

As best as Plaintiff can make out, the City of Atlantic City moves for summary judgment, arguing that no genuine issues of material fact exist for trial with respect to Plaintiff's *Monell* claims, because all of the City's written policies are constitutional on their face and any custom or practice of ACPD did not directly cause Plaintiff's injuries. (City's MSJ at pg. 8-14) The City's motion is entirely lacking in legal or factual support. Indeed, the City did not even bother to flesh out its argument in a cogent matter.  Notwithstanding the total lack of support for the City's motion, Plaintiff will endeavor to highlight the overwhelming evidence showing that genuine issues of material fact exist as to Plaintiff's *Monell* theories. Critically, in *Costantino v. City of Atlantic City, et al.*, 13-6667 [Doc. No. 259], this Court already ruled that ample evidence exists to support a number of Plaintiff's *Monell* claims in a similar excessive force case that occurred less than a year before the instant case.

Plaintiff concedes that the City's liability is not premised on a theory that its written policies are patently unconstitutional. However, the summary judgment records reveals overwhelming evidence that:  (1) Defendant Atlantic City has a widespread, well-settled practice or custom of permitting its officers, including the individually named officers, to employ excessive force without fear of discipline**;** (2) Defendant Atlantic City has a widespread, well-settled practice of exonerating rogue officers, including defendants Abrams and Devlin, by failing to meaningfully investigate citizens' internal affairs complaints;  (3) Defendant Atlantic City failed to supervise, discipline and train its officers with regard to officers' use of force; (4) Defendant Atlantic City failed to supervise, discipline and train its officers with regard to the appropriate and constitutional use of patrol dogs for so-called criminal apprehension; (5) Defendant Atlantic City has a widespread, well-settled practice of condoning its K-9 handlers'

3

use of patrol dogs to bite non-threatening, non-violent, often impaired petty offenders as a means of gratuitous punishment causing serious and permanently disfiguring injuries.

As set forth below, and as discussed in Plaintiff's two unrebutted expert reports (attached as Exhibits A & B), the City of Atlantic City knew that its officers were routinely engaging in unnecessary and excessive use of force against the citizens of Atlantic City between 2007 and 2014. Indeed, officers with inordinately long internal affairs complaint histories and use of force incidences are viewed as "workers" or "pro-active" police officers and are rewarded for their conduct – rather than disciplined, reprimanded or ordered for remedial training. Even in the rare occurrence where an officer is disciplined, he/she is invariably disciplined for a minor administrative offense that bears little relationship to the complained-of conduct. The internal affairs function of APCD is designed to cover-up officers' unconstitutional conduct and is used as a tool harassment and retaliation by members of the department, rather than as a legitimate body that meaningfully investigates citizen complaints.

Furthermore, Atlantic City has shown a willful disregard for the safety and well-being of its constituents where it encourages its K9 handlers to use their patrol dogs as potentially life-threatening weapons against petty offenders, rather than as a "finding" tool for hiding, violent offenders. Atlantic City not only condones the unconstitutional use of force by K9 apprehension, it encourages it by assigning officers with the most prodigious complaint histories to the K9 unit. Unsurprisingly, the City of Atlantic City has found every K9 apprehension in the past 10 years legal, justified and proper.

In this brief, Plaintiff identifies some, although not all, of the evidence collected during the course of discovery that supports the *Monell* claims identified above and in his Complaint. Many of the facts developed during the course of discovery support more than one of the *Monell*

theories identified in Plaintiff's complaint and fleshed out in greater detail in this pleading. There is no question that Plaintiff has amassed wide-ranging and comprehensive evidence supporting his *Monell* claims that require this Court to deny the City's motion for summary judgment as to Plaintiff's *Monell* theories of liability.

## FACTUAL BACKGROUND

On the evening of March 13, 2013, Plaintiff burglarized a car wash located on Atlantic and Albany Avenues after spending a day consuming drugs and alcohol. Plaintiff admitted to entering the car wash where he found a screw driver and hammer and then attempted to pry open two change boxes located outside in a car port. Unknown to Plaintiff, the car wash was owed by Atlantic City Police Sergeant Greg Voci.

As Plaintiff attempted to pry open one of the change boxes, a dark-colored SUV pulled up and an individual in dark clothing got out of the car and said, "[w]hat are you doing?" (Ex. B to Plaintiff's Response to the Ind. Def. Officer's Motion for Summary Judgment – Deposition of Steven Stadler at pg. 71) The individual did not identify himself as a police officer but Plaintiff later learned that the person was off-duty Atlantic City police officer defendant Glenn Anthony Abrams, Jr. *Id.* at pg. 72-73.

Plaintiff did not respond to Defendant Abrams and began to walk away from the area at a brisk pace. *Id.* at 73. Plaintiff headed towards an alley adjacent to the car wash and dropped the tools he had on his person. *Id.* at 73-74. The same dark SUV pulled into the alley where Plaintiff was sitting to catch his breath. When Plaintiff saw the SUV, he immediately got up and started walking towards Albany Avenue. Defendant Abrams yelled, "[s]top" but still did not identify himself as a police officer. *Id.* at 75-76. As Plaintiff approached the corner of West End Avenue, he observed a marked police car driving at a slow pace toward him. *Id.* at 77. Defendant Moore

who was in uniform exited his car and told Plaintiff to put his hands on top of the hood of the car. *Id*. Plaintiff complied.

Defendant Abrams walked up to the car from behind Plaintiff, swung him around and punched him in the face several times. *Id*. at 82. Plaintiff recalls losing his bearings and being kicked and punched on either side of his face, head and body. *Id*. at 82-83. Plaintiff explained that he deduced that he was being hit by both the plain clothes and uniformed officers because "I was getting punched and kicked on both sides of my body, so I would have to say yes, I was being struck by both police officers." *Id*. at 84.

Plaintiff lost consciousness during the beating but was roused by an unbearable pain to his left thigh. *Id*. at 86. After regaining consciousness, Plaintiff recalled being dragged down the street by a dog that had bitten his upper left thigh. *Id.* at 89. Plaintiff was later transported to the emergency room for medical treatment. Plaintiff was hospitalized at the Atlantic County Justice Facility for almost a month after this brutal attack.

## APPLICABLE LEGAL STANDARD

Pursuant to Fed. R. Civ. P. 56, the individual defendant officers move for summary judge. A grant of summary judgment is appropriate where the moving party has established that there is no genuine dispute of material fact and "the moving party is entitled to judgment as a matter of law." *Hugh v. Butler County Family* YMCA, 418 F. 3d 265, 266-67 (3d Cir. 2005). A factual dispute is genuine only if there is "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and it is material only if it has the ability to "affect the outcome of the suit under governing law." *Shuman v. Raritan*, 2016 U.S. Dist. LEXIS 164996, *22 (D.N.J. 2016). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-

moving party's evidence 'is to be believed and all justifiable inference are to be drawn in his favor.'" *Id. citing Marino v. Indus. Crating Co.,* 358 F. 3d 241, 247 (3d Cir. 2004).

The burden of establishing that no "genuine issue" exists is on the party moving for summary judgment. *Shuman*, 2016 U.S. Dist. LEXIS 164996 at *23. "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial." *Id. citing Gleason v. Norwest Mortg., Inc.*, 243 F. 3d 130, 138 (3d Cir. 2001). In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Credibility determinations are the province of the factfinder. *Shuman*, 2016 U.S. Dist. LEXIS 164996 at *24.

## ARGUMENT

**I.   Genuine Issues of Material Fact Exist As to Whether Defendant City of Atlantic City Has a Widespread, Well-Settled Practice or Custom of Permitting its Officers, including the Defendant Officers, to Employ Excessive Force Without Fear of Discipline.**

The summary judgment record presents a compelling case that the City of Atlantic City has a widespread practice or custom of condoning its officers' routine use of excessive force. When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom. *Beck v. City of Pittsburgh*, 89 F. 3d 966, 971 (3d Cir. 1996) *citing Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978). The Court's holding and reasoning in *Monell* has created a two-path track to municipal liability under § 1983 depending on whether the allegation is based

on municipal policy or custom. *Id*. In *Andrews v. City of Philadelphia,* 895 F. 2d 1469, 1480 (3d

Cir. 1990), the Third Circuit articulated the distinction between these two sources of liability:

> A government police or custom can be established in two ways. Policy is made when a "decision maker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict. A course of conduct is considered to be a "custom" when, though, not authorized by law "such practices of state officials [are] so permanent and well settled" as to virtually constitute law. *See also, Beck*, 89 F. 3d at 971.

Custom may also be established by evidence of knowledge and acquiescence. *Id*.

Plaintiff bears the additional burden of proving that the municipal liability was the

proximate cause of the injuries suffered. *Bielevicz v. Dubinon*, 915 F. 2d 845, 850 (3d Cir. 1990).

To establish the necessary causation, a plaintiff must demonstrate a "plausible nexus" or

"affirmative link" between the municipality's custom and the specific deprivation of

constitutional rights at issue. *Id*. at 851.

Plaintiff has developed a mountain of evidence showing that Atlantic City did not take its

officers' use of force seriously and has/had a well-settled practice of condoning and acquiescing

to its officers' use of excessive force. Contrary to the City's cursory argument, this custom has a

"plausible nexus" to the specific constitutional deptivation in this case, namely the use of

unreasonable and excessive force against Plaintiff. As a starting point, it is useful to review the

complaint histories of the individual Defendant officers in this case who have a striking pattern

of excessive force complaints. Collectively, Defendants Abrams, Moore, and Devlin

accumulated 69 internal affairs complaints in a ten-year period; an astounding 38 of those

complaints involve a claim of excessive force, assault or domestic violence. (Ex. C – Defendant

Officers IA Index Cards) Not a single excessive force complaint against these officers has ever

been sustained.

Plaintiff's police practice expert, Dr. Shane, reports that a significant pattern of

complaints emerged from Defendants Abrams and Devlin shortly after their hiring. (Ex. A –
Expert Opinion Re: the Pattern of Complaints Against Atlantic City Police Officers Glenn A.
Abrams and John Devlin – November 29, 2016 at pg. 20) Dr. Shane states, "[o]fficer Abrams's
internal affairs history began to accumulate around August 2007 and steadily increased between
2008 and 2015, including several complaints for excessive force and harassment that were not
addressed or were only addressed in a facile manner that did not change Officer Abrams's
behavior." *Id*. As to defendant Devlin, Dr. Shanes writes, "[o]fficer Devlin's internal affairs
history began to accumulate around January 5, 2005 and steadily increased each year to
2015, including several complaints for excessive force and demeanor that were not
addressed or were only addressed in a facile manner that did not change Officer Devlin's
behavior." *Id*.

As set out by its own internal affairs policy and consistent with the Attorney General
guidelines, ACPD had an obligation to track officer conduct, identify any concerning patterns or
trends, and *address* them. (Ex. B at pg. 59-61) ACPD failed to comply with its own policy on
tracking and addressing officer misconduct. To be specific, ACPD's 2010 internal affairs policy
pronounced that it would use an electronic tracking system known as Guardian Tracking to
monitor its officers' behavior. (Ex D – ACPD Internal Affairs Policy, Section XII, Eff.
11/5/2010) The policy further provided that a separate early warning system policy ("EWS")
would contain "schedules for remedial action taken and the protocol for associated
documentation and reporting requirements." *Id.* However, ACPD never implemented the
Guardian system nor did it enact a separate EWS policy that would set forth how the department
would respond to officers who triggered the early warning system. (Ex. E – Chief White's
Deposition April 15, 2016 at pg. 141-152)

In March, 2012, the department revised its Internal Affairs policy and called for the implementation of the AIM software to track employee behavior. The policy stated that "[t]he early warning system is to identify any pattern or practice by any member of the agency which warrants intervention or remediation before it develops into a glaring problem." (Ex. F - ACPD Internal Affairs Policy, Section XII, Eff. 3/6/2012) However, again, ACPD did not implement the AIM software or any EWS policy. Despite claiming that such a system existed as of 2012, ACPD did not actually attempt to implement the system until 2015. (Ex. E – Chief White's Dep. at pg. 152)

Critically, between 2010 and 2012, ACPD was going through an accreditation process that required it to improve its Internal Affairs policy by incorporating an electronic EWS that would track officer conduct. When ACPD re-issued its Internal Affairs policies in 2010 and 2012 it incorporated the appropriate language but misrepresented the existence of the electronic EWS. ACPD falsely suggested to accreditors and the public at large that it had a robust electronic system that tracked officer conduct, identified concerning patterns or behaviors, and then responded appropriately to address those concerns. In reality, ACPD was doing nothing but tallying IA complaints and sending them up the chain of command to the abyss where they were ignored. (Ex. X – Former Chief of Police Ernest Jubilee Deposition, January 12, 2015 at pg. 170-176)

Lt. Bridgett Pierce, the City's 30(b)(6) designee on ACPD's early warning system, testified that in 2012, ACPD used a *manual* EWS (not an electronic system) that involved notifying the Chief of Police via memo or special report when an officer received three internal affairs complaints within a calendar year. (Ex. G – Lt. Pierce's Deposition at pg. 40:18-25) Retired Chief of Police Ernest Jubilee, who served as chief between 2010 and November, 2013

candidly admitted that despite their written policies, ACPD had no real early warning system.

(Ex. X Former Chief of Police Ernest Jubilee Deposition, January 12, 2015 at pg. 170)

> Q.     As long as you touched on it, let's talk about this early warning system, which I think you've alluded to already. When you were police chief, was there any early warning system in place?
>
> A.     None really to speak of.
>
> Q.     Okay, And tell me what you understand an early warning system to be.
>
> A.     It would alert the administration of individuals who – who got multiple complaints over a time period, and I did get memos from the Commander of Internal Affairs that over a six-month period Officer Jones or Officer Doe got three or more complaints. You know what we didn't have in place, is, well, what do we do with Officer Jones when he got that or she got that number of complaints. As early warning systems progress, there are going to be parameters where the officer is going to be subjected to something. *Id*. at pg. 170-171
>
> * * *
>
> Q.     What was the purpose of these memos?
>
> A.     To keep me informed of the particular officers who were getting the number of the complaints that they were. *Id*. at 172
>
> * * *
>
> Q.     Do you remember taking any action with respect to any memo you received during your course and tenure as Chief of Police?
>
> A.     No.
>
> Q.     Do you have any protocol you followed when you got a memo informing you of an officer having received an inordinate number of complaints?
>
> A.     No, we didn't have a regulation in place to address that at the time. *Id*. at 172-173
>
> * * *
>
> Q.     Okay. Let me ask the question this way. In September, 2011, did the Attorney General pass – strike that
> Did the Attorney General direct the Atlantic City Police Department that it should establish a protocol for tracking employee behavior and reviewing

all internal affairs complaints made against its officers, regardless of outcome, for evidence of pattern or practice of inappropriate or unconstitutional conduct?

