NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| STEVEN M. STADLER, | |
| Plaintiffs, | Civil No. 13-2741 (RBK/AMD) |
| v. | **OPINION** |
| GLENN ABRAMS, JR., *et al.*, | |
| Defendants. | |

**KUGLER**, United States District Judge:

This matter comes before the Court upon the Motion for Summary Judgment of Defendant Officers Glenn Abrams, Jr., John Devlin, and William Moore (the "Individual Defendants") (Doc. No. 171), the Motion for Summary Judgment of the City of Atlantic City ("Atlantic City") (Doc. No. 172), and the Plaintiff's Response (Doc. No. 181), the Individual Defendants' Reply (Doc. No. 189), and Atlantic City's Reply (Doc. No. 190) thereto. For the reasons that follow, the Individual Defendants' motion is **DENIED** and Atlantic City's motion is **DENIED**.

## I. FACTUAL BACKGROUND

### A. The Incident

Plaintiff Steven Stadler was prying open a coin box at an Atlantic City car wash on March 13, 2013 when the security alarm went off, attracting the attention of Officer Glenn Abrams, Jr. (Individual Defendants' Statement of Undisputed Material Facts ("Def. SUMF") at ¶¶ 1-6.) Officer Abrams, an off-duty member of the Atlantic City Police Department ("ACPD"), saw Plaintiff opening the coin box and called 911. (Def. SUMF at ¶¶ 11-12.)

1

The parties dispute what happened next. Officer Abrams reported to the dispatcher that Plaintiff ran away from him, and the officers on scene reported back that Plaintiff was resisting arrest. (Def. Br. Ex. F.) Aside from that, however, the only evidence that we have about what happened is the differing accounts of the parties. We take the facts in the light most favorable to Plaintiff.

Plaintiff claims that he did not know that Officer Abrams was a police officer when he stepped out of an SUV to ask what Plaintiff was doing. (Opp'n at 2.) Plaintiff fled; he went down an adjacent alley, stopped to catch his breath, saw Officer Abrams' SUV close off the alley, and kept moving. (*Id.* at 3.) Plaintiff then saw a marked police car coming near him, and claims that an officer in uniform, Officer Moore, told him to put his hands on the hood of the car. (*Id.*) He complied, but Officer Abrams then caught up with him and punched him in the face several times, knocking him over. (*Id.*) Officer Moore "immediately jumped in . . . [and] started giving [Plaintiff] knee strikes." (Opp'n Ex. C at 96:19-97:5.) Plaintiff claims that he briefly lapsed into unconsciousness. (Opp'n at 2.) Officer Devlin arrived on the scene at some point, along with his dog, K-9 Clancy. Plaintiff recalls being dragged down the street by a dog who had bitten his upper-left thigh. (*Id.*) Plaintiff remembers that more than one officer beat him while the dog attacked him. (*Id.*; Opp'n Ex. B at 157:22-158:10.)

The Individual Defendants called the ambulance shortly after. Plaintiff was hospitalized at 10:34 p.m., and discharged a few hours later. (Def. SUMF at ¶¶ 33-34.) ACPD officers came to see his condition in the hospital and were "pretty much just laughing and giggling, high-fiving each other and taking pictures and videotaping [his] leg through their phones." (Opp'n Ex. B at 146:12-19.) Plaintiff states that he was hospitalized for almost a month afterward. (Opp'n at 3.) Pictures after the alleged assault show him bloodied, battered, and bitten. (Opp'n Ex. A.) He was

treated for "facial contusions, closed head injury . . . and a left black eye." (*Id.*; Opp'n Ex. E at 3.) His leg now has "massive scarring," "there is a hole missing out of [his] leg," he walks "with a slight limp," and he claims to have nerve damage that makes prolonged sitting painful. (Opp'n Ex. B at 141:6-142:1.) Plaintiff has provided an export report claiming "the bites did not comport with generally accepted standards of the use of physical force in law enforcement." (Opp'n Ex. D.)

Prior to these events, the ACPD had been looking for an individual who had robbed the carwash previously. A March 8 memo described the suspect as a "white or light complected Hispanic male, approximately 5'10" tall, medium build, with a goatee and a shaved or bald head." (Def. SUMF at ¶ 8.) Plaintiff is a white male and March 13 records following the incident indicate Plaintiff was 5'8" and weighed 165 pounds. (*Id.* at ¶ 9.) Plaintiff states that he did not have a goatee or a shaved head on March 13. (*Id.* at ¶ 10; Pl. SUMF at ¶ 10.)

