**Bonjean Law Group, PLLC**
**1000 Dean St., Ste. 422**
**Brooklyn, New York 11238**
**Tel: (718) 875-1850**
**Fax: (718) 230-0582**
**jennifer@bonjeanlaw.com**

Attorney for Plaintiff

**UNITED STATES DISTRICT**
**COURT DISTRICT OF NEW**
**JERSEY CAMDEN VICINAGE**

**STEVEN STADLER**,

      Plaintiff,

      v.                                                    13-cv-02741

**CITY OF ATLANTIC CITY; ACPD**
**OFFICER WILLIAM MOORE; ACPD**
**OFFICER GLENN ANTHONY**
**ABRAMS; ACPD OFFICER JOHN**
**DEVLIN.**

      Defendants.

---

**MOTION *IN LIMINE* FOR AN ORDER PERMITTING PLAINTIFF TO INTRODUCE**
**EVIDENCE RELATED TO DEFENDANT ABRAMS' INTERNAL AFFAIRS**
**COMPLAINT HISTORY[1]**

      **NOW COMES**, Plaintiff by and through his counsel and respectfully moves this Court to

enter an order permitting the introduction of evidence related to the internal affairs history of

---

[1] To avoid confusion, this motion *in limine* is devoted solely to Plaintiff's intent to admit
evidence bearing on defendant Abrams' IA history. Plaintiff will file a separate motion *in limine*
as to defendant Devlin. Furthermore, this motion should not be construed as the sum total of
evidence Plaintiff intends to introduce related to the internal affairs histories of non-defendant
officers that bear on the City's *de facto* policies and practices. Plaintiff will present significant IA
evidence relevant to prove Plaintiff's *Monell* theories of liability but since defendants voiced
concern about prejudice to the individual defendant officers, Plaintiff has pro-actively identified
internal affairs evidence specific to the named defendant officers in this case that he intends to
produce at trial to tee up potential objections that may arise at trial.

defendant Abrams. As set out in detail below, evidence regarding Abrams' internal affairs history

is relevant for a number of reasons and is not offered for propensity purposes or to show that

because Abrams acted badly in the past he is likely to have acted badly in this case. Indeed, apart

from the specific 404(b) evidence identified in section C below, the vast majority of evidence

related to Abrams' IA history is relevant evidence against the *City* not Abrams himself.

**A.**   **Evidence Related to the City's Failure to Implement an Early Warning System and Mandated Risk Management Protocols**

       1.      First, as set forth in Plaintiff's Complaint and as was litigating extensively during

summary judgment motion practice, Plaintiff intends to present evidence against the Defendant

City of Atlantic City showing that despite what its written internal affairs policy states, Atlantic

City failed to implement any meaningful Early Warning System ("EWS") as required by the

Attorney General guidelines. Specifically, Plaintiff will show that although Atlantic City

"counted" internal affairs complaints, it did nothing to identify patterns among its officers who

triggered the EWS. In short, Plaintiff will show that Atlantic City's EWS was a fraud and served

no other purpose than to conceal officer misconduct and mislead accreditors into believing that

one existed.

       2.      Plaintiff will introduce evidence to prove this point in a number of ways including

by showing that Defendant Abrams triggered the Early Warning System ("EWS") in 2008, 2009,

2011, 2012 and never received any additional monitoring, supervision, reassignment, or remedial

training as a result of triggering the system. Indeed, defendant Abrams will testify that he was

unaware that he had ever triggered the EWS since no supervisor had even notified him that he had

Similarly, Plaintiff intends to introduce evidence that between 2007 and 2013, an overwhelming

pattern of complaints alleging excessive force was obvious from defendant Abrams' complaint

history but that the City did nothing to address it – again in direct contradiction of its own policies, the AG policies, and national standards for risk management. The failure of the City to address these obvious warning signs is strong evidence of deliberate indifference of the harm that may follow from an officer who raised as many red flags as Abrams did.

3.      To be clear, this evidence is not being introduced as propensity evidence against Abrams but rather is being offered as evidence against the City of Atlantic City for three distinct purposes: (1) the evidence supports Plaintiff's claim that the City failed to supervise its officers, including Defendant Abrams when it did nothing to respond to Abrams triggering the EWS and accumulating a significant number of excessive force complaints without any response by ACPD; (2) the evidence supports Plaintiff's claim that the City has a *de facto* policy of encouraging the use of excessive force among its force because it failed take any meaningful action in response to Abrams' accumulation of a lengthy internal affairs' history for excessive force; and (3) the evidence supports Plaintiff's claim that the City's internal affairs function existed in name only and did not operate in accordance with its own policies or national norms.