A.     Yes. *Id*. at 176

Jubilee further admitted that when he was the Chief the goal of the department was to simply count complaints but *not* to identify patterns and trends, in direct contravention of its own policy and the New Jersey Attorney General guidelines. (Ex. H – Retired Ernest Jubilee Deposition February 9, 2016) As Dr. Shane sets out in his expert report, "merely counting complaints without any action is tantamount to managerial indifference . . . ACPD did not use their knowledge of complaints to institute any remedial action, training, policy changes, modifications to assignment or supervision, despite the fact that an internal affairs investigator could recommend remedial training upon completing an investigation."

(Ex. B at pg. 61¶d)

Numerous Atlantic City police officers with prodigious complaint histories, including the defendant offiers, testified that despite "triggering" the early warning system, their supervisors took no action or even addressed their complaint histories. Between January, 2005 and May, 2015, Defendant Devlin accumulated 34 internal affairs complaints, 21 of which involved claims of assault, excessive force, threats of violence, or domestic violence. Not a single complaint related to assault, excessive force, threats of violence, or domestic violence was sustained. (Ex. C – Devlin's IA index card) Prior to 2014, Devlin had never been informed that he had triggered the EWS even though he had accumulated greater than three internal affairs complaints in a calendar year on at least six occasions between 2005 and 2014. (Ex. C and Ex. O – Devlin Dep. pg. 141-142) Devlin testified that the first time he was notified that he had triggered the EWS was in 2014. The email notified Devlin that he was required to meet with his chain of command

(Ex. O – Devlin Dep. pg. 141) Devlin testified that the meeting was merely informative and not

centered on discipline or training.

> Q.     Did they give you actually a warning, hey, don't get any more internal
>        affairs complaints?
>
> A.     No. That's not what it was about.
>
> Q.     Okay. Did they tell you that you had to attend any type of remedial
>        training?
>
> A.     No.
>
> Q.     Did they tell you that they were concerned about the number of internal
>        affairs complaints that you had accumulated?
>
> A.     No.
>
> Q.     Did they ask you to explain or discuss any of the internal affairs
>        complaints that you had accumulated.
>
> A.     No. (Ex. O at pg. 148:1-15)

Similarly, between August, 2007 and April, 2015, Defendant Abrams accumulated a total

of 26 internal affairs complaints, 14 of which involved a claim of assault or excessive force. Not

a single claim related to assault or excessive force was sustained. (Ex. C – Abrams IA index

card) Although Abrams tripped the early warning system in 2008, 2009, 2011, 2012, he testified

that he had never received a notice during his career as a police officer that he triggered ACPD's

early warning system. (Ex. Q – Abrams Dep. pg. 241:5-21)

Lack of oversight by ACPD supervisors was is not unique to Defendants Devlin and

Abrams. Between May, 2001 and August, 2014, Sergeant Frank Timek accumulated a total of 63

internal affairs complaints, 43 of those complaints involved an allegation of assault or excessive

force. (Ex. N – Timek's IA index Card) Timek admitted during his deposition that he had tripped

the EWS *his entire career* and that until 2015 he could recollect no communication where he was

either informally or formally reprimanded or even warned about the number of internal affairs complaints he had accrued. (Ex. K - Timek Dep. 363:1-7)

Officer Sterling Wheaten, no stranger to civil litigation, accumulated 33 internal affairs complaints in his short seven-year career, 23 involving an allegation of assault or excessive force. (Ex. J - Wheaten IA index card). Not a single internal affairs complaint against officer Wheaten has ever been sustained. Furthermore, Wheaten's complaint history was *never* addressed with him by any supervisor. Wheaten triggered the early warning system for the entirety of his career but has never been disciplined, ordered to remedial training, monitored, or even notified by his command staff that he had triggered the early warning system. (Ex. J – Wheaten's IA Index Card) (Ex. I - Wheaten's Dep. 278:18-279:12) (Ex. L – Wheaten's EWS Documents)

ACPD Officer Michael Oldroyd accumulated a total of 91 internal affairs complaints in a fourteen-year career. (Ex. R – Oldroyd Internal Affairs IA Index card) Oldroyd testified that his complaint history was *never* addressed by any supervisor until February 25, 2014. Oldroyd testified that although he triggered the early warning system his entire career, he was never disciplined or even notified by his command staff that he had triggered the early warning system. (Ex. AAA – Michael Oldroyd's Deposition pg. 264-266; 276:18-23) When he was finally told for the first time that he had triggered the EWS in February, 2014, officer Oldroyd's command staff reassured him that they did not give any credit to those complaints and that he was not expected to police any differently than he had been policing. Officer Oldroyd was not ordered for retraining, was not reassigned, or even warned. (Ex. AAA at pg. 276-268; 276) During that meeting, his command staff communicated to him that "most if not all [of his IA complaints] were nonsense, not factual, some of them admittedly fraudulent, and that they had an obligation

14

to speak to me because it was a certain amount of accusations." (Ex. AAA at pg. 270:10-18.)
Oldroyd testified that his takeaway after meeting with his command staff about his internal
affairs history was that, he was a pro-active police officer who was doing a good job and that
they approved of what he was doing but he just needed to be aware that his complaints were
being tallied. (Ex. AAA to Ind. Def. MSJ at pg. 270-276)

> Q.     And if they're just – I am just confused – to say be aware, what do
> they want you to do differently?
>
> A.     I couldn't tell you.
>
> Q.     You didn't take away from this meeting that you are supposed to
> do anything differently, right?
>
> A.     No. (Ex. AAA at pg. 275:4-11)

On June 24, 2013, Officer Oldroyd received remedial training regarding *completing* "use
of force" reports. Prior to this remedial training, Oldroyd had accumulated a whopping 46
complaints for excessive force, but the department merely ordered Oldroyd undergo remedial
training as it related to filling out paperwork. Rather than conduct a meaningful investigation
into whether Oldroyd was using appropriate force, the department essentially messaged to
Oldroyrd to enhance his factual basis for his use of force – whether it was truthful or not.
Unsurprisingly, following that remedial training, Oldroyrd accumulated four additional
complaints for excessive force. (Ex. R)

Officer Anthony Alosi testified that in August, 2015 he was informed by Sergeant
Falcone that that he had triggered ACPD's EWS for use of force incidences. (Ex. BBB –
Deposition of Officer Anthony Alosi at pg. 123) He sat down with the Sergeant to discuss his
triggering of the system, but left the meeting believing that the only purpose of the meeting was a
"paperwork thing." (Ex. BBB at pgs. 125-129)

Q.      Did she say what the purpose of the meeting was?

A.      Because I triggered the early warning system.

Q.      And what did that mean from your perspective when she said you triggered the early warning system?

A.      That I submitted too many use of force – not too many, but I submitted a certain amount of use of force reports that triggers that system.

Q.      And what is the purpose of the early warning system?

A.      To track our activity.

Q.      Okay. And why is it important to track an officer's activity?

Mr. Gelfand:   Objection.

Mr. Silverstein:        Objection.

Q.      From your understanding?

A.      I don't know what the exact reason for it is.

Q.      You don't?

A.      No.

Q.      Do you seen any purpose in it?

A.      No. We submit these use of forces every time we use force on somebody.

Q.      But do you see any purpose in tracking the use of force reports?

A.      For statistics maybe. I don't know.

Q.      But in terms of policing, and improving policing, is it important to track the statistics?

Mr. Gelfand:   Objection.

Q.      From your perspective?

A.      I believe so, yes.

Q.      And so did she tell you you need to reduce or – strike that

16

Did she express any concerns about the number of use of force that you had used?

A.     No.

Q.     Aside from asking you whether you needed counseling – well, let me go back. She didn't express any concern about the number of use of force that you had generated right?

A.     No.

Q.     Didn't tell you that there was anything concerning about it, right?

A.     No, ma'am.

Q.     Didn't say anthing that led you to believe that you had done anything less than desirable in your policing activity having generated these numbers of use of the force reports, right?

A.     No.

Q.     If that is all the case, what was your understanding of why she was asking if you needed counseling?

A.     Because it triggers this early warning system. She doesn't have a choice but to do that. Once you submit a certain amount of these, it triggers the system and she has to give you counseling –

Q.     But what from you –

A.     She has to give you this interview or whatever it is.

Q.     What is the correlation from your perspective?

A.     I honestly don't know.

Q.     You don't have any theory about it?

A.     No.

Q.     Just sort of a paperwork thing, right?

A.     Yes.

Q.     And what other questions were asked of you besides whether you needed counseling?

A.      That is the only question. I really don't remember.

Q.      Anything else happen as a result of you triggering the early warning system?

A.      No.

Q.      Any orders of remedial training or anything of that nature?

A.      No.

Q.      Any discussion about the cases themselves in which you had been accused of excessive force?

A.      No. (Ex. BBB at pgs. 127-130)

This array of testimony from a number of ACPD officers who have a history of triggering the EWS shows that ACPD's EWS exists in name only. Officer Alosi testified that after triggering the EWS he had a meeting with his supervisor but left that meeting with no sense that he should do anything different. The supervisor didn't discuss any specifics of cases with him, didn't order any remedial training, and didn't even tell him that it was less than optimal to have so many incidences of force. Officer Alosi seemed dumbfounded as to the purpose of the meeting and assumed it was merely a "paperwork thing." Alosi's testimony reveals a belief that use of force is standard operating procedure and that belief flows directly from ACPD's indifference to whether their officers' routine use of force.

Although statistics "alone" are insufficient to establish a pattern and custom, statistics can been powerful evidence. Between 2009 and 2013, the most frequent internal affairs complaint in the department was for excessive force. (Ex. B at 49) Incredibly, between January 2007 and 2014, Atlantic City Police Department logged a total of 570 complaints for excessive force. (Ex. E – Chief of Police White Dep. pg. 107-108) Only *two* of those complaints were sustained. *Id.* Chief of Police Henry White conceded under oath that ACPD's sustain rates, "didn't look good" but admitted that he made no effort to determine why ACPD's sustain rates for excessive force

were so low and was unaware of any effort by the department to determine the cause of these

low sustain rates for excessive force. (Ex. E at pg.136-139)

Q.      Did the sustain rates that you became familiar with or were
        familiar with at the time that you became the Chief of Police raise
        any red flags for you?

A.      Well I told you at the beginning part of this deposition that the
        numbers didn't look good, but. . .

Q.      Why didn't they look good?

A.      Because –

Mr. Gelfand:   Objection. Asked and answered. But you can tell her again.

A.      Because of what you just cited, the percentage of the sustain rates.
        But I didn't go into why the numbers were the way they were.

Q.      What's the problem with those – with the sustain rates? I mean, I
        feel like you are talking out both sides of your mouth. You said it
        doesn't look good, but you are not sure it means anything at all?

A.      Okay.

Mr. Gelfand:   Objection

Ms. Conte:     Objection.

Mr. Gelfand:   If you understand what the question means, you can go
               ahead and answer it.

The Witness:   Well, on the surface, the numbers don't look good, but
               someone would have to dig down into each individual
               cause to see if the low sustain rate is saying that something
               was wrong back then. I did not do that.

Q.      Okay. Has anyone done that, as far as you know, from the Atlantic
        City Police Department?

A.      It could have been done, but I am not aware if it was or not?

Q.      Well have you ever seen any document or any report or had any
        conversation with anybody saying, you know what, from 2007 and

2014, our sustain rates are absurdly low. Maybe we should look at this and see if we have a problem in our department?

A.       No, I have not done that. (Ex. E at pg. 136:19-139)

The overall use of force incidences by ACPD is particularly alarming and strongly suggests that using force is condoned and seen as normal operating procedure. The Attorney General guidelines require officers to complete a "use of force" report whenever they use physical force during an arrest. In 2008, ACPD reported 587 incidences of use of force; in 2009 ACPD reported 658 uses of force; in 2010, ACPD reported 678 uses of force; in 2011, ACPD reported 676 uses of force; in 2012, ACPD reported 747 uses of force, and in 2013 ACPD reported 826 uses of force. (Ex. U – Chart Summarizing Use of Force Incidences between 2008 and 2013) In 2012, ACPD made a total of 4,562 arrests (Ex. V - ACPD 2014 Brochure at Pg. 11) Of those arrests, 826 use of force reports were prepared. That means that ACPD officers were using force in 1 in 5 arrests, including arrests for disorderly persons offenses.