After these events, Plaintiff was subsequently charged with a litany of offenses, including burglary, assault on a law enforcement animal, and resisting arrest. (Def. SUMF at ¶ 36.) Indictments followed, and he took a plea deal on the counts of burglary and resisting arrest. (*Id.* at ¶¶ 37-38.) Plaintiff filed this complaint, pro se, on April 29, 2013. He later retained counsel, and the remaining claims are a 28 U.S.C. § 1983 claim against the Individual Defendants for excessive force, and a § 1983 claim against Atlantic City under a theory of municipal liability.

### B. The City of Atlantic City's Policies and Procedures

Atlantic City has asked this Court to grant summary judgment on the issue of municipal liability, an issue requiring discussion of the underlying facts and policies of the ACPD. Unlike Atlantic City, Plaintiff has provided a factual basis for his claims, and we turn to the facts as presented in the record as a means of orienting this discussion. The Court notes that Plaintiff has

presented more evidence relevant to Atlantic City's policies in his briefing, but a complete synopsis is unnecessary to decide this set of motions.

Atlantic City follows a number of policies on the use of excessive force by the ACPD. The New Jersey Attorney General's policy, to look at one relevant policy, states:

> At a minimum, every law enforcement agency should establish a protocol for tracking employee behavior and reviewing all internal affairs complaints made against its officers, regardless of outcome, for evidence of a pattern or practice of inappropriate or unconstitutional conduct. . . . If the review points toward the emergence of a pattern, practices or trend of inappropriate behavior or misconduct, the internal affairs investigator shall consult with the appropriate supervisor . . . .

(Opp'n Ex. A at 33.) Plaintiff's expert maintains that "the ACPD did not adhere to this provision of the policy." (*Id.* at 34.) The former Chief of the ACPD, Ernest Jubilee, similarly stated that the purpose of internal affairs complaints was not to identify patterns and trends, but rather to simply count the number of complaints received. (Opp'n Ex. H at 43:15-44:18.) Plaintiff's expert interpreted ACPD's response to internal affairs complaints as follows:

> [M]erely counting complaints without any action is tantamount to managerial indifference . . . ACPD did not use their knowledge of complaints to institute any remedial action, training, policy changes, modifications to assignment or supervision, despite the fact that an internal affairs investigator could recommend training upon completing an investigation.

(Opp'n at 10.)

ACPD's internal affairs policies of 2010 and 2012 indicate that it would use an electronic tracking system to monitor its officers' behavior, but that this system was never implemented. (*Id.*) Furthermore, an "early warning system" (EWS) was supposed to contain "schedules for remedial action taken and the protocol for associated documentation and reporting requirements," with the intent to notify officers of potential problems if "triggered." (Opp'n Exs. D, F.) However, Chief Jubilee indicated that the EWS did not function well during his service from 2010 to November of 2013, the time period relevant to this complaint. (Opp'n at 10.)

4

Atlantic City has received numerous complaints about its police officers. Officers Abrams, Moore, and Devlin have accumulated more than 69 internal affairs complaints across a ten-year period, with 38 of those claims involving a claim of excessive force, assault, or domestic violence. (Opp'n Ex. C.) Not a single excessive force complaint against these three officers has ever been sustained. (*Id.*) Plaintiff's police practice expert, Dr. Jon Shane, a professor of criminal justice at John Jay College who has been studying or working in law enforcement in either a civilian or sworn capacity since 1985, has identified a pattern of complaints against Officers Abrams and Devlin. (Opp'n Ex. A at 20.) Dr. Shane concluded that their actions were not consistent with various standards in the field, including the Commission on Accreditation for Law Enforcement Agencies (CALEA), the New Jersey Attorney General's policy for internal affairs on risk management procedures, and the ACPD's policy for internal affairs on risk management. (*Id.*) Complaints against Officers Abrams and Devlin steadily increased each year until 2015. (Opp'n at 9.)