4.      Defendant Abrams will unquestionably respond by pointing out that he has never had an excessive force sustained against him. But this misses the point. Defendant Abrams could have been exonerated of every civilian complaint made against him; it doesn't change the fact that the City failed to respond to Abrams' complaint history in accordance with its policies and with national norms. It is the City's response or lack thereof that demonstrates its deliberate indifference to the warning signs that arguably led to Plaintiff's injuries.

5.      Accordingly, this evidence is clearly admissible for non-propensity reasons. Any potential prejudice to the defendant can be cured by limiting instructions from this Court.

**B.      Internal Affairs Investigations of Complaints 09-163, 09-168, and 12-268**

6.      Defendant Abrams has a prodigious complaint history that unquestionably would be prejudicial to the defendant if introduced 'whole cloth' to the jury. However, Plaintiff does not seek to introduce Abrams' entire complaint history merely to demonstrate that Abrams is a "bad" cop. Rather, Plaintiff seeks to introduce three internal affairs complaint investigations involving defendant Abrams (and other officers) for reasons wholly unrelated to defendant Abrams' character, namely to demonstrate that the City failed to conduct thorough and fair internal affairs investigations so as to conceal the misconduct, indeed crimes, of its officers.

7.      Specifically, Plaintiff intends to introduce evidence pertaining to these particular investigations to show the following: (1) the City mislabels civilian complaints to conceal unconstitutional and *illegal* conduct of its officers; (2) purposefully tanks internal affairs investigations to cover-up officer misconduct; and (3) routinely slaps the wrists of officers who should be fired if not indicted for criminal conduct, messaging to the officers that they may behave unconstitutionally and/or unlawfully without fear of losing their jobs or of real discipline.

8.      First, Plaintiff seeks to introduce evidence related to the investigation of internal affairs complaint 09-163. A short factual summary is necessary to understand the relevance of this investigation.

9.      On September 23, 2009, Defendant Abrams and ACPD officer Brent Dooley (a defendant in the pending matter *Adams v. City of Atlantic City, et al*, 13-cv-7133) executed a search warrant at the home of Maria Mendez. Ms. Mendez's puppy was stolen out of its crate from her residence during the execution of the search warrant. Defendant Abrams was the lead investigator in connection with the search of Ms. Mendez's home and her puppy was later discovered in the possession of Defendant Abrams after his girlfriend posted photos of the puppy

on Facebook.

10.    Defendant Abrams implausibly claimed that he received the puppy from officer

Dooley the day after the search of Ms. Mendez's home, but did not realize that it was stolen from

the Mendez home. Although officer Dooley claimed to have found the dog wandering around

outside, several on-scene officers reported seeing officer Dooley holding the puppy in the Mendez

home and placing the puppy in his police car.

11.    Despite the fact that cell phone records showed that Abrams and Dooley were in

constant contact with one another immediately after the search and the days that followed,

defendant Abrams claimed he had no idea that the dog belonged to Ms. Mendez until after an

internal affairs investigation was initiated by Ms. Mendez. But even after learning that the puppy

belonged to Ms. Mendez, defendant Abrams attempted to conceal the puppy by bringing it to his

mother's house in Margate and then having his mother bring the puppy to the ASPCA (putting the

dog at risk of being euthanized). The dog was later retrieved from ASPCA and eventually

returned to its owner.

12.    Defendant Abrams was charged with the following IA violations untruthfulness,

standard of conduct and obedience to laws and regulations. He was not criminally charged with

theft or official misconduct. After an investigation that led to the inescapable conclusion that

Abrams and Dooley stole Ms. Mendez's puppy and had engaged in serious official misconduct,

IA recommended sustaining charges against Abrams for untruthfulness and "standard of conduct,"

concluding that Abrams had violated 2C:28-6(1): Tampering with or Fabricating Physical

Evidence.

>    The facts, when considered as a whole, demonstrate that Police Officer Abrams
>    actively attempted to conceal stolen property when he took the puppy to his
>    mother's house. Police Officer Abrams' conduct in this regard violated the law of
>    the State of New Jersey. His conduct amount [sic] violations of Atlantic City

5

Police Department's Rules and Regulations and is conduct unbecoming an Atlantic City Police Officer and a Public Employee. The facts reveal that Police Officer Abrams was untruthful concerning the health of the puppy, his knowledge on an investigation regarding the puppy, and his knowledge that the puppy was stolen. Because Police Officer Abrams was not truthful regarding his involvement in this matter, he has violated Atlantic City Police Department's Rules and Regulations regarding truthfulness and has engaged in conduct unbecoming an Atlantic City Police Officer and Public Employee

13.     Defendant Abrams accepted a 90-day suspension but demanded that the City drop the untruthfulness finding. The City complied.