To put these numbers in context, in 2013, the Newark Police Department ("NPD") was comprised of approximately 1000 officers who policed a community of roughly 278,427 people. In 2013, NPD made 12,558 stops, 3174 of which resulted in summons or arrests. (Ex. DD – NPD Stats) Yet, in 2013, Newark reported only 373 incidences of use of force. *Id*. In contrast, ACPD, a department of roughly 323 officers that polices a community of approximately 40,000 people reported 826 incidences of use of force. (Ex. U and V)

Although the decision-makers for ACPD were not interested in determining why the department had such high incidences of use of force and high rates of excessive force complaints, the New Jersey Attorney General was concerned about ACPD's rates of use of force. In 2014, the New Jersey Attorney General initiated a series of meetings with ACPD about how

to reduce its use of force and conducted a study of use of force by ACPD. (Ex. S – Dep. of Gregory Anderson at pg. 23:10-23; 25:16-21; 27:22–28:8) (Ex. T – OLEPS Report on Use of Force by ACPD between 2012 – 2013) On June 18, 2014, the Office of the Attorney General, Department of Law and Public Safety ("OLEPS") prepared an in-depth study of uses of force by ACPD from January 1, 2012 to December 31, 2013. *Id.* OLEPS reported their findings in a lengthy report that was forwarded to the Chief of Police, Henry White. *Id.*

According to the OLEPS report, between 2012 and 2014, there were 1547 reports filed for uses of force by ACPD officers. (Ex. T. at pg. 7) OLEPS concluded that between the relevant time period, 262 officers of the 343 officers employed by ACPD were involved in a use of force incident. OLEPS reported that "[m]any officers were involved in a large proportion of those incidents. The fact that these officers are responsible for the highest numbers of use of force in each quarter may raise a red flag. However further analysis of these officers is needed prior to drawing a conclusion that the officer poses a definite risk to the department." (Ex. T – OLEPS report at pg. 31)

Despite OLEPS' finding that a few officers were involved in a large proportion of use of force incidents and despite the recommendation that further analysis was needed to determine the risk that they posed to the department, ACPD did nothing to identify whether it employed rogue officers prone to violence. Chief White admitted that ACPD's excessive force sustain rates didn't "look good" and acknowledged reviewing the OLEPS report regarding uses of force in Atlantic City. However, Chief White testified that in attempting to improve the internal affairs function of ACPD,  he did not "focus in on individual officers" who were accumulating excessive force complaints or high use of force incidences. (Ex. E at pg. 273) Instead, White testified that he

thought it better to concentrate on the "whole picture" and that "focusing on the individual

officers wasn't going to solve the problem" *Id.*

Dr. Shane reports that Chief White's approach "is completely incorrect as management

practice." (Ex. B at pg. 49) ACPD failed to identify the problem and therefore had no ability to

fix it. ACPD cannot differentiate between an individual officer or the "whole" as described by

Chief White. If the problem was the individual officer then the organization had an obligation to

protect the public from that officer. White concedes neither he nor his predecessors engaged in

this analysis. Former Chief of Police Jubilee readily admitted that he did nothing to respond to

officers who accumulated high rates of excessive force complaints. (Ex. E. at pg. 136:19-139)

In a recent deposition with retired ACPD Sergeant Cupani, Cupani testified that he had

never received any training by ACPD with respect to de-escalating violence but that he

personally tried to incorporate that approach into his own policing activities. (Ex. GG – Retired

ACPD Sergeant Cupani Deposition – Dec. 8, 2016 at pg. 162-165) Cupani testified that as a

Sergeant one of his duties was to sign off on 'Use of Reports' prepared by officers under his

command. His role was not to investigate whether the use of force was appropriate but to ensure

that the form was completed property *and to forward the report to internal affairs*. Cupani

admitted that by signing off on UOF reports, he observed obvious patterns that revealed that

certain officers were repeat offenders of use of force. Cupani was never told how to deal with

those repeat offenders and simply forwarded the UOF reports to Internal Affairs. Cupani testified

that ACPD command staff never seemed particularly concerned about officers who had high

incidences of use of force. Cupani further testified that he personally did not have a significant

complaint history for excessive force, but admitted that he wouldn't have been concerned even if

he did receive a  complaint because nothing ever came of civilian complaints for excessive

force. Cupani also testified that between 2008 and 2012 after routinely observing public complaints about the behavior of ACPD officers, he circulated a number of department-wide emails expressing his concern about the ethics and integrity of the department. Cupani testified that he was warned to refrain from criticizing the department and thereafter, he believes he was retaliated against in part for criticizing the department. (Ex. GG – Cupani Dep. at pgs.)

Given this sampling of compelling facts, there is no question that genuine issues of material fact exist as to the question of whether ACPD condones use of excessive force by its officers without fear of discipline. Contrary to the City's argument, Plaintiff relies on a wide-range of evidence, including his unrebutted expert report, to demonstrate municipal liability on this theory. Accordingly, the City's motion for summary judgment must be denied.

II.   **Genuine Issues of Material Fact Exist As to Whether Defendant City of Atlantic City Has a Widespread, Well-Settled Practice of Exonerating Rogue Police Officers by Failing to Meaningfully Investigate Internal Affairs Complaints.**

Relatedly, Plaintiff has amassed a mountain of evidence that raises genuine issues of material fact on the question of whether ACPD has a sham internal affairs process that is designed to exonerate rogue police officers. Like Argument I of this brief, this Court recently denied the City's motion for summary judgment with respect to this exact claim also brought in *Costantino, supra*.

Plaintiff submitted an unrebutted expert report from Dr. Jon Shane that meticulously examined ACPD's internal affairs function and concluded that "the Atlantic City Police Department did not properly implement this internal affairs program as required by the New Jersey Attorney General Office and did not follow accepted industry standards in effect at the time for conducting internal affairs investigations. The Atlantic City Police Department also did

not follow accepted industry standards for identifying and addressing patterns and trends of complaints against police officers." (Ex. B at 26) The City offers no expert report to rebut Plaintiff's report.

Dr. Shane conducted an in-depth analysis of ACPD's internal affairs function for the years spanning 2009 through 2013. First, Shane did a "process" or "qualitative" evaluation of 33 randomly selected ACPD internal affairs investigations to determine whether those investigations comported with: (1) national standards for conducting internal affairs investigations; (2) the New Jersey Attorney General's policy on internal affairs; (3) the CALEA standard for early warning systems; and (4) ACPD's policy on internal affairs. (Ex. B – Shane Report II at pg. 24-25) Second, Shane conducted a statistical analysis of *all* internal affairs files between 2009 and 2013. Notably the City offered no expert report to rebut Dr. Shane's conclusions.

Dr. Shane's thorough 'process evaluation' revealed that ACPD's investigations are superficial, incomplete and fail to comport with the New Jersey Attorney general guidelines and accepted national norms. (Ex. B at pg. 26) Dr. Shane discovered the following flaws in ACPD's internal affairs investigations that lead to the exoneration of rouge officers: (1) there is no independent investigative effort from IA investigators before a disposition is rendered; (2) officers are not personally interviewed; (3) IA investigators do not collect all documents and evidence relevant to the investigation; (4) electronic statements are not taken from the officers, victims, witnesses, or complainants to create a permanent record; (5) victims/complainants often submit their own written statement of events and are not interviewed or asked probing questions; (6) there is no canvas of the area for evidence, witnesses, or surveillance video; (7) there is often no attempt to corroborate the allegations made by the victims or officers; (8)

attempts to identify officers that are not known to the victim are not undertaken; (9) there is no evidence the officers submit reports accounting for their actions separately without conferring with each other beforehand; (10) IA investigators use the term "statement" in a misleading fashion; (11) flawed investigations are endorsed by ACPD supervisors; (12) flawed investigations are concurred with by the ACPO; (12) ACPO does not independently investigate IA cases from ACPD; (13) ACPD officers self-grant use immunity; (14) criminal allegations (e.g., excessive force) are often investigated as administrative complaints; (15) excessive force is investigated as a policy violation; (16) the ACPD IA process treats criminal allegations (e.g. excessive force) no differently that internal policy violations (e.g., demeanor); and (16) the allegations are investigated against a defined customary standard. (Ex. B at pgs. 28-40).

Dr. Shane's statistical analysis provides additional compelling evidence that ACPD's internal affairs function offers no meaningful recourse for the citizenry to complain about officers' conduct. Between 2009 and 2013, ACPD conducted 778 internal affairs investigations involving a total of 1,999 complaints. *Id*. at pg. 47. The national rate of sustained complaints for excessive force in a department of similar size to ACPD is 12%. ACPD's sustain rate for excessive force is a mere .219%. (Ex. B at pg. 50)

As set out in greater detail in Argument I, *supra*, Chief of Police White admitted that the low sustain rates for internal affairs complaints for excessive force (and all other types of civilian complaints) "didn't look good" but did nothing to investigate why his department had such a low sustain rate and did not meaningfully consider whether the department employed any "problem" officers.

> Q.     Would you agree that that two sustained findings of in excess of
>        550 complaints of excessive force between the years of 2007 and
>        2014 might have contributed to the public's perception that the

> Atlantic City Police Department was covering up or not taking
> internal affairs complaints seriously?

A.    Yes. (Ex. E. – White's Dep. at pg. 108)

* * *

Q.    I am not really a math person, but you realize that that sustain rate
is like less than a half a percent, right?

A.    It doesn't look good. I don't know what the percentage is, but it
doesn't look good.

Q.    Right. Do you have an explanation – I mean this is free reign, do
you have an explanation as to why the sustain rate is so low?

Mr. Gelfand:   Objection.

Ms. Conte:    Objection to the form.

Mr. Hegarty:   Objection.

Mr. Silverstein:    Join.

The Witness:  No, I don't. (Ex. E – pg. 108-109)

Chief White testified that he did not think it would do any good to look at individual

officers' conduct and further testified that it was his belief that the majority of people who make

internal affairs complaints are not truthful. (Ex. E – pg. 109)  As discussed in Argument I, *supra*,

Chief White's attitude reveals reckless indifference to the efficacy of the internal affairs function

and raises genuine issues of material facts on the issues of whether ACPD's internal affairs

function was a sham.

The incompetence of ACPD's internal affairs division was so well known and well-

accepted that even the former Mayor Lorenzo Langford who served as mayor between 2009 and

2013 expressed his constant dissatisfaction with the department. Langford explained that even as

the Mayor he was powerless to change or improve IA. According to Langford, so long as the

head of IA was appointed by the Chief, that person's primary goal would be to remain loyal to

the chief – which necessarily meant protecting rogue members of the department.

> Q.     Okay. And just to follow up on this one point that we were talking about
>        previously: Were you satisfied with the internal affairs division while you were
>        mayor, or was that something that –
>
> A.     I have never been satisfied with internal affairs. And it may not be – and I'll say
>        this: It may not have been fair of me to have that perspective. But ultimately,
>        people are designated in that department by the chief. So you've got to believe
>        that there's some kind of relationship between the person who's overseeing
>        internal affairs and the chief who appointed them in that position.
>        And if that person had to choose between being loyal to the administration and
>        being loyal in the chief, I would think that person would choose to be more loyal
>        to the chief. That's who put him there.
>        And there's nothing that a mayor – me or anybody else could do to exact
>        retribution if we were so inclined. I'm not. I never was, but if I were – some
>        mayors were. But if I were – in other words, if I came to you and you were head
>        of internal affairs and I said, I'm not satisfied with all of these cases that are
>        falling in your lap going back unsustained and damn it, you better do this or you
>        better do that – all I can do is complain. There's nothing I can do. Like, I can't
>        say. I'm moving you out of internal affairs or I'm changing your shift, taking you
>        from alpha and putting you in – there's nothing I can do. Only the chief can do
>        that. So who are you going to be more loyal to, me or the chief? (Ex. II at pg.
>        102:21-104:7)

Another very important fact to consider for the purpose of determining whether

ACPD's internal affairs process is designed to exonerate rogue officers of civilian complaints

is a comparison of how IA treats internal complaints (those brought from within the department)

versus external complaints (those brought by civilians). (Ex. B. at 51-52)  Over 80% of *all*

internal affairs complaints were generated from civilians or external sources while 16.4% were

generated from inside the department, yet the rate of sustained complaints for those generated

internally are nearly four times higher than those generated externally. Also notable is that when

the complaint is brought by someone from inside the department, officers were more likely to be

formally interviewed – strongly suggesting that IA investigates a complaint brought from inside

the department with a greater level of care and seriousness. Dr. Shane observed that these two

statistics, taken together, "suggest potential bias in the investigation, where there is an intrinsic credibility granted to those inside the organization who initiate a complaint compared to those from outside the organization who initiate a complaint. Said differently, those outside the organization may not be seen as credible as those inside the organization and therefore don't have their allegations sustained at an equal rate. Findings such as these are cause for police management to pause and examine the individual cases more closely for quality; external investigations may be missing several important aspects such as those found in the process evaluation." (Ex. B at pg. 52-53).

In addition to the data developed by Plaintiff and evaluated by Plaintiff's expert Dr. Shane, Chief White admitted that prior to February, 2015, the internal affairs function of ACPD had no policy or procedure that dictated how to deal with officers who triggered the early warning system. (Ex. E at pg. 157-158) Retired Chief Ernest Jubilee admitted during his deposition that when he was chief and received notification that an officer had triggered the early warning system, he ordered one of his deputy chiefs to respond to the EWS trigger. Jubilee took no steps to ensure that there was an appropriate response by his command staff to the officers who triggered the system. (Ex. H – Jubilee Dep. at pg. 29-32)

Not a single document was produced by the City that shows that prior to 2015, an officer who triggered the early warning system was notified that he had done so or ordered to undergo any time of remedial training. And as set out in great detail in argument I, *supra,* ACPD officers who had accumulated greater than three internal affairs complaints within a calendar year throughout most or all of their career testified that they had never been told that they triggered the EWS system, let alone, ordered to undergo any training. (Ex. I at 278:18-279: Ex. K at 363:1-7; Ex. AAA at 264-266; 276:18-23; Ex. O at pg. 141; Ex. Q at 241:5-21)

Furthermore, testimony from retired ACPD Internal Affairs investigator Gena Dorn strongly suggests that Atlantic City ran an internal affairs division that served as a vehicle for officers to harass and retaliate against one another, rather than a meaningful outlet for civilians to have their claims of police misconduct heard and properly investigated. Dorn admitted that when she assigned to internal affairs in 2013, she did not want the assignment. (Ex. W – Retired Sergeant Gena Dorn's Dep. July 29, 2015 at pg. 45-52) She explained that it was a stressful assignment, in part, because it's not an assignment where you "make a lot of friends." She elaborated that it's a unit that can be "taxing on personal relationships and work-related relationships." *Id* at 52. And that one of the reasons she was displeased with the assignment was that she "didn't always agree with the final disposition of cases." *Id*. at 55. Plaintiff's counsel asked Dorn for specifics:

> Q.     Can you remember any occasion in your history in internal affairs, either your first time in internal affairs or your second time in internal affairs, where you made an assessment or a recommendation regarding a finding and it was changed by someone up the chain of command?

Mr. Gelfand:   Objection. You can answer.

A.     Yes. (Ex. W pg. 58:1-24)

Dorn then testified in detail about a complaint for improper search that she investigated in 2014. After her investigation, she recommended that the complaint be sustained as to two sergeants, Sergeant Fair and Sergeant Herrerias. (Ex. W at pg. 67-70) Dorn later learned that Chief White had overruled her finding without making any effort to speak with her about her investigation. *Id*. at 72. Dorn admitted that she was displeased with the Chief's decision to overrule her and thought that the case had received unnecessary attention because of *who* the target officers were.

Q.      Okay. Was it your belief that Chief White was reluctant to discipline
        Sergeant Fair because of the fact that Sergeant Fair's father was a captain?

A.      That was my belief.

Q.      Okay. Did you have a similar belief with respect to sergeant – I can't
        remember his name, the other sergeant?

A.      Her – it's a she.

Q.      Oh. It's a she.

A.      Herrerias.

Q.      Herrerias. Did you have any theory about why Chief White was
        disinclined to discipline Sergeant Herrerias?