There is a long record of complaints filed against other officers of the ACPD, who similarly have seldom—or never—faced consequences for the complaints. Sergeant Frank Timek accumulated 63 internal affairs complaints over thirteen years, including 43 that involved assault or excessive force; Officer Sterling Wheaton accumulated 33 internal affairs complaints over seven years, including 23 that involved assault or excessive force; Officer Michael Oldroyd accumulated 91 across fourteen years, including 43 that involved assault or excessive force. (Opp'n at 12; Opp'n Ex. R.) Responses to these complaints were lax. Sergeant Timek and Officer Wheaton could not remember a time when they were informally or formally reprimanded by the ACPD, and Officer Oldroyd stated his complaint history was never addressed until he was years into his career. (Opp'n at 12.) The three of these officers had "triggered" the EWS, but nothing

5

came of it. (Opp'n at 11-12.) Officer Anthony Alosi, another ACPD police officer, similarly reported having triggered the EWS for use of force incidents, but felt it was only a "paperwork thing." (Opp'n at 13.) All told, Plaintiff alleges that between January 2007 and 2014, ACPD logged a total of 570 complaints for excessive force. (*Id.*)

The ACPD files a large number of "use of force" reports. Every time the ACPD uses physical force during an arrest, they must complete a "use of force" report pursuant to New Jersey Attorney General guidelines. (*Id.*) In 2012, ACPD reported 4,562 arrests, with 826 use of force reports prepared; one out of five arrests involved the use of force. (*Id.* at 14.) In 2013, the ACPD had (the numbers presented to the Court vary) about 323 officers policing a community of approximately 40,000 people, with 826 reported incidences of the use of force. (*Id.*) By way of comparison, in 2013 the Newark Police Department had 1,000 officers policing a community of over 275,000 people, with 373 reported incidences of the use of force. (*Id.*)

This appears to have raised concerns at the office of the New Jersey Attorney General. The Attorney General initiated a series of meetings with Atlantic City about how to reduce its use of force, and its Office of Law Enforcement and Professional Standards ("OLEPS") conducted a study on the matter. (Opp'n at 14; Opp'n Ex. T.) The OLEPS Report concluded that 262 of 343 officers employed by the ACPD were involved in a use of force incident. (Opp'n at 15.) It stated:

> [W]hile many officers may be involved in use of force incidents, there are a few officers who are likely involved in a large proportion of those incidents. The fact that these officers are responsible for the highest numbers of force in each quarter may raise a red flag. However, further analysis of these officers is needed prior to drawing a conclusion that the officer poses a definite risk to the department.

(Opp'n Ex. T at 31.) Although the OLEPS Report questions whether certain officers engaged in conduct that may have raised a "red flag," it is unclear what effect, if any, the OLEPS Report had on the ACPD. Chief Henry White of the ACPD stated the ACPD focused more on the "whole picture" rather than on individual officers, noting that "focusing on the individual officers wasn't

going to solve the problem." (Opp'n at 15.) ACPD Sergeant Steven Cupani stated at deposition, in connection with another excessive force case involving Atlantic City, that he had never received any training with respect to de-escalating violence. (*Id.*) He has also previously stated that the internal affairs process at ACPD "was a joke" with little actual oversight. (*Id.* at 16.)

## II. LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A genuine dispute of material fact exists only if the evidence is such that a reasonable jury could find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When a court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id*. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Furthermore, "[w]hen opposing summary

judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" *Corliss v. Varner*, 247 F. App'x. 353, 354 (3d Cir. Sept. 17, 2007) (quoting *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

### III. DISCUSSION

#### A. Section 1983 Claims of Excessive Force against the Individual Defendants

Claims that police officers used excessive force in an arrest are analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). To state a claim for excessive force under the Fourth Amendment, a plaintiff must show that a "seizure" occurred and that it was unreasonable. *Curley v. Klem*, 499 F.3d 199, 203 (3d Cir. 2007). The test of Fourth Amendment reasonableness of force used during seizure is whether, under the totality of the circumstances, an officer's actions are objectively reasonable in light of facts and circumstances confronting him, without regard to his underlying intent or motivations. *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004); *Graham*, 490 U.S. at 397. An excessive force claim must be evaluated from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Rivas v. City of Passaic*, 365 F.3d 181, 198 (3d Cir. 2004); *Lamont v. New Jersey*, 637 F.3d 177, 183 (3d Cir. 2011) ("Monday morning quarterbacking is not allowed").