14.     Defendant Abrams' internal affairs index card reflects only a sustained finding as to standard of conduct and Obedience to Laws and Regulation with no mention of the precise standard of conduct that was violated or even the punishment received. Any citizen looking at Abrams' IA card would have no sense of the level of misconduct Abrams engaged in or the lengths he went to conceal his criminal behavior.

15.     As further evidence that the City fails to impress upon its officers the seriousness of committing criminal acts and lying about it, defendant Abrams lied during his deposition falsely testifying that his 90-days suspension was related to a "notification" issue.

16.     Plaintiff intends to introduce evidence against the City of Atlantic City as it relates to its handling of this internal affairs investigation and its cover-up of officer Abrams' criminal conduct. Specifically, Plaintiff will introduce evidence regarding the City's misuse of use immunity, its practice of concealing criminal behavior and official misconduct by categorizing the behavior as "standard of conduct" in its stats and as reflected on officer index cards. This investigation will reveal how the City refuses to mete out real discipline to officers instead concealing serious conduct and sustaining charges for minor administrative offenses.

17.     Separately, Plaintiff has every intention of cross-examining defendant Abrams regarding the sustained findings (standard of conduct based on tampering and fabricating physical

evidence and untruthfulness) and the fact that he falsely testified during his deposition that his discipline was a "notification" issue. This testimony is relevant as it bears on defendants' lack of truthfulness and is proper under Fed. R. Evid. 608(b).

18.     Plaintiff also seeks to introduce evidence related to the internal affairs investigation of complaint 09-168.

19.     During the investigation of the theft of Ms. Mendez's puppy, Defendant Abrams' police-issued vehicle was towed to the Atlantic County Prosecutor's office as part of the internal affairs investigation. A search of the car revealed a cornucopia of contraband recovered from the center console, the glove compartment, on the floor, in between the seats, and in the trunk. The following is a sampling of the items recovered from Abrams' police car, multiple bags of marijuana, an oxycodone pill bottle prescribed to a Michael Cox, random bottles with pills, several pill bottles prescribed to "Ricardo Harris," a black bag containing items belonging to Mr. Harris, three pairs of brass knuckles, four folding knives, several asps, a flashlight labeled "Abrams," a .40 caliber black Glock with a (15) round magazine and (15) spear hollow point bullets.

20.     An investigation revealed that defendant Abrams had confiscated many of these items from arrestees, in some cases many months prior to their discovery in Abrams' car. Interviews with individuals who were the rightful owners of these items reported that Abrams and other officers (including ACPD officer Michael Rivera) had stolen the items from them. For his part, Abrams claims he simply failed to "inventory" the items.

21.     Even assuming the truth of defendant Abrams' statements, the failure to inventory evidence in criminal cases may amount to official misconduct. This case did not involve one oversight but the failure to inventory a bevy of narcotics and weapons. Incredibly, Abrams

testified that he was not even disciplined for that sustained finding.

22.    When asked specifically about what discipline he received for the sustained

finding for "neglect of duty" Abrams testified as follows:

Q.    And what was your discipline for that?

A.    They just – I don't know. Actually – I don't believe I was. Actually
I don't believe it was disciplined for that. I took the 90 days for the – you know, for
the dog, but I don't believe it had anything – but I don't believe I was disciplined
for that. (Abrams Dep. At pg. 262)

23.    Again, this evidence is highly relevant to show that Atlantic City has no

meaningful internal affairs functions and bends over backwards to protect its officers and conceal

misconduct from the public. For example, despite the fact that probable cause clearly existed to

demonstrate that defendant Abrams unlawfully possessed CDS or had engaged in "official

misconduct," he was given use immunity when he was interviewed by the prosecutor office. In

other words, defendant Abrams knew from jump street that he had no fear of criminal prosecution

and that the case would be treated as an "administrative violation"

24.    This case offers another example of how the City mislabels serious misconduct of

officers with vague and ambiguous classifications that have no meaning to the public at large and

skews statistics so that regulating agencies have no idea that officers are routinely being accused

of crimes. Rather than acknowledge the obvious, that is, defendant Abrams has a pattern of

stealing personal items from civilians during the course of his police duties, investigators stuck

their head in sand, pretending to believe the preposterous and patently false defenses offered b y

Abrams – defenses they never would have accepted from the average citizen.