A.      He couldn't discipline one without disciplining the other. (*Id.* at 92-93)

Dorn further testified that she spoke directly with her supervisor, Lt. Bridget Pierce,

about her disagreement with Chief White overruling her finding. According to Dorn, Pierce

originally agreed with her but then changed her opinion. Dorn testified that she believed that

Pierce was "influenced" to change her opinion. (*Id*. at 95) When asked about this particular

investigation, Chief White admitted that he had sought a second review of Dorn's work from the

prosecutor's office, because if he was going to discipline an officer he wanted to make extra sure

the finding White could recall no other time when he had sought review by the prosecutor's

office when the IA investigator recommended a finding of "not sustained" "unfounded" or

"exonerated."

 Dorn also admitted that she felt pressured to avoid asking target officers difficult or

uncomfortable questions, including questions about whether certain conduct was motivated by

race. Dorn admitted that her job was made more difficult because there was a lot rumor and

innuendo surrounding internal affairs investigations and that others had broken the rules of

confidentiality during the course of investigations, making her job more difficult. Incredibly

Dorn testified that by doing her job, she was concerned that she might be retaliated against by
her fellow officers.

> Q.    Did you feel when you were in the internal affairs division that merely by
>        doing your job and investigating internal affairs complaints, you were at
>        risk of being retaliated against by other officers.
>
> A.    Yes, absolutely.
>
> Ms. Riley:    Object to the form.
>
> The Witness:  I'm sorry.
>
> Ms. Riley:    That's okay, you can answer.
>
> A.    Absolutely.
>
> Q.    And one way that you could be retaliated against is that they might
>        complain to the Attorney General about something that had no merit?
>
> Ms. Riley:    Same objection. You can answer.
>
> A.    Yes
>
> BY MS. BONJEAN:
> Q.    Any other ways in which you felt at risk of being retaliated against by
>        other officers?
>
> A.    I learned that Sergeant Herrerias threatened to sue at some point?
>
> Q.    Okay. So there was a threat of litigation against?
>
> A.    Me.
>
> Q.    Against you?
>
> A.    Yes.
>
> Q.    For doing your job? (*Id*. at 101-103)

Dorn explained that Sergeant Herrieras had threatened to sue Dorn because she was upset
that Dorn had even questioned her about the complainant's allegations that the officers' targeted
the complainants because they lived in a "black neighborhood." Dorn's testimony is strong

evidence that ACPD's internal affairs unit did not function with the independence or freedom to conduct meaningful investigations of citizens' complaints. Surely, if an IA investigator cannot even ask target officers difficult questions without fearing retaliation, there can be no trust that the investigations are thorough, complete and unbiased.

Atlantic City not only fails to conduct meaningful investigations of civilian complaints, it actively conceals complaints regarding its officers' *criminal* conduct by either failing to properly designate the complaint or purposefully mislabeling it. ACPD routinely labels complaints alleging criminal conduct by its officers as rule violations, thereby manipulating its statistics and concealing evidence of a pattern of criminal behavior by its officers. (Ex. B at pg. 37-39)

For example, on two separate occasions, civilians complained that Sergeant Frank Timek wrongfully detained and/or arrested them. Those complainants also alleged that Timek confiscated certain personnel effects that were never returned to the complainants. (Ex.AA) At no point did internal affairs look at these cases as possible thefts but rather labeled them, as "improper procedure" "security of personal property" "missing property" and treated these complaint merely as administrative issues. Time and time again, ACPD ignores serious allegations of criminal activity among its officers by concealing it as merely administrative violations. (Ex. AA – IA Files 08-153/05-060)

As another example of this phenomenon, officer Sterling Wheaten has been accused of stealing or destroying evidence on at least two occasions. In *Costantino v. City of Atlantic City, et al.*, 13-CV-6667, an internal affairs investigation was initiated after Plaintiff sued officer Wheaten, making a number of allegations, including excessive force, theft, destruction of evidence, and false arrest. Critically, ACPD failed to identify or acknowledge the complaints involving theft and destruction of evidence on Wheaten's IA card. Instead, ACPD identified the

complaint as an excessive force and "other rule violation" and "performance of duty." IA

ignored the serious allegations that Wheaten had committed crimes by destroying evidence and

obstructing justice, minimizing the allegations by mischaracterizing them as rule violations. In

another example, complainant Leon Henry also accused ACPD officer Sterling Wheaten

Wheaten of assaulting him and stealing his phone. ACPD labeled the complaint "Improper

procedure; return of property." (Ex. J – Wheaten IA Index Card) (Ex. Y(1) – Leon Henry IA

investigation – 12-110)) This designation is highly misleading as the complainant clearly alleged

that Wheaten stole his phone in an effort to destroy evidence.

   In another example, complainant Carmel Francois made an internal affairs complaint

against ACPD officer Avette Harper, alleging that Harper, and other ACPD officers, beat and

robbed her husband. (Ex. Y(2) –  Carmel Francois - IA File 08-059) However, internal affairs

labeled the complaint as excessive force and "failure to secure prisoner's property." Rather than

properly label the complaint as a "theft," ACPD minimized and concealed the allegation by

categorizing it as "failure to secure prisoner's property." (Ex. Y(2) – Carmel Francois IA File –

08-059

   A look at officer Oldroyd's internal affairs history provides a striking example of how

APCD refused to identify and actually *concealed* a disturbing pattern of criminal; conduct by

Oldroyd. In one case, a complainant, Diane Zavacky, reported to internal affairs that she was

alarmed when officer Oldroyd (a complete stranger to her) left a love note and flowers at her

doorstep, even though she had never spoken to him or provided any personal information to him.

Apparently, their paths had crossed at a Wawa and Oldroyd had a fellow officer run the tags on

her vehicle to determine her home address. Oldroyd then went to her home and left the letter and

roses at her front door which concerned the complainant and "creeped her out." Oldroyd

admitted that the woman never provided him with any personal information. (Ex. Z(1) – Zavacky IA File – 06-024) Oldroyd's index card merely reflects a complaint of "standard of conduct" and Oldroyd was disciplined for "misusing property." (Ex. R – Oldroyd IA Index Card) By labeling these allegations as merely administrative violations, the City misled the public and hid the underlying complaint which was far more serious, indeed a criminal act. *See* 2C:21-15 – Misapplication of Entrusted Property and Property of Government.

Like this above example, Atlantic City routinely conceals allegations of criminal conduct by its officers, particularly as it relates to allegations of theft. In one complaint, the complainant, Kevin Mayfield, accused Oldroyd of harassing him and of stealing $943 from him, yet Oldroyd's IA index card does not reflect Mayfield's allegation of theft. (Ex. Z(2) – Mayfield IA File 06-010) In another example, Raul Madera, filed a complaint against Oldroyd claiming that Oldroyd beat him and stole two of his phones. Oldroyd's index card and the internal affairs file reflects a complaint for excessive force and "neglect of duty." (Ex. Z(3) – Madera IA File 11-118) Oldroyd's index cards fails to reflect the claim of "theft" made against Oldroyd. Another complainant, Germaine Wiggins, alleged that he was assaulted by Oldroyd and that Oldroyd stole a number personal items from him, Oldroyd's index card merely reflects complaints for "excessive force" and "improper procedure." (Ex. Z(4) – Wiggins IA File 12-104) Again, a complainant, Tracey Bennett, made a complaint against Oldroyd that he beat her up and stole her cell phone. Oldryod's index card reflects a complaint for "excessive force" and "performance of duty." (Ex. Z(5) – Bennett IA File 13-123)

As another example, on December 2, 2013, an internal affairs investigation was initiated after shooting victim, Charlie Hvasta, received treatment at AtlantiCare regional medical center. A nurse inventoried Hvasta's personal property, including cash, and gave it to Office Anthony

Alosi. Alosi re-inventoried the money at ACPD's detective division – less $500. (Ex. Y(4) –

Charlie Hvasta IA Investigation – 13-216) Although Alosi was the last officer in control of the

money and had no explanation for why $500 was missing from the money when he inventoried

it, ACPD did not even identify, let alone investigate, this complaint as a possible theft. Rather,

the entry appears as an, "other rule violation" on Alosi's index card. (Ex. C – Alosi Index Card)

       The foregoing are just a sampling of internal affairs files that provide compelling

evidence that ACPD routinely mislabels or omits complaints that involve *criminal* conduct by

their officers. Specifically, ACPD conceals the nature of allegations like theft by labeling it

"performance of duty" "standard of conduct" "missing property" "improper procedure" "return

of property." By refusing to even identify the nature of the allegations, ACPD has knowingly

stuck its head in the proverbial sand to avoid facing facts – namely that certain officers routinely

engage in official misconduct and lie about it.

       Internal Affairs not only mislabels complaints to conceal *allegations* of criminal conduct,

but when the City is confronted with overwhelming evidence that an officer has *committed* a

crime, it disciplines the officer for a rule violation rather than referring the case for a criminal

investigation. Again by way of example, a complaint for excessive force was brought against

officer Avette Harper, the underlying complaint was not sustained but Harper was disciplined for

failing to file a use of force report or even an incident report. This failure should have raised red

flags for the investigator who was asked to consider whether the complainant's claim of

excessive force was credible. Instead of drawing the obvious inference from Harper's failure to

complete the required use of force and incident reports, that is that Harper was possibly

concealing facts about the incident, internal affairs drew no such inference, refused to sustain the

complaint and simply reprimanded Harper for failing to complete the necessary reports. (Ex. CCC – IA File 12-0401)

Again by way of example, officer Oldroyd admitted that he used police equipment to learn a random woman's address who he saw at a Wawa. He then left the woman a note and flowers at her house. Yet, the department only sustained allegations of "Standard of Conduct" and "Misuse of Property."

In another striking example, Officer Brent Dooley and Defendant Abrams participated in the execution of a search warrant of Maria Mendez's home on September 23, 2009. (Ex. BB – Maria Mendez – IA Filed 09-163) At the conclusion of the search, Ms. Mendez was missing $100 and her puppy. The puppy was discovered in the care of Defendant Abrams after Abrams' girlfriend posted photos of the puppy on Facebook. Although the department concluded that Officer Dooley had taken the puppy, a criminal act, he was disciplined for standard of conduct and other administrative violations. (Ex. P Dooley IA Card) Critically, Dooley's index card does not reflect that he was disciplined for any conduct related to this crime. Similarly, Defendant Abrams was only disciplined for administrative violations rather than charged with a crime. (Ex. C- Abrams IA Card)

In another example, Defendant Abrams was subject to an internal affairs investigation after his department-issued vice car was searched and a collection of contraband was discovered, including marijuana, an oxycodone prescription pill bottle prescribed to Michael Cox, three pill bottles prescribed Ricardo Harris, a plastic bag with two random pills, a glass pipe, three sets of brass knuckles, four folding knives, a black glock, ammunition, three asps, a plastics bag. Abrams was disciplined for neglect of duty. (Exhibit EE – IA File 09-168)

Time and time again, the City turns a blind eye to allegations of criminal acts by its officers and when forced to discipline an officers' misconduct it punishes its officers for seemingly benign administrative violations. When an officer should be disciplined for excessive force, he is reprimanded for failing to properly complete a use of force report. When an officer should be disciplined for stealing, he is reprimanded for standard of conduct or improper procedure. When an officer harasses or stalks a woman, he is reprimanded for "misusing police property." When an officer steals drugs, perhaps for personal use, and weapons, he is disciplined for "neglect of duty." There are countless examples revealing that ACPD bends over backwards to conceal the criminal conduct of its officers. This practice is not merely an isolated event or favoritism directed at one or two officers, rather the department as a matter of course, mislabels IA complaints to cover-up the allegations, and when it does find criminal conduct, it disciplines for administrative violations. This practice has the effect of covering up officer misconduct and signals to these rogue officers that they may continue to break the law with impunity.

Last, Atlantic City had a policy of destroying internal affairs files after five years in direct contradiction of the Attorney General guidelines. This policy is further evidence that the City refuses to take its internal affairs function seriously and is more invested in covering up police conduct than conducting meaningful investigations of civilian complaints. The 2000 Attorney General Guidelines states that all internal affairs investigative records should be maintained for at least five years, "agencies should maintain these files as they relate to a particular officer for the career of that office plus five years." (Ex M at pg. 46)  Until 2009, ACPD refused to conform to this guideline and destroyed internal affairs that were over five years old. Indeed, the City actually "whites out" internal affairs entries on individual officers index cards (Ex. R – Oldroyd IA Card) For example, Sergeant Daryl Hall's IA card does not reflect his entire complaint history

and the investigative files associated with all of Hall's internal affairs complaints prior to 2005 have been destroyed. Plaintiff was only able to learn of Hall's complete internal affairs history by reviewing the "master log" which reflects at least 11 other complaints against Hall that are not reflected on his index card. The City further admits that it destroyed internal affairs files  and that Officer Oldroyd's index card reflects that a number of entries were "whited out" and concealed. Defendant Oldroyrd is still on the force. (Ex. R – Oldroyd Index Card)

The foregoing is some of the evidence that Plaintiff will present at trial that proves that Atlantic City's internal affairs division was a charade. The City is hard pressed to argue that material issues of fact do not exist on the question of whether Atlantic City has a well-settled custom or practice of conducting sham internal affairs investigations.

III.    **Genuine Issues of Material Fact Exist on the Question of Whether the City Failed to Supervise, Discipline and Train its Officers With Regard to Officers' Use of Excessive Force.**

Plaintiff has identified an abundance of factual support in the preceding arguments that shows that ACPD officers engaged in routine use of excessive force against the citizens of Atlantic City and that the Defendant City did nothing to address the issue of excessive force in its department. Put another way, the City did not supervise, train, or discipline its problem officers, showing deliberate indifference to the well-being and safety of the people ACPD are sworn to protect. Plaintiff will highlight some of those facts below but relies on her prior arguments in further support of this related, but separate, theory of *Monell* liability. Critically, like Issues I and II, *supra*, this Court denied the City's motion to dismiss this very issue in the matter of *Costantino, supra*.

A municipality may be held directly liable for the constitutional violations of a Plaintiff if the violation was caused by a policy, custom or practice of the municipality. *Beck*, 89 F. 3d at 971. "Failure to" claims - failure to train, failure to supervise, or failure to discipline – are generally considered a subcategory of municipal policy or practice liability. *Barkes v. First Corr. Med., Inc.,* 766 F. 3d 307, 316 (3d Cir. 2014). If the conduct at issues relates to a failure to train, supervise, or discipline municipal employees, "liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of the persons with whom these employees will come into contact." *Carter v. City of Phila.*, 181 F. 3d 339, 357 (3d Cir. 1999). "A pattern of similar constitutional employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train. *Carswell v. Borough of Homestead*, 381 F. 3d 235, 244-45 (3d Cir. 2004).