In assessing whether the use of force was objectively reasonable, courts consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the

suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Rivas*, 365 F.3d at 198 (quotation marks and citation omitted). Courts may also consider "the possibility that the persons subject to the police action are violent or dangerous . . . the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." *Kopec*, 361 F.3d at 777. While reasonableness is often a question for the factfinder, summary judgment in favor of defendants is appropriate "if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." *Id.* (quoting *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999)).

The parties agree that a seizure occurred here. The only question before the Court is whether a factfinder could find the Individual Defendants' conduct was unreasonable, taking the facts in the light most favorable to the Plaintiff.

The Individual Defendants first argue that summary judgment is appropriate because Plaintiff made no allegations against Officer Moore in his pro se complaint, which was only later amended to include a claim against Officer Moore. (Doc. No. 47 at 11.) Since Plaintiff did not include Officer Moore in his pro se complaint, the reasoning goes, it proves that he did not actually know about Officer Moore. Defendants, however, cite no authority for the extraordinary argument that a pro se complaint nullifies a subsequent amended complaint, because there is none. *See* Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1476 (3d ed.) ("Once an amended pleading is interposed, the original pleading no longer performs any function in the case."). Defendants are just as wrong when they argue that Plaintiff's decision not to seek punitive damages from Officer Moore evinces Officer Moore's "lack of involvement." Defendants again cite no authority for this proposition, and what is freely asserted is freely dismissed as without merit.

The Individual Defendants make a final attempt to show why summary judgment is appropriate as to Officer Moore. They argue "Plaintiff's medical records do not reflect any injury to Plaintiff's 'body' other than swelling/laceration to the left eye, and a K9 bite." (Def. Br. at 11 (scare quotes in original)). Under this line of argument, Officer Moore wasn't present on the scene, first because he neither hit Plaintiff in the face nor bit his leg, and second because Plaintiff was unable to distinguish who struck him. (*Id.*) This bizarre argument misses the mark. Putting aside the fact that Plaintiff's testimony is relevant and admissible evidence sufficient to create a genuine dispute of material fact as to Officer Moore's involvement in the incident, there is at least some other evidence supporting Plaintiff's claim: Officer Moore himself. He stated in his deposition that he jumped into the fray and began giving knee strikes to Plaintiff's torso and legs. (Opp'n Ex. C at 96:19-97:5.) We see no reason to doubt him. When Officer Moore says he was there, knee-striking the Plaintiff, it is not legally significant at this stage in the litigation that Plaintiff had difficulty identifying who struck him. *See Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002) (the fact that plaintiff could not see his assailants "neither negates their involvement nor their liability as a matter of law" under an Eighth Amendment excessive force claim); *Perez v. City of Camden*, 2014 WL 4681037, at *10 (D.N.J. Sept. 22, 2014) ("The fact that Plaintiffs cannot [] each identify which individual Officer tackled, punched or kicked them in every circumstance is not fatal to Plaintiffs' claim.").

We address one more argument before considering whether summary judgment is appropriate. The Individual Defendants argue that Plaintiff's guilty plea to resisting arrest is dispositive on his excessive force claim. They are mistaken. A claim for damages under § 1983 will only be barred by a prior conviction if a judgment would necessarily invalidate the prior conviction. *Heck v. Humphrey*, 512 U.S. 477, 487 (1994); *Garrison v. Porch*, 376 F. App'x 274,

277 (3d Cir. 2010) ("[A] conviction for resisting arrest does not necessarily preclude an arrestee for recovering damages on a § 1983 excessive force claim."). Defendants have not presented any argument that if Plaintiff prevailed in this claim it would have the effect of invalidating a prior conviction, and the facts of this case do not raise such issues now.