25.    Even assuming defendant Abrams was telling the truth that he just "overlooked"

inventorying the massive amount of contraband he had in his car, a significant suspension was

justified and Abrams received none. Minimally, one would have expected to see that Abrams be

ordered for remedial training on the importance of inventorying evidence. The City didn't even bother to do that.

26.     Significantly, at least two of the witnesses who reported that Abrams and another officer (officer Rivera) had stolen the items from them should have prompted the City to initiate an investigation into Rivera or any other officers on the scene. Again, rather than conduct an investigation to determine whether other officers on the force were committing crimes or engaging is gross negligence, the City chose to turn a blind eye.

27.     Time and time again, Atlantic City refuses to employ basic investigative guidelines and standards when it comes to investigating its own. The same holds true for the Atlantic County Prosecutor's office who works hand-in-hand with the City to conceal or minimize serious police misconduct.

28.     As set forth above, the internal affairs investigation for complaint 09-168 demonstrates a variety of ways in which ACPD with the complicity of the prosecutor's office covered up the conduct of an officer who had showed a pattern of theft, untruthfulness, and official misconduct.

29.     Last, Plaintiff intends to offer evidence concerning the investigation of internal affairs complaint 12-268, also involving detective Abrams and other ACPD officers.

30.     By way of background on August 7, 2012, defendant Abrams and other officers executed a search warrant that resulted in the recovery of 3,024 wax paper folds containing CDS and a handgun. Defendant Abrams was responsible for inventorying the CDS and swore to a judge on a search warrant return that 3,024 bags of heroin were recovered and inventoried.

31.     However, the New Jersey State police lab only received 2,967 paper folds. The discrepancy prompted an internal affairs investigation against Abrams for "performance of duty."

32.     Despite the fact that a significant portion of defendant Abrams' internal affairs complaints involve allegations of theft, the City immediately decided to investigate this matter as an administrative violation rather than a possible crime. Furthermore, rather than thoroughly investigate how a major discrepancy could occur between the amount of heroin recovered versus what was sent to the crime lab, the investigators blindly accepted Abrams feigned ignorance.

33.     Given Abrams' history of storing contraband in his police vehicle, a thorough investigation would have involved searching Abrams' car or locker. But the City made no effort to get to the bottom of this serious matter, instead simply labeling the charges "performance of duty."

34.     The IA investigator concluded the following:

It is this investigator's belief that no malice was involved in this investigation. It is also this investigator's belief that there was confusion in the counting and the logging of the evidence due to fatigue. However, Officer Abrams was the officer who signed the paperwork and therefore if was he who was responsible to ensure that the items were seized and logged into evidence were accurate.

35.     Ultimately, the City sustained a finding against Abrams for "performance of duty." and recommended a 10-day suspension.

36.     However, Abrams' index card shows only a sustained finding for "performance of duty" and it does not appear that he was actually *ever* disciplined for the violation.

37.     When asked about this particular IA investigation, Defendant Abrams testified that he was never disciplined for this sustained finding.

Q.     Okay. October of 2012 there was a sustained finding against you with regard to performance of duties. Do you see that?

A.     Yeah.

Q.     What's that?

A.      I actually don't know.

Q.      You have no recollection of this?

A.      No. I don't know what – performance I don't have a clue what that is.

Q.      So the complainant is your – Deputy Chief White, yeah?

A.      Yeah. The chief now. I don't know what that's for.

Q.      Well, did you receive any type of –

A.      No.

Q.      --discipline?

A.      No. Nope.

Q.      So as you look here now, at this entry of October 4, 2012, right?

A.      Uh-huh.

Q.      You see an entry that says Deputy Chief H. White, right?

A.      Correct.

Q.      And you can see there that there's been a sustained finding as to performance of duty right.

A.      Correct.

Q.      And it's your testimony that you were not disciplined with regard to that?

A.      I was not disciplined.

Q.      You did not have any remedial training with regard to that?

A.      No.

Q.      And, in fact, you don't even know what it –

A.      I –

Q.      -- involves?

A.      No.

Q.      Doesn't ring a bell at all?

A.      Not at all. (Abrams Dep. 263-264)

38.     Evidence related to the City's handling of these investigations is strong evidence of their deliberative indifference toward supervising and disciplining their officers. In two separate instances, defendant Abrams had sustained findings for extremely serious offenses, arguably criminal conduct.