In addition to demonstrating deliberate indifference through either failure to train/supervise/discipline, the plaintiff must further show that the alleged deficiency in training "actually causes injury." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). The municipality's conduct must be a "moving force" behind the constitutional violation at issue. *Bd. Of the County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397 (1997).

Genuine issues of material fact exist on the question of whether the City of Atlantic City failed to supervise, train, and discipline its offenders in connection with their use of excessive force. At the outset, on December 18, 2013, a jury in the matter of *Troso v. City of Atlantic City, et. al*, 10-1566 returned a verdict and $250,000 judgment finding that "the City of Atlantic City through its police department maintained a custom, policy or practice of failing to train its officers on the use of force." The verdict in *Troso* is consistent with the overwhelming evidence developed by Plaintiff revealing that ACPD neither supervised, trains, or otherwise disciplined

rouge officers with long histories of excessive force. In fact, the City simply ignored the glaring

problem of excessive force in its police department.

Preliminarily, Plaintiff's use of force expert Vanness Bogardus opined that Atlantic City

failed to adequately train its officers with respect to use force. Bogardus stated:

> The Atlantic City Police Department's Use of Force Policy did not offer adequate
> guidance to line level officers of dog handler to prevent issues of unreasonable,
> unnecessary and excessive use of force in the form of [1] "tackling Mr. Stadler
> from behind to the ground," [2] delivery of multiple fist strikes to Mr. Stadler's
> face, [3] holding him down, exerting blunt force to the body (*i.e.* punching and
> kicking), and [4] unwarranted dog biting of an unarmed, immobilizes and non-
> threatening suspect. On March, 2013, had there been an adequate ACPD use of
> force policy and had that policy been completely supervised, K9 Officer Devlin
> would not have permitted his dog to bite anyone, especially without an adequate
> warning with an opportunity to comply, because to do so would have been
> recognized as an improper escalation of force in violation of their department's
> policy governing the use of physical force and potentially subjecting them to
> departmental discipline. (Ex. NN at pg. 6-7)

Furthermore, the summary judgment record as a whole presents overwhelming evidence

that the City did not supervise its officers with respect to use of force. As set out in great detail in

Arguments I and II, Chief Ernest Jubilee, admitted that he was the final decision making

authority on the day-to-day operations of the police department between 2010 and February,

2012. Lt. Hendricks, and the City's 30(b)(6) designee on internal affairs testified that as a matter

of policy the Chief of Police is informed every time an internal affairs complaints was made

against an officer. (Ex. FF – Lt. Hendricks March 25, 2015 Testimony at pg. 56:13-14) Jubilee

further admitted that he was notified when an Atlantic City police officer triggered the early

warning system by accumulating more than three internal affairs complaints within a calendar

year but that he did nothing to respond to those complaints. Jubilee confessed that when he was

chief between 2010 and November, 2013, the department merely counted complaints and did

nothing to address patterns.

Even after the Attorney General conducted an in-depth study of use of force in the ACPD and found that a small group of officers were responsible for a disproportionate number of use of force incidences, Chief White admittedly did nothing to determine whether certain officers were problem officers, prone to violence. When asked whether he thought it was unreasonable for the public to draw the perception that Atlantic City was not doing its job in terms of monitoring and disciplining its officers in light of the data related to excessive force complaints, Chief White testified, "[n]o I don't thinks it's unreasonable."

Furthermore, numerous officers with extensive IA complaint histories who have spent the vast majority of their careers triggering the EWS, including Defendants Abrams and Devlin, Sergeant Timek, Officer Oldroyd, and Officer Wheaten all testified that they had never been disciplined, ordered for remedial training, or even told that they had triggered the EWS until 2015. (Ex. I at 278; Ex. K at 363:1-7; Ex. AAA at 264-266; 276:18-23; Ex. O at pg. 141; Ex. Q at 241:5-21)

ACPD's policy and practices related to conducting performance evaluations of its officers further show that the City simply did not supervise its officers on the issue of use of force. ACPD has a written policy that requires ACPD officers to undergo yearly performance evaluations. One of the objectives of the performance evaluation is to determine whether an officer is suitable for a specialized assignment. Lt. Hendricks admitted that ACPD was not in compliance with its own policy for conducting yearly performance evaluations.

Q.    Do you know how many performance evaluations have been ordered since 2010?

A.    I could recall three specifically.

Q.    So there have been three performance evaluations ordered in the last five years approximately?

A.     Sounds about right.

Q.     Okay. You would agree that that's not consistent with Atlantic City Police Department's own policy on how often performance evaluations should be conducted, right?

A.     Yes. (Ex. GG – Lt. Hendricks' Testimony from July 31, 2015 at pg. 100)

Critically, Lt. Hendricks testified that an officer's performance evaluation does not take into account his internal affairs complaint history or whether the officer triggered the EWS. In fact, the policy does not even require a reviewing officer to consider whether the officer has been subjected to any discipline. (Ex. GG - Hendrick's dep. 105-109 July 31, 2015) Relatedly, former Chief of Police Jubilee admitted that an officers' internal affairs history played no role in whether they were promoted to a higher rank. According to Jubilee, the appointing authority is the Mayor of Atlantic City and the person responsible for promoting an officer to a higher rank. Chief Jubilee conceded that the Chief of Police does have input into the promoting decision, but that he could not recall ever informing the Mayor's office that an officer seeking promotion had a significant complaint history. (Ex. X. at pg. 87) When questioned about the promotion of Frank Timek to Sergeant, an ACPD officer with one of the most prodigious complaint histories in the department; Jubilee had this to say:

Q.     Did you review Frank Timek's Internal Affairs history prior to his promotion to sergeant?

A.     No.

Q.     Did you inform the mayor's office that Frank Timek had a lengthy Internal Affairs History?

A.     No.

Q.     Did you provide the mayor's office with Frank Timek's index card of complaints prior to his promotion for Sergeant?

A.     I can't do that.

Q.      Why not?

A.      I can't provide the Internal Affairs Index card to the mayor.

Q.      So it's your position – it's your testimony that the one person who is responsible
        for promoting people is not privy to their internal affairs histories?

Ms. Riley:      Objection to the form. You can answer.

A.      Yes. (Ex. X at pg. 86-87)

The former Mayor of Atlantic City, Lorenzo Langford corroborated Chief Jubilee's testimony on

this point, admitting that the Mayor's office did *no* independent investigation and conducted zero

due diligence in deciding whether an officer should be promoted (Ex. II – Deposition of Lorenzo

Langford (7/20/15) at pg. 85:9-17) Langford admitted that in making a decision to promote an

officer he would have no information about the candidate unless it was provided by the Chief of

Police and he could not remember a scenario between 2008 and 2013 when he was the Mayor

during which the Chief of Police cautioned him about promoting an officer with a significant

disciplinary or internal affairs history. (Ex. II at 85:5-8)

Q.      Do you have a recollection of the chief ever weighing in one way or another on a
        particular promotion?

A.      No.

Q.      The mayor's officer certainly didn't do an independent investigation into whether
        someone was appropriate for promotion, right?

A.      No.

Q.      What would you say – other than having this list, what would you say, if
        anything, the mayor's office quote/unquote due diligence would have been?"

A.      Nothing. (Ex. II at 85:5-17)

At the same time, Langford conceded that an officer disciplinary history *should* play a

role in the decision to promote an officer.

Q.      Would you agree – let me ask you this: Do you have an opinion about whether someone's disciplinary history should factor into whether or not they are promoted?

A.      I have an opinion.

Q.      And what is your opinion about that?

A.      I have an opinion about opinions, too.

Q.      Fair enough. I'm more interested in your opinion about the subject matter.

A.      I think it – I think it should matter; but you know, seriously. It doesn't matter what I think. (Ex. II at pg. 88:12-24)

Atlantic City not only promoted officers in complete disregard of their complaint histories, the City also rewarded officers with prodigious complaint histories with prestigious assignments. For example, even though ACPD's K9 Policy expressly states that an officer's internal affairs history must be reviewed to determine whether the officer is suitable for appointment to the prominent and highly competitive K9 assignment, Defendant Devlin was offered one of the highly coveted K9 handler spots despite his extraordinary complaint history that overwhelmingly reflected an officer prone to violence. (Ex. C – Devlin's IA Card)

Similarly, officer Sterling Wheaten's prodigious IA history was ignored when he was offered one of three K9 positions in the 2012 K9 class (Ex. LL – List of Prospective K9 Handlers for 2012). Critically, a list of prospective K9 candidates reveals that although Wheaten had the second greatest number of internal affairs complaints made against him out of 24 candidates, he was offered one of the three highly coveted positions. *Id*. Incredibly, when officer Frank Timek applied to be a K9 officer, he had accumulated 30 internal affairs complaints for excessive force and had triggered the so-called EWS every year he was on the force.

In sum, the summary judgment record in this case unquestionably raises issues of material fact regarding whether Atlantic City failed to train, supervise, and discipline its officers

44

with respect to use of force. Ample evidence demonstrates that Atlantic City not only failed to

take any action with respect to officers who repeatedly used excessive force but systematically

concealed evidence of their officers' criminal conduct.

**IV.   Genuine Issues of Material Fact Exist on the Question of Whether the City Failed to Train, Supervise, and Discipline its K9 Handlers, Including Defendant Wheaten, With Regard to the Appropriate and Constitutional Use of Patrol Dogs for so-called "Criminal Apprehension[1]."**

Plaintiff's permanent dog-bite injuries were not only the result of unreasonable and

excessive force by Defendant Devline but were caused by Atlantic City's failure to train,

supervise, and discipline its K9 handlers in accordance with accepted national norms governing

K9 use for "criminal apprehension," New Jersey Attorney General guidelines, ACPD's own K9

policy, and Public Safety Directive 025-2010. As Plaintiff's K9 expert, Vanness H. Bogradus, III

opines, "the canine bite suffered by Mr. Hall on  was a direct result of the policies, practices,

training and customs permitted by the Atlantic City Police Department." (Ex. NN at pg. 50)

A municipality may be held directly liable for the constitutional violations of a Plaintiff if

the violation was caused by a policy, custom or practice of the municipality. *Beck*, 89 F. 3d at

971. "Failure to" claims - failure to train, failure to supervise, or failure to discipline – are

generally considered a subcategory of municipal policy or practice liability. *Barkes v. First Corr.

Med., Inc.,*  766 F. 3d 307, 316 (3d Cir. 2014). If the conduct at issue relates to a failure to train,

supervise, or discipline municipal employees, "liability under section 1983 requires a showing

that the failure amounts to 'deliberate indifference' to the rights of the persons with whom these

---

[1] "Criminal Apprehension" as defined by ACPD's K9 policy, "is when a K-9 Officer effects a lawful arrest by commanding their K-9 to bite and hold a suspect . . ."  (Ex. MM - ACPD K9 Policy (7/29/2-2011) at pg. 2)

employees will come into contact." *Carter v. City of Phila.*, 181 F. 3d 339, 357 (3d Cir. 1999).

"A pattern of similar constitutional employees is 'ordinarily necessary' to demonstrate deliberate

indifference for purposes of failure to train. *Carswell v. Borough of Homestead*, 381 F. 3d 235,

244-45 (3d Cir. 2004).

In addition to demonstrating deliberate indifference through either failure to

train/supervise/discipline, the plaintiff must further show that the alleged deficiency in training

"actually causes injury." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989). The

municipality's conduct must be a "moving force" behind the constitutional violation at issue. *Bd.*

*Of the County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397 (1997).

**A.** **Defendant Atlantic City Showed Deliberate Indifference To The Safety And**
**Well-Being Of The Citizens Of Atlantic City When ACPD Re-Deployed The**
**K-9 Patrol Units Back To The Streets Of Atlantic City In 2010 Without**
**Satisfying The Re-Training And Re-Certification Criteria For Their Return**
**As Set Forth In Public Safety Director Petersen's Directive 025-2010.**

The people of Atlantic City have a long and torrid history with ACPD's K9 division. In

August, 2009, Atlantic City Mayor Lorenzo Langford made the controversial decision to suspend

ACPD's K9 units from the streets in the wake of citizen outcry over their misuse. (Ex. II -

Langford Dep. at pgs. 39-51) Langford explained in his deposition that a number of factors

prompted his decision to suspend the K9s from the streets in 2009, namely (1) members of the

community had repeatedly complained that dogs were being misused and a mob of concerned

citizens had stormed the City Council demanding their removal from the streets; (2) he was privy

to the disproportionate number of civil rights cases involving K9 "criminal apprehensions" that

came before the City Council for settlement approval and was sensitive to the expense associated

with litigating and resolving those cases; and (3) he, personally, had witnessed an incident where

APCD K9 officers were all too eager to release their K9s into a crowd as a means of "crowd

control." (Ex. II at pgs. 39-51) Langford further explained in his deposition:

> Q.   Would it be fair to say that the primary concern was how dogs were being used in apprehending people?

> A.   The primary issue was that we were getting a number of complaints, a number of lawsuits were resulting from complaints, and the City was spending a lot of money on dog-bite cases. And I wanted to take a look at trying to find out whether or not if where there was smoke, there was fire; and if so, what did we need to do to sort of make the situation better. (Ex. II at pg. 54:12-23)

On July 24, 2009, Mayor Langford's Business Administrator, Michael Scott, issued a

cease and desist order to Chief of Police Mooney suspending the K-9 units from the streets. Scott

wrote: (Ex. JJ – K9 Suspension Memos and Directives)

> Chief Mooney, in light of the community outcry with regards to the City's Police Department's use of police dogs, I am hereby directing you to temporarily cease and desist the use of police dogs while the administration, along with your department, does a thorough review. There are areas with respect to the use of police dogs which must be addressed along with concerns and complaints from the community. (Ex. JJ – Scott Memo Dated July 24, 2009)

In a subsequent memo to Chief Mooney, Scott wrote:

> In light of the many complaints regarding the Police Department especially those that have been submitted to the Internal Affairs Division, I am hereby requesting a report to be compiled of the number of Internal Affairs complaints over the past (2) years regarding those which were generated by citizens outlining incidents of police brutality, canine bites and improper actions as permitted by law. (Ex. JJ – Scott Memo Dated July 27, 2009)

Scott's order was met with hostility by the then-Chief of Police Mooney who challenged

the administration's authority to take action suspending the K9 Units. (Ex. JJ – Mooney Memo

Dated July 30, 2009) (Ex. OO - Christine Peterson's deposition at pg. 146:19-23) Indeed,

Mooney refused to comply with the order until he was warned that his insubordination would

result in the City refusing to defend him if any civil suits that resulted. Scott wrote in a memo

dated August 18, 2009:

> Your failure to comply with my instructions constitutes insubordination and has
> placed the City of Atlantic City in a position of potential liability. This type of
> conduct will not be tolerated. Since you have taken it upon yourself to ignore my
> instruction regarding the K-9 units, it is my considered opinion that you are acting
> outside the scope of your employment. If there is any civil action taken regarding
> the latest of any further incidents and you are personally named as a defendant,
> unless and until my instruction is rescinded or modified it will be the position of
> the City that you have acted outside the scope of your authority and you will not
> be defended by the City unless a contract order is issued by the courts." (Ex. JJ –
> Scott Memo to Mooney Dated August 18, 2009)

Reluctantly, Mooney eventually complied with the order.