Since it is clear from the record that all the Individual Defendants were on the scene for the incident and that Plaintiff's conviction for resisting arrest is not dispositive, we now take the Individual Defendants together. There is a genuine dispute of material fact about what happened between the Individual Defendants and Plaintiff, including whether K-9 Clancy was deployed for purposes of apprehension. While the Third Circuit has held that it is acceptable to use a police dog to apprehend a suspect, *Moore v. Vangelo*, 222 Fed. App'x 167, 170 (3d Cir. 2007), Plaintiff's version of the facts casts doubt on whether the dog was actually used for such purpose. Were a factfinder to believe Plaintiff, it could reasonably conclude that the conduct here, where two officers beat a suspect while a third unleashes a German shepherd to tear a hole in the suspect's leg, is conduct that constitutes the excessive use of force. *See, e.g.*, *Perez v. City of Camden,* 2014 WL 4681037, at *9 (D.N.J. Sept. 22, 2014) (factfinder could reasonably find the use of excessive force on plaintiffs' version of events, where plaintiffs were punched and beaten while handcuffed on the ground); *French v. Squire–Tibbs*, 2013 WL 3283869, at *4 (D.N.J. June 26, 2013) (same, where officers entered a compliant plaintiff's holding cell and deployed "the use of a billy club to the face with sufficient force to break a person's orbital bone"); *Watson v. Haverford Twp. Police Dep't*, 2012 WL 1900629 at *13 (E.D. Pa. May 25, 2012) (same, where plaintiff was put faced down on a table with her hands behind her back, complained of pain, and was then carried down a driveway and forcibly pushed into a police car). Taking the facts in the light most favorable to Plaintiff, as this Court must on summary judgment, a reasonable factfinder could find the

Individual Defendants acted unreasonably in their use of force. Summary judgment is therefore denied as to all of the Individual Defendants.

### B. Municipal Liability of Atlantic City

Atlantic City makes two sets of arguments: one geared toward the conduct of the Individual Defendants, the other toward its alleged customs and practices. We take each in turn.

#### 1. Atlantic City's Liability for the Individual Defendants' Conduct

Defendant Atlantic City argues it cannot be held liable under *any* theory of municipal liability because the Individual Defendants inflicted no constitutional harm on Plaintiff. *See Popiolek v. Twp. of Deptford*, 2015 WL 9462909, at *3 (D.N.J. Dec. 23, 2015) ("Where there is no underlying constitutional violation, there can be no *Monell* claim.") (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978)). In the alternative, Atlantic City argues in its reply brief that the Individual Defendants' behavior, as alleged, was "outrageous conduct" (AC Reply Br. at 6) that is so obviously wrong and out-of-line that it could not possibly implicate Atlantic City's failure to train or supervise its police officers. *See, e.g.*, *Romano v. Young*, 2011 WL 346558, at *5 (E.D. Pa. Feb. 2, 2011) ("All police officers should know, without the need for training, that sexually assaulting minors is against the law."). In short, Atlantic City tries to have it both ways: either there was no constitutional violation at all and Atlantic City cannot be held liable, or else there was a constitutional violation so obviously wrong and outrageous that Atlantic City cannot be held liable. However, a factfinder could reasonably conclude that Plaintiff's version of the incident falls somewhere between these two poles. As discussed above, there remain genuine disputes of material fact in this case, and the question of whether the Individual Defendants violated Plaintiff's constitutional rights is one to resolve at trial.

Atlantic City presents a variety of other arguments under the heading that Atlantic City cannot be "directly" liable for a violation of Plaintiff's rights. Although murky, the essence of these arguments seem to be that Atlantic City is not liable because its written policies are not themselves the cause of Plaintiff's injuries. (AC Def. Br. at 7.) Defendant fails to carry its burden of persuasion here. First, Atlantic City does not identify which written policies in particular are constitutional, and we decline to figure out which policies the City refers to. Second, Atlantic City does not argue how its policies did not cause Plaintiff's injury, a burden it bears on summary judgment when contesting (for example) Plaintiff's claim that complaints were systematically ignored. Finally, Atlantic City has presented no factual evidence to support this argument; it only argues that Plaintiff's experts believed the written policies were constitutional. We are unable to discern anything in the record that suggests Plaintiff's experts said these policies were constitutional, despite Atlantic City's certified averment that said as much. But it is of no moment: expert witnesses are not legal authority. For these reasons, we deny summary judgment as to this issue.