39.     Not only did the City investigate these allegations as "administrative offenses" but ultimately never ever disciplined Abrams after sustaining findings against him.

40.     This evidence is highly relevant and admissible as to various theories of *Monell* liability pled in Plaintiff's complaint.

**C.     Evidence of Other Bad Acts Probative of Abrams' Intent and Plan**

41.     In a civil case, "[e]vidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Fed. R. Evid. 404(a). However, Rule 404(b) provides in pertinent part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identify, or absence of mistake or accident. . .

42.     The four-prong test enunciated by the Third Circuit to determine the admissibility of Rule 404(b) evidence provides as follows: (1) the evidence must have a proper purpose under Rule 404(b); (2) it must be relevant under Rule 402; (3) its probative value must outweigh its prejudicial effect under Rule 403; and (4) the court must charge the jury to consider the evidence only for the limited purpose for which it was admitted. *Becker v. ARCO Chem. Co.*, 207 F. 3d

176, 189 (3d Cir. 2000).

43.     Here, Plaintiff seeks to introduce testimony from a number of third-party witnesses who will describe how defendant Abrams assaulted them with no notice or opportunity to respond and after they have been handcuffed or otherwise immobilized. This 404(b) evidence is highly probative of Abrams' intent and plan in the case at bar (described further below). Plaintiff also seeks to elicit testimony from these witnesses about how Atlantic City's internal affairs division failed to meaningfully investigate their complaints instead attempting to discredit their version of the events. Plaintiff also intends to elicit evidence that Abrams' index card fails to reflect complaints made by these complainants, including claims of assault and theft.

44.     Consistent with his deposition, Plaintiff will testify (in sum and substance) that he was attempting to break open a coin box in a car wash bay at the Atlantic City car wash on Albany Avenue when he observed a dark-colored truck pull up. Plaintiff will testify that he began to walk away when he noticed the truck and that the truck followed him. A man dressed in a t-shirt and gym shorts got out of the truck and asked Plaintiff what he was doing. Plaintiff ignored the stranger's question and continued to walk away at a brisk pace, carrying some tools he was holding. The man did not identify himself and returned to his truck.

45.     Plaintiff continued to walk away from the scene at a quick pace and concealed himself behind some garbage cans when he noticed the dark truck pull up again. Plaintiff abandoned the tools he had and began walking toward Albany avenue. Plaintiff could hear that the man had exited the truck and was on foot running toward him and yelling at him to stop. The man still did not identify himself as a police officer. As Plaintiff approached Albany Avenue, a marked police car pulled up and ordered him to stop which he immediately did, putting his hands on the car.

46.     With his hands on the police car indicating his complete surrender, the man in the truck (defendant Abrams) caught up to him, turned him around and punched Plaintiff in the face multiple times and then tacked him to the ground. Even after placing Plaintiff in handcuffs, te officers continued to beat him mercilessly until he lost consciousness only to be awakened by a vicious dog biting his leg.

47.     In contrast, defendant Abrams will testify that he immediately identified himself to Plaintiff as a police officer and that Plaintiff assaulted him before fleeing.

48.     In light of the foregoing, Plaintiff intends to offer evidence from third-parties probative of Abrams' intent and plan to hide the fact that he is a police officer so he can justify assaulting unsuspecting people without giving them any opportunity to submit to an arrest or comply with his commands

49.     As the chart below shows, Abrams has been the subject of numerous allegations with uncanny similarities to those presented in this case.

| Date | IA No. | Complainant | Allegations |
|------|--------|-------------|-------------|
| 8-27-07 | 07-096 | Henry Nellons, III | Nelllons states that he was walking from a friend's house on Florida Ave. when he stopped to a guy. Abrams and another office pulled up. Abrams got out of his car, approached him, grabbed him by the shirt, called him a piece of shit, and "out of nowhere punched him in the face." The next thing he knew he was on the ground and Abrams and the other officer were "kicking the shit" out of him |
| 3-3-08 | 08-022 | Khali Nelson | Nelson states that in August 24, 2007 he was walking out of an alley on to California Ave. on Pacific, heading for the Greyhound station when apropos of nothing he was assaulted by Abrams and another officer. He was "struck several times with a closed fist in the face and was stuck forcibly to the body. What's more, the assault continued well after I have [sic] been subdued and in handcuffs." |