To this day, consensus among ACPD K9 handlers is that there was no legitimate basis to

suspend the units and that Langford's decision was motivated by politics and a dislike of Chief

Mooney. K9 Supervisor Sergeant Hall testified that he disagreed with the decision to suspend the

canines from the street and that he believed that the complaints from the community were all

from people who were unhappy with being arrested. (Ex. PP - Hall Dep. at pgs. 71-75) Hall

opined that politics motived Langford's decision and that he was pandering to the community.

(Ex. PP at pg. 75:6-23)

> Q.     But in 2009, it was your belief that there was no justification for
>        suspending the K-9 units, right?
>
> A.     Right.
>
> Q.     Was it your belief in 2009 that there was no misuse of the K-9 dogs?
>
> A.     Correct.
>
> Q.     And as you sit here today, do you believe there was any misuse of the K-9
>        dogs?
>
> A.     No.

Q.      Do you believe there has ever been any misuse of the K-9 dogs since
        you've been a K-9 officer.

        Mr. Gelfand:   Objection.

A.      No. (Ex. PP at pg. 74:15-24)

                                        ***

Q.      Based on your conversations with other K-9 handlers, is it fair to say that
        there was consensus among the K-9 handlers that this suspension was
        unwarranted?

A.      Yes.

Q.      And isn't it true that Chief Mooney was not in agreement with this K-9
        suspension?

A.      Yes. (Ex. PP at pg. 76:13-20)

Sergeant Frank Timek, who tallied an astounding 26 apprehensions in the first year he

was assigned to the unit, testified that he had no idea why the K-9 Units were suspended, had

never heard of any complaints about the K-9 units being made to Internal Affairs, and to this

day, has never learned the outcome of the investigation. (Ex. QQ – Timek Dep. at pgs. 140-149).

Timek explained that he believed that the majority of dissatisfaction with the K-9 units was

coming from a particular "segment of the community" that lived in the "projects." *Id*. at 144.

Timek opined that the citizen outcry was greatly exaggerated by the Langford administration

who suspended the units for political advantage. *Id*. at 147-149. Similarly, ACPD's former head

K-9 trainer, Joe Rodriguez also disagreed with the suspension of the K-9 units. (Ex. R – Joseph

Rodriguez Dep. at pg. 91)

In contrast to ACPD's views, members of the Atlantic City community applauded

Langford's decision. Attorney Alan M. Lands characterized Langford' move as a "profile

in courage" noting that the use of the canines in Atlantic City were "reminiscent of the

use of canine in Mississippi and Alabama in the 1960s." (Ex. SS  – Lands Letter dated

Sept. 1, 1999). In a letter to the Mayor, Lands recounted his 24 years of experience

representing civilians in civil rights cases involving Atlantic City's K9 units. Lands

detailed his first case in 1985 when a K9 was released on a sleeping, homeless man –

who eventually prevailed in a lawsuit against the City. Lands described another case he

settled in 2009, *Perry v. Jackson*, in which a 57-year old grandfather was mauled by a K9

on the beach wearing nothing but a bathing suit, sandals, and tank top. There, a video

showed that the K9 failed to follow the handler's directives and the officer's use of force

report did not indicate that the victim had posed a threat to anyone. (Ex. SS) Lands wrote:

> Over the years I have handled cases and read Internal Affairs files in which
> canines have been allowed to bite suspects who were handcuffed or who had
> surrendered by laying face down on the beach, boardwalk or street. Other cases
> involved young boys accused of possessing marijuana who were hiding either in
> closets or plastic toy houses for fear of coming out and facing the canine. In these
> instances the canines were sent in and instructed to bite for several minutes even
> though there was no evidence of any weapon and the suspect was willing to
> surrender.
>
> ***
>
> In closing, the use of canines in Atlantic City is sometimes reminiscent of the use
> of canines in Mississippi and Alabama in the 1960's. I have reviewed many
> Internal Affairs files over the years and have never found an instance of discipline
> within the K-9 Unit involving a finding of excessive force upon an arrestee. Even
> persons who commit offenses should not be subject to permanent disfigurement
> from the ripping and pulling apart of human flesh. This is especially true where a
> suspect is not armed or has surrendered. Many years ago I wrote a similar letter to
> Mayor Usry and nothing was changed. In my opinion, your actions in suspending
> the use of canines for apprehension is a **<u>Profile in Courage</u>** that we very rarely
> see in public office. (Ex. SS)

In the face of fierce criticism, overt hostility from the department, and even threat of

litigation by the Chief of Police, Langford directed his Public Safety Director, Christine

Peterson, to undertake a review of ACPD's K9 Units to determine whether the K9 units were

properly trained and whether any policy changes could improve the unit. Peterson was named

Public Safety Director on March 1, 2010. (Ex. OO - Peterson Dep. at pg. 34:9-12) and as such

was one of the final decision-making authorities as to *policy* for ACPD. The final decision-

making authority for the day-to-day operations of ACPD was the Chief of Police, then Chief

John Mooney and after him, Chief Ernest Jubilee. Petersen held the position of Public Safety

Director for roughly 18 months, completing her final day on July 31, 2011. (Ex. OO at pg. 53)

Upon her hiring, Petersen was tasked with undertaking a "review" of ACPD's K9 unit

but was met with exceptional resistance and a generally uncooperative attitude by the Chief of

Police. (Ex. OO at 153: 9-23) (Ex. II at pg. 69:1-10) From the start, Chief Mooney made it

abundantly clear that he would resist any move to modify or "improve" the K9 unit and

obstructed every effort made by Petersen and the Langford administration. Mayor Langford

testified to the following:

> Q.    Was it your understanding that the police department was cooperating with Ms.
>        Petersen regarding a – the data that she was seeking to collect?
>
> A.    It was *not* my understanding that the police department was cooperating with Ms.
>        Petersen about anything. [italics added]
>
> Q.    Okay. What's your understanding?
>
> A.    That she was in a hostile environment and they didn't take too kindly to her being
>        there. (Ex. II at pg. 65:14-24).

Petersen began her inquiry by seeking data regarding the complaint histories of the K9

handlers, but was met with significant resistance. Chief Mooney, with support from the Atlantic

County Prosecutor Housel[2], took the position that no internal affairs files of the officers could be

_____

[2] Although not entirely relevant at this juncture, the Atlantic County Prosecutor's office had
every incentive to line up with Chief Mooney against the administration on this point. Plaintiff
will demonstrate at trial that APCO has failed to ensure that ACPD conducts meaningful and
thorough internal affairs investigation and has operated as a "rubber stamp" for ACPD's IA
division. Indeed, in the thousands of IA and K9 apprehension cases that it has "reviewed," since

released to Public Safety Director or Business Administrator Scott and that only a summary of

the nature and disposition would be provided. (Ex. JJ – Housel Memo Dated August 28, 2009)

Despite the fact that Petersen was tasked with determining whether the K-9 policy should be

modified, Chief Mooney objected to providing her with any meaningful data that would have

aided her decision making. Petersen admitted that she was never able to get an understanding of

why no complaint had ever been sustained against any K9 handler.

> Q.   Did it strike you as concerning that there have never been a sustained complaint
>       against the K-9 handlers?
>
> A.   It was a question that I would liked to have heard the answer to. Was there ever a
>       sustained case and under what circumstances, and it seems odd.
>
> Q.   And did you get an answer to that question?
>
> A.   I don't think so, unless he – unless he attached this as the answer, or as far as I
>       can tell, there was never any sustained cases against the K-9 officers in – from
>       what I was reviewing.
>
> Q.   And did you, through your examination of the K-9 unit, ever make a
>       determination about why there has never been a sustained case against a K-9
>       officer?
>
> A.   No. Because that would be interjecting myself into the role of internal affairs,
>       chief of police, and the prosecutor. (Ex. OO at pgs. 172-173)

Petersen testified at length about how she was hamstrung when attempting to determine

whether any of the community dissatisfaction with the K9 units were as a result of the behavior

of certain officers because she was unable to obtain specific information regarding the complaint

histories of those stand-out officers. Petersen testified that after reviewing the summary

complaint histories of the K9 handlers, two officers stood out in terms of the number of

complaints regarding canine bites. (Ex. OO at pg. 157:7-14) Petersen identified those officers as

---

2007, ACPO could not identify a single one in which it disagreed with ACPD's IA finding or
found that its investigation was less than optimal.

Frank Timek and Dean Dooley. (Ex. OO at pg. 157:15-20) Petersen admitted that her initial

thoughts were to find out why these two handlers' complaint histories were "skewed." (Ex. OO

at pg. 157:21-158:6) However, Petersen did not communicate her specific concerns to the Chief

of Police and did nothing to determine whether these officers were "problem" officers or whether

there was a legitimate explanation for their exceptional complaint histories. Petersen explained

that the complaint histories of Timek and Dooley were "self-evident" and that the Chief simply

refused to discuss "his" officers with Petersen.

> Q.   And upon reviewing this material for the first time and making that observation,
> did you talk to anybody and say, "Listen, these guys stand out? What's up with
> them?" or something along those lines?
>
> A.   I don't recall specific discussions and those two. It was really evident looking at it
> that there were more complaints than – do you know what I'm saying? They
> weren't singled out. The units were already off the street. They were already
> disbanded. So I know there's more to the story, and unless I've given more
> information to tell me what each circumstance is, I can just look at it and say, huh,
> those two, huh, and let's just take a closer look here, maybe before the units come
> back. You know what I'm saying? It wasn't like I sat down and talked about two
> officers. I just didn't do that and definitely not with Chief Mooney.
>
> Q.   Why not?
>
> A.   We didn't discuss his officers.
>
> Q.   Why not?
>
> A.   That was day-to-day functioning. You know, the supervision, the training, the
> assignments, all those issues regarding officers, internal affairs investigations,
> complaints was his domain. He would not talk about those with me, even if I
> asked him. (Ex. OO at pgs.159-161)

During her deposition Petersen admitted that apart from making a note that certain

officers stood out, there was nothing more she could do to determine whether those officers were

the source of any of the problems with the K9 units.

> Q.   You made an internal note about it and that was the end of it?

A.     What else could I do?

Q.     I don't know. Could you not have called Chief Mooney and said, I don't know if
       the K-9 unit needs to be revamped or there needs to be a new policy, but have you
       considered looking at these two particular officers as the source of the community
       disrest about this K-9 division?

A.     I think that's kind of presumptuous for me to say to him, have you looked at two
       officers, because he's very well-aware of all of his officer intimately, all the
       complaints intimately, all of the investigations intimately. That would not be in
       my role to presume his authority over these officers and whether or not they
       should be allowed to come back or not be there. Those are decision that are
       outside my purview. It just isn't –

Q.     You keep answering a different question. No one is suggesting it was in your
       authority to discipline them, to let them come back, not to let them come back.
       My question is simple and it is that: In your pursuit of trying to improve the K-9
       policy and the K-9 unit, did you ever have a conversation with Chief Mooney
       about Offier Timek and/or Officer Dooley and their inordinate number of
       excessive force complaints?

A.     No. (Ex. OO at pgs. 170-171)

At the conclusion of Petersen's "review" she authorized the return of the patrol dogs on

the condition that certain criteria were satisfied as promulgated in her Directive 025-2010. (Ex.

JJ – Directive 025-2010 and Revised K-9 Policy) Directive 025-2010 required that "all officers

seeking to be reappointed to the K-9 Unit must be evaluated under Section IV. Selection Criteria

for K-9 Personnel, to ensure that they presently meet the qualifications for the assignment." The

Directive directed that those officers were to undergo medical and psychological examinations

and have their " personnel records and Internal Affairs files to determine present suitability."

Second, the Directive ordered that "all K-9 Teams are required to be evaluated at an outside

police K-9 training facility, by a recognized K-9 training expert. . ." (Ex. KK) Third, Director

Petersen pronounced that "[c]omplete compliance with all of the above directions is required in

order to promptly restore the K-9 Unit to active patrol duty, which must be accomplished by

May 24, 2010. You are to confirm in writing to this office that this has been accomplished." (Ex. KK)

Extensive discovery leads to the inescapable conclusion that ACPD returned the dogs to streets without satisfying the criteria set forth in Directive 025-2010. First, the City can produce no writing from any ACPD officer confirming that ACPD *complied* with Directive 025-2010. (Ex. TT - Certification of Todd J. Gelfand) Whether documents connected to the suspension and re-deployment of the K-9 units ever existed or were spoliated has been the subject of protracted motion practice. Indeed, Judge Donio granted Plaintiff the opportunity to conduct specific discovery on the creation and maintenance of K9 documents that the City repeatedly claimed were "missing." (Ex. UU – Order in *Adams v. City of Atlantic City, et al.,* 13-07133)

Plaintiff noticed the deposition of a 30(b)(6) witness specifically on the issue of the "creation and maintenance" of documents pertaining to compliance with Directive 025-2010. The City produced current Chief of Police Henry White as its 30(b)(6) witness. Chief White testified that he conducted a diligent search for any documents that would reflect compliance with the portion of the directive relating to the re-evaluation of the handlers and could find no document in ACPD's care or control that reflected that the K-9 handers were, in fact, reevaluated pursuant to Section IV of the Selection criteria set forth in the K-9 policy. (Ex. VV at pgs. 26-39; 66-68; 85-86) White testified that he could not say whether any such documents were ever prepared and was unable to locate them despite a diligent search. *Id*. Relatedly, White could not produce, or explain the absence of, any writing showing that the K-9 handers' personnel, medical, or internal affairs files were reviewed consistent with Directive 025-2010.

> Q.     So I will ask again. Chief White, were you able to identify or locate any documents, reports, memos, paper with words on it, that reflect that the K-9 handlers who wished to be reconsidered for reassignment to the K-9 units when

they were going to be redeployed to the streets in 2010 had their Internal Affairs files reviewed?