2. <u>Atlantic City's Municipal Liability</u>

We now turn to Atlantic City's argument that summary judgment is appropriate because Plaintiff's alleged injuries are not causally connected to any policy or custom of Atlantic City. We begin by stating Plaintiff's five theories of municipal liability:

(a) Atlantic City has a widespread, well-settled practice or custom of permitting its officers to employ excessive force without fear of discipline;

(b) Atlantic City has a widespread, well-settled practice of exonerating rogue officers by failing to meaningfully investigate citizens' internal affairs complaints;

(c) Atlantic City has a widespread, well-settled practice of condoning its K-9 handlers' use of patrol dogs to bite non-threatening, non-violent, often impaired petty offenders as a means of gratuitous punishment causing serious and permanently disfiguring injuries.

(d) Atlantic City failed to supervise, discipline, and train its officers with regard to officers' use of force;

(e) Atlantic City failed to supervise, discipline, and train its officers with regard to the appropriate and constitutional use of patrol dogs for so-called criminal apprehension; and

(Opp'n at 3-4.) In short, Plaintiff alleges Atlantic City may be liable under either a theory of a deficiency in Atlantic City's internal practices and customs or a failure to train. *See Monell*, 436 U.S. at 691; *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Plaintiff has presented a variety of evidence to support these claims, some of which is described above.

Atlantic City has not met the requirements of Rule 56 of the Federal Rules of Civil Procedure with respect to seeking dismissal of these arguments on summary judgment. Rule 56 requires that "a party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . *citing to particular parts of materials in the record* . . . ." Fed. R. Civ. P. 56 (emphasis added). The movant for summary judgment bears the burden of presenting such evidence, either by showing the absence of a genuine issue of material fact, or else by showing the absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. Neither showing is apparent here.

The segments of Atlantic City's brief dedicated to refuting Plaintiff's allegations of municipal liability are devoid of reference to the record. Atlantic City's reply brief is similarly bereft of citations to Atlantic City's customs or practices, and makes no effort to refute or even so much as acknowledge the evidence Plaintiff has offered. The paucity of evidence presented by Atlantic City contrasts with the volumes of evidence offered by Plaintiff. Atlantic City does not argue with reference to a factual record that is readily apparent, and it is not this Court's place to scour the record to assemble a genuine dispute of material fact on its behalf.

We note a further defect as well. Atlantic City has joined in the Statement of Undisputed Fact submitted on behalf of the Individual Defendants, and relies on the Individual Defendants' exhibits. However, Local Civil Rule 56.1 typically requires the movant to furnish his own Rule 56.1 statement:

> On motions for summary judgment, the movant shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion. *A motion for summary judgment unaccompanied by a statement of material facts not in dispute shall be dismissed.*

L. Civ. R. 56.1 (emphasis added). Atlantic City seems to argue that the Individual Defendants' Rule 56.1 statement is sufficient for purposes of municipal liability, directing us to *Locascio v. Balicki*, which noted that "where possible, a single joint Rule 56.1 statement is favored." 2011 WL 2490832 at *3 (citing Allyn Z. Lite, New Jersey Federal Practice Rules (2006 ed.)).

We emphasize that *where possible* is the operative phrase here. Atlantic City has joined in a Rule 56.1 statement that only speaks to the question of whether the Individual Defendants violated Plaintiff's constitutional rights. It is silent on ACPD policy, custom, and training. This is a problem, because those facts are necessary to support the motion that Atlantic City has moved for. Atlantic City has made no effort to refute Plaintiff's claims directly by reference to the record, even though Plaintiff's allegations necessarily require some discussion of the policies and customs of Atlantic City.

Procedure is not merely a cosmetic concern. Compliance is a precondition to a court reaching the merits of an argument, a burden equally and fairly imposed on all parties and one designed to make the resolution of cases expeditious, coherent, and just. We will only evaluate these arguments with the undisputed facts Atlantic City has presented to the Court—i.e., none. Because "[a] motion for summary judgment unaccompanied by a statement of material facts not

15

in dispute shall be dismissed," L. Civ. R. 56.1, summary judgment is denied as to questions of municipal liability.

## IV. CONCLUSION

For the reasons stated herein, the Individual Defendants motion for summary judgment is **DENIED** and Atlantic City's motion for summary judgment is **DENIED**. An appropriate order shall issue.


Dated: 10/04/2017                                       s/Robert B. Kugler
                                                                                          ROBERT B. KUGLER
                                                                                          United States District Judge