| 6-12-08 | 08-069 | Jermaine Elliot | Elliot was riding his bike down New York Ave. when he noticed a police car. Elliot continued to ride his bike when he heard someone say "stop." Elliot stated that he stopped and got off his bike. Officer Abrams walked up to him and punched him in the face. Elliot stated that Abrams kept saying "stop resisting" even though Elliot was not resisting arrest. Abrams kneed him in the head as he was laying in the ground. Ultimately, Elliot was charged for a bicycle ticket and resisting arrest and obstruction of justice. Elliot suffered a concussion as a result of the beating. |
|---|---|---|---|
| 6-22-09 | 09-088 | James Hill | Hill states that he was walking back to his house when Abrams and punched and attached him from behind. He lost consciousness briefly and found himself surrounded by several police officers. Hill had no idea Abrams was a police officer. Abrams IA card fails to identify a complaint for assault or excessive force. |
| 11-05-09 | 09-165 | Robert Creek | Creek was driving his car and was stopped at a red light when for no apparent reason an unmarked car swerved in front of his car, no lights flashing. Creek thought someone was going to jump out and shoot him so he reversed his car, turned around and drove to his sister's house a block away. When he got to his sister's house, the car finally put on his flashers and Creek realized that it was police officers. Creek immediately submitted to an arrest after Abrams ordered him to the ground. After Creek was in handcuffs, Abrams began to punch and kick him. Creek will further testify that numerous witnesses were there and internal affairs refused to obtain the statements of witnesses who corroborated his version of events. |
| 1/19/12 | 12-013 | Bomani Nikrumah | Nikrunah was walking home on the south side of New York Ave when a squad car approached him and asked him where he was going. He responded telling the occupants that he was going home. The car stopped and on the officers got out of the car and asked him his name. Mr. Nikrunah stated he was nervous and the officer told him not to run. Nikrunah kept walking and Abrams tried to grab him so he |

| | | | |
|---|---|---|---|
| | | | began running. The officer caught him and beat him, punching, kicking and kneeing him. Money was stolen from Nikrumah although that claim is not reflected on Abarms' IA card. |
| 8-25-11 | 11-098 | Tyre Davis | Mr. Davis was riding his bicycle in the area of New York and Pacific Aves. When he was approached by two plain clothes officers in an unmarked car. The plain clothes officers told him to stop and get off his bike. Mr. Davis dropped his bike, fearful that he would be assaulted. Although defendant Abrams claimed to announce that he was an officer and that Davis was under arrest, David maintains that Abrams never announced that he was a police officer or that he was under arrest. Abrams and the other officers eventually caught up with him and punched and kicked him, causing serious injuries. Davis will further testify how internal affairs attempted to intimidate him and discourage him from pursuing his internal affairs complaint. |
| 9-6-12 | 12-110 | Leon Henry | Henry testified that Abrams had been harassing him and that he suffered a vicious attack by Abrams and other officers. Henry's cell phone was confiscated after his arrest and never returned to him. Although Henry complained about his missing phone, IA did not identify this charge on Abrams (or any of the other officers) IA card. |

50.     As the foregoing summaries demonstrate, Abrams has a pattern of surprising suspects, some of whom are doing nothing but minding their own business, without identifying himself as a police officer and then physically assaulting them when they refuse to submit to Abrams' demands.

51.     These witnesses' stories are admissible pursuant to 404(b) since they show Abrams' intent to conceal the fact that he is a police officer and then justify physically assaulting a suspect who does not immediately comply with his commands.

52.     This evidence is highly relevant because Abrams will testify that he told Plaintiff

that he was a police officer and Plaintiff will testify that he had no idea that Abrams was a police

officer as he was dressed in a t-shirt in shorts and was in an unmarked pick-up truck. The third-

party testimony identified above makes it more likely than not that Plaintiff's account is the

truthful one.

53.     Plaintiff would concede that testimony from eight separate victims of Abrams'

assault has the potential to prejudice Abrams, but this Court has the ability and the authority to

limit the potential for prejudice through limiting instructions.

54.     And as a practical matter, it is unlikely that Plaintiff will, in fact, present *all* eight

witnesses to testify.

## CONCLUSION

55.     In conclusion, Plaintiff respectfully requests an order from Court permitting

Plaintiff to introduce evidence concerning defendant Abrams' IA history as it relates to

Plaintiff's *Monell* claims against the City of Atlantic City and for the specific reasons identified

in sub-section C and admissible under Fed. R. Evid. 404(b).


                                                Respectfully Submitted,


                                                /s/JENNIFER BONJEAN