Mr. Gelfand:   Objection, asked and answered. You can answer. Answer the question.

A.      Again, I don't have firsthand knowledge whether their files were reviewed, who reviewed, and I have not been able to find any documentation that says they were reviewed.

Q.      Okay. And what efforts did you make to locate any reports, documents that would reflect that the Internal Affairs files of the officers wishing to be redeployed to the street in 2010 had their Internal Affairs files reviewed pursuant to Directive 025-2010.

A.      I directed my personnel to do any exhaustive search to see if there is any written documentation that Internal Affairs files were reviewed, and I have not found any written documentation.

Q.      Okay. And as you sit here today, you cannot say whether or not those Internal Affairs files were reviewed, correct?

A.      That is correct. (Ex. VV at pg. 36:19-21)

                                    ***

Q.      If documents were created that reflected that the K-9 handlers Internal Affairs files were reviewed as directed in Directive 025-2010, the Atlantic City Police Department would be required to maintain those documents in accordance with the New Jersey Attorney General Guidelines?

Mr. Gelfand:   Objection. You can answer.

A.      If the files were created, the Atlantic City Police Department would have maintained those files.

Directive 025-2010 also mandated that the K-9 Units (handlers and canines) be evaluated

at an outside police K-9 training facility before returning to the streets of Atlantic City. As was

the case with the re-evaluation of the K-9 handlers, the City is unable to produce any writings

that reflect that *all* of the K-9 units were evaluated by an outside facility and passed that

evaluation. Although the City produced a partial memo that suggests that six of the patrol K-9

Units underwent a re-evalution, the partial memo failed to indicate what teams passed the re-

evaluation. Moreover, the memo expressly indicated that Sergeant Martinez "ha[d] not evaluated all of the teams." Other than this partial memo, there is not a single shred of evidence that *all* of the K-9 Units were successfully re-evaluated pursuant to Peteresen's directive.

On this issue, Chief White testified to the following:

> Q.   Other than the partial report that Detective Martinez apparently wrote, and that is Bates stamped Atlantic City 039359 and 039360, other than this 2-page document, were you able to locate any other pieces of paper that would reflect or memorialize the specific training exercises, tests, whatever went on during this evaluation? That is my question.
>
> A.   No.
>
> Q.   And were you able to find any documents that reflected how each individual K-9 handler and his K-9 partner performed during this evaluation?
>
> Mr. Gelfand:   No objection to that question, but I object to the prior 1. You can answer.
>
> A.   No. (Ex. VV at pgs. 91:17-92:7)

Darryl Hall, a K-9 handler who was promoted to K-9 Supervisor when the dogs were returned to the streets in 2010 admitted that he had never seen any writing reflecting that the K-9 units were successfully recertified. (Ex. WW– Darryl Hall's Dep 12/5/15 at pg. 149)

Not only is the City unable to produce any writings that reflect that Petersen's directive was implemented, ample deposition testimony from the handlers confirm that most of the directive was completely ignored. Retired K9 trainer, Joe Rodriguez, testified

> Q.   What actually happened to recertify both the canines, the dogs and the handlers?
>
> A.   It was basically the same thing I do with the in-service sheet. They're put through the same battery of tests that we do.
>
> Q.   And this is something you would have done anyway, correct?
>
> A.   Correct.
>
> Q.   Something you say you did twice a year?

A.      Twice a year certification and then we do it every multiple.

Q.      So you would agree that nothing really special happened before these canines were returned to the street in 2010?

A.      Yes. (Ex. RR at pg. 131:4-19)

Consistent with Rodriguez's testimony, K-9 handler and supervisor Defendant Daryl Hall testified that the patrol units did undergo a recertification at an off-site location, but that the certification was nothing different than what they had been doing and what they would have done any way. (Ex. WW – Hall Deposition 112/5/15 at pgs. 138:20-139) In fact, K-9 Supervisor Hall opined that the recertification that was completed by the third-party was less rigorous than what Atlantic County would have done itself. (Ex. WW at pgs. 138-139) Hall agreed that the re-certification was a "watered down" recertification. (Ex. WW at pg. 150:4-13)

K-9 Supervisor, Sergeant Hall also testified that other than the "watered-down" recertification conducted by Sergeant Martinez, he could not recall any other criteria that had to be satisfied prior to returning the dogs to active duty. Sergeant Hall testified that he had no knowledge that the handlers were supposed to be re-evaluated prior to restoring the dogs to active status and has no recollection of participating in any re-evaluation process.

Q.      Was it your understanding that prior to the canine team's being restored to active duty, all the officers who were appointed to the canine unit had to be evaluated against under the selection criteria articulated in the canine policy?

A.      No.

Q.      Okay, and in fact, you weren't re-evaluated under the same selection criteria?

A.      No.

Q.      And you are not aware of any other officer – or any other canine handler being re-evaluted then, under specifically that selection criteria, correct?

A.      Correct. (Ex. WW – Hall's Dep 12/9/2015 at pgs. 132:8-22)

Sergeant Hall further testified that there were no notable changes to the K-9 units when
they were returned to the streets other than morale was low.

Q.     And from your perspective, how were things different when they came back to the
       streets, if in any way?

A.     I just think the, you know, the zeal of being a canine officer was , you know, not
       looked prestigious among the authority of the City.

Q.     So it dampened moral? Would that –

A.     Yes.

Q.     Okay, any other way in which things were different when you came back?

A.     Not that I can recall.

Q.     How about the way in which you did your job; did it feel like it changed
       dramatically, or was it kind of like this was all for nothing, we are not even doing
       anything differently really?

A.     Did it change dramatically, no, it did not change dramatically at all.

Q.     Okay, other than the dampened moral, can you think of any other ways in which
       the work changed when you came back to it?

A.     No. (Ex. WW at pgs. 153:9-154:4)

Plaintiff deposed at least five K-9 handlers (Sergeant Darryl Hall, Trainer Joe Rodriguez,

Sergeant Frank Timek, Officer Michelle Clark, and Sergeant Adams) who were part of the Unit

in 2009 when it was suspended and not a single one recalled undergoing any type of re-

evaluation as it pertained to their suitability for the job when the dogs were returned to the streets

in 2010 per Directive 025-2010.

        Consistent with its initial obfuscation and uncooperative attitude, ACPD largely ignored

Petersen's directive and redeployed the K-9 patrol units to the street without ensuring that the

handlers met the suitability requirements as set forth in the K-9 policy or that the units were

properly recertified. Unfortunately for the people of Atlantic City, neither Public Safety Director

Petersen nor any other member of Langford's administration did anything to verify compliance with Directive 025-2010 – seemingly defeated by the contemptuous attitude of Chief Mooney and his minions.

The City showed deliberate indifference to the safety and well-being of the citizenry of Atlantic City when it stuck its head in the proverbial sand and rubber-stamped the return of *all* of its K-9 handlers – even those with alarming complaint histories, excessive apprehensions and questionable psychological evaluations. Director Petersen testified that one of her first observations in reviewing the limited data provided to her by Chief Mooney was the inordinate number of complaints against two particular handers, Frank Timek and Dean Dooley. Petersen explained that the pattern of complaints against these officers was self-evident but that because she could not interject on matters that involved the "day-to-day" operations of the police department, she was powerless to do anything about it. Unsurprisingly, Chief Mooney did not share Petersen's' concerns about officers Timek and Dooley and took no action to determine whether these officers *should* be handlers.

Incredibly, even when the psychological evaluations of some of the handlers raised concerns about their suitability, the City did not even bother *reviewing* the psychological reports. Directive 025-2010 mandated that all K-9 handers undergo psychological evaluations before returning to the streets. Dr. William M. Glass conducted those psychological evaluations, and on May 20, 2010, wrote a letter to Chief Mooney and Captain Myers indicating that all thirteen K-9 handlers passed. Dr. Glass wrote "[f]ull comprehensive reports will follow." (Ex. XX – Dr. William Glass Letters)

On June 1, 2010, Dr. Glass wrote a follow-up memorandum to Director Petersen and Captain Myers informing them that while he originally "passed" all of the K-9 handlers after

reviewing their two psychological tests (the MMPI and IPI) and his notes, he "found some concerns" with three candidates: Officer Dean Dooley, Sergeant Eugene Maier, and Defendant Frank Timek. (Ex. NN – June 1, 2010 Glass Memo) Dr. Glass indicated that he wanted to re-interview those candidates.

The City cannot produce any documentation showing that Defendant Timek and Dooley and Sergeant Maier were re-interviewed by Dr. Glass. In fact, the City was unable to produce *any* of the "comprehensive reports," and its 30(b)(6) witness could not state that the City ever obtained the reports and was unable to state whether or where they were maintained. (Ex. 39-26) The summary judgment record shows that ACPD ignored Dr. Glass's memo. ACPD never obtained the full comprehensive reports of any of the officers, did not maintain the reports in the officers' personnel or training files, and did not order the three "concerning" officers for follow-up interviews. (Ex. VV - Chief White's Dep. at pgs. 39-46; 65-66) Even when the psychological evaluations raised concerns about officers Frank Timek and Dean Dooley, handlers with the greatest amount of apprehensions and greatest amount of civilian complaints for excessive force, the City did not even bother to review the psychological evaluation. The City's failure to review the psychological evaluations of its K-9 officers is more strong evidence of its deliberate indifference to whether their handlers were fit and suited to the job of K-9.

Between July, 2007 and August, 2009, ACPD utilized its K9 patrol dogs to apprehend people a whopping 77 times. (Ex. JJ – Memo from Scott to Mooney 9/21/2009) Understandably, the City undertook an investigation of ACPD's use of its patrol dogs in light of these astronomical numbers and the community's outrage. Unfortunately for the citizens of Atlantic City like Plaintiff, ACPD sabotaged a meaningful review of its K9 unit and resisted any change to their policies and practices. Despite a complete lack cooperation from the department, Public

Safety Director Petersen issued a directive that was intended to ensure that the K9 units were properly trained and that every handler was suited to the assignment per ACPD's K9 policy. However, ACPD failed to comply with the directive in most respects and returned to business as usual. Defeated by Chief Mooney's belligerent attitude and refusal to cooperate, the City did nothing to ensure that the Directive was complied with. The end result was a message to ACPD's K9 handlers that they could continue to deploy their dogs unfettered by any real restrictions or supervision. By failing to comply with Directive 025-2010, the City of Atlantic City was deliberately indifferent to the well-being and safety of the people of Atlantic City.

      **B.**    **Instead Of Disciplining, Monitoring, Or Supervising Problem Officers, ACPD Rewarded Unqualified And Problem Officers With Lengthy Complaint Histories And Reputations For Aggressiveness With The Prestigious K9 Assignment.**

Incredibly, Atlantic City rewarded unsuitable officers with the prestigious K-9 assignment – even when its own head K9 trainer warned against their appointment. Joe Rodriguez was a K-9 handler and the head K-9 trainer between 2010 and 2015 when he retired. On a number of occasions, Rodriguez expressed concern up his chain of command regarding the assignment of certain officers to the K-9 unit. Specifically, Rodriguez disagreed with the appointment of Officer Michelle Clark to the K-9 unit on the basis that she did not meet the physical requirements for doing the job. Rodriguez explained that because Clark's father was an ACPD Captain, his opinion was ignored and he suffered retaliation for even voicing it.

    Q.    Okay. And have you heard of people being retaliated against who challenged their higher command?

    A.    I've got some experience with that.

Q.      And do you feel like you've actually been retaliated against for some ways for maybe challenging your chain of command?

A.      Absolutely.

Q.      Can you elaborate on your experience?

A.      Well, the one was when I was up for – to get a bomb dog. Actually almost 10 years to the date they made me wait.

Q.      And this was in retaliation for you questioned whether a female officer was qualified to be a canine handler, right?

A.      Correct

.
Q.      And was – do you know why you were retaliated against for challenging that?

A.      Yeah, it was the Captain's daughter.

Q.      And because of nepotism, right?

A.      Correct. (pg. RR at 187:19-188:14)

Rodriguez also testified that he had previously voiced concern over the appointment of

officers Timek and Jaques to the K-9 unit on account of their aggressive temperament.[3] Again,

Rodriguez's concerns were dismissed and both Timek and Jacques, officers with extensive

complaint histories for excessive force, were rewarded with the assignment.

Q.      Okay. But you definitely would not have recommended Frank Timek [to the canine unit]; isn't that fair to say?

Ms. Conte:      Same objection. You can answer.

---

[3] Incredibly, Officer Rodriguez's instincts were spot on. Just last month a video was released on-line that went viral showing officer Jaques and officer Abrams (discussed above) conducting a traffic stop of two young men. The video depicts officer Jacques screaming at and threatening harm to the the young men apropos of nothing. Officer Jaques can be heard warning the young man that if he acts up his "90 pound dog is going to come out and rip the fuck out of you." The young men were not resisting any police authority or apparently breaking any laws since they were not arrested. The video can be seen here and exemplifies ACPD's pattern and practice of escalating violence without justification. http://lawnewz.com/crazy/officer-loses-it-tells-man-dog-will-rip-him-apart-video/. Undersigned counsel represents the two young men in the video.

A.      I wouldn't have recommended him.

Q.      In fact, you did tell your higher ups that Frank Timek wasn't a good choice for canine, isn't that right?

A.      I did.

Q.      And they told you to go blow basically, isn't that right?

Ms. Conte:      Objection.

Q.      You can answer if you –

A.      Basically.

Q.      Were there any other canine handlers that you told your higher ups that you were concerned about them being suitable for the – for the position?

A.      Yeah.

Q.      Can you tell me who?

Ms. Conte:      You can answer.

A.      Andrew Jakes [Jacques].

Q.      Okay. And when you communicated your concerns about – let's first talk about Mr. Timek. Did you do so verbally or in written form?

A.      Verbally.

Q.      Okay. And what about Jakes?

A.      Verbally.

Q.      Okay. And you were never asked anyways, right?

A.      No.

Q.      Meaning they weren't looking –

A.      No.

Q.      You were going out of your way actually to express a concern, because that's what you do?

A.      I had learned my lesson back in I think it was 2005 or 2006. They had recommended a female officer, and I love female officers. Some of them do the greatest job. And I voiced my opinion, and she couldn't physically handle it. And they prevented me from getting a bomb dog for probably a good eight years or something. Before I got that.

Q.      And when you say "they" are you talking about the – the higher ups?

A.      The higher ups.

Q.      In the chain of command?

A.      So I just learned not to do it. Just not to do it.

Q.      Unless you're being asked to weigh in, your opinion was not something you were willing to offer for the most part, right?

A.      Yeah. No I wasn't.

Q.      But you went out of your way with respect to Timek and they were like, we don't want to hear it, basically?

A.      Yeah, it just falls of deaf ears. So I just got nixed out of the programs was the easiest way to do it.

Q.      And do you know who you communicated your concern with about Timek himself?

A.      No. I don't know if I told Darryl Hall or – or Campbell. But I voiced that – I thought there were better candidates out there.

Q.      Right.

Q.      With respect to Frank Timek would it be fair to say that one of your concerns was his temperament?

A.      It was.

Q.      And as we discussed earlier I think based on your expertise, you said that it's important to have balanced temperament, right?

A.      I think so.

Q.      And there's really nothing [no one] out there that has more training and expertise than you?

Ms. Conte:      I'm sorry. Object to the form.

Ms. Bonjean:  Yeah.

A.        Yeah there is not. (Ex. RR at pg. 156:4-159:16)

Not only was Rodriguez's recommendation ignored, the administration retaliated against

him for voicing concerns about his fellow officers suitability for K-9 assignment.

Q.        And did you get a response?

A.        They were going to take – and the one that I put in in, they were probably going
          to remove me out of the academy.

Q.        Remove him out of the academy, who was that?

A.        No, remove me out of the academy.

Q.        Remove you out of the academy?

A.        Yes.

Q.        Because you expressed concern about somebody?

A.        Yes.

Q.        Who was going to make the decision to remove you out of the academy?

A.        Oh, I guess they would just punch it up through the chain.

Q.        What made you think they would remove you out of the academy?

A.        I've seen them do it before.

Q.        If you complained about a fellow officer or say that another officer isn't qualified
          to do this work, they would retaliate against you?

MS. CONTE:  Objection to the form. You can answer.

A.        Yes.  (Ex. RR at pg. 53:20-54:19)

As set out in the prior argument Atlantic City not only promoted officers in complete

disregard of their complaint histories, the City also rewarded officers with prodigious complaint

histories with prestigious assignments to the K9 Unit. Officers Wheaten, Timek, Jaques, and Devlin have among the most exceptional complaint histories in the department and have tripped the EWS throughout their entire careers. The City, nonetheless, rewarded these officers with appointment to the highly selective and prestigious K9 unit.

At bottom, genuine issues of material fact exist as to whether the City of Atlantic City failed to train, supervise, and discipline its K9 handlers on the appropriate use of its patrol dogs for criminal apprehension. Not only did the City fail to comply with Directive 025-2010 and actually rewarded rogue officers prone to violence with additional weaponry in which to violate the constitutional rights of the people of Atlantic City, namely a vicious attack dog.

V.     **Defendant Atlantic City Has a Widespread, Well-Settled Practice of Condoning Its K-9 Handlers' Use of Patrol Dogs to Bite Non-Threatening, Non-Violent, and often Impaired Petty Offenders as a Means of Gratuitous Punishment Causing Serious and Permanently Disfiguring Injuries.**

The City of Atlantic City not only has a widespread, well-settled practice of tolerating its officers' use of excessive force as set forth in Argument I, *supra*, but the City also has a widespread practice of allowing its K9 handlers to use their patrol dogs to bite non-threatening disorderly persons and/or non-violent offenders who are not hiding or concealing themselves - like the Plaintiff in this case. In contradiction of nationally accepted norms governing K9 use, ACPD also regularly deploys its dogs for apprehension on impaired suspects - like Plaintiff. ACPD's routine use of its dogs to maul non-threatening arrestees like Plaintiff led to his permanent disfiguring injuries. This case marks one of Defendant Devlin's first apprehensions, his conduct is consistent withother handlers' misuse of their K9 partners.

While the K-9 patrol dogs are touted as useful tools to "find" dangerous suspects, in

reality, it is a rare occurrence that ACPD's dogs are tasked with "finding" anyone, let alone

someone armed and/or dangerous. Rather, the typical apprehension looks a lot like the

apprehension in this case. The K9 handler is called to the scene of a relatively minor offense

(e.g., a traffic stop, disorderly persons complaint, investigatory stop), and for reasons that defy

logic, the situation escalates because the suspect "violently resists" the officer in his duties, and

the dog is deployed for "officer safety." If ACPD's apprehension reports are believed, the

citizens and visitors of Atlantic City routinely assault armed police officers simply because they

are inconvenienced by being pulled over, awakened while sleeping in a car, or questioned

pursuant to a disorderly or domestic complaint.

      In his letter to the Mayor, attorney Lands recounted his experience representing scores of

individuals who had been mauled by police dogs, even though they posed no threat, were not

armed, and were not hiding. Lands wrote in 2009:

> In short, while I believe that canines are an effective law enforcement took to
> discover drugs, explosives, and locate dangerous and armed criminal who are
> hiding, they have been overused in Atlantic City. In many instances, the use is
> sadistic and vindictive. In other cases, well-trained and good-intentioned officers
> are using their dogs inappropriately because their training has allowed them to use
> the canines to apprehend suspects for minor disorderly persons offenses where the
> suspect is clearly unarmed. Just as the discharge of firearms should not be
> used to effectuate arrests of unarmed suspects, canines should not be used when
> there is more than adequate police manpower to make an arrest, handcuff the
> suspect, or subdue the suspect. (Ex. SS)

The summary judgment record in this case bolsters Lands' decades-long experience and

impressions from representing victims of ACPD's K-9 unit.

      At the outset, ACPD has maintained a K-9 unit since the 1970s. However, no

police officer can recall a single instance in which a K9 apprehension was ruled unjustified or

improper. Notably, retired Sergeant Darryl Hall, ACPD's K9 Supervisor between 2010 and 2015

and an ACPD K9 handler since January, 2007, testified that he could recall no instance when

ACPD's dogs had been misused in any way. Between 2009 and 2013, ACPD reported 120 K9 apprehensions.[4] Every single apprehension was ruled justified, legal, and proper. Indeed, Plaintiff has reviewed every K9 file dating back 2007 and cannot find a single instance in which a K9 apprehension was ruled unjustified. Even when Frank Timek's K9 partner bit the victim of a domestic violence call, the victim was blamed for the bite.

Putting aside the patent implausibility that ACPD handlers got it right every single time over the course of decades, an in-depth review of ACPD's K9 apprehensions review files shows that ACPD "rubber stamps" its use of force by K9 apprehension despite its obvious, well-settled, and unconstitutional practice of using vicious attack dogs *primarily* as a weapon against non-violent offenders who typically are guilty of nothing more than 'contempt of cop' rather than as a "finding" tool to apprehend dangerous and violent offenders. ACPD officers routinely justify the excessive use of force by exaggerating or fully fabricating the amount of resistance offered by the suspect. *See generally,* Ex. NN Expert Report of Vanness H. Bogardus, III

Pursuant to ACPD's own K9 policy, criminal apprehension is only permitted when the handler believes that the action is "immediately necessary to protect himself against a threat of a deadly weapon or serious/significant bodily injury." (Ex. MM ACPD K9 Policy) A review of scores of ACPD's K9 apprehensions show that the use of a weapon, deadly or otherwise, features into very few K9 apprehensions. (Ex. YY – K9 Apprehension Chart for Handlers Clark, Timek, Dooley) The vast majority of ACPD's apprehensions are justified because the handler allegedly "feared for officer's safety." This boilerplate language appears in nearly every K9 apprehension review whether or not there are underlying facts to support the handler's state of

---

[4] This number of apprehensions is based entirely on officers' self-reporting their use of their dogs. Furthermore, Plaintiff has no information regarding the number of K9 apprehensions that preceded 2008 since ACPD admits that those documents are "missing." (Ex. ZZ – Emails re: Missing Deployment Logs)

mind.

Attached to this motion is a chart summarizing data culled from the apprehension review files of handlers Officer Clark, Officer Timek and Officer Dooley. Plaintiff studied the handlers' apprehensions from 2009, 2011, and 2012 (omitting 2010 since the dogs were off the streets for the majority of the year). Plaintiff reviewed a total of 42 apprehension files [one was omitted for lack of information] for the following information: (1) was the suspect armed (with any weapon or any instrument that could be used as a weapon); (2) did the dog actually find the suspect; (3) the basis for the stop of the suspect in the first instance (i.e. why were the police there?); (4) what level of resistance was offered per the officer's UOF report; (5) was the suspect under the influence; (6) the race of the suspect; and (7) was any on-scene officer or civilian treated for physical injuries. (Ex. YY - K9 Apprehension Review Chart for Clark, Timek, Dooley)

A review of Timek's apprehensions reveals an alarming pattern of deploying his K9 partner on unarmed, non-threatening suspects, often impaired and usually a person of color. During the relevant time period discussed above Timek deployed his dog 24 times. In only two instances, the suspect was allegedly armed (one purportedly had a weapon that he abandoned prior to his apprehension and the other allegedly had a bottle that was never recovered). No case involved an officer who required medical treatment for any physical injuries. In only one of the 24 apprehensions was the suspect "hiding" or needed to be found. In 14 of the apprehensions the suspect was under the influence of drugs or alcohol. And in all but five apprehensions the suspect was a person of color. Lastly, in virtually every case, the apprehension escalated from a minor traffic offense, DV call, investigatory stop, disorderly persons or disturbance call, or petty/non-violent crime (purse snatching, possession of CDS). In one case, Timek's dog bit the victim of a domestic violence call. (Ex. YY)

Although Timek's apprehension history is particularly alarming, he is no aberration. During the relevant time period, K9 Handler Clark reported 10 criminal apprehensions. In only one instance was the suspect "hiding," and in *all* cases the suspect was unarmed. In four of the cases the offender was under the influence of drugs or alcohol. Significantly, the K9 review data shows that in virtually every apprehension, Clark was called to the scene of a minor, non-violent offense or merely an investigation (e.g. domestic disturbances, a "suspicious" male, and a DUI). And in each case of those cases, the suspect brought on his own dog attack by " violently resisting" officer control. However, in none of the cases was an officer treated for any physical injuries. (Ex. YY)

Critically, even Clark's own UOF reports undermine the legitimacy of her apprehensions. Per the Attorney General Guidelines, when a K9 handler deploys his dog for criminal apprehension, he must complete a UOF report. A UOF report has a section entitled "subject's actions" that requires the officer to check a box(es) indicating the level/type of force used by the suspect. The choices: (Box 1) resisted police officer control; (Box 2) physical threat/attack on officer or another; (Box 3) threatened/attack officer or another with blunt object; (Box 4) threatened/attack officer or another with knife/cutting object; (Box 5) threatened/attack officer or another with motor vehicle; (Box 6) threatened officer or another with a firearm; (Box 7) fired at officer or another; (Box 8) other. According to Clark's UOF reports, in two of her apprehensions, the subject offered no more resistance than "resisted police officer control." In the remaining apprehensions, the suspect allegedly presented a "physical threat/attack on officer or another," but suspiciously, not a single apprehension involved an officer seeking any medical treatment for physical injuries.  (Ex. YY)

Similarly, handler Dean Dooley, a prolific user of his K9 for criminal apprehension, used his K9 partner for criminal apprehension no fewer than six times, during a seven-month period in 2009 and in 2011, he reported two apprehensions. Every apprehension was made of a person of color. Two apprehensions involved a suspect with a weapon, but the remaining apprehensions involved no weapon and the police interaction started as a minor or petting offense or stop. Five of the apprehensions involved suspects who were under the influence. (Ex. YY) Unsurprisingly Dooley's K9 apprehensions were all ruled legal and proper and approved by the Atlantic County Prosecutor's officer – an unsurprising outcome since the chief law enforcement officer responsible for reviewing the K9 apprehensions is Dooley's uncle, Chief Darin Dooley.

To put this data in context, of the 42 apprehensions reviewed and summarized on the attached chart:

- **Less than 10% involved the use of any weapon or object that could be used as a weapon**

- **Only two cases involved an on-scene officer or civilian who sought medical treatment for physical injuries\* [one of those instances involved Frank Timek seeking medical treatment for a car accident that preceded any interaction with the suspect]**

- **Less than 5% of cases involved the K9 actually "finding" the suspect**

- **Nearly 80% of suspects were people of color**

- **Greater than 50% of cases involved impaired or "under the influence" suspects**

- **In all but a handful of cases, the precipitating offense was a non-violent offense or merely an investigatory stop that uncovered no offense whatsoever.**

(Ex.  YY)

These statistics support Plaintiff's experts' findings in regards to the practices of ACPD's K-9 division. Plaintiff's K-9 expert observed that the ACPD K9 Program Administrators failed to recognize the latitude given in their Canine policy for handlers. Without clear guidelines regarding felony/misdemeanor distinctions or active/passive resistance distinctions exhibited by suspects, ACPD permitted its K9 handlers, like Defendant Devlin, to order their dogs to bite just about anyone they deemed necessary. (Ex. NN at 26) Plaintiff's K9 expert, Mr. Bogardus writes:

> Promulgation of a bad or wrong policy by the ACPD is not a simply oversight. The ACPD policy clearly offers wide discretion for a line-level dog handler to abuse their position as law enforcement officers and take what they would claim otherwise is a "tool," albeit a searching tool, and use it as a mean to inflict horrific pain and injury the same as a "weapon," even against defenseless persons or those person they may take a personal dislike to. A handler, like K9 Officer Devlin allows his dog to bite with confidence that he will not be held accountable or disciplined by management for their indiscretions. (Ex. NN at 22)

A recent video released on-line of K9 handler Jaques conducting a traffic stop epitomizes ACPD's misuse of its K9 partners. In a minor traffic stop that did not result in any arrests, officer Jaques can be seen terrorizing two young men who politely challenged the traffic stop and started video taping the incident. Officer Jacques can be seen and heard swearing at the young (and obviously frightened) young men in a manner that intended to incite violence. With no justification whatsoever, officer Jaques can be heard threatening to release his 90 lb. dog on the young men to "rip the fuck" out of them. http://lawnewz.com/crazy/officer-loses-it-tells-man-dog-will-rip-him-apart-video/ This video clip is a hallmark example of how ACPD officers excalate violence with the malicious intent to cause serious, life-threatning, injuries to young men of color.

The foregoing evidence raises genuine issues of material fact concerning whether the Atlantic City Police Department has a well-settled custom and practice of using its patrol dogs to bite non-violent, non-hiding, and non-threatening offienders.

## **CONCLUSION**

For the foregoing reasons, Defendant City of Atlantic City's Motion for Summary Judgment as to Plaintiff's *Monell* claims should be denied.

Respectfully Submitted,

/s/JENNIFER BONJEAN